**<u>Exhibit A</u>**

**Transcript**

```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2
                                      .   Chapter 11
3   IN RE:                            .
                                      .   Case No. 18-10512 (KBO)
4   ZOHAR III, CORP., et al.,         .
                                      .   Courtroom No. 6
5                                     .   824 North Market Street
                                      .   Wilmington, Delaware 19801
6                                     .
                                      .
7                         Debtors.    .   October 21, 2019
    . . . . . . . . . . . . . . . . .     2:00 P.M.
8
              TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
9               BEFORE THE HONORABLE KAREN B. OWENS
                   UNITED STATES BANKRUPTCY JUDGE
10
11  APPEARANCES:

12  For the Debtors:          James L. Patton, Jr., Esquire
                              Robert S. Brady, Esquire
13                            Michael R. Nestor, Esquire
                              Joseph M. Barry, Esquire
14                            Ryan M. Bartley, Esquire
                              Shane M. Reil, Esquire
15                            YOUNG CONAWAY STARGATT & TAYLOR LLP
                              Rodney Square
16                            1000 North King Street
                              Wilmington, Delaware 19801
17

18

19  Audio Operator:           Electronically Recorded
                              by Al Lugano, ECRO
20
    Transcription Company:    Reliable
21                            1007 N. Orange Street
                              Wilmington, Delaware 19801
22                            (302)654-8080
                              Email:  gmatthews@reliable-co.com
23
    Proceedings recorded by electronic sound recording,
24  transcript produced by transcription service.

25
```

1  APPEARANCES (Continued):

2  For the Zohar III          Brian J. Lohan, Esquire
   Noteholders:               ARNOLD & PORTER KAY SCHOLER LLP
3                             70 West Madison Street, Suite 4200
                              Chicago, Illinois 60602
4

5  For White & Case LLP:      J. Christopher Shore, Esquire
                              Brian Pfeiffer, Esquire
6                             WHITE & CASE LLP
                              1221 Avenue of the Americas
7                             New York, New York 10020

8  For U.S. Bank:             John W. Weiss, Esquire
                              ASLTON & BIRD LLP
9                             90 Park Avenue
                              New York, New York 10016
10

11 For Patriarch:             Ron E. Meisler, Esquire
                              SKADDEN, ARPS, SLATE, MEAGHER
12                               & FLOM LLP
                              155 N. Wacker Drive
13                            Chicago, Illinois 60606

14 For Lynn Tilton:           Norman L. Pernick, Esquire
                              COLE SCHOTZ P.C.
15                            500 Delaware Avenue, Suite 1410
                              Wilmington, Delaware 19801
16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 2:14 p.m.)

2          (Call to order of the court)

3              THE COURT:  Good afternoon, counsel.  This is

4 Judge Owens.  I understand the parties are on the line and

5 we're here to discuss scheduling of the Zohar debtor's motion

6 to transfer the Dura bankruptcy cases.

7              I'd like to hear from counsel to the Zohar debtors

8 first.

9              Counsel to Zohar?

10              THE CLERK:  Operator?

11              OPERATOR:  Yes.  We are connected and lines are

12 live.

13              THE CLERK:  Just make sure everyone is live.

14              THE COURT:  Is anyone on the line from Young

15 Conaway?

16              MR. PETRICK:  Your Honor, this is Greg Petrick.

17 Joe Barry was on shortly before.  I don't know what happened

18 to him, but he should be on.

19              OPERATOR:  I am still showing his line is

20 connected and it is live.  He may want to check his mute

21 function.

22              MR. LOHAN:  Your Honor, this is Brian Lohan.  Mr.

23 Barry believes CourtCall dropped and he is reconnecting right

24 now.

25              THE COURT:  Okay.  Let's pause a few moments.  I

1  do want to hear from the Zohar debtors first.

2       (Pause)

3            OPERATOR:  Mr. Barry is reconnected, Your Honor.

4            THE COURT:  Okay.  Mr. Barry, are you on the line?

5            MR. BARRY:  Judge Owens, I am.  I apologize.  I

6  got dropped by CourtCall.  I do apologize for the

7  inconvenience.  I guess I'm not starting my first appearance

8  before you on the right foot.  So, I do apologize.

9            THE COURT:  No problem.  We thought it was on our

10 end.

11           So, we have not begun the hearing.  We were

12 waiting for you.  I'd like to hear from the Zohar debtors on

13 scheduling of the venue motion.

14           MR. BARRY:  Thank you, Your Honor.  I'd like to

15 give Your Honor an update as to what's happened over the last

16 couple of days to kind of frame that up.  Before I do, there

17 is a couple of issues that will really frame-up with how we

18 proceed with the venue issue because this doesn't just -- the

19 request to transfer venue under 1014 doesn't just implicate

20 the first filing or the affiliate rules under venue.  There

21 are two or three other issues that we think are implicated

22 and are critical to how we schedule this and how it gets

23 framed.

24           The first is Zohar is secured term loan lenders to

25 Dura.  We are the biggest creditors in those cases and I

1 think that -- I don't think that's disputed by the parties.

2 As such we think that Your Honor has exclusive in rem

3 jurisdiction over Zohar's liens and the claims under the

4 governing documents.  So, we think that's going to be an

5 important factor between what happened last week, what

6 happens today and what happens in the near term.

7        The other issue is we now know that in the Dura

8 bankruptcy case, and you will hear more about this, I think,

9 in a minute and probably throughout the course of this

10 telephonic status conference that Ms. Tilton and her Ark

11 entity are proposing to fund Dura's DIP and to buy Dura

12 through a sale process in that case, but that was done

13 without any consult with the Zohar's.

14        As Your Honor is aware, we are currently the

15 Zohar's, and Ms. Tilton and all are currently subject to a

16 court approved monetization process that defines a

17 monetization event as a sale or a refinancing which the sale

18 in the Dura cases would qualify as both.

19        Then the third, Your Honor, is that Judge

20 Mashburn, in Tennessee, at the first day hearing on Friday

21 asked that the parties, all of the parties, talk to you today

22 about the extent of his ability to grant relief in the

23 Tennessee case in light of Your Honor's order granting our

24 emergency motion.

25        So, Your Honor, with all these things in mind I'd

1  like to just launch into, sort of, what happened over the

2  last few days.

3          After Your Honor entered the emergency order on

4  Thursday of last week the Zohar's filed that order in the

5  Tennessee case so Judge Mashburn was on notice of it and had

6  the benefit of your ruling.  Thereafter, Dura rolled out its

7  first day throughout the course of the day and Judge Mashburn

8  set a hearing for 10:30 on Friday and issued what was,

9  essentially, an order to show cause as to why the debtors

10  hadn't fully filed all their first day motions without

11  requesting the hearing without having all their first day

12  motions on file.

13          So, the DIP motion got filed around two o'clock

14  Tennessee time and at that point it was confirmed that the

15  DIP was coming from Ms. Tilton.  Again, Your Honor, just the

16  cap structure of Dura, Ms. Tilton holds the ABL in the amount

17  of about $26.7 million dollars.  And the Zohar's hold the

18  term loan debt in the amount of about $105 million dollars.

19  So, again, we're by far the largest creditor in the Dura

20  case.

