# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | Case No. 19-12378 (KBO) |
| Debtors. | (Jointly Administered) |
| | Related D.I. 19 |
| | Judge Karen B. Owens |

### FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS, AND (V) MODIFYING THE AUTOMATIC STAY

Upon consideration of the motion (the "**Motion**")[2] filed on October 17, 2019, by

Dura Automotive Systems, LLC ("**Dura**") and certain of its affiliates, each as a debtor and debtor-

in-possession (each a "**Debtor**" and collectively, the "**Debtors**") in the above captioned chapter

11 cases (collectively, the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code (the

"**Bankruptcy Code**"), rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") and rules 4001-2- and 9013-1 of the Local Bankruptcy Rules

for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), seeking,

inter alia, entry of a final order (i) authorizing the Debtors to obtain postpetition financing,

---

[1]     The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax
identification number, are:  Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive
Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188);
Dura Operating, LLC (2304); and NAMP, LLC (3693).  Dura Automotive Systems, LLC's service address
is:  1780 Pond Run, Auburn Hills, Michigan 48326.

[2]     Unless otherwise indicated, capitalized terms used but not defined herein have the meanings assigned to them in
the DIP Credit Agreement or, if not defined therein, the Second Interim Order.

(ii) authorizing the Debtors to use cash collateral, (iii) granting liens and providing superpriority administrative expense status, (iv) granting adequate protection to the Debtors' prepetition lenders, and (v) modifying the automatic stay (this "**Final Order**"):

The first interim hearing on the Motion having been held on October 18, 2019 (the "**First Interim Hearing**") before the Nashville Court[3] and the second interim hearing on the Motion having been held on October 23, 2019 before the Nashville Court (the "**Second Interim Hearing**," and together with the First Interim Hearing, the "**Interim Hearings**"); and based upon the record made by the Debtors in the Motion, in the *Declaration of Richard W. Morgner in Support of the Motion* [Docket No. 37], in the *Declaration of Matthew Ray in Support of the Motion* [Docket No. 36], and in the *Declaration of Kevin Grady, Executive Vice President and Chief Financial Officer of Dura Automotive Systems, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 20], and at the Interim Hearings, as well as the final hearing before the Delaware Court on November 18, 2019 (the "**Final Hearing**", and together with the Interim Hearings, the "**Hearings**"); and the Nashville Court having entered a first interim order with respect to the Motion [Docket No. 86] on October 18, 2019 (the "**First Interim Order**") and the Nashville Court having entered a second interim order with respect to the Motion [Docket No. 212] on November 1, 2019 (the "**Second Interim Order**"); and this Court having noted the appearance of all parties in interest; and it appearing that the relief granted in this Final Order and as requested in the Motion is in the best interests of the Debtors and the Debtors' estates and creditors; and the

---

[3]    These chapter 11 cases were originally filed in the Bankruptcy Court for the Middle District of Tennessee and jointly administered under Case No. 19-06741 (RSM) (the "**Nashville Court**").  On November 1, 2019, this Court entered an order in the bankruptcy cases captioned *In re Zohar III, Corp., et al.*, Case No. 18-10512 (KBO) (Bankr. D. Del.) (the "**Zohar Chapter 11 Cases**") transferring the Debtors' chapter 11 cases to this Court, effective as of November 8, 2019 at 12:01 a.m. [Zohar Chapter 11 Cases Docket No. 1060]. Unless otherwise specified, all docket references shall refer to the Nashville Court's docket.  Copies of all pleadings referenced herein can be accessed through the Debtors' claims agent's website: cases.primeclerk.com/duraautomotive/home-docketinfo.

113674127\V-2

Debtors having provided notice of the Motion as set forth in the Motion and it appearing that no further or other notice of the Motion need be given; and after due deliberation and sufficient cause appearing therefor and there being no objections to the relief sought in the Motion that have not previously been withdrawn, waived, settled, or resolved;

IT IS FOUND, DETERMINED, ORDERED, AND ADJUDGED, that:

1.    *Disposition.* The relief requested in the Motion is granted on a final basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived, settled, or resolved solely for the purposes of this Final Order, and all reservations of rights included therein are hereby denied and overruled on the merits.  This Final Order shall become effective immediately upon its entry.

2.    *Jurisdiction.* This Court has core jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334, including but not limited to, the property that is the subject of paragraph 6(a-b) of this Final Order. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  On November 1, 2019, the United States Trustee's Office for Region 8 appointed a five (5) member official committee of unsecured creditors [Docket No. 213] (the "**Committee**").

3.    *Notice*. Proper, timely, adequate, and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Final Order shall be required.

113674127\V-2

4.      *Debtors' Stipulations*. Without prejudice to the rights of the Committee or any other parties in interest (other than the Debtors) contained in **paragraph 20** below, which rights are hereby expressly reserved and preserved, the Debtors admit, stipulate and agree that:

(a)      as of the Petition Date, and pursuant to that certain Loan and Security Agreement (as amended, modified, supplemented, or waived from time to time on or prior to the date hereof, the "**Prepetition ABL Credit Agreement**"), dated as of January 21, 2010, among Dura, the other borrowers and guarantors party thereto (the "**Prepetition ABL Loan Parties**"), the lenders from time to time party thereto (the "**Prepetition ABL Lenders**"), and Patriarch Partners Agency Services, LLC ("**Patriarch Agency**") (as successor by assignment to Wells Fargo Capital Finance, LLC, successor by merger to Wachovia Capital Finance Corporation (Central)), as administrative and collateral agent (the "**Prepetition ABL Agent**" and collectively with the Prepetition ABL Lenders, the "**Prepetition ABL Secured Parties**"), the Prepetition ABL Loan Parties were justly and lawfully indebted and liable to the Prepetition ABL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $26,898,702.80 of indebtedness (the "**Prepetition ABL Obligations**");

(b)      Notwithstanding anything to the contrary in this Final Order or any subsequent order, the Debtors' stipulations, admissions, agreements and releases contained in the First Interim Order, including, without limitation, in paragraph 4 of the First Interim Order, shall be binding upon the Debtors'

113674127\V-2

estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in the First Interim Order, including, without limitation, in paragraph 4 of the First Interim Order, shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Committee) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless and solely to the extent that a valid Challenge (as defined below) is brought within the Challenge Period (as defined below) and there is a final non-appealable order in favor of the plaintiff or prosecuting party sustaining any such Challenge (or relevant portion thereof) in any such timely filed adversary proceeding or contested matter.  For the avoidance of doubt, if any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in the First Interim Order, the Second Interim Order and this Final Order, including, without limitation, those contained in paragraph 4 of the First Interim Order, shall nonetheless remain binding and preclusive on any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases, including the Committee, and on any other person or entity, except to the extent that

such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in the First Interim Order, the Second Interim Order, or this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee or any other statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Financing Documents, the Prepetition Secured Obligations, or the Prepetition Liens (as each such term is defined in the First Interim Order).  For the avoidance of doubt, the Committee reserves its rights with respect to any Challenge (including its rights to seek avoidance, expungement or recharacterization of liens, a determination that loans are not secured by collateral, equitable subordination, disgorgement of any adequate protection payments, or otherwise);

(c)     As of the Petition Date and pursuant to that credit agreement, dated as of January 10, 2010 (as amended, modified, supplemented, or waived from time to time on or prior to the date hereof, the "**Prepetition Term Loan Credit Agreement**"), among Dura Operating, LLC ("**Dura Operating**"), the guarantors party thereto (together with Dura Operating, the "**Prepetition Term Loan Obligors**"), the lenders party thereto (the "**Prepetition Term Loan Lenders**"), and Ankura Trust Company, LLC (as

successor to Patriarch Agency), as administrative and collateral agent (in such capacity, the "**Prepetition Term Loan Agent**," and, together with the Prepetition Term Loan Lenders, the "**Prepetition Term Loan Secured Parties**," and the Prepetition Term Loan Secured Parties, together with the Prepetition ABL Secured Parties, the "**Prepetition Secured Parties**"), the Prepetition Term Loan Obligors were justly and lawfully indebted and liable to the Prepetition Term Loan Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $104,000,000 in respect of loans made pursuant to, and in accordance with, the terms of the Prepetition Term Loan Credit Agreement, *plus* accrued and unpaid interest thereon and any fees, premiums, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Term Loan Documents (as defined below)), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Term Loan Documents (the "**Prepetition Term Loan Obligations**" and, together with the Prepetition ABL Obligations, the "**Prepetition Secured Obligations**");