21          Some important features of the DIP were $50

22  million dollars of new money plus a roll-up of the Tilton

23  held ABL, twenty of which was going to be rolled up on the

24  first day.  Non-consensual priming of the Zohar's as to the

25  term loan collateral released by Dura, Tilton and her

1  affiliated entities payment of various unquantified fees and

2  expenses to Ms. Tilton, a good faith finding, and the

3  financing was conditioned on Ms. Tilton or one of her

4  entities being designated as the stalking horse, and any bid

5  protections approved by her in her sole and absolute

6  discretion.

7       So, again, you know, our initial concerns with

8  this were Your Honor's jurisdiction under 1334(e) since this

9  was clearly going to be a non-consensual priming situation,

10 and financing and proposed sale absent consent or

11 consultation with the Zohar's violates the monetization

12 protocol in our case.

13      Judge Mashburn opened the hearing expressing

14 concern about your order and the extent to which he could

15 enter any relief at all including, you know, procedurally

16 joint administration and the like.  We, I and Mr. Lohan on

17 behalf of Barton Hill, advised the court, you know, that we

18 weren't there to prevent any necessary relief.  We were

19 supportive of the restructuring efforts.  We weren't there

20 to, you know, essentially burn the house down and we weren't

21 going to stand in the way of critical operational relief to

22 the extent Judge Mashburn was comfortable entering it.

23      We did remind Judge Mashburn that we believe under

24 1334(e) he could not prime us.  He also raised to the extent

25 to which the automatic stay could apply.  We advised him

1  again that the proposed sale process violated the

2  monetization process in the Zohar cases.

3          The court -- Judge Mashburn allowed the parties

4  multiple breaks to see if we could, you know, resolve the DIP

5  in a mutually satisfactory way.  At several points Barton

6  Hill stepped up and offered to provide an alternative DIP of

7  $5 to $10 million dollars without the over-reaching

8  protections Ms. Tilton was demanding, and offered to do it on

9  a five-page order and not priming Tilton at all.  Ms. Tilton

10  and the debtors would not agree.

11          Judge Mashburn's view at that point, Your Honor,

12  was that he simply couldn't force Dura to borrower on a DIP

13  that they didn't want.  So, we had quite a show-down in

14  Tennessee that lasted all day.  We had Your Honor's order

15  limiting what Judge Mashburn could do.  We had the

16  jurisdictional constraint under, among others, 1334.  We had

17  the fact that Tilton's proposed sale financing violated the

18  settlement agreement in the monetization protocol in

19  Delaware, but we also had, you know, a company that was

20  desperate for financing and by all accounts wouldn't have

21  survived the weekend without some accommodation.

22          So, throughout the day Judge Mashburn expressed

23  things like it appeared people were playing a game of

24  chicken.  After probably six or so hours of negotiation Judge

25  Mashburn expressed a significant concern that Ms. Tilton was

1  holding up the process unless or until she was designated as

2  the stalking horse bidder.  And ultimately, at the end of the

3  day, Ms. Tilton modified the demands placed in the interim

4  DIP from Friday till Wednesday of this week, and she deferred

5  her request for the roll-up and she deferred her request to

6  be named as a stalking horse as a condition to the financing.

7  The debtor reduced its interim funding request to $10 million

8  dollars.  And we advised Judge Mashburn, given the

9  criticality of having funding for Dura, we wouldn't stand in

10  the way, but nonetheless reserved all of our rights and

11  continued to voice our ongoing concerns.

12          So, when I say defer that means that Judge

13  Mashburn has now scheduled the hearing for Wednesday in

14  Tennessee where the totality of the funding request from Ms.

15  Tilton will be heard on a second interim basis including the

16  requirement that she be designated as the stalking horse and

17  that the interim roll-up occur on Wednesday.

18          So, as I mentioned earlier, Your Honor, Judge

19  Mashburn closed the hearing by asking us to seek clarity from

20  you on what he can and cannot do under your emergency.  We

21  think that we would hopefully be able to cover that with you

22  today.  We also think, again, there are other limitations

23  beyond your order including 1334 and the monetization

24  process.

25          So, that takes us through Friday and the weekend,

1  Your Honor.  Barton Hill has been working pretty tirelessly

2  on an alternative DIP that would, as I understand it, what

3  they're working on, take out Ms. Tilton's ABL and offer the

4  debtor the same level of financing being offered under the

5  current debt facility.  They're currently working on getting

6  diligence from Dura and the hope would be that Barton Hill

7  emerges prior to Wednesday with an alternative financing

8  package to take out Ms. Tilton.  There likely won't have a

9  lot of the case control measures that we have in the existing

10  DIP facility.

11        If not, and here's, I think, where the rubber

12  meets the road, we're going to have another show-down in

13  Tennessee on Wednesday.  If Ms. Tilton is moving forward with

14  the roll-up, the good faith findings, the designated stalking

15  horse requirements, the release that's in the DIP, all of

16  which, again, we think are constraining under both

17  statutorily and under the court order here in Delaware.

18        So, we did have our meet and confer yesterday with

19  Dura, as you had requested.  We asked, if it's possible, to

20  defer Wednesday's hearing, but we were told that the debtor,

21  being Dura, needs additional borrowing to get passed

22  Wednesday.  We have to see if Ms. Tilton would agree to fund

23  beyond Wednesday on the same terms that Judge Mashburn

24  approved on Friday, and we don't know the answer to that, so

25  that you could have more time to adjudicate the venue issue.

1          So, we think, Your Honor, currently it seems we're

2     hurling forward towards a contested DIP hearing in Nashville

3     on Wednesday.  That's going to put Judge Mashburn, once

4     again, in an untenable position because we think the Zohar's

5     are going to have to object to the DIP, but we understand

6     that Dura needs financing.

7          So, unless we have either an agreement from Ms.

8     Tilton to either fund beyond Wednesday on the same terms that

9     were approved Friday or on agreement to further defer some of

10    these bells and whistles in her DIP.  One of those two, in

11    our view, I think, unless one of those two happens the only

12    thing that we see being -- you know, the result is we think

13    we're going to have to ask you to try to adjudicate the venue

14    issues on or before Wednesday; otherwise, we're going to have

15    this showdown where Judge Mashburn is limited on what he can

16    do.

17         The DIP lender is unwilling to give up, at least,

18    until we resolve the venue issue, the various case

19    controlling demands that she's put in the DIP facility.  And

20    the debtors are being put in a position of, you know, giving

21    in on matters that could forever prejudice in our bankrupty

22    case here in Delaware or stand in the way of funding, you

23    know, a desperate company that we have a significant stake

24    in.

25         So, you know, our request, Your Honor, would be,

1  you know, if at all possible, we would like to try to get an

2  adjudication of the venue issue as soon as possible and if

3  that could happen on or before Wednesday that would be our

4  ask unless Ms. Tilton is willing to defer the various case

5  control requirements in her DIP or to further lend under the

6  existing interim order that Judge Mashburn approved on

7  Friday.

8              THE COURT:  And, I'm sorry, can you clarify, I

9  wasn't following, the designated stalking horse requirement?

10  So, in the DIP in Tennessee is it a milestone, sort of, term

11  or is it part of the DIP order, Ms. Tilton or her entities

12  would be designated as the stalking horse.

13             MR. BARRY:  Ms. Tilton has sole discretion over

14  the approval of the bidding procedures including designating

15  herself as the stalking horse bidder.