(d)     (i) The Prepetition Secured Obligations constitute legal, valid, and binding obligations of the Prepetition ABL Loan Parties and Prepetition Term Loan Obligors, as applicable, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (ii) no portion of the

7

Prepetition Secured Obligations, nor any payments made to the Prepetition ABL Secured Parties or Prepetition Term Loan Secured Parties, or applied to or paid on account of the obligations owing under the Prepetition Financing Documents (as defined below) prior to the Petition Date, in each case, is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination (subject to the Intercreditor Agreement (as defined below)), recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(e)     The Prepetition ABL Obligations are secured by prepetition liens and security interests granted to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties (the "**Prepetition ABL Liens**"), pursuant to and in connection with the Prepetition ABL Credit Agreement (collectively with all other agreements and documentation executed in connection therewith, the "**Prepetition ABL Documents**"), which Prepetition ABL Liens are: (i) valid, binding, perfected (subject to the limitations set forth in the Prepetition ABL Documents), enforceable prepetition liens and security interests in the Collateral (as defined in the Prepetition ABL Credit Agreement, the "**Prepetition ABL Collateral**") and as further described in the Motion; (ii) not subject to avoidance, recharacterization, subordination (subject to the Intercreditor Agreement), recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iii) as of the

8

Petition Date are subject and subordinate only to valid, perfected and unavoidable liens permitted under the Prepetition ABL Credit Agreement to the extent that such permitted liens are senior to or *pari passu* with the Prepetition ABL Liens;

(f)     The Prepetition Term Loan Obligations are secured by prepetition liens and security interests granted to the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Secured Parties (the "**Prepetition Term Loan Liens**," and together with the Prepetition ABL Liens, the "**Prepetition Liens**"), pursuant to and in connection with the Prepetition Term Loan Credit Agreement (collectively with all other agreements and documentation executed in connection therewith, the "**Prepetition Term Loan Documents**," and together with the Prepetition ABL Documents, the "**Prepetition Financing Documents**"), which Prepetition Term Loan Liens are: (i) valid, binding, perfected (subject to the limitations set forth in the Prepetition Term Loan Documents), enforceable prepetition liens and security interests in the Collateral (as defined in the Prepetition Term Loan Credit Agreement, the "**Prepetition Term Loan Collateral**," and together with the Prepetition ABL Collateral, the "**Prepetition Collateral**"); (ii) not subject to avoidance, recharacterization, subordination (subject to the Intercreditor Agreement), recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iii) as of the Petition Date are subject and subordinate only to valid, perfected and unavoidable liens permitted under the Prepetition Term Loan

113674127\V-2

Credit Agreement to the extent that such permitted liens are senior to or *pari passu* with the Prepetition Term Loan Liens;

(g)     The Prepetition Secured Obligations and the Prepetition Liens, as applicable, are subject to that certain intercreditor agreement, dated as of January 21, 2010, by and among the among the Prepetition ABL Agent and the other agents named therein (as amended, modified, supplemented, or waived from time to time on or prior to the date hereof, the "**Intercreditor Agreement**"), pursuant to which (i) the Prepetition ABL Liens are afforded priority over and are senior in all respects to the Prepetition Term Loan Liens with respect to the Revolving Loan Priority Collateral (as defined in the Intercreditor Agreement), and (ii) the Prepetition Term Loan Liens are afforded priority over and are senior in all respects to the Prepetition ABL Liens with respect to the Term Loan Priority Collateral (as defined in the Intercreditor Agreement);

(h)     [reserved];

(i)     [reserved];

(j)     Effective as of the date of entry of the First Interim Order, but subject, for the avoidance of doubt, to the provisions of **paragraph 20** hereof, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition Secured Parties and their respective subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective permitted

113674127\V-2

successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and collectively, the "**Representatives**," and together with the Prepetition Secured Parties, the "**Released Parties**") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the date of the First Interim Order (collectively, the "**Released Claims**") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition ABL Documents with respect to the Prepetition ABL Secured Parties and the Prepetition Term Loan Documents with respect to the Prepetition Term Loan Secured Parties, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the First Interim Order, whether such Released Claims are matured or unmatured or known or unknown; *provided*, that the foregoing shall not release any claims against a Released Party that a court of competent

jurisdiction determines, pursuant to a final, non-appealable order, results primarily from the gross negligence, bad faith, fraud or willful misconduct of such Released Party;

(k)      All or substantially all cash, securities, or other property of the DIP Loan Parties (and the proceeds therefrom) as of the Petition Date, including, without limitation, all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the DIP Loan Parties in any account or accounts with any depository institution, as to each, that constitute property of the estate, were either subject to rights of set-off, valid, perfected, enforceable, first priority prepetition liens under the Prepetition Financing Documents and applicable law, or constituted proceeds of the Prepetition Collateral and therefore are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

5.      *Findings Regarding the DIP Facility and Cash Collateral.*  Based on the evidence presented at the Hearings and the representations made by the Debtors in the Motion and on the record of the Hearings:

(a)      Good and sufficient cause has been shown for the entry of this Final Order.

(b)      The DIP Loan Parties have an immediate need to obtain the financing provided for under the DIP Facility and to use Prepetition Collateral (including Cash Collateral) to allow for, among other things, the orderly continuation of the Debtors' businesses, to maintain relationships with vendors, suppliers and customers, to make payroll, to make capital

expenditures permitted by the DIP Credit Agreement, and to satisfy other working capital and operational needs. The DIP Loan Parties' access to sufficient working capital and liquidity through the DIP Facility and use of Cash Collateral and other Prepetition Collateral is necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Credit Agreement and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under section 364 of the Bankruptcy Code without the Debtors granting to the DIP Agent and the DIP Lenders, the DIP Liens and the DIP Superpriority Claims (as defined below) under the terms and conditions set forth in this Final Order and in the DIP Credit Agreement.

(d)     Based on the record presented to the Court at the Hearings, (i) the terms of the DIP Facility, (ii) the terms of the Adequate Protection Provisions (as defined below) granted to the Prepetition Secured Parties, and (iii) the terms on which the DIP Loan Parties may continue to use the Prepetition Collateral and Cash Collateral pursuant to this Final Order and the DIP Credit Agreement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

13

(e)     The Prepetition Secured Parties have consented to the use of Cash Collateral and the other Prepetition Collateral, the priming of the Prepetition Liens pursuant to section 364(d)(1) of the Bankruptcy Code, and the Debtors' entry into the DIP Credit Agreement in accordance with and subject to the terms of this Final Order and the DIP Credit Agreement.

(f)     The terms and conditions of the post-petition financing approved by this Final Order (the "**DIP Facility**"), the DIP Credit Agreement, the Adequate Protection Provisions, and the use of the Prepetition Collateral and Cash Collateral have been negotiated in good faith and at arm's length, and therefore all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Credit Agreement, including, without limitation: (i) the DIP Loans (including principal and interest); and (ii) any other obligations of the DIP Loan Parties owing to the DIP Agent, any DIP Lender or any of their respective affiliates, in accordance with the terms of the DIP Credit Agreement, including any obligation, to the extent provided for in the DIP Credit Agreement, to indemnify the DIP Agent and the DIP Lender (together, the "**DIP Secured Parties**") and to pay any fees, reasonable and documented out-of-pocket expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable by the DIP Loan Parties under the DIP Credit Agreement), charges, costs, and other obligations that are chargeable or reimbursable by the DIP Loan Parties in favor of the DIP Secured Parties under the Second Interim Order, this Final Order or the DIP

14

Credit Agreement (the foregoing in **clauses (i)** and **(ii)** collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Second Interim Order, this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(g)     Subject to paragraph 20 of this Final Order, the Prepetition Secured Parties are entitled to the adequate protection provided in this Final Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, but subject to paragraph 20 of this Final Order, the terms of the proposed adequate protection arrangements are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral) and the priming of the Prepetition Liens by the DIP Liens;

(h)     The DIP Secured Parties have also acted in good faith regarding the DIP Facility and the DIP Loan Parties' continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the

113674127\V-2

Debtors' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens (each as defined below)), in accordance with the terms hereof, and therefore the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Second Interim Order, this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(i)     Consummation of the DIP Facility and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Final Order and the DIP Credit Agreement are in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

(j)     No Claims, Causes of Action.  As of the date hereof, there exist no claims or causes of action against any of the DIP Secured Parties with respect to, in connection with, related to, or arising from the DIP Credit Agreement that may be asserted by the Debtors or any other person or entity.