16             THE COURT:  Within the DIP order.  So, Judge

17  Mashburn would be deciding that issue on Wednesday.

18             MR. BARRY:  Correct.

19             MR. MEISLER:  Your Honor, Ron Meisler of Skadden

20  Arps on behalf of the funds affiliated with Ms. Tilton that

21  are providing the DIP loans.

22             Mr. Barry has it wrong, Your Honor.  You had it

23  right.  It's a milestone.  So, Mr. Barry did have it right

24  that we have currently sole discretion rights and we're

25  working with the debtors.  They've also asked us to open the

1  sole discretion to just reasonable acceptance; we're working

2  on that.

3            The termination rights or the events of default

4  would not trigger from now until the bid procedures hearing

5  so long as the debtors did file bid procedures motion.  That

6  in and of itself is also a milestone that would be, not now,

7  but at Wednesday's hearing.  The only milestone that would be

8  up between now and November 12th, which is the proposed bid

9  procedures hearing, is just the debtors filing bid procedures

10 motions.

11           THE COURT:  So, I haven't seen any of the

12 paperwork that's been filed in Tennessee.  So, I want to be

13 crystal clear as to what he is approving in connection with

14 the DIP.  I'm sorry if I am just not quick on the uptake

15 here.  So, in connection with the DIP motion Judge Mashburn

16 would be approving milestones only that the bid procedures

17 motions need to be filed or is he approving in addition to

18 those milestones that Ms. Tilton, as a condition of the DIP

19 would have sole authority to direct the -- to approve the bid

20 procedures and to, I guess -- well, it sounds like she would

21 not be designated as a stalking horse on Wednesday.  So, I

22 want complete clarity as to what he will be seeking because I

23 am not following what is going on right now in connection

24 with those points.

25           MR. BARRY:  Your Honor, this is Joe Barry.

1          The term sheet that is attached to the DIP motion

2   provides that the proceeds of the new money DIP loans and the

3   cash collateral are available subject to in pursuit of what

4   is defined as an acceptable 363 sale.  And acceptable 363

5   sales is defined as the DIP administrative agent, i.e. Ms.

6   Tilton, shall have reviewed and approved in writing and have

7   sole and absolute discretion any bid procedures and stalking

8   horse asset purchase agreement.

9          And it's our understanding that Ms. Tilton has

10  designated or intends to designate herself or one of her

11  entities as the stalking horse bidder.  So, as I read this

12  the condition to the new money financing is the pursuit of a

13  sale process that's in Ms. Tilton's sole and absolute

14  discretion which includes the designation of her as the

15  stalking horse.

16          THE COURT:  Okay.  So, if that wasn't approved it

17  would be an event of default?

18          MS. MEISLER:  Your Honor, this is Ron Meisler of

19  Skadden Arps on behalf of the proposed DIP lender in the Dura

20  bankruptcy.

21          THE COURT:  Thank you.

22          MR. MEISLER:  Right now, for the $10 million

23  dollars that's been put in, there is no conditioning to any

24  sort of stalking horse or any sort of sale process.  We

25  agreed to that on Friday.  When this goes forward on

1   Wednesday, yes, we are asking for certain rights with respect

2   to pushing the process forward.  And inclusive of pushing the

3   process forward is moving forward with the stalking horse

4   proposal that we're negotiating with the debtors.

5          Your Honor, it's very important to understand that

6   as part of our proposal, as part of our sale proposal we're

7   assuming all the trade, we're assuming all the employee

8   obligations.  And so, we believe that we're not only setting

9   a floor for the process, but we're giving a lot of comfort to

10  critical stakeholders to make sure that the company hangs

11  together.

12         So, yes, it's true that we are asking and

13  requiring the debtors, as a condition to funding if we make

14  it to the next draw that they push forward on the bid

15  procedures.  And it's true that we have currently in our term

16  sheet, still to be negotiated because those terms are not

17  applicable right now, but we have terms that give us sole

18  consent rights on what the bid procedures look like and,

19  obviously, we have sole consent rights on what the purchase

20  agreement looks like because we got to agree to it with the

21  debtors.  And for that matter the debtors had sole discretion

22  rights to.

23         Between the moment in time that the debtors filed

24  the bid procedures motion, until we're back in front of Judge

25  Mashburn on November 12th the debtors, as would be the case

1  in any forum, they are not obligated on the purchase

2  agreement.  They are not obligated on the bid procedures.

3  And there is no hair trigger that we could trip the DIP

4  between Wednesday's hearing, assuming that the debtors get

5  what they asked for, and November 12th other than just

6  continuing to push forward.

7           If the debtors get a better offer, a higher and

8  better offer in the interim then I'm sure we're going to be

9  negotiating, and that party who provides that higher and

10 better offer they will presumably also provide a competing

11 DIP on better terms.

12          THE COURT:  So, Mr. Meisler, the bid procedures --

13          MR. MEISLER:  I'm sorry, Your Honor.

14          THE COURT:  -- hearing is going to be proposed to

15 be heard on November 12th?

16          MR. MEISLER:  Correct, Your Honor.

17          THE COURT:  Okay.  Thank you.

18          MR. MEISLER:  And, Your Honor, while Skadden, and

19 myself, and my colleagues we have not been before Your Honor

20 in connection with the settlement agreement.  Your Honor, I

21 do want you to take comfort that we looked at that settlement

22 agreement, we studied that settlement agreement.  And in

23 Paragraph 20, specifically, it makes it clear that a

24 financing, after the expiration of the fifteen months window,

25 is permissible because, in face, even during the fifteen-

1   month window Ms. Tilton was permitted to provide financing,

2   but it was subject to first consulting with the CRO, not

3   consent, consulting.

4          Now that the fifteen month window has expired Ms.

5   Tilton has her right and she can use one of her funds, it's

6   not Ms. Tilton giving the loan, but it's one of the funds

7   that's providing the loan, and it's clear in the settlement

8   agreement that Ms. Tilton can act in the best interest of the

9   portfolio companies as can the Zohar with respect to the

10  Zohar funds.

11         It is also clear that upon the expiration of the

12  fifteen-month window Paragraph 25, all parties to the Chapter

13  11 cases referring to Zohar shall have and may exercise any

14  and all rights available under applicable law.  Your Honor,

15  from our -- what we did in proposing the DIP and doing what

16  we need to do to protect the value of Dura was straight down

17  the middle permissible by the settlement agreement.  We,

18  otherwise, wouldn't have proposed it.

19         Thank you, Your Honor.

20         THE COURT:  I understand.  I make no comment as to

21  the basis by which the proposed DIP lender for Dura has made

22  those proposals, but I appreciate your explanation of the

23  settlement agreement.

24         Okay.  I'd like to hear from the Dura debtors in

25  connection with scheduling the venue transfer motion.

1    MR. BENNETT:  Yes, Your Honor; it's Ryan Bennett

2  of Kirkland & Ellis on behalf of the Dura debtors.  I haven't

3  had the privilege to appear before you before and thank you

4  for granting the *pro hac* today.

5    THE COURT:  You're welcome.

6    MR. BENNETT:  Your Honor, Mr. Barry said a number

7  of things today and also in the venue motion that they filed.

8  I just would like, if I could, the brief opportunity to step

9  back and give the court some context as it relates to the

10  company's, you know, decision to file where and the need to

11  re-empower the national court so that we can get the relief

12  that, you know, the company, the operating company needs

13  while venue determination is pending.