(k)     Release.  In addition to the release provisions in the DIP Credit Agreement, the Debtors forever and irrevocably release, discharge, and acquit the DIP Secured Parties, and their officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, and predecessors and successors in interest of each of the DIP Secured Parties, acting in such capacity, of and from any and all

claims, causes of action, demands, obligations, rights, allegations, actions, suits, controversies, proceedings, losses, damages, attorneys' fees, costs, expenses or judgements, whether known or unknown, arising under common law, statute or regulation or by contract, arising out of, in connection with, or relating to the DIP Facility, the DIP Credit Agreement and/or the transactions contemplated hereunder.

6.      *Authorization of the DIP Facility and the DIP Credit Agreement.*

(a)      The DIP Loan Parties are hereby authorized to execute, enter into, and perform all of their respective obligations (including the DIP Obligations) under the DIP Credit Agreements and this Final Order.  Dura is hereby authorized on a final basis to borrow money pursuant to the DIP Credit Agreements and this Final Order, and the "Guarantors" under the DIP Credit Agreement (the "**DIP Guarantors**") are hereby authorized, and shall be deemed, to guarantee Dura's obligations with respect to such borrowings, in an aggregate principal or face amount not to exceed $84,000,000.00, subject to any additional limitations on borrowing under the DIP Credit Agreement and this Final Order (including the Carve Out), which borrowing shall be for purposes permitted hereunder, consistent with the Approved Budget, a copy of which is attached hereto as **Exhibit B** (subject to any Permitted Variance (as defined below)), and under the DIP Credit Agreement, including the payment of expenses of administration of the Chapter 11 Cases (including the payment of estate professional fees, costs, and expenses allowed by the Court), subject to the terms and conditions set

forth herein and therein.  Irrespective of what is set forth in the Approved Budget, the Approved Budget shall be deemed to include $2,875,000.00 with respect to fees and expenses incurred by the Committee Professionals during the period of November 1, 2019, through March 15, 2020; provided that this Final Order shall not be deemed to allow or approve any fees and expenses, or act as a cap on any fees and expenses, in each case, of the Committee Professionals.  The Debtors may engage in on-lending transactions with their Foreign Subsidiaries (as defined in the DIP Credit Agreement) (the "**On-Lending Transactions**"); *provided* that (i) the Debtors shall structure and transfer any cash or cash equivalents in the On-Lending Transactions in a manner that the Debtors determine in their business judgment is in the best interests of and maximizes the value of their estates, (ii) the Debtors shall use commercially reasonable efforts to structure such On-Lending Transaction as a loan to such Foreign Subsidiary (unless structuring such transfer as a loan would be materially adverse to the Debtors' estates, in which case the Debtors may structure such transfer in a manner that is more beneficial to the Debtors' estates as determined by the Debtors), (iii) any On-Lending Transaction will be secured by first priority liens on the equity of such Foreign Subsidiaries and their applicable assets, which liens are deemed perfected as of the date such On-Lending Transaction is made, and the automatic stay imposed by section 362 of the Bankruptcy Code shall apply to the equity of such Foreign Subsidiaries and their assets in order to protect the Debtors' interests in these liens and in

113674127\V-2

recognition of the fact that such Foreign Subsidiaries are receiving estate proceeds via the On-Lending Transactions, (iv) counsel to the DIP Agent, counsel to the Prepetition Secured Parties, and counsel to the Committee shall be provided five days' notice (email shall suffice) of any On-Lending Transaction, (v) the Debtors shall, and shall use commercially reasonable efforts to cause any such Foreign Subsidiary that is in receipt of such On-Lending Transaction to, take all commercially reasonable actions requested by the Required Lenders (as defined in the DIP Credit Agreement) and the Committee to secure such On-Lending Transaction as permitted under applicable law, including, without limitation, by virtue of a stock pledge, purchase money security interest or other security interest, and (vi) any such On-Lending Transaction complies with the other requirements of the DIP Credit Agreement for intercompany loans (or other transfers) to Foreign Subsidiaries.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for the DIP Loan Parties' performance of their obligations under or related to the DIP Facility, including, without limitation:

(i)     the execution and delivery of, and performance under, the DIP Credit Agreement;

(ii)    subject to paragraph 36, the execution and delivery of, and performance under, one or more amendments, waivers, consents, supplements or other modifications to and under the DIP Credit Agreement and the Approved Budget, in each case, in such form as the DIP Loan Parties, the DIP Agent and the requisite DIP Lenders may agree, it being understood that no further approval of the Court shall be required for non-material authorizations, amendments, waivers, consents or other modifications to and under the DIP Credit Agreement that do not shorten the scheduled maturity of the extensions of credit thereunder or increase the aggregate DIP Loan Commitments or the rate of interest or fees payable thereunder;

(iii)    the non-refundable payment to the DIP Secured Parties of all fees (which fees shall be, and shall be deemed to have been, approved upon entry of the Second Interim Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification obligations and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders, in

113674127\V-2

each case in their respective capacities as such, as provided for in the DIP Credit Agreement, without the need to file retention motions or fee applications or to provide notice to any party, except as expressly set forth herein;

(iv)     the performance of all other acts required under or in connection with the DIP Credit Agreement, the Second Interim Order and this Final Order, including, subject to the Carve Out (as defined below), the granting of the DIP Liens and DIP Superpriority Claims and perfection of the DIP Liens and the DIP Superpriority Claims as provided for therein and herein; and

(v)      the performance of any act to protect or secure repayment of (i) any payment or loan made by any of the Debtors to any direct or indirect non-Debtor subsidiaries of the Debtors, or (ii) any claim held by any of the Debtors against any direct or indirect non-Debtor subsidiaries of the Debtors, including the payment of any expense incurred in connection with the foregoing.

(c)     Upon execution and delivery of the DIP Credit Agreement by all parties to the DIP Facility, the DIP Credit Agreement shall constitute a valid, binding, and unavoidable obligation of the DIP Loan Parties, enforceable against each DIP Loan Party in accordance with the terms of the DIP Credit Agreement and this Final Order. No obligation, payment, transfer or grant of security under the DIP Credit Agreement or this Final Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or

21

recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim or counterclaim.

7.     *Payment of the Prepetition ABL Obligations and Initial DIP Obligations.*  Subject to paragraph 20 of this Final Order solely with respect to the Prepetition ABL Obligations, the repayment of the outstanding Prepetition ABL Obligations and Initial DIP Obligations, subsequent to the Second Interim Hearing, pursuant to the Payoff Letter is approved.[4]  Subject to paragraph 20 of this Final Order solely with respect to the Prepetition ABL Obligations, the DIP Loan Parties are hereby authorized and directed (to the extent such actions have not already occurred) to execute and deliver, and to perform all of their obligations (including contingent expense reimbursement and indemnification obligations) under, the Payoff Letter and (b) use the proceeds of the Initial DIP Loan Commitments (as defined in the Second Interim Order) to, at the closing of the DIP Facility, pay in full in cash and discharge (i) all outstanding Prepetition ABL Obligations, including all principal, interest, fees and expenses due and chargeable under the Prepetition ABL Facility through the date of payment pursuant to the Payoff Letter; and (ii) all outstanding Initial DIP Obligations pursuant to the Payoff Letter, including all principal, interest, fees and expenses

---

[4] The Debtors funded all amounts set forth in the Payoff Letter on October 25, 2019, a copy of which is attached hereto as Exhibit A.

due and chargeable on account of such Initial DIP Obligations through the date of payment pursuant to the Payoff Letter.

8.      *DIP Superpriority Claims.* Subject to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the DIP Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) (including the Adequate Protection Superpriority Claims (as defined below)) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Loan Parties (other than the DIP Loan Parties' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**")), including, all proceeds of Avoidance Actions (the "**Avoidance Action Proceeds**"). The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Second Interim Order, the Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

113674127\V-2

9.    *Carve Out Provisions*.