14    I think one of the things we wanted to address to

15  the court as an initial matter is that as to venue the

16  company, its advisors, its independent directors we all

17  greatly respect Delaware, you know, the bench, the bar.

18  Prior to Dura I personally filed my last three cases in

19  Delaware and they all went wonderfully.

20    In this case, for the Dura debtors we have

21  independent directors who are very experienced in a fiduciary

22  capacity who exercise their business judgment, filed in the

23  District of Tennessee.  Not to avoid Delaware, but to

24  distance the operating companies from the various Zohar

25  disputes that have caused the company a lot of turmoil.

1  Instead, to be closer to the company's substantial

2  operations, employees, customers and vendors that are in

3  Tennessee.

4          You know, leading up to our bankruptcy, Dura's

5  bankruptcy, you know, our financial position suffered on a

6  number of fronts due to this Zohar over-hang.  Our customers

7  placed us on no bid status.  Our vendors contracted our trade

8  terms.  We lost credit insurance.  You know, there is just a

9  general cloud over the whole company.  It put our operations

10 in real peril.  It also had a fight and an agreement that,

11 you know, we're not a party to.

12         So, that limited our ability to effect adequate

13 restructuring transactions.  So, in light of that the

14 independent directors chose to file in Tennessee, you know,

15 to really distance ourselves from the Zohar over-hang and to

16 put ourselves, really, in proximity with that which we wanted

17 to realize value from, the operations of the business, our

18 customer relationships.

19         I mean we have two out of our five U.S.

20 manufacturing facilities are in Tennessee.  Over 300 of our

21 800 U.S. employees are in Tennessee.  We've got over twenty

22 different OEM manufacturing facilities that we service in

23 Tennessee and over 400 Tennessee based vendors that provide

24 us with raw materials and other goods in that community.

25 Conversely, you know, we have no facilities in Delaware with

1  no employees, no customers.  All we have is this damaging

2  overhang that, you know, we're trying to get away from.

3         So, you know, our view, Judge, is under the

4  supervision of the Tennessee Bankruptcy Court and, you know,

5  the direction of these two independent directors I mentioned

6  that we would seek to maximize value in that context through

7  what, you know, should be an undisputed orally and

8  transparent sale process in bankruptcy court.  I'm not sure

9  any of the folks on the other side pushing for venue transfer

10 would disagree with that notion.  It's just an issue of

11 where.

12        And for the reasons I said, I think that the

13 company has decided it would be better served and value

14 better maximized in that location.  Then, however, the sale

15 panned out, right -- again, very equipped, experienced

16 bankruptcy judges would supervise that.  However, the sale

17 panned out, what kind of proceeds were obtained through that

18 process would then flow-up to whomever is entitled to those

19 proceeds, right, on the waterfall, their lender or their

20 equity holder.

21        So, with that, like I said, we didn't have a lot

22 of out-of-court options in light of the overhang, but we were

23 able to obtain the Patriarch DIP which helped stabilize very

24 necessary operational needs including simple things like

25 simple, but extremely important things like employee payroll

1   and customer commitments that we, otherwise, would not have

2   the liquidity for.

3          Then, you know, that came with it, as has been

4   discussed, a stalking horse bid, but rather then view that as

5   some kind of burden, right, it actually is a benefit to the

6   company and its how the independent directors looked at it.

7   Here, we have a scenario where we can communicate to our

8   customers who are sensitive and concerned about Dura's

9   future.  Our employees, likewise, and the vendors we've been

10  relying upon.  We can communicate that there is a well-

11  equipped operator, experienced operator that can take the

12  company and manage their contracts, and administer their jobs

13  and the future of the company.

14         So, that's a big message, a valuable message.  As

15  Mr. Meisler pointed out, I mean this proposed stalking horse

16  does propose to take out, to assume all the trade obligations

17  or, substantially, all the trade obligations.  That is a big

18  message that really results in a lot of stability for our

19  company.  You know, we're not like the Zohar debtors.  We're

20  not just a financial tool or a fund.  We actually have a

21  tremendous amount of operational sensitivity points on the

22  labor front, the supply front and the production front that

23  we have to keep in mind and the, kind of, messaging that we

24  can deliver with that stalking horse proposal is exactly what

25  we need independent directors to turn and was the right

1  course.

2  Mr. Meisler pointed out earlier, you know, it is

3  just right now seeking approval of a stalking horse and the

4  company could decide, consistent with its fiduciary

5  obligations, to pursue a different path, pursue a different

6  lender, pursue a different purchaser and have that

7  flexibility in bankruptcy.  So, if the Barton Hill creditors

8  want to mature their proposal in a way that provides the Dura

9  debtors with the same level of comfort and certainty that the

10  Patriarch currently does then we'll have the ability to

11  pursue that, right, without putting the company in peril by,

12  you know, playing the game of chicken as Judge Mashburn

13  mentioned last week.

14  So, you know, on the venue front, and we filed a

15  paper this morning.  You can see some of our issues in

16  addition to the proximity to the creditors, and customers and

17  if it all goes toward the venue argument which we will

18  eventually brief.  It was also predicate issues of whether

19  we're even subject to Rule 1014 on account of an affiliate

20  status.  And, you know, there's, obviously, if Your Honor is

21  aware, a big dispute about the ownership of the beneficial

22  and controlled security.  The non-debtor that sits above us,

23  Dura buyer.  That is its own substantive litigation to figure

24  out who owns what and could be an affiliate.  Likewise,

25  there's a stipulation in the term loan agreement with the

1  Zohar's where they recognize that we're not an affiliate.

2  So, the point being that's its own, kind of, drawn out

3  process to even see whether 1014 applies.

4         THE COURT:  But, Mr. Bennet, that's where we are.

5  So, we have a pending Dura bankruptcy case that may or may

6  not be an affiliate.  And I am faced and have in my

7  possession a venue transfer motion under 1014(b).  So, we

8  need to go ahead and we're going to have to schedule a venue

9  motion, and it sounds like the predicate issue is going to be

10  ownership.  It's going to be, perhaps, an answer to the

11  question that has been in the ethers for eighteen months

12  which are these portfolio company's affiliates of Zohar

13  funds.  And he issues that were disputed outside of

14  bankruptcy court before the Zohar funds landed in Delaware

15  Bankruptcy Court before my appointment.  It sounds like some

16  of those may come to fruition.

17         So, I guess what I need to hear from the parties

18  and it sounds like after reading your submission is that you

19  would just like to schedule the venue motion on regular

20  notice.  So, we would be looking sometime around November,

21  beginning of November, is that correct?

22         MR. BENNETT:  That's correct, Judge.  We don't see

23  the urgency here, right.  I mean we have, like I said, an

24  equipped bankruptcy judge in Tennessee and if he is re-

25  empowered to hear our request for relief down there that, you

1  know, we can continue to proceed as debtors-in-possession.

2  You know, again, the operating company point, I mean there is

3  a lot of sensitivities when you're an operating company and

4  you have all -- as Your Honor is aware if you have all these

5  different commercial components to the company that we need

6  to look out for and we need to have a bankruptcy judge that's

7  empowered to provide us with that relief and not feel, in his

8  own words, enjoined in that context.