(a)    <u>Carve Out</u>.  As used in this Final Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below) (collectively, the "**Statutory Fees**"); (ii) all reasonable fees and expenses up to (a) $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below) and (b) up to $75,000 incurred by the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) in connection with its defense of any investigation, prosecution or cause of action commenced by the Committee or a party-in-interest prior to the expiration of the Challenge Period, solely as it relates to the Prepetition ABL Agent and the Prepetition ABL Lenders' prepetition security interest to the extent the Prepetition ABL Agent or any Prepetition ABL Lender is entitled to indemnity from the Debtors under the Prepetition ABL Documents for such investigation, prosecution or cause of action; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") or the Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the

"**Professional Persons**"), at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (the "**Pre-Trigger Date Fees**"), subject to any limits by the Financing Orders or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses of any Prepetition Secured Parties pursuant to the First Interim Order, the Second Interim Order or this Final Order; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,500,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice (the "**Trigger Date**"), to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this **clause (iv)** being the "**Post-Carve Out Trigger Notice Cap**" or the "**Carve Out Cap**")); *provided*, that nothing herein shall be construed to impair the ability of any party to the DIP Credit Agreement to object to the fees, expenses, reimbursement or compensation described in **clauses (iii)** or **(iv)** above, on any grounds.  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or its counsel to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the credit agreement attached hereto as **Exhibit C** (as

amended, modified or supplemented from time to time in accordance herewith, the "**DIP Credit Agreement**") and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     [Reserved]

(c)     Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Committee  (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall (x) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Loan Commitments (on a pro rata basis based on the then outstanding DIP Loan Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans) less amounts available under clause (ii) and any Statutory Fees then due and owing, and (y) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (x) be deemed a request by the Debtors for DIP Loans under the DIP Loan Commitments (on a pro rata basis based

on the then outstanding DIP Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) less amounts available under clause (ii) and (y) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such DIP Loan Parties, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default or Event of Default (each as defined in the DIP Credit Agreement), the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans, any termination of the DIP Loan Commitments following an Event of Default (as defined in the DIP Credit Agreement), or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), each DIP Lender with an outstanding DIP Loan Commitment (on a pro rata basis based on the then outstanding DIP Loan Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with

respect to such borrowing in accordance with the DIP Facility up to, but not exceeding, the remaining undrawn DIP Loan Commitments.

(d)    <u>Application of Carve Out Reserves</u>.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in **clauses (i)** through **(iii)** of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in **clause (iv)** of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders.  Notwithstanding anything to the contrary in the DIP Credit Agreement, or this Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this **paragraph 9**, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this **paragraph 9**, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Credit Agreement or this Final Order, following delivery of a Carve Out Trigger

Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with this Final Order and the DIP Credit Agreement.  Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve Out Reserves funded in accordance with subsection (c) hereof shall not constitute DIP Loans or increase or decrease the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors, including by professionals retained by the Debtors or the Committee.  For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the DIP Facility, or in any Prepetition Secured Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

113674127\V-2

(e)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(f)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Credit Agreement, the Bankruptcy Code, and applicable law.

(h)     <u>Committee Professional Fees</u>.

113674127\V-2

(1)     Any payments on account of Committee Allowed Professional Fees shall not exceed $1,500,000.00 in the aggregate through December 31, 2019, with any Committee Allowed Professional Fees incurred in excess of that amount during 2019 paid as soon as reasonably practicable after December 31, 2019 if allowed prior to that date, and on the first date they are allowed, if allowed after January 3, 2020.    The foregoing is not a cap on Committee Allowed Professional Fees and instead only affects the timing of payment thereof.

(2)     Notwithstanding anything in the Approved Budget, the Approved Budget shall be deemed to include $2,875,000.00 with respect to fees and expenses incurred by the Committee Professionals during the period of November 1, 2019, through March 15, 2020.

10.     *DIP Liens*. Subject to the Carve Out, as security for the DIP Obligations, effective and perfected upon the date of the Second Interim Order and without the necessity of the execution, recordation of filings by the DIP Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, any notation of certificates of title for a titled good, or the possession or control by the DIP Agent, the following security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders, subject to customary exceptions (all property identified in **clauses (a)**, **(b)** and **(c)** below being collectively referred to herein as the "**DIP Collateral**," and all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders,

113674127\V-2

pursuant to the Second Interim Order, this Final Order and the DIP Credit Agreement, the "**DIP Liens**"):

    (a)    <u>First Lien on Unencumbered Property</u>.  Subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all assets and property (except such assets and property that are subject to Prior Senior Liens (as defined below)) of each DIP Loan Party and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, *et seq.*)), trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign

jurisdiction), all equity interests (to be limited to the extent of any adverse tax consequences, as reasonably determined by the DIP Agent and Dura, and limitations by applicable law), all books and records relating to the foregoing, all other personal and real property of the DIP Loan Parties (but excluding any property subject to a purchase money lien, capital lease or similar arrangement permitted under the DIP Credit Agreement to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third-party consent thereunder), other rights to payment whether arising before or after the Petition Date (including postpetition intercompany claims against and loans to and receivables from non-Debtor subsidiaries and affiliates, including those resulting from On-Lending Transactions) and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)), and (b) the Avoidance Action Proceeds and proceeds from any of the Debtors' directors or officers insurance, other than proceeds from such insurance policies that are payable to or on behalf of insured individuals;

(b)     <u>Priming Liens</u>.  Subject to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, perfected, first priority, senior priming lien on all of the property of the Debtors (including, without limitation,

inventory, receivables, equipment, machinery, intellectual property, general intangibles, real property, capital stock of subsidiaries (including Foreign Subsidiaries), membership interests in limited liability companies), including the Prepetition Collateral.  Subject to **subparagraph (c)** below and the immediately prior sentence, such security interests and liens shall be senior in all respects to the interests in the Prepetition Collateral of the Prepetition Secured Parties arising from current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Term Loan Secured Parties hereunder) (collectively, the "**Primed Liens**") and to any liens and security interests to which such Primed Liens are senior or *pari passu*.

(c)      Liens Junior to Certain Other Liens.  Subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each DIP Loan Party subject to valid, binding, and unavoidable liens (other than Primed Liens) on the Petition Date that were permitted senior liens under both of the Prepetition Financing Documents (the "**Prior Senior Liens**").  For the avoidance of doubt, Prior Senior Liens do not include any of the Prepetition Collateral of the Prepetition Secured Parties; and

(d)      Liens Senior to Certain Other Liens.  Subject to the Carve Out, other than the Prior Senior Liens, the DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the

benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Credit Agreement or in this Final Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (C) any intercompany or affiliate liens of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code.  The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is expressly subject to the DIP Liens and Prepetition Liens.

11.    *Protection of DIP Lenders' Rights.*

(a)    So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding DIP Loan Commitments under this Final Order or the DIP Credit Agreement, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted pursuant to the Prepetition Financing Documents or this Final Order, or otherwise seek to exercise or enforce any rights or remedies against or with respect to the DIP Collateral, the Prepetition Collateral, or the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Loan Parties, the DIP Collateral, or the Prepetition Collateral (but not

any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Loan Commitments (as defined in the Second Interim DIP Order)), to the extent such transfer, disposition, sale or release is authorized under the DIP Credit Agreement; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this **clause (iii)**, the DIP Agent or the DIP Lenders also file financing statements or other documents to perfect the liens granted pursuant to the Second Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition authorized or permitted under the DIP Credit Agreement.

(b)     Subject to the payment in full in cash of the ABL Debt, and the granting of adequate protection set forth in paragraph 16 below, (A) to the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as a secured party on any certificate of

title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and the Prepetition Agents shall comply with the instructions of the DIP Agent with respect to the exercise of such control.  In furtherance of the foregoing, the DIP Agent shall be deemed to be the controlling secured party with respect to, and exercise full dominion and control over the accounts (the "**Prepetition Controlled Accounts**") subject to, all deposit account control agreements in existence on the Petition Date and continuing thereafter applicable to the Debtors' accounts and naming either or both of the Prepetition Agents as secured party, including the following deposit account control agreements (the "**Prepetition DACAs**"): (i) that certain Deposit Account Control Agreement between Dura Operating, Patriarch Agency (as successor to Wells Fargo Capital Finance, LLC), Ankura Trust Company, and Bank of America, N.A., entered into on June 18, 2019 (as has been or will be amended from time to time); and (ii) that certain Deposit Account Control Agreement between Dura Operating, Patriarch Agency (as successor to Wells Fargo Capital Finance, LLC), Ankura Trust Company, and Bank of America, N.A., entered into on October 8, 2019 (as has been or will be amended from time to time); and (B) the banks maintaining the Prepetition Controlled Accounts are hereby directed to treat the DIP Agent as the controlling secured party with respect

to such accounts as if the DIP Agent were originally named "secured party" or "controlling secured party" or similar term therein and, unless instructed otherwise by the DIP Agent, provide for "sweeps" (daily or otherwise) to Dura's primary operating account. Each Debtor shall cause all Cash Collateral, other than the proceeds of the DIP Loans, to be promptly deposited pursuant to the DIP Credit Agreement. Subject to the Carve-Out, prior to the deposit of Cash Collateral into the Prepetition Controlled Accounts, each Debtor shall be deemed to hold such proceeds in trust for the benefit of the DIP Agent and the DIP Lenders. Subject to the Carve-Out, the DIP Agent shall be entitled to apply such Cash Collateral to the payment of outstanding DIP Loans as authorized by the Second Interim Order, this Final Order and the DIP Credit Agreement.