9          So, while we're proceeding forward on an orderly

10  schedule for a venue determination we can go do things like

11  go down to the bankruptcy court this week and seek debtor-in-

12  possession financing whether that's staying on course with

13  the Patriarch course approach or altering and going with

14  Barton Hill because they have been able to put something

15  together.

16          In either case our company's stability can't go on

17  a week to week basis, you know, with financing that may or

18  may not happen.  And last week was dangerously close.  And

19  we're hoping that we're able to liberate the process in

20  return to, kind of, a standard Chapter 11 approach while Your

21  Honor decides venue. And when Your Honor decides that that

22  will be where we'll end up.

23          THE COURT:  Thank you. Does anyone else wish to be

24  heard on behalf of -- excuse me, to discuss scheduling of the

25  transfer motion?

1      MR. LOHAN:  Yes, Your Honor.  This is Brian Lohan.

2  I represent the controlling class, one of its members Barton

3  Hill, a name who's been tossed around, you know, on this

4  call, and in this matter.

5      We have proposed an alternative DIP.  We were

6  pretty flexible during last Friday's hearing on the

7  structure.  We believed that the -- you know, we don't need

8  to rehash everything that's been said, but we believe that

9  the Patriarch proposed DIP, essentially, tied the debtors'

10 hand on the stalking horse in a process, and we believe that

11 was directly in conflict with the settlement agreement that

12 we entered into in the Zohar bankruptcy cases.

13     And we did propose a junior DIP to try to, you

14 know, align with your ruling to Judge Mashburn to do what was

15 necessary to avoid immediate and irreparable harm, nothing

16 further. We tried to, you know, kind of bridge us to a

17 hearing on venue.

18     We've been working through the weekend to propose

19 that would take Ms. Tilton's ABL and eliminate some of the

20 obstacles that we ran into on Friday.  But, most importantly,

21 would maintain maximum flexibility for an open and

22 transparent sale process including through a, you know, a

23 process where debtors could, you know, outside, you know, the

24 threat of an event of default the termination what a process

25 to identify a stalking horse bidder with maybe a little bit

1  more time.

2          And, you know, we think the venue issue should be

3  decided sooner rather than later because we're going into

4  Wednesday's hearing and, you know, wherever it's going to

5  take place, but presumably, at this point, Nashville, and you

6  know we have an order by Your Honor that says, you know,

7  Judge Mashburn can only do anything that's necessary to avoid

8  immediate and irreparable harm.

9          And, you know, as you've heard his call, our DIP

10 is going to have to take out Ms. Tilton's ABL.  And what we

11 don't want -- we think that's good for the process.  We think

12 that's good for the Dura debtors.  We think that's good for

13 the debtors before Your Honor, but we don't want Judge

14 Mashburn to have a reservation given in light of the order.

15          Now, I think we can stall for that if that's an

16 issue after the hearing you on scheduling, but those are the

17 types -- and even in our DIP we're going to require the

18 debtors to file bid procedures not tied to a stalking horse,

19 but we believe a process should begin -- a marketing process

20 should begin immediately for this company.  And, you know,

21 those things are going to have to take place whether it's the

22 Barton Hill DIP, which we hope its our DIP or its the

23 Patriarch DIP.

24          So on scheduling, I would urge Your Honor to

25 schedule the venue hearing sooner rather than later because a

1    lot will have to start happening in order for the case to be

2    successful.

3            THE COURT:  Thank you.

4            Does anyone else wish to be heard in connection

5    with the scheduling of the venue motion?

6            UNIDENTIFIED SPEAKER:  Yes, Your Honor.  Okay.

7    I'll let Mr. Meisler go next.

8            MR. MEISLER:  Yeah, Ron Meisler on behalf of the

9    proposed Dura DIP lender.

10           Your Honor, I just want to make clear, in

11   particular, that with respect to the characterization by Mr.

12   Barry, he said, and I will quote, the DIP loan is subject to

13   a monetization process.

14           Your Honor, I just want to be sure you're aware

15   that that's not correct.  I'm sure it was inadvertent by Mr.

16   Barry, but Paragraph 8 of the settlement agreement makes it

17   clear that the financing that's subject to the monetization

18   process is one where it refinances the debtors' interest in a

19   portfolio company.  DIP financing does not do that.  And so,

20   the DIP financing is not subject to the monetization process.

21           I also want it to be clear too that there are a

22   few other points that I think Mr. Barry surely inadvertently

23   misstated.  And that is that the "relief of Tilton."  That's

24   not the case.  That's overbroad and purposely obfuscates what

25   it does.

1          It's a typical provision of a DIP order that says

2    that the lender in its capacity as lender is released. We see

3    it all the time.  It's just from the company to the lender.

4    It's a typical concession made by a borrower who's getting

5    consideration in the form of a loan from a lender.  And so,

6    it solely releases that the lender in its capacity as lender

7    and it's Dura only.

8          So, I wanted to be clear on that there's not some

9    sort of overbroad massive relief of any and all claims by all

10   parties.  It's just -- that's just not the case.

11         And then, finally, on the statement that it was

12   "non-consensual priming", that's really an issue for Judge

13   Mashburn.  But to be sure in the intercreditor agreement what

14   we proposed was there's right down the middle of the

15   intercreditor agreement, they already agreed to it.  It's

16   what's in the intercreditor agreement.

17         And so, Your Honor, I think those three points are

18   really important for you to keep in mind because, at least,

19   from our perspective, between now and November 12th, we just

20   don't even think it's an issue whatsoever with respect to any

21   sort of friction between whatever the settlement agreement

22   might say and what's happening in the Tennessee court.

23         Thank you, Your Honor.

24         THE COURT:  Okay.  Thank you.

25         MR. PERNICK:  And, Your Honor, this is Norm

1  Pernick from Cole Schotz on behalf of the Patriarch

2  stakeholders and Lynn Tilton personally.

3         THE COURT:  Yes, Mr. Pernick.

4         MR. PERNICK:  Thank you, Your Honor.

5         I wanted to answer Your Honor's question about the

6  venue motion and, if I could, if you'll indulge me, there are

7  a couple of other comments in response left out from the

8  things that Mr. Barry indicated in his presentation.

9         First of all, we don't take a position on debtors'

10 venue motion other than we reserve the right to respond and,

11 of course, we will respond to the allegations that the

12 debtors made regarding Ms. Tilton's conduct in this regard,

13 including compliance with the court's order, but that's for

14 another day, but I wanted the court to know that we're not

15 going to take a position on the motion itself as to what the

16 merits are.

17         Second, as to the Dura debtors' request for relief

18 from the court's prior order on venue to authorize the

19 Tennessee Judge to enter a broader relief with respect to the

20 DIP financing and the stalking horse bid.  We're also not

21 going to take a position on that.

22         I want to say a couple of things about or provide

23 the court with a little bit more flushing out of background

24 around some of the allegations that were stated.

25         First of all, Ms. Tilton has an obligation under

1 the settlement agreement and the court's ruling to

2 participate in a joint monetization process, but she also has

3 a duty as a fiduciary to Dura.  So recognizing those various

4 interests, competing or even just appear as such, Ms. Tilton

5 did the right thing and she established an independent

6 process.

7 　　　　　The company, Dura, hired two well-known, well

8 qualified independent directors and provided them with the

9 resources to hire competent legal and financial advisors.

10 The independent directors are making gains for the Dura

11 debtor, not Ms. Tilton.