(c)     Any proceeds of Prepetition Collateral or DIP Collateral subject to the Primed Liens received by any Prepetition Agent or Prepetition Secured Party in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral, the DIP Collateral, or otherwise shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. The DIP Agent is hereby authorized to make any such endorsements as agent for each of the Prepetition Agents or any such Prepetition Secured Party. This authorization is coupled with an interest and is irrevocable.

(d)     Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Second Interim Order or this Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), the DIP Secured Parties shall be entitled to immediate payment of all obligations under the DIP Facility and to enforce the remedies provided for under the DIP Credit Agreement or under applicable law, without further notice, motion or application to, hearing before, or order from, the Court, but subject to the following conditions (the "**Waiting Period Procedures**"):

(i)     The DIP Agent shall notify the DIP Loan Parties, the U.S. Trustee, and the Committee in writing that the Maturity Date has occurred (such notice, a "**Maturity Date Notice**" and the date of any such notice, the "**Maturity Date Notice Date**").  A copy of any Maturity Date Notice shall be provided by email to the Debtors' counsel, the U.S. Trustee, and counsel to the Committee.

(ii)     A waiting period shall commence upon delivery of the Maturity Date Notice and shall expire five (5) business days after the Maturity Date Notice Date (the "**Waiting Period**").   During the Waiting Period, the Debtors shall be entitled to seek an emergency hearing before the Court solely for the purpose[s] of contesting the occurrence of the Maturity Date (including, for the avoidance of doubt, contesting the occurrence of any breach, default, or Event of

Default alleged to underlie the occurrence of the Maturity Date) or requesting the nonconsensual use of Cash Collateral.

(iii)    During the Waiting Period, the Debtors may continue to use the DIP Collateral, including the Cash Collateral, so long as such DIP Collateral (including Cash Collateral) is used solely to pay any expenses which are (a) necessary to preserve the Debtors' going concern value, or (b) necessary to contest in good faith the occurrence of the Maturity Date or underlying Event of Default (each as defined in the DIP Credit Agreement), provided however, the Debtors may not use the DIP Collateral or Cash Collateral for any capital expenses during the Waiting Period.

(e)    None of the DIP Secured Parties shall object to any motion filed by the Debtors during the Waiting Period seeking such expedited hearing nor seek to reduce such Waiting Period.  In no event shall the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral; *provided*, *however*, that the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties will use commercially reasonable efforts to satisfy the DIP Obligations, Prepetition Secured Obligations, or Adequate Protection Obligations, as applicable, first from all DIP Collateral or Prepetition Collateral, as applicable, other than proceeds of causes of action (other than any Avoidance Actions against the Prepetition ABL Agent and any insider thereof, solely in their capacities

as insiders of the Debtors), and second from such proceeds of causes of action.  Moreover, the Debtors waive the right to apply the "equities of the case" exception in section 552(b) of the Bankruptcy Code to the secured claims of the Prepetition Secured Parties.

(f)        Notwithstanding the provisions of section 362 of the Bankruptcy Code, but subject to the Waiting Period Procedures and any other applicable provisions of the First Interim Order, Second Interim Order or this Final Order (collectively, the "**Financing Orders**"), as the case may be, if any Event of Default (as defined in the DIP Credit Agreement) occurs and is continuing, the DIP Secured Parties may, as the direction of the Required DIP Lenders (as defined below), subject to the Carve-Out, take any or all of the following actions:

(i)        declare by a Maturity Date Notice that the commitment of the DIP Lenders to make DIP Loans, whereupon such commitment and consent shall be terminated;

(ii)        declare by a Maturity Date Notice that the unpaid amount of the DIP Obligations, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Credit Agreement, the DIP Credit Agreement, and the Financing Orders to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the DIP Loan Parties; or

41

(iii)    take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Agent and the DIP Lenders) permitted under the DIP Credit Agreement, or by applicable law.

(g)    No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of the Second Interim Order, this Final Order or the DIP Credit Agreement shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the DIP Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

12.    *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Prepetition ABL Agent and the Prepetition Term Loan Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as applicable, and nothing contained in this Final Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders, the Prepetition ABL Agent or the Prepetition Term Loan

113674127\V-2

Agent to any charge, lien, assessment or claim against the DIP Collateral or the Prepetition

Collateral under section 506(c) of the Bankruptcy Code or otherwise.

13.    *Payments Free and Clear*. Any and all payments or proceeds remitted to the DIP

Agent on behalf of the DIP Lenders pursuant to the provisions of the Second Interim Order, this

Final Order, or the DIP Credit Agreement shall be received free and clear of any claim, charge,

assessment or other liability, including, without limitation, any such claim or charge arising out of

or based on, directly or indirectly, section 506(c) of the Bankruptcy Code, whether asserted or

assessed by, through or on behalf of the Debtors.

14.    *Use of Cash Collateral and DIP Loans.*

(a)    The DIP Loan Parties are hereby authorized, subject to the terms and

conditions of this Final Order, the Approved Budget, and any budget

variances permitted under the DIP Credit Agreement (the "**Permitted**

**Variances**"), to use Cash Collateral and the DIP Loans; *provided*, that the

DIP Loan Parties shall operate their cash management system in a manner

that is the same as or substantially similar to their prepetition cash

management system or as may be modified by the DIP Credit Agreement

to provide for, among other things, daily "sweeps" to Dura's primary

operating account.

(b)    The Debtors shall use the proceeds of the DIP Facility and Cash Collateral

in a manner consistent with the terms and conditions of this Final Order, the

DIP Credit Agreement and the Approved Budget (subject to Permitted

Variance) solely for: (i) working capital and general corporate purposes,

including capital expenditures, of the Debtors and, to the extent funded

through intercompany loans evidenced by promissory notes pledged to the DIP Agent to secure the DIP Obligations on a first-priority basis in accordance with this Final Order, their direct and indirect subsidiaries; (ii) payment in full in cash of the Prepetition ABL Obligations and Initial DIP Obligations; (iii) the pursuit of an Acceptable 363 Sale and/or an Acceptable Plan (each as defined in the DIP Credit Agreement); and (iv) and bankruptcy-related costs and expenses, subject to the Carve Out.

(c)     As contemplated by the DIP Credit Agreement, the Approved Budget depicts, on a weekly and line item basis, among other things, (i) cash receipts of the DIP Loan Parties (the "**Cash Receipts**"), (ii) cash operating disbursements of the DIP Loan Parties (the "**Cash Operating Disbursements**"), and (iii) non-operating, bankruptcy-related cash disbursements of the DIP Loan Parties (the "**Cash Bankruptcy Disbursements**") for a thirteen (13) week period commencing on the Petition Date. The DIP Loan Parties shall provide to the DIP Agent and its counsel, and the Committee's counsel, so as to actually be received at or before the end of the second (2nd) week following the Petition Date (and every two (2) weeks thereafter), a supplement to the Approved Budget (each such supplement, an "**Updated Budget**"), updating and/or extending the period covered by the Approved Budget so that it covers at least the period ending 13 weeks from the week in which an Updated Budget is delivered through the Maturity Date. Each Updated Budget shall be subject to the DIP Agent's approval in its sole and absolute discretion and without further

order of the Court, and the Committee's approval to the extent of any impact on Committee professionals' fees and expenses.  The Approved Budget shall remain in effect with respect to the period covered by such Approved Budget until such time as the DIP Agent approves an Updated Budget. Upon (and subject to) the approval of any such Updated Budget by the DIP Agent in its sole and absolute discretion (or the Committee, as applicable), such Updated Budget shall then constitute the Approved Budget.  A copy of any Approved Budget shall be delivered via email to the U.S. Trustee and the Committee's counsel following the Approved Budget's approval by the DIP Agent (or the Committee, as applicable). For the avoidance of doubt, the first variance testing period will cover the two weeks ending Sunday, November 3, 2019, and the variance test results will be submitted to the DIP Agent and the Committee, or their respective counsel by 12:00 noon New York City time on Thursday, November 7, 2019 and every two weeks thereafter.