12 　　　　　She did the right thing in finding competent

13 directors to guide the company through this extraordinarily

14 challenging time.  The independent directors exercised an

15 independent and informed judgment, cannot now be used against

16 her.

17 　　　　　I want to emphasize that Ms. Tilton will comply

18 with the court's order requiring her to participate in a

19 joint monetization process.  I'm sure that argument is for

20 another day, but I wanted to just reassure the court and the

21 parties on the phone about that.

22 　　　　　Second, Ms. Tilton was well within the terms of

23 the settlement agreement to provide for the independent

24 directors and charge them with evaluating strategic

25 alternatives for Dura.  As Mr. Bennett noted, Dura is an

1  independent breathing living company of its own.  The filing

2  of Dura did not come as a surprise to the Zohar debtors as

3  Ms. Tilton shared with Mr. Katzenstein and Mr. Farnan on

4  several occasions the impossible position in which Dura has

5  been placed, operating with no expense and (indiscernible),

6  hundred plus million dollar loan facility and inability to

7  obtain a clean auditor as a result, while the creditor

8  (indiscernible).  All these mounting issues were communicated

9  timely to the Zohar debtors' representatives.

10        Third, while it's not time to talk about the

11  stalking horse bid, Ms. Tilton purposely submitting the

12  stalking horse bid was to calm the trade of the employees.

13  And I'm not going to belabor this point because I thought Mr.

14  Bennett went through it pretty well and explained it to the

15  court, but that is the purpose.

16        Ms. Tilton is the CEO of this company.  She's

17  charged with its well-being from an operational standpoint

18  and that is the purpose of, at least, here intent of the

19  stalking horse bid.

20        There is nothing inconsistent in the proposed DIP

21  financing and stalking horse bid with a joint process ordered

22  by the court.  I'm sure we'll talk about that another day.

23  But the independent director and the CRO are not excluded

24  from the bid process.  The DIP is not a refinancing under the

25  settlement agreement, as it doesn't serve to monetize the

1  Zohar.

2          The refinancing reference or refinancing of Dura's

3  debt.  And so, I think it's important just -- I know the

4  court is being inundated with a lot of information that you

5  weren't necessarily aware of before and we thought it would

6  be helpful  to you to, at least, hear the different party's

7  perspective on why certain actions were taken.

8          I appreciate your time.

9          THE COURT:  Okay.  Thank you, Mr. Pernick.

10          Is there anyone else who wishes to be heard in

11  connection with the scheduling of the venue motion and, if

12  not, I will allow Mr. Barry to have the last word?

13          MR. SHORE:  Your Honor, this is Chris Shore from

14  White & Case on behalf of Mr. Farnan.  May I be heard

15  quickly?

16          THE COURT:  Yes, Mr. Shore.

17          MR. SHORE:  All right.  What Mr. Farnan would like

18  is, consistent with what the debtor said, a hearing on

19  Wednesday, if we can all have it and I'll talk about why I

20  don't think that is impossible, but, at least, as a setting -

21  - the court setting a clear set of conditions on how the

22  process is going to move forward in Tennessee if that's

23  what's going to happen.

24          But just a quick digression.

25          After we left you last time, and after we got your

1  ruling, the debtors proposed a process for monetizing the

2  companies.  Ms. Tilton went in another direction on, perhaps,

3  a true color moment.

4       You know, Mr. Farnan came in after all the

5  prepetition, contacted the creditors, and he's listened to

6  her for years about the importance of the companies, the

7  importance of the employees, the importance of maximizing

8  value, getting past, what she's calling, noise about

9  conflicts and personal enrichment.

10      What went on last week is extremely troubling to

11 Mr. Farnan.  Ms. Tilton had the honor of -- and let's be

12 clear about this, these are all single purpose entities in

13 which Ms. Tilton is the manager so whether we're calling it

14 Zohar, or Ark, or Patriarch, it is Ms. Tilton.

15      As the owner of Dura, you heard, she brought in

16 the independents.  She was control over the company.  She is

17 the CEO of Dura.  Put forward a situation in which the

18 entities had to file in which she is proposed DIP lenders,

19 seeks to prime the Zohar debt that she put in place long

20 before this case started, before her using the intercreditor

21 rights as the ABL lender, that she acquired by acquiring the

22 ABL loans which she refused to allow to be taken out.

23      And as a DIP agent demand the sale process in

24 which she is perspective purchaser gets releases of all the

25 stalking horse protections.  And she gets to remain in

1  continued control as CEO of Dura and is now conducting

2  business on behalf of Dura, all of which is leading to a

3  process in which there was no bones about it in Tennessee,

4  mainly even to a wipe out of her equity in C1, 2 and 3;

5  without all of that would have any input from the independent

6  director or the CRO.

7          From Mr. Farnan's perspective, this is an

8  untenable situation.  First, and we got the position where

9  the company couldn't survive a weekend without access to

10  cash.  What Mr. Farnan wants is, first, to avoid any more

11  harm to Dura.  It is one of the biggest portfolio companies

12  that is and always has been a key to repayment in full of the

13  1, 2 and 3, and Zohar is the largest creditor of that entity.

14          So we are definitely invested in making sure that

15  moves forward in the process which can be to pay liquidity;

16  two, he wants to avoid the 1, 2 and 3 rights getting impaired

17  in a manner that cannot be fixed if the court ultimately

18  takes jurisdiction and; three, he wants to protect, in full,

19  to the fullest extent possible the court's jurisdiction.

20          Given what we've heard about where the liquidity

21  is and where Ms. Tilton is, you take the best path forward is

22  to have the hearing before the second interim.  We had a meet

23  and confer over the weekend.  The debtors said that they

24  could get papers in, and they did.

25          The parties agreed we didn't need discovery right

1 now to get this heard.  And I'm not sure the affiliate issue

2 is such a big issue.  It's either owned by Ms. Tilton or it's

3 owned by Z1, 2 and 3 that Ms. Tilton owns.  The Dura and the

4 1, 2 and 3 are affiliates in light of the common ownership of

5 Ms. Tilton if Z1, 2 and 3 is a direct affiliate.

6 Now if the court either can't hear it or there are

7 issues that can't be done, the Judge was very clear in

8 Tennessee that he wants a clear set of guidelines along what

9 he can do and I think, in fairness, to your sister court,

10 there do need to be some things put in place, not just

11 listening to the parties today, some of this may not be that

12 controversial.

13 I don't think he should be approving a stalking

14 horse sale process as part of a financing.  Financing is

15 okay, but putting a sale process attached to it, I'm sure

16 given the excellence of debtors' counsel and their advisors,

17 they can convince trade to stay onboard without a stalking

18 horse bidder being in place.  There will be a process.

19 There shouldn't be any releases to implicate

20 estate assets of Z1, 2 and 3.  And it maybe just clarifying

21 that the releases aren't going to anyway impinge upon Z1, 2

22 and 3 estate rights.  There shouldn't be a good faith finding

23 that would prevent this court from finding that there was a

24 breach of the settlement agreement.  We heard a lot about why

25 Tennessee is a fine venue.

1          But there's no reason why Ms. Tilton and the

2    advisors of Dura couldn't have come to Mr. Farnan as Dura was

3    required to do under the settlement agreement and had a

4    discussion about that in a joint monetization process in

5    every single thing that has happened to (indiscernible) Dura

6    and then without the input of Mr. Farnan or Mr. Katzenstein.