(d)     The DIP Loan Parties shall be deemed to be in compliance with the Approved Budget for all purposes under the DIP Credit Agreement and this Final Order unless, as of any applicable date of determination, the DIP Loan Parties' (x) cumulative Cash Receipts or (y) cumulative Cash Operating Disbursements, as applicable, vary from the Approved Budget by more than the applicable Permitted Variance as measured on any Testing Date (as defined in the DIP Credit Agreement).

45

113674127\V-2

(e)      As required under the DIP Credit Agreement and in a manner consistent with the DIP Credit Agreement and this Final Order, the Debtors shall also deliver to the DIP Agent and the Committee, or their respective counsel, so as to actually be received by the DIP Agent and the Committee, or their respective counsel (which may be via email) on the date that is three (3) weeks following the Petition Date and every week thereafter, a budget variance report (the "**Variance Report**") setting forth on a line item basis for Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements (i) detail of the variance, if any, of actual cash disbursements and actual cash receipts from the Approved Budget, and (ii) an explanation of any per line item variance greater than 5.00%.

15.      *Adequate Protection of Prepetition Term Loan Secured Parties*.   Subject to paragraph 20 of this Final Order, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Secured Parties it represents, is entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), 503(b), 507(a), and 507(b) of the Bankruptcy Code, to adequate protection of its respective interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Term Loan Agent's interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors of the Prepetition Collateral, including Cash Collateral, the priming of the Prepetition Term Loan Agent's security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Credit Agreement, the Second Interim Order and this Final Order, and the imposition of

the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "**Prepetition Term Loan Adequate Protection Obligations**"); *provided*, *however*, that the Committee's rights are fully reserved with respect to the existence or extent of any diminution in the value of the Prepetition Term Loan Agent's interests in the Prepetition Collateral from and after the Petition Date.  In consideration of the foregoing, and subject to the Carve Out and paragraph 20, the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Secured Parties, are hereby granted the following (collectively, the "**Prepetition Term Loan Adequate Protection Provisions**"):

(a)     Prepetition Term Loan Adequate Protection Liens.  The Prepetition Term Loan Agent (for itself and for the benefit of the Prepetition Term Loan Lenders) is hereby granted (effective and perfected upon the date of the First Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Prepetition Term Loan Adequate Protection Obligations owing to it, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral, junior only to (i) the Carve Out, (ii) the DIP Liens, (iii) Prior Senior Liens and (iv) the Contingent Adequate Protection Liens on the Revolving Loan Priority (as defined in the Intercreditor Agreement) (collectively, the "**Prepetition Term Loan Adequate Protection Liens**").

(b)     Adequate Protection Payments.  As adequate protection to the Prepetition Term Loan Secured Parties, the Debtors shall pay in cash (i) to the Prepetition Term Loan Secured Parties all fees, costs and expenses of the

professionals to the Prepetition Term Loan Lenders and the Prepetition Term Loan Agent incurred in connection with the Prepetition Term Loan Documents, regardless of whether accrued prepetition or postpetition, and without the need to file retention motions or fee applications, in each case, as and when such fees, costs and expenses become due and payable (but for the commencement of the Chapter 11 Cases) under the Prepetition Term Loan Documents (the payments set forth in this clause (i), the "**Prepetition Term Loan Professional Costs**"), (ii) to the Prepetition Term Loan Agent, for the benefit of the Prepetition Term Loan Secured Parties, on or about the last business day of each month, adequate protection payments in an amount equal to all accrued and unpaid prepetition and postpetition interest due and payable and required to be paid in cash under the Prepetition Term Loan Documents, calculated based on the applicable default rate set forth in the Prepetition Term Loan Documents, it being understood for purposes of this clause that the default rate will accrue to the fullest extent permitted under the Bankruptcy Code, with all rights to object thereto fully preserved (the payments set forth in this clause (ii), the "**Adequate Protection Interest Payments**"), and (iii) to the Prepetition Term Loan Agent all annual and other administrative fees and costs and expenses of the Prepetition Term Loan Agent, regardless of whether accrued prepetition or postpetition, and without the need to file retention motions or fee applications, in each case, as and when such fees, costs and expenses become due and payable (but for the commencement of the Chapter 11

48

Cases) to the Prepetition Term Loan Agent.  Notwithstanding the foregoing, any portion of the Prepetition Term Loan Professional Costs that are invoiced to the Debtors in excess of $65,000 per month and the full amount of the Adequate Protection Interest Payments shall accrue, but not be paid in cash, until the DIP Loans are paid in full, and all accrued but unpaid Adequate Protection Interest Payments and Prepetition Term Loan Professional Costs shall be payable upon full repayment of the DIP Loans, and shall be payable on the last business day of each month thereafter.

(c)    <u>Prepetition Term Loan 507(b) Claims</u>.  The Prepetition Term Loan Agent (for itself and for the benefit of the Prepetition Term Loan Lenders) is hereby granted, subject to the Carve Out, the DIP Superpriority Claims, and the priorities set forth in **clause (d)** below, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Term Loan Adequate Protection Obligations owing to it, with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition Term Loan 507(b) Claims**"), which Prepetition Term Loan 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral including, without limitation, the Avoidance Action Proceeds.

(d)    <u>Priority of Adequate Protection Liens and Prepetition Term Loan 507(b) Claims</u>.  Except to the extent expressly set forth in this Final Order or the DIP Credit Agreement, the Prepetition Term Loan Secured Parties shall not

receive or retain any payments, property or other amounts in respect of the Prepetition Term Loan Adequate Protection Obligations and Prepetition Term Loan 507(b) Claims unless and until the DIP Obligations and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full and all DIP Loan Commitments have been terminated.

16.    *Adequate Protection of Prepetition ABL Secured Parties.*

(a)    <u>Prepetition ABL Agent Adequate Protection Liens</u>.  Subject to the terms and conditions herein (including, without limitation, the priming liens granted hereunder, the Carve Out, paragraph 20, and expiration of the Challenge Period (as defined below)), the Prepetition ABL Agent, for itself and for the benefit of the Prepetition ABL Lenders, is hereby granted adequate protection replacement liens on the DIP Collateral, which liens shall (i) continue to secure the unpaid and/or contingent portion of any Prepetition ABL Debt (including, without limitation, any Prepetition ABL Debt subsequently reinstated after the repayment thereof because such payment (or any portion thereof) is required to be returned or repaid to the Debtors or the DIP Lenders), and (ii) be (A) junior and subordinate in all respects (including the right of payment) to the DIP Lenders' liens on and security interests in the DIP Collateral (including, without limitation, the DIP Liens granted under the Second Interim Order, this Final Order and the DIP Credit Agreement), (B) senior in priority in all respects to the Adequate Protection Liens and the Prepetition Term Loan Liens on the Revolving

Loan Priority Collateral (as defined in the Intercreditor Agreement) granted to the Prepetition Term Loan Agent under this Final Order and the Prepetition Term Loan Documents, respectively, and (C) junior in priority to the Adequate Protection Liens on the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) granted to the Prepetition Term Loan Agent under this Final Order and the Prepetition Term Loan Documents, respectively (collectively, such liens and security interests of the Prepetition ABL Secured Parties are hereinafter referred to as the "**Contingent Adequate Protection Liens**")), and any such reinstated or contingent Prepetition ABL Obligations described in clause (i) of this subparagraph is hereinafter referred to as the "**Contingent Prepetition ABL Debt**").  If no Challenge is brought against the Prepetition ABL Agent or any Prepetition ABL Lender within the Challenge Period, then the Contingent Adequate Protection Liens shall be automatically released.

(b)     Adequate Protection Payments.  Subject to paragraph 20 or a successful Challenge, the Debtors are authorized and directed under sections 361, 363 and 364 of the Bankruptcy Code to make adequate protection payments, if and when due or as soon as practicable thereafter, of all reasonable and documented costs, fees and expenses incurred after the Petition Date by Skadden, Arps, Slate, Meagher & Flom LLP (and one local counsel and a conflicts counsel, to the extent required), as counsel to the Prepetition ABL Secured Parties, in connection with defending against any Challenge or threatened claim against the Prepetition ABL Agent or any Prepetition ABL

Lender arising out of or relating to the Prepetition ABL Secured Obligations (including preparations for and consultations concerning any such matters) that is indemnified under the Prepetition ABL Documents, without the need to file retention motions or fee applications, in each case, as and when such fees, costs and expenses become due and payable (but for the commencement of the Chapter 11 Cases) under the Prepetition ABL Documents.