7          But there should be nothing in the ruling that the

8    court would have to make on an interim that would preclude

9    this court from finding that putting Dura into that process

10   constitutes a breach of the settlement agreement and reserves

11   the right to impose remedies on the signatories to the

12   settlement agreement if the court finds that that's a breach.

13         It doesn't sound like there's any reason why the

14   Tennessee court would have to kick jurisdiction over the

15   ownership issue.  As Your Honor largely pointed out that

16   issue has been around this case for a long time, and we don't

17   need two courts asserting jurisdiction, both of whom under

18   the Bankruptcy Code would have exclusive jurisdiction over

19   the assets of the debtor.

20         And then, finally, I don't think there should be a

21   rollup of the ABL that, at least, at this stage in a way that

22   if it insulates Ms. Tilton's purchase of those loans.  There

23   are issues that we need to look into there and those would be

24   estate claims of the 1, 2, 3 that we don't want insulated

25   with the rollup.

1            So, you know, just to go through that no rollup,

2   no stalking horse sale process tied to the financing, no

3   releases that implicate estate assets, no good faith finding

4   that would insulate a claim against the signatories in this

5   court for breach of the settlement agreement, and no taking

6   jurisdiction over the ownership issues.

7            And that's all I have, Your Honor.

8            THE COURT:  Thank you.

9            MR. BENNETT:  Judge, it's Ryan Bennett.

10           THE COURT:  Yes, Mr. Bennett.

11           MR. BENNETT:  On behalf of the Dura debtors.

12   Could I just correct a couple of things, or just comment on

13   that?

14           THE COURT:  Sure.

15           MR. BENNETT:  So, I was taken in the order that

16   was laid out, there are a lot of things that were imprecise

17   there in that rollout by Mr. Shore, but I think, first, like

18   with respect to Lynn knowing independents. Just so you're

19   aware of the process, the independent directors at Dura were

20   recommended by the company's advisors.

21           Now, Lynn, technically, had to officially appoint

22   them as the manager of Dura buyer, the non-debtor holdco, but

23   they were -- she did not know them, does not know them

24   personally, has never spoken with them.  And these folks have

25   great records in the restructuring community and would not

1 sacrifice or risk those records to, you know, have some kind

2 of an inside line deal that I think was being intimated

3 there.

4 But, again, you know, folks keep mentioning how

5 Dura is a party to this settlement agreement.  It's just not

6 true.  We're our own company down below and that agreement

7 was with different stakeholders above us and different

8 entities and funds and stuff.  We're an operating company and

9 not subject or party to that settlement agreement.

10 And, finally, on that ownership dispute, we're not

11 seeking to have -- to ask Judge Mashburn to decide that

12 ownership dispute.  That's, again, above us and not between

13 us.  And so, we're not looking to do that.

14 But everything else, I mean, with respect to

15 freeing him up to hear motions and requests for relief that

16 are in the best interest of the debtors' estate pursuant to

17 and not some special custom guidelines, but just the

18 standards of the Bankruptcy Code and case law.

19 You know that's what we'd like and that's what we

20 think is necessary.  Again, we are an operating company with

21 a lot of fragility right now, and we need the ability to

22 realize the breathing space and protections afforded in the

23 Bankruptcy Code.

24 THE COURT:  So, Mr. Bennett, how is my ruling any

25 different than what the bankruptcy rules provide for?  It

1   says that the court is limited to entering what is necessary

2   to avoid immediate and irreparable harm to the debtors'

3   estates.  Isn't that what is standard, Judge Mashburn's

4   standard is as we sit here today?

5          MR. BENNETT:  Your Honor, Judge Mashburn's view,

6   as I believe was summarized by Mr. Barry, at the outset, was

7   that he could enter some relief but couldn't add additional,

8   I don't know, ancillary components to it.  Right, so if, you

9   know, he could do a two-page term sheet, he felt comfortable

10  on an irreparable harm basis, but couldn't add additional

11  covenants and requirements to it because, you know -- and,

12  again, that's his -- that was his view.

13         I think now we're past the first day hearing.  The

14  view of the imminent irreparable harm, you know, in addition

15  to just his own perspective, his own perception, right, but

16  also just the standards, I think we're best, at least from a

17  Dura standpoint, allowing ourselves to, you know, have access

18  to just the regular bankruptcy standards and burdens, and not

19  continue to layer on this particular requirement that has

20  caused him such pause and risk to, you know, our operating

21  profile.

22         THE COURT:  Okay. Thank you.

23         MR. BENNETT:  Thank you, Judge.

24         THE COURT:  All right. Does anyone else wish to be

25  heard before I let Mr. Barry have the last word?

1          MR. MEISLER:  Yes, Your Honor.  This is Ron

2    Meisler, Skadden Arps, on behalf of the Dura DIP lender and

3    DIP agents.

4          There's various things that Mr. Shore mentioned

5    as, you know, you can't do this, you can't do that, you can't

6    do the other.

7          Your Honor, as far as the financing goes, as

8    mentioned in Paragraph 8 makes it clear that it's not the

9    monetization process, so Judge Mashburn's can's on what the

10   terms of the DIP should be should not be shackled.

11         We are not seeking a release beyond capacity as

12   lender, and that's from the borrower, so we're not seeking

13   releases from the Zohar estate.  We're not doing things in

14   this DIP that tie the hands of this court with respect to the

15   settlement agreement.

16         But Mr. Shore (indiscernible) says you can't do a

17   rollup.  This is an ABL.  It's the way an ABL works.  It

18   rolls over.  It turns inventory into cash, inventory into AR

19   into cash -- it's the natural mechanics.  And I personally

20   never seen an ABL that doesn't get rolled up.

21         With respect to, you know, the good faith finding,

22   well we're a DIP lender. We need the 364(e) finding.  No

23   party on the planet would loan money to a Chapter 11 debtor

24   without that 364(e) finding.

25         And so, there are certain elements that Mr. Shore

1   is demanding that are simply out of place and shouldn't be

2   comments by this court.  We do understand that this court

3   could take the matter up on a venue transfer motion on or

4   prior to November 12th and that's okay with us.  We really

5   think the rubber hits the road on the November 12th bid

6   procedures hearing.

7           Again, we think it's straight down the middle that

8   what we did is absolutely okay and within the confines of the

9   settlement agreement.  But in between now and then, Your

10  Honor, we do have an investment in this, and so we would like

11  to see the Dura debtors can take the liquidity that we're

12  operating and run a value maximizing process as the

13  settlement agreement states, its acknowledged that the CRO,

14  and I'm quoting Paragraph 10, it is acknowledged that the CRO

15  will act in the best interest of the Zohar funds and Tilton

16  in the best interest of the Group A portfolio companies.

17  Dura is one of those portfolio companies.

18          We are trying to act in the best interest of Dura.

19  We're trying to maximize value.  And, Your Honor, quite

20  honestly, Mr. Shore and his clients and Zohar estate they're

21  only worried about their term loan.  And so, they have a very

22  parochial interest and it just -- it doesn't belong in our

23  DIP order, so we're not trying their hands as to whatever it

24  is that they believe is going on in the settlement agreement.