17.     *Reservation of Rights of Prepetition Secured Parties*. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties' holding interests that are secured by Primed Liens; *provided*, that any of the Prepetition Secured Parties, upon a change in circumstances, may request further or different adequate protection, and the Debtors or any other party may contest any such request.

18.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     The DIP Agent and, subject to **paragraphs 11(a)(iii) and 20** hereof, the Prepetition Agents are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, patent filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them

52

hereunder.  Whether or not the DIP Agent, on behalf of the DIP Lenders or any of the Prepetition Agents shall, in their sole discretion, choose to file such financing statements, trademark filings, patent filings, copyright filings, mortgages, notices of lien or similar instruments, or take control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to Prior Senior Liens), as of October 24, 2019.  Upon the request of the DIP Agent, each Prepetition Secured Party and DIP Loan Party, without any further consent of any other party, is authorized (in the case of the DIP Loan Parties) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)      A certified copy of the Second Interim Order or this Final Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of the Second Interim Order and/or this Final Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified

to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this **subparagraph (b)** and the immediately preceding **subparagraph (a)**.

(c)    Notwithstanding anything to the contrary in the Motion, the First Interim Order, the Second Interim Order, the DIP Credit Agreement or this Final Order, for purposes of this Final Order, in no event shall the DIP Collateral include, or the DIP Liens or Adequate Protection Liens attach to, (a) any lease, license, contract, property rights or agreement to which any DIP Loan Party is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of such DIP Loan Party therein, or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction, the Bankruptcy Code or any other applicable law or principles of equity); *provided*, *however*, that the DIP Collateral shall include and such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, license, contract, property rights or agreement that does not result in any of the consequences specified in (i) or (ii) above; (b)

equity interests owned directly by the Debtors in joint ventures (if any); (c) any of the outstanding Capital Stock of a controlled foreign corporation (as defined in the Internal Revenue Code) owned directly by a Debtors in excess of 65% of the voting power of all classes of Capital Stock of such controlled foreign corporation entitled to vote; provided that, to the extent DIP Agent and Dura reasonably determine that no material adverse consequences would result therefrom, there shall be no limitation on the percentage of Capital Stock of a controlled foreign corporation owned directly by a Debtor included in the DIP Collateral; (c) property subject to a purchase money agreement, capital lease or similar arrangement permitted under the DIP Credit Agreement to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third party consent thereunder, provided however, that the DIP Collateral shall include any equity or residual value in such property; or (d) any trademark application filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act; (e) Dura's directors and officers insurance policy or any proceeds thereof payable to or on behalf of insured individuals; or (f) any Capital Stock owned directly by a Debtor to the extent the pledge of which would cause adverse tax consequences as reasonably determined by the DIP

55

Agent and Dura or to the extent such pledge is limited by applicable law (such assets collectively referred to as the "**Excluded Assets**"); *provided*, that the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Obligations shall in all events attach to or have recourse against all proceeds, products, offspring, or profits from any and all Excluded Assets (including from the sale, transfer, disposition or monetization thereof), in each case, in accordance with the terms of this Final Order (including the priorities set forth herein).

19.    *Preservation of Rights Granted Under This Final Order.*

(a)    Subject to the Carve Out, paragraph 20 (solely with respect to the rights of the Prepetition Secured Parties) and other than the Prior Senior Liens, or as permitted under the DIP Credit Agreement, no claim or lien having a priority superior to or *pari passu* with those granted by the Second Interim Order or this Final Order to the DIP Agent or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise provided in the Second Interim Order, this Final Order or permitted under the DIP Credit Agreement, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu*

with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, unless expressly permitted under the DIP Credit Agreement; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.  No lien or security interest shall be granted to any other party in any of the Excluded Assets without first granting such lien or security interest to the DIP Agent and the Prepetition Agents (solely with respect to the Adequate Protection Obligations).

(b)       Except as otherwise provided in this Final Order or the DIP Credit Agreement, or as otherwise agreed in writing by the DIP Agent, the Debtors' right to use the proceeds of DIP Loans or Cash Collateral hereunder shall terminate immediately upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement).

(c)       [Reserved]

(d)       Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise: (i) the DIP Superpriority Claims, the Adequate Protection Obligations, the Adequate Protection Provisions, the DIP Liens, and the Adequate Protection Liens shall continue in full force and effect as provided herein and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations shall have been

indefeasibly paid in full in cash (and that such DIP Superpriority Claims, Adequate Protection Obligations, Adequate Protection Provisions, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Final Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Final Order.

(e)     If any or all of the provisions of the Second Interim Order or this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation, or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacation or stay, the DIP Obligations, the DIP Liens, the Adequate Protection Provisions, the Adequate Protection Obligations, and the Adequate Protection Liens incurred by the DIP Loan Parties for the benefit of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, shall be governed in all respects by the original provisions of this Final Order, and

58

the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted in section 364(e) of the Bankruptcy Code, the Second Interim Order, this Final Order, and the DIP Credit Agreement with respect thereto.

(f)    Except as expressly provided in this Final Order (including, solely with respect to the rights of the Prepetition Secured Parties, paragraph 20) or in the DIP Credit Agreement, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Provisions, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, as applicable, granted by the provisions of this Final Order and the DIP Credit Agreement shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of the Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral or Prepetition Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Credit Agreement); or (iii) the entry of an order confirming a plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP Credit Agreement shall continue in the Chapter 11 Cases, in any

successor cases if the Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Provisions, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders, and, subject to paragraph 20, the Prepetition Secured Parties granted by the provisions of the Second Interim Order, this Final Order and the DIP Credit Agreement shall continue in full force and effect until the DIP Obligations or Adequate Protection Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Credit Agreement, and the DIP Loan Commitments have been terminated.

20.    *Effect of Stipulations on Third Parties.*  The Debtors' stipulations, admissions, agreements and releases contained in this Final Order, including, without limitation, in **paragraph 4** of this Final Order, shall be binding upon the Debtors' estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Final Order, including, without limitation, in **paragraph 4** of this Final Order, shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Committee) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless and solely to the extent that:

113674127\V-2

(a)     such party in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely commenced an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this **paragraph 20**) (a "**Challenge**") (1) objecting to or challenging (which shall include any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law) the amount, validity, or enforceability of the Prepetition Secured Obligations or the perfection or priority of the Prepetition Liens (and the provisions of the First Interim Order, Second Interim Order, or this Final Order relating thereto), or (2) otherwise asserting or prosecuting any objections, claims, or causes of action (including, without limitation, any actions for preferences, fraudulent transfers or conveyances, other avoidance power claims, any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law) on behalf of the Debtors' estates against any of the Prepetition Secured Parties or their respective Representatives in connection with matters related to the Prepetition Financing Documents, the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Collateral, by no later than (i) with

respect to parties in interest (other than any of the Debtors) with requisite standing, the earlier of the date an order confirming a chapter 11 plan for the Debtors has been entered and 60 calendar days after entry of the Second Interim Order, (ii) with respect to the Committee, the later of (a) January 31, 2020 and the date that is ten business days after the entry of a final, non-appealable order adjudicating a motion for standing to assert a Challenge, (iii) any such later date as has been agreed to, in writing, by the relevant Prepetition Agent, and (iv) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph (the time period established by the foregoing **clauses (i)**, **(ii)**, and **(iii)**, the "**Challenge Period**"); and

(b)     there is a final non-appealable order in favor of the plaintiff or prosecuting party sustaining any such Challenge (or relevant portion thereof) in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If or to the extent no such Challenge is timely and properly filed during the Challenge Period or (to the extent) the Court does not rule in favor of the plaintiff (in full or in any relevant part) in any such proceeding then (except as expressly filed or ruled): (i) the Debtors' stipulations, admissions, agreements and releases contained in this Final Order, including, without limitation, those contained

in **paragraph 4** of this Final Order, shall be binding on all parties in interest, including, without limitation, the Committee, (ii) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense but subject to the priorities described herein; and (iii) the Prepetition Secured Obligations and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by the Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Financing Documents or this Final Order shall be deemed forever waived, released and barred.

(c)     If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Final Order, including, without limitation, those contained in **paragraph 4** of this Final Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or non-statutory

committee appointed or formed in the Chapter 11 Cases, including the Committee, and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged (in whole or relevant part) in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in the Second Interim Order or this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee or any other statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Financing Documents, the Prepetition Secured Obligations, or the Prepetition Liens.