25          Thanks, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          MR. LOHAN:  Your Honor.

3          THE COURT:  Yes.

4          MR. LOHAN:  I know Your Honor wants to get to Mr.

5  Barry, but may I be heard for just one second.  This is Brian

6  Lohan on behalf of Barton Hill.

7          THE COURT:  Sure.

8          MR. LOHAN:  I don't know how Mr. Meisler can say

9  that the DIP it's not part of monetization when the DIP

10  expressly tied its existence to the existence of a sale

11  process for the company that doesn't contemplate a joint sale

12  process.

13          It's all one and the same.  It's really hard to

14  say a loan is a financing that's separate from the sale

15  process.  They're all intertwined.  And we think that's just

16  inappropriate and it's too far in light of the settlement

17  agreement.  That's all.

18          THE COURT:  Okay.  Thank you.  Okay.

19          MR. MEISLER:  Excuse me, Your Honor.  Ron Meisler,

20  Skadden Arps.

21          It's not the DIP loan.  (Indiscernible) that is

22  clearly, by the way, so that the company can implement

23  whatever it needs to implement to maximize value.

24          What Mr. Lohan is confusing is the bid procedures.

25  The bid procedures are mechanics for how the Dura debtors are

1  going to go about marketing the business and implementing a

2  sale.  So that distinction is extremely important.  And while

3  it is the debtors' bid procedures, it's the debtors' bid

4  process.  And we want to be sure that it's one that maximizes

5  value.  We want to be sure it's one that pays our DIP and

6  pays our ABL.

7           We will cheer if there is a better bid.  We want

8  better bids.  We would love -- we're a beneficiary also

9  because, yes, we have an equity interest in Dura and we hope

10  that all the debt gets paid off and there's valuable that

11  rolls up to the equity.  That would be fantastic, but, Your

12  Honor, it's critically important that nobody confuse a DIP

13  loan and a sale process.

14           Thank you, Your Honor.

15           THE COURT:  Okay.

16           MR. BARRY:  Your Honor, it's Joe Barry.  I got to

17  chime in or I guess or I'm never going to get heard.

18           THE COURT:  Go ahead, Mr. Barry.

19           MR. BARRY:  Thank you, Your Honor.  A couple of

20  points.

21           First, I think to address Mr. Meisler's sort of

22  nothing to see here attitude, I'll give you a simple example

23  as to why there very much is something to see here.

24           There's clearly a dispute under the settlement

25  agreement whether or not what's being proposed here is a

1  monetization event or not.  First of all, Mr. Meisler

2  contends that the financing is not but he hasn't addressed

3  how the sale is not.  But, more importantly, there is a

4  dispute as to whether or not, at least, the financing is a

5  monetization event under the settlement agreement.

6        If Judge Mashburn gives the DIP lender, the DIP

7  lenders who is a signatory to the settlement agreement -- if

8  Judge Mashburn gives Ark a good faith finding on that debt,

9  on that DIP loan, how then can we come back -- they're going

10 to come back to Your Honor and say, Judge, even if we breach

11 the settlement agreement, we got a finding in Tennessee that

12 says us doing so within good faith.

13       So, I'm not going to make our argument here,

14 Judge, but just to address, again, the nothing to see here

15 view expressed by Mr. Meisler, there's just one small example

16 as to why this is much more complicated than just an ordinary

17 everyday DIP.

18       Another thing --

19       UNIDENTIFIED SPEAKER:  (indiscernible).

20       THE COURT:  Go ahead, Mr. Barry.

21       MR. BARRY:  Thank you.

22       There was a reference that the determination of

23 what goes in and what comes out of the DIP should be within

24 Judge Mashburn's purview.  Well that may be true if Zohar's

25 weren't being primed, but, again, there's the jurisdictional

1  defect allowing Judge Mashburn to allow the priming of the

2  Zohar's liens and debt claims because, again, that's the

3  exclusive jurisdiction of Your Honor under 28 U.S.C. 1334.

4  So, again, this is not an ordinary everyday restructuring

5  situation where there's nothing to see.

6          Third, we get that Mr. Bennett needs and wants --

7  desperately needed financing, and we support them getting

8  that financing.  The problem is the terms of those financing

9  are being controlled by Ms. Tilton and the Ark entity.  So,

10  it's not that we oppose them getting the funding at all.

11  It's that they're doing tremendous violence to the value of

12  the Zohar estates in doing it.

13          Finally, Your Honor, our view on -- this is a

14  scheduling conference.  Our view is that Judge Mashburn

15  should be permitted to do what he needs to do but only to the

16  extent it doesn't violate Zohar's rights, impair our claims

17  or, otherwise, do injustice to what's pending before Your

18  Honor including the monetization process and including 1334.

19          So, we're not looking for you to shackle Judge

20  Mashburn.  To the extent he can be freed up that's fine, but

21  I think we all need to keep in mind the thing that's really

22  shackling him are the terms of the DIP.  It's not anything

23  Your Honor has done.

24          THE COURT:  Okay.  Thank you very much.

25          I have been given a lot to think about.  And I

1  understand we need a prompt ruling, but I need a little bit

2  of time to think about if I need to modify the terms of my

3  order, so here's what I'd like to do.

4          I'd like to reconvene and at 4:15, if we can all

5  reconvene via CourtCall and, at that point, we'll address the

6  matters before the court.  Okay.  So, we're going to take a

7  brief break, and I will be back online at 4:15.  Thank you.

8          (Recess at 3:21 p.m.)

9          (Proceedings resumed at 4:20 p.m.)

10          THE COURT:  Good afternoon, counsel.  This is

11  Judge Owens.  Thank you very much for affording me a few

12  moments to collect my thoughts after the presentation about

13  an hour ago.

14          So, here is what I would like to do:

15          First, the court intends to hold a hearing on the

16  debtor's venue motion on Friday, November 1st at 9:30 a.m.  I

17  would like the parties to meet and confer regarding an

18  appropriate briefing schedule, but I'd like replies filed no

19  later than end of the day Tuesday.  A certification of

20  counsel with an order approving the agreed upon briefing

21  schedule should be filed and submitted by this Wednesday.

22          Second, the parties today have asked this court to

23  make significant rulings with respect to the DIP financing

24  motion that will be before Judge Mashburn this week, and to

25  modify the order it entered last week regarding the relief

1  Judge Mashburn may enter in the Dura cases; however, I

2  decline to do so.

3          The parties have attempted to summarize the DIP

4  relief sought, but as we all know the devil is in the

5  details.  What I have heard, however, is extremely troubling

6  and I will not be inclined to readily approve such relief;

7  nonetheless, that is for Judge Mashburn to decide.  My order

8  is consistent with Rule 6003, 4001, and 1014, and it will

9  stand as written.

10          I will simply note that any order that is to be

11  entered by Judge Mashburn on Wednesday is an interim order

12  and under the bankruptcy rules and our local rules that

13  relief can be re-visited at a final hearing by the court with

14  jurisdiction at that time.

15          Thank you.  I will look for the certification of

16  counsel on Wednesday.

17          We will stand adjourned.  Thank you.

18      (Proceedings concluded at 4:25 p.m.)

19                      CERTIFICATE

20

21  I certify that the foregoing is a correct transcript from the

22  electronic sound recording of the proceedings in the above-

23  entitled matter.

24

   /s/Mary Zajaczkowski_____          October 22, 2019
25  Mary Zajaczkowski, CET**D-531