21. *Limitation on Use of DIP Facility and Collateral.* Notwithstanding any other provision of this Final Order or any other order entered by the Court, without the consent of the DIP Agent, no DIP Loans, DIP Collateral, Prepetition Collateral, Cash Collateral, or any portion of the Carve Out may be used directly or indirectly by any Debtor, any DIP Guarantor, any official committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any successor case, including any chapter 7 case, or any other person, party or entity (a) in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, or their respective predecessors-in-interest or Representatives, or any action purporting to do the foregoing in respect of the Prepetition Secured Obligations, Prepetition Liens on the Prepetition Collateral, DIP Obligations, DIP Liens, DIP Superpriority Claims, the

64

Adequate Protection Obligations, Adequate Protection Liens, and superpriority claims granted to the Prepetition Secured Parties under the First Interim Order, the Second Interim Order or this Final Order, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Prepetition Secured Obligations, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the First Interim Order, Second Interim Order, this Final Order, the DIP Credit Agreement, or the Prepetition Financing Documents including, in each case, without limitation, for lender liability or pursuant to sections 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) to prevent, hinder, or otherwise delay the Prepetition Secured Parties', the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization on the Prepetition Obligations, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Financing Orders, each to the extent permitted under the DIP Credit Agreement, the Prepetition Financing Documents, the Intercreditor Agreement, the Second Interim Order, and this Final Order; (c) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders under this Final Order, the Prepetition Financing Documents, or the DIP Credit Agreement, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Credit Agreement) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, and superpriority claims and liens granted to the Prepetition Secured Parties hereunder, unless all DIP Obligations and Adequate Protection Obligations have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit); or (e) to seek to pay any amount on

113674127\V-2

account of any claims arising prior to the Petition Date (other than with respect to the Adequate Protection Provisions) unless such payments are otherwise included in the Approved Budget and approved by the Court; *provided*, that, notwithstanding the foregoing or anything else to the contrary herein, advisors to the Committee may incur fees and expenses in investigating and seeking standing to prosecute, but not litigating, the claims and liens of the Prepetition Secured Parties, including, for the avoidance of doubt, the claims and liens that were extinguished pursuant to the Payoff Letter, prior to the expiration of the Challenge Period in an amount not to exceed $150,000 in the aggregate.

22.     *Loss or Damage to Collateral*.   Nothing in this Final Order, the DIP Credit Agreement, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or any DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Credit Agreement and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral (the DIP Agent shall be deemed to have exercised reasonable care in the custody and preservation of any DIP Collateral in its possession if such DIP Collateral is accorded treatment substantially equal to that which it accords its own property), (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the DIP Loan Parties.

113674127\V-2

23.     *Final Order Governs*.  In the event of any inconsistency between the provisions of this Final Order and the DIP Credit Agreement or any other order entered by this Court, the provisions of this Final Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Final Order and the DIP Credit Agreement, including, without limitation, the Approved Budget.

24.     *Binding Effect; Successors and Assigns*.  The DIP Credit Agreement and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Committee, any other statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, the Debtors, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Debtors, and their respective successors and assigns; *provided*, that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

25.     *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Facility, to permit the use of Cash Collateral or DIP Collateral or in exercising any

113674127\V-2

rights or remedies as and when permitted pursuant to this Final Order or the DIP Credit Agreement, the mere entry of this Final Order in no way deems the DIP Agent and the DIP Lenders to (a) be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

26.      *Master Proof of Claim.*  The Prepetition Term Loan Agent shall not be required to file proofs of claim in the Chapter 11 Cases or any successor case in order to assert claims on behalf of itself and the Prepetition Term Loan Lenders for payment of the Prepetition Term Loan Obligations arising under the Prepetition Term Loan Credit Agreement, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Term Loan Credit Agreement.  The statements of claim in respect of the Prepetition Term Loan Obligations set forth in this Final Order, together with any evidence accompanying the Motion and presented at the Interim Hearings, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such claimed secured status.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, the Prepetition Term Loan Agent is authorized to file in the Debtors' lead chapter 11 case—*In re Dura Automotive Systems, LLC,* Case No. 19-06741, a single, master proof of claim on behalf of the Prepetition Term Loan Secured Parties, as applicable, on account of any and all of their respective claims arising under the Prepetition Credit Agreement and hereunder (the "**Master Proof of Claim**"), which shall be deemed asserted against each of the Debtors.  The

provisions of this **paragraph 26** and the Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Term Loan Secured Party (or its successors in interest) to vote separately on any plan proposed in the Chapter 11 Cases. The Master Proof of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Term Loan Secured Parties, which instruments, agreements, or other documents will be provided upon written request to counsel to the Prepetition Term Loan Agent.

27.     *Insurance*.  The DIP Agent is deemed to be a loss payee under Dura's or the DIP Guarantors' insurance policies on a senior basis and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, *first*, to the payment in full of the DIP Obligations, and *second*, to the payment of the Prepetition Secured Obligations.

28.     *Effectiveness*.  This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

29.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

30.     *Payments Held in Trust*.  Except as expressly permitted in this Final Order or the DIP Credit Agreement, and subject to the Carve-Out, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral, or receives any other payment with respect thereto from any other

source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Credit Agreement, and termination of the DIP Loan Commitments in accordance with the DIP Credit Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Credit Agreement and this Final Order.

31.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

32.    *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Final Order.

33.    *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

34.    *Chubb Reservation of Rights.*  For the avoidance of doubt, nothing in this Final Order and any document related thereto, including the DIP Credit Agreement, alters or modifies the terms and conditions of any insurance policies or related agreements issued by ACE American Insurance Company and Federal Insurance Company and each of their affiliates and successors to any of the Debtors.

35.    *Customer Rights*.  Notwithstanding anything to the contrary herein, any liens, set offs, recoupments, or security interests existing by and between any Debtor and any of Ford, FCA, BMW, Daimler AG, Mercedes-Benz AG, Mercedes-Benz U.S. International, Inc., MBExTra, and Daimler Trucks North America (and any affiliates of the foregoing), if any, in each case, solely to

70

113674127\V-2

the extent (a) senior to the liens relating to the Debtors' term loan and (b) provided by applicable non-bankruptcy law, shall not be affected, altered, amended, primed, subordinated, waived, deleted, and/or changed in any way, and shall remain in full force to the same extent and in the priority in which they existed immediately before the filing of these chapter 11 cases.

36.    *Modifications of DIP Loan Documents*. The Debtors, the DIP Agent and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the DIP Credit Agreement, any non-material modifications of the DIP Credit Agreement (other than this Final Order) without further notice, motion, or application to, order of or hearing before, this Court, after providing two business days' notice thereof to counsel to the Committee and counsel to the Prepetition Secured Parties. Any material modification or amendment to the DIP Credit Agreement and the Approved Budget shall only be permitted pursuant to an order of this Court (which may be sought on (3) business days' notice), upon notice to counsel for the Committee, the U.S. Trustee, and the Prepetition Secured Parties, provided, however, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant, representation or any other agreement or (b) a Default or an Event of Default (including breach of any Milestone), in each case under the DIP Credit Agreement shall not require an order of this Court.

37.    *Notices and Reporting to Committee and the Prepetition Term Loan* .  Any of the notices and reporting that are required to be delivered by the Debtors to the DIP Agent or the DIP Lenders pursuant to the terms hereof or the terms of the DIP Credit Agreement shall also be delivered to counsel to the Committee and counsel to the Prepetition Secured Parties, and the Debtors shall discuss same with and respond to the reasonable inquiries of the Committee or the Prepetition Secured Parties regarding such notices and reporting.

38.     All approvals, rights and defenses granted herein are granted to the extent permitted by law.

39.     The Debtors shall promptly serve copies of this Final Order to the parties having been given notice of the Interim Hearings, to any party that has filed a request for notices with this Court and to the Committee's counsel.

40.     *Indemnity*.   In addition to the indemnification provisions in the DIP Credit Agreement, the DIP Agent and DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors, jointly and severally, in respect of any claim or liability incurred with respect to the DIP Facility and the use of Cash Collateral or in any way related thereto except for claims relating to gross negligence, bad faith and willful misconduct.   No exception in contract, law or equity exists as to any obligation set forth, as the case may be, in this paragraph 40 or in the DIP Credit Agreement, to indemnify and/or hold harmless the DIP Agent or any DIP Lender, as the case may be, and any such defenses are hereby waived.

[*Remainder of page intentionally left blank.*]

**KAREN B. OWENS**
**UNITED STATES BANKRUPTCY JUDGE**

**Dated: November 19th, 2019**
**Wilmington, Delaware**

72

113674127\V-2