**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) Case No. 19-12378 (KBO) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

### DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF
### DURA AUTOMOTIVE SYSTEMS, LLC AND ITS DEBTOR AFFILIATES

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett, P.C. (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:       jsprayregen@kirkland.com
       rbennett@kirkland.com
       gregory.pesce@kirkland.com

- and -

Christopher J. Marcus, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:       christopher.marcus@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

Justin R. Alberto (No. 5126)
Erin R. Fay (No. 5268)
Daniel N. Brogan (No. 5723)
600 N. King Street, Suite 400
**BAYARD, P.A.**
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:   jalberto@bayard.com
       efay@bayardlaw.com
       dbrogan@bayardlaw.com

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1]   The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are:  Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693).  Dura Automotive Systems, LLC's service address is:  1780 Pond Run, Auburn Hills, Michigan 48326.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF DURA AUTOMOTIVE SYSTEMS, LLC AND ITS DEBTOR AFFILIATES.[2]

NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT OR THIRD-PARTY ADVISORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Joint Chapter 11 Plan of Dura Automotive Systems, LLC and Its Debtor Affiliates* (as may be amended, supplemented or modified from time to time, the "**Plan**"), attached hereto as **Exhibit A**.

ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. THE DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

Page

**ARTICLE I. INTRODUCTION**................................................................................................**1**
    A.    The Plan. ...............................................................................................................1
    B.    The Plan Structure.................................................................................................2
    C.    The Sale Transaction.............................................................................................4

**ARTICLE II. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT**.................**4**
    A.    What is Chapter 11?..............................................................................................4
    B.    Why are the Debtors sending me this Disclosure Statement?...............................4
    C.    Am I entitled to vote on the Plan?.........................................................................5
    D.    What will I receive from the Debtors if the Plan is Consummated? ......................5
    E.    How will I know if my Executory Contract or Unexpired Lease is Assumed or Rejected? ............6
    F.    What is the Process for Objecting to Assumption or Rejection of an Executory Contract or Unexpired Lease? ..................................................................................6
    G.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?.......................................................................................7
    H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?".......................................................................................................7
    I.    What are the sources of cash and other consideration required to fund the Plan? .........................7
    J.    Who supports the Plan?.........................................................................................7
    K.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ................7
    L.    Am I releasing Claims under the Plan?.................................................................8
    M.    What consideration am I receiving in exchange for releasing my claims under the Plan? ..............8
    N.    What is the deadline to vote on the Plan? .............................................................8
    O.    How will I know when the Auction occurs?..........................................................8
    P.    How do I vote for or against the Plan?..................................................................8
    Q.    Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur? ....................................................................................9
    R.    What is the purpose of the Confirmation Hearing?...............................................9
    S.    What is the effect of the Plan on the Debtors' ongoing business? .......................9
    T.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .......................................................................................................9
    U.    Do the Debtors recommend voting in favor of the Plan?....................................10

**ARTICLE III. BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES**............**10**
    A.    Corporate History................................................................................................10
    B.    Relationship with Non-Debtor, Global Automotive Systems, LLC.....................11
    C.    Business Operations.............................................................................................11
    D.    Prepetition Capital Structure. ..............................................................................14

**ARTICLE IV. EVENTS LEADING UP TO THE CHAPTER 11 CASES**.................................**15**
    A.    Disputes with the Zohar Funds and Pre-Petition Sale Efforts.............................15
    B.    The Debtors' Deteriorating Financial Condition.................................................16
    C.    Increasing Liquidity Constraints. ........................................................................17
    D.    The Debtors' Proactive Approach to Addressing Liquidity Constraints..............18

**ARTICLE V. ADMINISTRATION OF THE CHAPTER 11 CASES**....................................**18**
    A.    First Day Pleadings, the Venue Transfer, and Other Case Matters.....................18
    B.    Employment and Compensation of Advisors.......................................................20
    C.    Appointment of the Official Committee of Unsecured Creditors. .......................20
    D.    Investigation by Official Committee of Unsecured Creditors..............................21
    E.    Zohar Challenge Motion. .....................................................................................21

i

F.       Investigation by the Transaction Committee.................................................21
G.       Summary of Claims Process, Bar Date and Claims Filed. ............................22
H.       Exclusivity. ..................................................................................................22
I.        Valued Employee Program. ..........................................................................23
J.        The Bidding Procedures Motion and Sale Process. ......................................23

**ARTICLE VI. SUMMARY OF THE PLAN**.................................................................**24**
A.       General Settlement of Claims and Interests. ................................................24
B.       Sources of Plan Consideration. ....................................................................24
C.       Proposed Creditor Recoveries......................................................................24
D.       The Sale Transaction. ...................................................................................26
E.       Restructuring Transactions. ..........................................................................27
F.       Vesting of Assets. .........................................................................................27
G.       Employee Incentive Plan. .............................................................................28
H.       Wind-Down Amount. ....................................................................................28
I.        Wind-Down....................................................................................................28
J.        The Liquidating Trustee.................................................................................28
K.       The Liquidating Trust....................................................................................29
L.       The General Unsecured Claims Amount. ......................................................29
M.       Cancellation of Notes, Instruments, Certificates, and Other Documents. .....29
N.       Corporate Action............................................................................................30
O.       Dissolution of the Boards of the Debtors. .....................................................30
P.       Release of Liens. ...........................................................................................31
Q.       Effectuating Documents; Further Transactions. ............................................31
R.       Exemption from Certain Taxes and Fees. .....................................................31
S.       Causes of Action. ..........................................................................................31
T.       Closing the Chapter 11 Cases. ......................................................................31
U.       Release, Injunction, and Related Provisions. ................................................32
V.       Applicability of Insurance Policies. ..............................................................36

**ARTICLE VII. VOTING AND CONFIRMATION** .....................................................**36**
A.       *Classes Entitled to Vote on the Plan.* ...........................................................37
B.       *Votes Required for Acceptance by a Class.*..................................................37
C.       *Certain Factors to Be Considered Prior to Voting.* ......................................37
D.       *Classes Not Entitled to Vote on the Plan.* ...................................................38
E.       *Solicitation Procedures.* ...............................................................................38
F.       *Voting Procedures.* .......................................................................................39
G.       *Confirmation Objection Deadline.* ...............................................................40
H.       Confirmation Hearing. ..................................................................................40
I.        Confirmation Standards. ...............................................................................41
J.        Acceptance by Impaired Classes...................................................................43
K.       Confirmation Without Acceptance by All Impaired Classes. ........................44

**ARTICLE VIII. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**.............**45**
A.       Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims
         Under the Plan...............................................................................................45
B.       Certain Bankruptcy Law Considerations. .....................................................46
C.       Risk Factors Relating to Equity in the Purchaser Issued Under the Plan........48
D.       Disclosure Statement Disclaimer ..................................................................49
E.       Liquidation Under Chapter 7. .......................................................................50

**ARTICLE IX. MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** .................**51**
A.       Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the
         Purchaser.......................................................................................................52

B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Class 3 Term Loan Claims, Class 4 General Unsecured Claims, Class 5 Affiliate Claims, and Class 9 Dura Interests. ........................................................................................................................... 53

C.      Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 Term Loan Claims, Class 4 General Unsecured Claims, Class 5 Affiliate Claims, and Class 9 Dura Interests. ........................................................................................................................... 58

D.      Information Reporting and Withholding. ................................................................... 62

**ARTICLE X. RECOMMENDATIONS OF THE DEBTORS** .............................................................. **63**

**EXHIBITS**

**EXHIBIT A**     Joint Chapter 11 Plan of Dura Automotive Systems, LLC and Its Debtor Affiliates

# ARTICLE I.
## INTRODUCTION[3]

The Debtors submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes to accept or reject the Plan.[4]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE PLAN, IF CONSUMMATED, WILL EFFECTUATE THE TERMS OF THE SALE TRANSACTION.  EACH OF THE DEBTORS HAVE APPROVED THE PLAN AND BELIEVES THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.  AS SUCH, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ACCEPT THE PLAN BY RETURNING THEIR BALLOTS (EACH, A "BALLOT") SO AS TO BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT (AS DEFINED HEREIN) NO LATER THAN [●], 2020, AT 4:00 P.M., PREVAILING EASTERN TIME.  ASSUMING THE REQUISITE ACCEPTANCES TO THE PLAN ARE OBTAINED, THE DEBTORS WILL SEEK THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN AT THE CONFIRMATION HEARING ON [●], 2020, AT [●] [A.M/P.M.], PREVAILING EASTERN TIME.**

**THE DEBTORS BELIEVE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS.  ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**THE PLAN IS NOT CURRENTLY SUPPORTED BY THE DIP LENDERS, THE TERM LOAN LENDERS, OR THE COMMITTEE.**

A.    *The Plan.*

As more fully described below, the Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code on the Petition Date.  The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors filed the Plan, the terms of which are more fully described herein.  The Plan contemplates a transfer of the Transferred Assets to the Purchaser, whose bid for the Transferred Assets will be selected as the highest or otherwise best bid at the Debtors' Auction.  The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and Interests and to distribute all property of the Debtors' Estates that is or becomes available for distribution, in each case, generally in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Debtors' Estates, and therefore the Debtors seek to confirm the Plan.

Generally speaking, the Plan:

(a) provides for the full and final resolution of all funded debt obligations;

---

[3]    If the Plan is not confirmed or the Effective Date does not occur, the Debtors reserve all of their rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, as applicable.  Furthermore, if the Plan is not confirmed or the Effective Date does not occur, nothing in the Disclosure Statement or the Plan shall be deemed an admission by the Debtors, and the Debtors reserve all such rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, including, without limitation, all rights with respect to the consummation of the Sale Transaction contemplated herein.

[4]    The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

(b) provides for 100 percent recoveries for Holders of Allowed Administrative Claims, Priority Tax Claims, DIP Facility Claims, Professional Fee Claims, Other Priority Claims and Other Secured Claims;

(c) provides for the distribution of the General Unsecured Claims Amount to Holders of Allowed General Unsecured Claims and Affiliate Claims, in each case, to the extent such claims are not assumed by the Purchaser;

(d) provides for any net cash proceeds of the Sale Transaction remaining after General Unsecured Claims and Affiliate Claims are paid in full to be distributed to Holders of Dura Interests following entry of an order directing such distribution;

(e) cancels all Section 510(b) Claims without making any distribution on account of such claims;

(f) provides for consummation of the Sale Transaction;

(g) grants certain releases to insiders (as such term is defined in section 101(31) of the Bankruptcy Code) of and lenders to the Debtors; and

(h) designates a Liquidating Trustee to (i) wind down the Debtors' businesses and affairs, (ii) pay and reconcile Claims as provided in the Plan, and (iii) administer the Plan in an effective and efficient manner.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Plan classifies Holders of Claims and Interests according to the type of the Holder's Claim or Interest, as more fully described below.  Holders of Claims and Interests in Class 3 (Term Loan Claims), Class 4 (General Unsecured Claims), Class 5 (Affiliate Claims), and Class 9 (Dura Interests) are entitled to vote to accept or reject the Plan.

B.      *The Plan Structure.*

The Plan proposes to fund creditor recoveries from Cash on hand, the Sale Transaction Proceeds (if any), the General Unsecured Claims Amount, the Wind-Down Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code, the return of any utility deposits as set forth in the Utility Order, and all Causes of Action not previously settled, released, or exculpated under the Plan, if any.  The Debtors intend to consummate the Sale Transaction with the bidder that provides the highest or otherwise best offer as contemplated under the Bidding Procedures Order, the Sale Transaction Documentation, and the Plan.

Pursuant to the Plan, the Debtors or the Liquidating Trustee shall pay or provide for payments of Claims and Interests as follows.

- Priority Claims will be paid in full on the Effective Date (or, in the case of Priority Tax Claims, treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code).

- Holders of Other Secured Claims shall receive, at the election of the Debtors:

    o   (i) payment in full in Cash of such Allowed Other Secured Claim;

    o   (ii) the Collateral securing such Allowed Other Secured Claim;

    o   (iii) Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or

2

- o (iv) such other treatment rendering such Allowed Other Secured Claim Unimpaired.

- DIP Facility Claims will be paid in full in cash, except to the extent such DIP Facility Claims are credit bid pursuant to the terms of the Sale Transaction Documentation.

- Holders of Term Loan Claims will receive either:

  - o (i) in the event the Sale Transaction is a Term Loan Credit Bid Transaction, its Pro Rata share of either (w) equity in the Purchaser entity that purchases the Assets, or (x) the Assets, in each case pursuant to the Sale Transaction Documentation; or

  - o (ii) in the event the Sale Transaction is not a Term Loan Credit Bid Transaction, payment in full in Cash on the Effective Date.

- Holders of General Unsecured Claims will receive their Pro Rata share of the General Unsecured Claims Amount; *provided*, however, that all General Unsecured Claims that are assumed by the Purchaser pursuant to the Sale Transaction Documentation shall be satisfied by the Purchaser in full in Cash following the Effective Date in the ordinary course of business.

- Holders of Affiliate Claims will receive their Pro Rata share of the General Unsecured Claims Amount.

- Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date.

- Holders of Dura Interests will receive either:

  - o (i) if the Sale Transaction Proceeds are sufficient to pay all Allowed General Unsecured Claims and Affiliate Claims in full, then (a) Holders of Dura Interests shall receive any remaining proceeds of the Sale Transaction Proceeds after all Allowed General Unsecured Claims and Affiliate Claims are paid in full from the Liquidating Trust, and (b) the Dura Interests will be canceled, released, and extinguished, and will be of no further force or effect; *provided* that the Dura Interests shall not be canceled until the entry of a Final Order in these Chapter 11 Cases or the Zohar Chapter 11 Cases directing such cancellation. No holder of Dura Interests shall receive any proceeds from the Debtors or the Liquidating Trust until a Final Order is entered in these Chapter 11 Cases or the Zohar Chapter 11 Cases directing a distribution to the Holders of Dura Interests; or

  - o (ii) if the Sale Transaction Proceeds are ***not*** sufficient to pay all Allowed General Unsecured Claims and Affiliate Claims in full, then the Dura Interests will be canceled, released, and extinguished, and will be of no further force or effect, and each Holder of a Dura Interest will not receive any distribution on account of such Dura Interest; *provided* that the Dura Interests shall not be canceled until the entry of a Final Order in these Chapter 11 Cases or the Zohar Chapter 11 Cases directing such cancellation.

The Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims and Interests in Class 3 (Term Loan Claims), Class 4 (General Unsecured Claims), Class 5 (Affiliate Claims), and Class 9 (Dura Interests) to vote to accept the Plan.

C.      *The Sale Transaction.*

The Plan contemplates the sale of substantially all of the assets of the Debtors (the "<u>Sale Transaction</u>") in accordance with the terms and conditions set forth in the Sale Transaction Documentation, the Bidding Procedures Order and the Plan.  Generally, the Sale Transaction contemplates that:

(a)     on the Effective Date, the Purchaser shall assume substantially all obligations owed by the Debtors to their customers and trade vendors that are expected to continue to do business with the Purchaser in the ordinary course of business following the Effective Date. Following such assumption by the Purchaser, the Purchaser shall satisfy such obligations in cash following the Effective Date, and for the avoidance of doubt, any obligations that are assumed by the Purchaser shall cease to be Claims against the Debtors;

(b)     the Debtors shall, among other things, transfer the Transferred Assets, comprised of the Purchased Assets, the Transferred Causes of Action, and the Interests of any Debtors that are transferred to Purchaser as part of the Sale Transactions, pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, the Plan and the Confirmation Order;

(c)     in the event the Sale Transaction is a Term Loan Credit Bid Transaction, the Purchaser may issue, or cause to be issued, the equity in the Purchaser for eventual distribution to the Holders of Allowed Term Loan Claims;

(d)     Cash proceeds (if any) of the Sale Transaction will be used to make payments or distributions pursuant to the Plan; and

(e)     the Purchaser shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and the Plan.

## ARTICLE II.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT

A.      *What is Chapter 11?*

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.      *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Plan contemplates a sale of the Debtors' assets to the

Purchaser, and this Disclosure Statement is being submitted to provide information about this transaction and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.      *Am I entitled to vote on the Plan?*

        Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any).  Each category of Holders of Claims or Interests in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

        1.      *Summary of Classification*

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Term Loan Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Affiliate Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Dura Interests | Impaired | Entitled to Vote |

D.      *What will I receive from the Debtors if the Plan is Consummated?*

        The following table provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| Class | Claim/Interest | Estimated Allowed Amount (In Millions) | Anticipated Recovery |
|-------|---------------|----------------------------------------|----------------------|
| 1 | Other Priority Claims | $[●] | 100% |
| 2 | Other Secured Claims[5] | $[●] | [●]% |
| 3 | Term Loan Claims | $[●] | [●]% |

---

[5]      The projected amount of Allowed Other Secured Claims set forth herein assumes that the value of the collateral securing such obligations is sufficient in amount to satisfy such Allowed Other Secured Claims in full.

| Class | Claim/Interest | Estimated Allowed Amount (In Millions) | Anticipated Recovery |
|---|---|---|---|
| 4 | General Unsecured Claims | $[●] | [●]% |
| 5 | Affiliate Claims | $[●] | [●]% |
| 6 | Intercompany Claims | $[●] | [●]% |
| 7 | Intercompany Interests | N/A | [●]% |
| 8 | Section 510(b) Claims | $[●] | [●]% |
| 9 | Dura Interests | N/A | [●]% |

E.      *How will I know if my Executory Contract or Unexpired Lease is Assumed or Rejected?*

Pursuant to the Bidding Procedures Order, the Debtors filed the preliminary Assumed Contracts and Leases List on December 10, 2019 [Docket No. 407].  The final version of the Assumed Contracts and Leases List will list all Executory Contracts and Unexpired Leases that are expected to be assumed or assumed and assigned to the Purchaser, as well as the proposed Cure Costs.  A revised version of the Assumed Contracts and Leases List will be included in the Plan Supplement.  All Executory Contracts and Unexpired Leases that are not included in the final Assumed Contracts and Leases List shall be automatically rejected as of the Effective Date, subject to certain exceptions set forth in the Plan.  Further, the Debtors expressly reserve the right to (a) add and/or remove any Executory Contract or Unexpired Lease from the Assumed Contracts and Leases List and assume or reject such Executory Contract or Unexpired Lease, pursuant to the terms of the Plan and the Sale Transaction Documentation, up until the Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease, all subject to the consent of the Purchaser.

Unless otherwise provided by a Final Order of the Bankruptcy Court, any Proof of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed with the Bankruptcy Court and served on the Debtors or, after the Effective Date, the Liquidating Trustee, as applicable, no later than 30 days after the effective date of the rejection of such Executory Contract or Unexpired Lease.  In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served on the Debtors or, after the Effective Date, the Liquidating Trustee, as applicable, no later than 14 days after service of the Debtors' proposed rejection of such Executory Contract or Unexpired Lease.

F.      *What is the Process for Objecting to Assumption or Rejection of an Executory Contract or Unexpired Lease?*[6]

If you object to proposed Cure Costs or a proposed assignment to the Purchaser of any Executory Contract or Unexpired Lease that appears on the preliminary Assumed Contracts and Leases List, your objection must have been Filed **not later than January 7, 2020, at 5:00 p.m., prevailing Eastern Time**, as set forth in the Bidding Procedures Order; *provided*, however, that the Debtors may serve a supplemental notice of proposed assumption at any time prior to the Effective Date, and you shall have 14 days following the date of service of such supplemental notice to file your objection.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption and assignment or cure amount will be deemed to have consented to such assumption.  Counterparties to such Executory Contracts or Unexpired Leases shall also have until the Confirmation Hearing to

---

[6]    Capitalized terms in this section shall have the meanings ascribed to them in the Bidding Procedures Order.

object to the assumption or assumption and assignment of any such Executory Contracts or Unexpired Leases on the basis of uncured defaults incurred after service of the applicable notice.

If you object to the proposed rejection of any Executory Contract or Unexpired Lease, your objection must be filed with the Bankruptcy Court and served and **_actually_** **_received_** **no later than 14 days following the date of service of the notice of rejection, at 4:00 p.m., prevailing Eastern Time**.  Further, the Debtors expressly reserve the right to serve a supplemental notice of rejection at any time prior to the Effective Date.

As part of the Solicitation Packages and/or Non-Voting Status Notices to be distributed to all Holders of Claims and Interests pursuant to the Disclosure Statement Order, the Debtors will include in the *Notice of Rejection of Executory Contracts and Unexpired Leases* a specific statement that if certain, but not all, of a contract counterparty's Executory Contracts and Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order will be a determination that such counterparty's Executory Contracts and Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and Unexpired Leases that are being assumed pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection by the Confirmation Objection Deadline on the grounds that their agreements are integrated and not severable.

G.      *What will I receive from the Debtors if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims, DIP Facility Claims, and Priority Tax Claims will be satisfied as set forth in Article II of the Plan.

H.      *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"*

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims and Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  "Consummation" means the occurrence of the Effective Date.

I.      *What are the sources of cash and other consideration required to fund the Plan?*

The Plan will be funded by the following sources of cash and consideration:  (i) Cash on hand; (ii) the Sale Transaction Proceeds (if any); (iii) the General Unsecured Claims Amount; (iv) the Wind-Down Amount; (v) the Debtors' rights under the Sale Transaction Documentation; (vi) payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation; (vii) payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code; (viii) the return of any utility deposits as set forth in the Utility Order; and (ix) all Causes of Action not previously settled, released, or exculpated under the Plan, if any.

J.      *Who supports the Plan?*

The Plan is supported by the Debtors.  At this time, the Plan is not supported by the DIP Lenders, the Term Loan Lenders, or the Committee, however, the Debtors intend to continue discussions with the DIP Lenders, the Term Loan Lenders, and the Committee to garner additional support for the Plan.

K.      *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, the Plan provides for releases and exculpation of the Debtors and other parties in interest as set forth in Article IX of the Plan.  In addition to the releases in favor of those parties and the other Released Parties, there is an

injunction against bringing claims and causes of action that were released against the Released Parties and Exculpated Parties.

Notwithstanding anything to the contrary in the Plan, no Person or Entity shall be exculpated (a) from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order, or (b) with respect to any disputes involving the Zohar Debtors that are unrelated to Dura or the other Debtors, including any disputes involving the Zohar Portfolio Companies or the ownership thereof (including the ownership of Dura's parent entity, Dura Buyer, LLC), the Zohar Settlement Agreement, the Zohar Monetization Process, or related matters (in each case, other than any disputes relating to the Debtors).

L.    *Am I releasing Claims under the Plan?*

The Plan provides that (a) all Holders of Claims and Interests that are presumed to accept the Plan **and** who do not opt out of the releases in the Plan, (b) all Holders of Claims and Interests who vote to accept the Plan, and (c) all Holders of Claims or Interests that (x) abstain from voting on the Plan **and** who do not opt out of the releases in the Plan, (y) vote to reject the Plan **and** who do not opt out of the releases in the Plan, or (z) are deemed to reject the Plan **and** who do not opt out of the releases in the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Released Parties (the "Third Party Releases").

The "Released Parties" include, among other parties, all insiders of the Debtors, including their current and former officers and directors, the DIP Lenders, and all substantial prepetition lenders to the Debtors, solely in their capacities as such, including their current and former shareholders, officers, and directors.  Notwithstanding the foregoing, the Term Loan Lenders shall not be Releasing Parties with respect to any of the Patriarch Parties.

To the extent the Sale Transaction is consummated under the Plan, the Purchaser may be a Releasing Party and Released Party, subject to reaching definitive documentation with the Purchaser with respect to the Sale Transaction.

The Debtors will file a Schedule of Non-Released Parties in the Plan Supplement which will list certain Non-Released Parties and the capacities in which such parties are Non-Released Parties.  The Non-Released Parties will be determined by the independent managers of Dura.

M.    *What consideration am I receiving in exchange for releasing my claims under the Plan?*

The consideration for releasing Claims under the Plan is the mutual releases provided by Released Parties to all other Released Parties.  The Debtors believe that this constitutes sufficient exchange of consideration in accordance with recent chapter 11 cases.

N.    *What is the deadline to vote on the Plan?*

The Voting Deadline is [●], 2020, at [●] [a.m./p.m.], **prevailing Eastern Time**.

O.    *How will I know when the Auction occurs?*

The Auction is currently scheduled to occur on **February 26, 2020, at 10:00 a.m., prevailing Eastern Time**, and may be rescheduled by the Debtors by filing a notice on the docket.  The Auction will be held at the offices of counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022.

P.    *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.  For your vote to be counted, you must submit your ballot in

accordance with the instructions provided in **Article VII.F.2** of this Disclosure Statement.  **BALLOTS SENT BY FACSIMILE TRANSMISSION ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

Q.      *Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?*

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for **[●], 2020, at [●] [a.m./p.m.], prevailing Eastern Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *The New York Times* (national edition), the *Detroit Free Press*, and the *Tennessean* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

R.      *What is the purpose of the Confirmation Hearing?*

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose prior to the effective date of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

The deadline by which all objections to the Plan (including any Successful Bids (as defined in the Bidding Procedures)) must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is **[●], 2020, at [●] [a.m./p.m.], prevailing Eastern Time**.

S.      *What is the effect of the Plan on the Debtors' ongoing business?*

Upon consummation of the Plan and the Sale Transaction, it is anticipated that substantially all of the Debtors' assets will be transferred to the Purchaser.

T.      *Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Prime Clerk LLC:

> *By Hand Delivery or Overnight Mail at*:
> Dura Automotive Systems, LLC Claims Processing Center
> c/o Prime Clerk LLC
> One Grand Central Place
> 60 East 42nd Street, Suite 1440
> New York, NY 10165
>
> *By electronic mail at*:
> duraautoinfo@PrimeClerk.com
>
> *By telephone at*:
> (877) 468-4591

Copies of the Plan, this Disclosure Statement and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice and Claims Agent at https://cases.primeclerk.com/DuraAutomotive (free of charge) or the Bankruptcy Court's website at https://ecf.deb.uscourts.gov (for a fee).

U.    *Do the Debtors recommend voting in favor of the Plan?*

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a sale of substantially all of the Debtors' assets to the Purchaser, is in the best interest of all Holders of Claims and Interests, and that other alternatives fail to realize or recognize the value inherent under the Plan.

## ARTICLE III.
## BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES

A.    *Corporate History.*

Dura (collectively with its debtor and nondebtor affiliates, the "Company"), formerly known as Dura Automotive Systems, Inc., was formed in 1990 by Hidden Creek Industries, Onex Corporation, J2R Corporation, and certain other investor groups that acquired Dura Automotive Hardware and Mechanical Components from the Wickes Manufacturing Company.  During the 1990's, Dura grew rapidly through a series of acquisitions in support of its former strategy of providing complete systems to its automotive original equipment manufacturer ("OEM") customers.

Beginning in February 2006, Dura embarked on substantial restructuring initiatives to achieve long-term profitability in North America and Europe, and, on October 30, 2006, Dura and its United States and Canadian subsidiaries (collectively, the "2006 Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "2006 Restructuring Cases").  The 2006 Restructuring Cases focused on (a) consolidating the 2006 Debtors' manufacturing footprint by closing underutilized high-cost facilities and transferring production to lower cost countries and "best in cost" facilities,  (b) identifying and selling non-core assets and assets with *de minimis* value, and (c) securing new long-term accommodation agreements with key customers.

On May 13, 2008, the bankruptcy court overseeing the 2006 Restructuring Cases entered an order confirming the 2006 Debtors' joint chapter 11 plan of reorganization and on June 27, 2008, the 2006 Debtors emerged from chapter 11.  Following the 2006 Debtors' emergence from bankruptcy, a group of financial and former mezzanine investors in the 2006 Debtors purchased or acquired the post-reorganized equity securities of these entities.  Shortly thereafter, Dura was confronted with sizeable operational and financial challenges, including a significant liquidity crisis as a result of the 2008/2009 global automotive and economic crisis, and Dura's resulting inability to access fresh investment capital.

Affiliates of investment firm Patriarch Partners, LLC (collectively, "Patriarch") acquired a majority equity stake in Dura and recapitalized the Company during this period of financial, operational, and industry-wide distress. In November 2009, Patriarch formed Dura Buyer, LLC ("Dura Buyer") and Dura Buyer acquired a controlling interest in Dura Automotive, Inc.  Dura Buyer owns and controls a 73% equity interest in Dura, with the remaining 27% belonging to ten investing entities, none of which are individuals.  Dura Buyer is controlled by Lynn Tilton as manager.

Today, headquartered in Auburn Hills, Michigan, the Company is a global Tier 1 automotive supplier specializing in the design, engineering, and manufacturing of products that support the evolution of automotive mobility, with a special recent emphasis on the electric vehicle.  The Company is nationally certified in the United States by the Women's Business Enterprise Council, and operates 25 facilities in 13 countries throughout North America, South America, Europe, and Asia.  The Company produces a broad array of automotive products and systems, however, over the past four years, the Company has focused its portfolio to meet the next generation of

10

automotive platforms and has strategically exited low-margin to no-margin business lines.  The Company employs approximately 7,400 individuals worldwide, 800 of which are located in the United States.

       B.     *Relationship with Non-Debtor, Global Automotive Systems, LLC.*

In 2005, Ms. Tilton, the Debtors' Chief Executive Officer, formed Global Automotive Systems, LLC ("GAS"), as a Patriarch portfolio company.  GAS acquired and consolidated certain assets and operations of various automotive companies, thereby transforming GAS into a robust and innovative manufacturing platform.  Under Ms. Tilton's management, Dura and GAS have been transformed into profitable Tier 1/Tier 2 suppliers that offer complementary services to OEMs across the globe.  While the assets and liabilities of Dura and GAS are managed separately, on January 21, 2010, Dura and GAS entered into the GAS Management Services Agreement that has allowed the two companies to share a leadership team, increase their operating efficiencies, and capitalize on synergies between the two companies.

C.     *Business Operations.*

The Company is a leading independent designer and manufacturer of automotive systems, including mechatronic systems,[7] exterior systems, and lightweight structural systems, among others.  The Company's three main product segments generated approximately $1.1 billion in global sales in 2018, and the Company's products are supplied for uses in many of the most popular car, light truck, sport utility, and multi-activity-vehicle models worldwide.  The Company markets its products to most major OEMs in North America, South America, Asia, and Europe, as well as many leading Tier 1 automotive suppliers.  The Company's manufacturing, sales, and engineering centers in Brazil, China, the Czech Republic, France, Germany, India, Japan, Korea, Mexico, Portugal, Romania, the United Kingdom, and the United States serve the Company's worldwide customer base by providing customers with convenient design and engineering expertise close to the customers' development locations.

     1.    *Products.*

The Company's OEM customers typically award contracts to supply products for a particular vehicle platform.  These contracts often cover the life of the model of the vehicle, which is typically five to seven years, and generally do not require the OEM customer to commit to purchasing a minimum quantity.  Before a supply contract is awarded, the Company must undergo a rigorous certification process for each part or assembly that will be integrated into the customer's final product.  Most of the parts the Company produces have a lead-time of two to three years from product development to production, due to extensive required evaluation and testing.  Even after the Company has been awarded a new contract, and before the start of production, extensive behind-the-scenes work and investment occurs.  Before the start of production and the receipt of revenue, companies in the automotive industry must invest heavily in time, production capital, engineering, design, technology, capital equipment, and tooling.  These investments are generally funded by cash from operations, capital leases, or the incurrence of additional indebtedness.

The Company works with its OEM customers through the full cycle of product development, from concept vehicle and prototype to the design and manufacturing processes.  The Company will often place engineers at OEM facilities to coordinate its product design and manufacturing efforts with those of the OEMs.  Because the entire process is lengthy, it is often several years before the Company realizes any revenues related to its investment in new equipment, tooling, and engineering supporting new production.

The Company generally competes for new business at the beginning of the development process for new and successor vehicle platforms.  The Company's failure to obtain new business on new models or to retain and increase business on redesigned platform extensions on existing models or new vehicles adversely affects the Company's long-term business and financial results.  The Company's reliance on any particular model historically has been minimized because the Company supplies parts for a broad cross-section of both new and mature models.  However, the relatively long lead times required for the production of many of the Company's complex structural components,

---

7    Mechatronic systems utilize microprocessors and software to control the motion of mechanical devices.

11

and the lengthy process associated with obtaining awards of new business from the OEMs make it difficult for the Company to obtain any substantial new sales arrangements to replace any unexpected decline in the sale of existing products.

During 2018 and the first three quarters of 2019, the Company was awarded an estimated $3.2 billion in new business contracts, based on volume expectations, program durations, and industry forecasts. These new business awards will require approximately $162 million of capital investments in order for the Company to meet production expectations. While these new business awards are expected to generate significant revenue over time, these business platforms will not generate steady revenue and profitability until approximately 2022. Specifically, the Company's largest new business contract was awarded in 2018 by a European OEM for the manufacturing and production of an electric vehicle battery tray for the OEM's vehicles through 2029.

Additionally, the Company's 2019 new business awards included significant global contracts in mechatronic, automatic, and manual gear shifter systems, including shift-by-wire, mechatronics systems, high-end exterior trim, and structural and safety systems, including high strength frame components. Although the Company sells a portion of its products directly to OEMs as finished components, most of the Company's products are used to produce "systems" or "subsystems," which are groups of component parts located throughout the vehicle that operate together to fulfill a specific vehicle function. The Company is organized into three global product segments:  (a) Structures; (b) Mechatronics and Control Systems; and (c) Exteriors.

      (a)      Structures.

The Company is an industry leader in fabricating automotive products with lightweight and tailored mixed materials, including aluminum and high strength steels. The Company's award-winning manufacturing forming processes include roll-forming of advanced geometries, robotic stretch-bending, hydroforming, stamping, welding, and precision machining. The Company's structures segment focuses on lightweight structural products, including cross car beams, door systems, suspension products, steering components, and battery trays, among others.

      (b)      Mechatronics Control Systems.

In 2017, the Company launched its latest state-of-the-art electronics manufacturing facility at its headquarters in Auburn Hills, Michigan. The mechatronics product segment offers, among other things, shift-by-wire controls, shift-by-wire actuators, automatic transaxle ("ATX") and manual transaxle ("MTX") cable shift systems, lighting technologies, tubes and fuel rails, manual park release cables, and guide controls and inertia modules. The Company's shift-by-wire mechatronic actuators and human machine interfaces play a crucial role in electrifying traditional and advanced ATX and MTX gearbox systems. The Company also uses cutting-edge automated manufacturing processes to reliably produce the precision printed circuit boards that drive its mechatronic and advanced driver assistance systems ("ADAS") solutions. The Company is currently exploring monetization options for its ADAS operations, including obtaining a joint venture partner.

      (c)      Exterior Trim.

The Company creates award-winning trim solutions through advanced forming techniques in stretch-bending, roll-forming, anodizing and nano-surface finishing. The Company's exterior trim product segment focuses on complete exterior trim systems, guide and roof rails, injection molded and pillar cappings, and decorative body components, among others.

      2.    *Supply and Logistics Support.*

The Company's products require a variety of raw materials, including aluminum, steel, composite mixed materials, and resin. The Company transacts with a number of raw materials suppliers and brokers, and limits its dealings to parties who have consistently delivered raw materials meeting the levels of quality and grade specified by the Company's OEM customers. If the Company outsources component parts used in its products, the Company—after a rigorous selection process—usually relies on a single vendor as the "sole source" supplier for that particular component. These outside components result from years-long collaboration, customization, testing and production

processes between the Company, its lower-tiered supplier, and the OEMs.  In the process of manufacturing line-ready parts, the Company is often recommended to purchase certain sub-components from suppliers identified by the OEMs.[8]

To minimize costs, allow for rapid shifts in manufacturing output, and in response to consumer purchasing trends, the automotive supply chain follows the "just-in-time" model.  Under this model, suppliers typically maintain no more than one to three days' inventory of parts and raw materials at each key junction in the production process, and schedule delivery of components in part number sequence directly to the assembly line at specified times and for certain parts.  The Company, in order to be a viable automotive supplier, has adopted this model both in delivering its products and managing its own supply chain, however, at this time (and as discussed further below), due to liquidity constraints, the Company has struggled to maintain sufficient inventory to meet its customers' needs.

Due in part to the customization of products, the parts produced by the Company are the culmination of a lengthy and intensive development, testing, and manufacturing process.  Before the manufacturing of a product commences, the Company must decide whether it will produce some or all of the component parts for a given product or outsource to third-party suppliers.  If outside suppliers are needed, the Company—through its own rigorous selection process—typically contract with one vendor for a particular component and rely on that vendor as its sole source supplier.  Significantly, the parts sourced by the Company are not standard parts that can be purchased from multiple suppliers, but rather custom parts that were sole-sourced, years in advance of production, and designed to fit the Company's needs.  Using sole-source suppliers allows the Company to reduce the cost of production startup, capital investment, and the validation cost necessary to make each part and to achieve a consistent quality.

While sole sourcing is normal practice in the global automotive industry and is necessary to remain cost-competitive, sole sourcing is primarily driven by rigorous certification standards.  For example, the Company and its suppliers must undergo the "Production Part Approval Process" ("PPAP") for each part that is integrated into the products shipped to OEM customers or other Tier 1 suppliers, and ultimately incorporated into a completed vehicle.  The parts produced by the Company and assembled components of these parts, respectively, must meet demanding specifications mandated both by the Company and the OEM customers, as well as federally-mandated safety standards, before the parts can be used in the Debtors' manufacturing processes.

Validation and qualification of each part requires extensive testing and evaluation, all of which takes, at least, several months to complete and generally is frozen once the OEM customer conducts final crash testing.  Due to these extensive design, development, certification, and testing requirements, the process by which the Company and its OEM customers select and certify a new supplier normally takes six months to two years.  Such lag-time and the just-in-time inventory process restrict the Company's ability to expeditiously re-source many of its vendors following the awarding of the contract but prior to production.  Further, most OEM customer contracts explicitly prevent the Company from changing suppliers, and in many instances the OEM customer must re-test a vehicle if a new supplier, new material, new location, or new processes are inserted into that vehicle's supply chain.  In short, the Company cannot readily re-source a part and shift its business to another supplier after undergoing the above-described process without losing its certification for that part (and potentially losing the OEM customer contract).  Thus, any disruption at any level of the production process could have a dramatic ripple effect up and down the automobile supply chain.

3.  *Legal Proceedings.*

From time to time, the Debtors are involved in various lawsuits that either arise out of or are incidental to conducting business in the ordinary course.  Such proceedings include contract disputes and employment matters, among other things, that have been brought against the Debtors. There are also lawsuits that the Company has initiated against third parties in an effort to protect its rights.  The Debtors believe that the pending legal proceedings are not material and likely will not adversely affect their operations and financial conditions.

---

[8]    A more detailed discussion of the critical nature of the Debtors' supply chain is set forth in the *Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing Payments of Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(b)(9) Vendors, Lien Claimants, and Shippers* [Docket No. 11].

4. *Employees.*

As of October 1, 2019, the Company employed approximately 800 individuals in the United States. Approximately 14% of the Company's U.S. employees are unionized, and most non-U.S. employees are members of industrial trade union organizations and confederations within their respective countries.  Dura Automotive Systems, LLC is party to a collective bargaining agreement dated February 1, 2018 (the "CBA"), with Local 2417 of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union"). Pursuant to the CBA, the Union is the sole collective bargaining representative for all production and maintenance employees, including shipping and receiving employees, quality engineer technicians, quality leads, R&D technicians, tool and die makers, and janitors employed by the Company at its Freemont Michigan plant.  In connection with the Asset Sale, the Company's CBA will be assumed by the Purchaser.

The Debtors provide certain eligible employees with health and welfare benefit plans, including medical and prescription drug, dental, and vision plans.  The Debtors are also subject to workers' compensation laws in the states in which they operate or used to operate.  The Debtors' maintain workers' compensation coverage through third party insurance providers and the Debtors may be required to contribute additional premiums in the future depending on the number and amount of claims.

D.      *Prepetition Capital Structure.*

Dura currently owns, directly or indirectly, each of Dura's eight North American subsidiaries.  Of these wholly-owned entities, six entities are obligated on the Debtors' funded debt.  As of the Petition Date, the Debtors had approximately $130 million in total funded debt obligations, consisting of approximately $26 million under a senior secured asset-based revolving credit facility (the "ABL Facility") and approximately $104 million in aggregate principal amount outstanding under the Debtors' secured term loan (the "Term Loan Facility").

The following table depicts the Debtors' prepetition capital structure:

| Funded Debt | Maturity | Outstanding Principal Amount as of 10/6/19 |
|---|---|---|
| Secured Debt | | |
| ABL Facility | December 31, 2019 | $25.8 million |
| Term Loan Facility | July 8, 2019 | $104 million |
| Total Funded Debt | | $129.8 million |

1. *The ABL Facility.*

Dura Automotive Systems, LLC, Dura Operating, LLC ("Dura Operating"), Dura Automotive Systems Cable Operations, LLC ("Dura Cable"), Dura Fremont L.L.C. ("Dura Fremont"), and Dura G.P., as borrowers, Dura Mexico Holdings, LLC ("Dura Mexico") and NAMP, LLC, as guarantors, ARK II CLO 2001-1, Limited, as lender, and Patriarch Partners Agency Services, LLC (the "ABL Agent"), successor by assignment from Wells Fargo Capital Finance, LLC, as agent, are parties to a credit agreement, dated January 21, 2010 (as amended, restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement").

As of the Petition Date, the ABL Facility was supported by a borrowing base calculated monthly, primarily based on eligible accounts receivable and inventory levels.  The obligations arising under the ABL Credit Agreement were secured by a first-priority lien on substantially all of each borrower's and guarantor's assets, including accounts receivable, goods, and inventory, among other things, and a second priority lien on the Debtors' assets that secure the Term Loan Facility Facility.  Pursuant to the Payoff Letter dated October 25, 2019, attached as Exhibit A to the Final DIP Order, the ABL Facility was repaid in full by the Debtors through proceeds of the DIP Facility.

2.    *The Term Loan Facility.*

Dura Operating, as borrower, Dura, Dura Cable, Dura Mexico, Dura Fremont, NAMP, LLC, and Dura G.P., as guarantors, Zohar II 2005-1, Limited ("Zohar II") and Zohar III, Limited ("Zohar III"), as lenders, and Ankura Trust Company, LLC (the "Term Loan Agent"), as successor to the prior term loan agent, as agent, are parties to a term loan agreement dated January 21, 2010 (as amended, restated, supplemented, or otherwise modified from time to time, the "Term Loan Credit Agreement"). The Term Loan Facility is secured by a first-priority lien on substantially all of the Debtors' U.S. assets other than the assets securing the ABL Facility, and a junior lien on substantially all of the Debtors' assets that secure the ABL Facility. The maturity date for the Term Loan Facility was July 8, 2019. The Debtors did not pay the interest payment due on October 1, 2019, pursuant to the terms of the Term Loan Credit Agreement. As of the Petition Date, approximately $104 million in aggregate principal amount remained outstanding under the Term Loan Facility.

3.    *The Intercreditor Agreement.*

Prior to the DIP Lenders' repayment of the ABL Facility, the relative contractual rights and priorities of the Prepetition ABL Secured Parties, the Term Loan lenders, and the Term Loan Agent with respect to the Debtors' shared collateral was governed by that certain Intercreditor Agreement, dated as of January 21, 2010 (as amended, restated, supplemented, or otherwise modified from time to time, the "Intercreditor Agreement"). The Intercreditor Agreement also governs the relative contractual rights of lenders to certain debt held by non-Debtor affiliates in Europe.

## ARTICLE IV.
## EVENTS LEADING UP TO THE CHAPTER 11 CASES

A.    *Disputes with the Zohar Funds and Pre-Petition Sale Efforts.*

On March 11, 2018, Zohar CDO 2003-1, Limited ("Zohar I"), Zohar II, Zohar III (together with Zohar I and Zohar II, the "Zohar Funds"), and certain of their affiliates (collectively, the "Zohar Debtors") filed the Zohar Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware. As set forth in the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions*, [Zohar Chapter 11 Cases Docket No. 5] (the "Zohar First Day Declaration"), the Zohar Funds raised capital by issuing notes to noteholders (the "Zohar III Noteholders"). In turn, the Zohar Funds loaned money to certain distressed companies (collectively, the "Portfolio Companies"), including Dura Operating. Pursuant to the Zohar First Day Declaration, substantial value had been, and now remains locked up in the Portfolio Companies as a consequence of the litigation pursued by the Zohar Funds' then collateral manager, Alvarez & Marsal Zohar Management LLC ("AMZM"), at the direction of (a) Zohar I and Zohar II's controlling creditor, MBIA Insurance Corporation ("MBIA"), and (b) the Zohar III Noteholders.

AMZM, MBIA, and the Zohar III Noteholders have alleged that the Zohar Funds are the beneficial owners of the Portfolio Companies' equity interests that are recorded in the names of the Zohar Funds. On the other hand, Ms. Tilton has alleged that the Zohar Funds are not the rightful beneficial owners of the equity interests in the Portfolio Companies, and were never structured to own equity. The ongoing litigation regarding who holds beneficial ownership of the equity in the Portfolio Companies has cast a cloud of uncertainty over the Company. As a result of the protracted litigation regarding the beneficial ownership of the Portfolio Companies, the Company has been unable to refinance its existing debt facilities, has lost access to routine capital lease financing and credit insurance, and is losing the confidence of the OEMs and the supply base.

In May 2018 the Company engaged Jefferies LLC ("Jefferies") to provide investment banking services related to a potential sale, disposition or other business transaction involving all or a material portion of the equity or assets of one or more entities comprising Dura and GAS. Thereafter, the Company commenced a protracted and intensive effort to market the Debtors' business to potential financial and strategic buyers. Following extensive due diligence and the preparation of marketing materials in the summer of 2018, the Company and Jefferies identified and contacted a broad array of potentially interested parties that had the ability to consummate a transaction with respect to some or all of the marketed assets. Specifically, Jefferies contacted 59 entities, including 31 potential strategic buyers and 28 potential financial buyers prior to the commencement of these Chapter 11 Cases.

In connection with these marketing efforts, Jefferies provided certain parties with diligence materials including, but not limited to, a confidential information memorandum ("CIM") and letters with respect to a quality of earnings report. By November 2018, eight parties expressed interest in a potential transaction and provided initial indications of interest ranging in value from $400 million to $875 million based on a 2018 pro forma adjusted EBITDA for the Company and GAS of $152 million.

Subsequent to receiving initial indications, the Company experienced significant headwinds resulting from (a) the closure costs associated with its facility in Plettenberg, Germany, (b) reduced European volumes, and (c) tariffs based on trade tensions between the United States and China. As a result of the foregoing, fiscal year 2018 actual results were below the forecast provided in the CIM, with 2018 actual adjusted EBITDA of $121 million. Further, many buyers were concerned about a near-term downturn in the automotive industry, causing skepticism regarding Dura's forecasted sales volumes and profitability. Many potential buyers were unwilling to give the Company full credit for its Plettenberg shutdown, recent new business awards, significant growth initiatives, and current forecast. The Company found it prudent to put the sale process on hold until the Plettenberg operations were successfully wound-down and the new battery tray business was closer to launch. As such, the Company explored financing alternatives to resolve the Debtors' July 2019 term loan maturity and finance capital equipment purchases.

As part of these refinancing efforts, the Company explored the possibility of a new money financing in the European debt markets for Dura Automotive Systems GmbH, a non-Debtor subsidiary. The Company intended to use any resulting proceeds to refinance the Debtors' ABL Facility and Term Loan Facility, marketed on a pro forma adjusted EBITDA of $121 million for the twelve-month period ended December 31, 2018. In January 2019, the Company and Jefferies drafted a European financing investor presentation that was presented to certain of the Company's existing lenders and potential new lending partners in Frankfurt, Germany, as well as certain credit funds in London, England.

While the Company's existing lenders and other lending partners continued to work towards internal financings commitments, the Company and Jefferies embarked on a parallel-track syndicated financing of a €20 million revolving credit facility and €200 million term loan facility with an expected timeline for completion by the end of March, or beginning of April 2019. Despite these extensive marketing efforts, the Company was ultimately unsuccessful in obtaining financing commitments and many potential lenders indicated that they were unwilling or unable to provide financing while the Zohar ownership dispute remained unresolved.

B.    *The Debtors' Deteriorating Financial Condition.*

1.    *Impact of Relationship with the Zohar Funds.*

The impact of the Company's inability to obtain a definitive resolution to the various issues stemming from the Zohar ownership dispute has negatively impacted the Debtors' operations. The Debtors were denied credit insurance by two leading credit insurance providers in 2018 and lost coverage from the last leading provider in August of 2019. The Debtors' inability to complete routine financial audits due to the Term Loan Facility maturity further complicated day-to-day operations, as evidenced by the Debtors' inability to access routine capital lease financing. As of the Petition Date, all three Detroit OEMs and two European OEMs had placed Dura on "no-bid" status due to these issues and the OEMs have escalated their risk management involvement. Lastly, as a result of the foregoing, Dura has experienced increased difficulty in recruiting and retaining qualified employees to continue day-to-day operations.

2.    *Impact of Declining Revenues.*

In addition to the challenges posed by the overhang of the Zohar ownership issue and the Zohar Chapter 11 Cases, the Debtors have also faced various operational challenges resulting from the recent downturn in the automotive market. The Company's revenue in 2019 is forecasted to decline to approximately $900 million (compared to $1.1 billion for the full year 2018). For the third quarter of 2019, revenue has declined to $670 million (compared to $875 million in the third quarter of 2018) and the Company's sales fell roughly 20% from January to September 2019. Specifically, the Company's revenue has been negatively impacted by the following factors:

(a)    Decline in Production Volume.

As described above, the Company's largest OEM customers are suffering from a precipitous and continuing decline in automobiles sales and overall production, particularly in Europe and Asia. Because the Company typically supplies its customers on a requirements basis and without guaranteed volumes, the Company's shipments are reduced whenever OEM customers experience a downturn or decrease in production. Lower OEM volume in the last six months of 2019 accounted for approximately $143 million of decreased revenue compared with the same period in 2018. The Company has eliminated fixed costs throughout the organization through workforce reductions, delayed infrastructure improvements, and other cost cutting initiatives including the shutdown of three facilities completed during 2019. Due to labor unions and statutory regulations, the fixed cost structure in Europe and Asia cannot be executed at a pace necessary to match the decline in revenues in those regions.

(b)    New Business Has Not Yet Replaced Existing Business.

The Company was awarded more than $3.2 billion in new business contracts during 2018 and 2019, however, these program awards will not generate any significant revenue in the near term. As part of the Company's strategy to focus on profitable business that provides better returns on invested capital, Dura has decided to exit certain product lines, specifically glass products that were less profitable, to focus on its future business lines based on its new innovation patents and technology. Nonetheless, the Debtors could have prospered despite the Debtors' reduced revenue, if not for the perfect storm of (a) lower global vehicle volumes, (b) the loss of credit insurance due to the Debtors' default on the Term Loan Facility, and (c) the Debtors' inability to access ordinary course capital lease financing as a result of the foregoing, as well as the overhang of the Zohar dispute.

C.    *Increasing Liquidity Constraints.*

As of the Petition Date, the Debtors had approximately $250,000 in borrowings available under the ABL Facility. Because of declining revenues and limited availability under the ABL Facility, the Debtors had suffered from significant liquidity constraints over the past several months. Further, recent trade tensions, engine regulations and other regulatory changes have had dramatic effects on global vehicle sales. While U.S. new vehicle sales hit a record high in 2015, analysts predict that sales will likely fall below 17 million for the first time since 2014. In March of 2019, interest rates on auto loans hit a ten year high. To reduce costs and otherwise cope with the decline in sales, several automakers across North America, including General Motors, have shut down plants and discontinued various vehicle models. By the end of 2019, GM will have ceased production at five plants in the United States and Canada, laying off approximately 15% of its salaried workforce.

The Debtors' principal source of liquidity has historically been cash flow generated from operations, cash on hand, ordinary course capital equipment leases, and borrowings under its ABL Facility and Term Loan Facility. During the past year, the slump in U.S. vehicle sales and the automotive factory shutdowns across the country has reduced the Company's revenue, cash flow, and ability to borrow. As a result, the Company's liquidity was severely restricted, thereby jeopardizing the Company's near-term ability to meet its obligations as they become due, and threatening the Company's ability to meet the demands of growth and development initiatives. As a result of the foregoing, the Debtors were unable to remain current with their vendor payables.

As noted above, in light of the evolution of the automotive market, the Company is required to continually invest in innovation and new product lines in order to sustain a long-term business. The OEMs' expectation for continuous innovation requires the Company to make significant capital expenditures to research, development, and technology. If the Company lacks the liquidity to make these capital investments, it will not be able to book the new business necessary for future success, also putting at risk the Company's existing customer contracts if the associated production schedules fall behind due to existing liquidity concerns. For example, as of the Petition Date, the Company had over $20 million of capital equipment awaiting payment, which consisted of machinery necessary to meet new production schedules for a key product platform that is critical to the Company's future value.

D.      *The Debtors' Proactive Approach to Addressing Liquidity Constraints.*

        The filing of these Chapter 11 Cases followed months of extensive restructuring initiatives that were undertaken to address the Debtors' tightening liquidity. As noted above, in 2018, the Company commenced a comprehensive marketing process for a potential sale, disposition, or other business transaction involving all or a material portion of the equity or assets of one or more entities comprising the Debtors and their non-Debtor affiliates and GAS. Despite extensive, protracted efforts to commence an asset sale or refinancing of the Debtors' funded debt, the Debtors were ultimately unable to consummate an out-of-court transaction.

        In mid-2019, in the face of continued tightening liquidity, the Debtors, in consultation with their secured term loan lenders (the "Term Loan Lenders"), determined not to repay the Term Loan Facility in July 2019 as required by the Term Loan Credit Agreement. While the Term Loan Lenders effectively agreed to forebear from exercising remedies upon this default, this arrangement did not provide the Debtors with sufficient cash on hand to fund ongoing operations and upcoming capital expenditures. As a result of the foregoing, the Debtors continued to negotiate with their key stakeholders regarding various potential out-of-court restructuring solutions, including the Prepetition ABL Secured Parties and the Debtors' current DIP Lenders. Specifically, in the days leading up to the Petition Date, the Debtors exchanged several term sheets regarding the terms of a potential out-of-court restructuring and sale transaction. However, despite these arm's-length, good faith negotiations, the parties were ultimately unable to reach an out-of-court resolution to avoid the filing of these Chapter 11 Cases.

        In response to the Debtors' need for a potential restructuring in the near future given the Debtors' liquidity troubles, the Debtors appointed two independent managers to oversee the Debtors' restructuring efforts. On October 12, 2019, Marc Beilinson and Jill Frizzley were appointed to the board of managers of Dura Automotive Systems, LLC and Dura Operating, LLC (the "Independent Managers") and established a transaction committee consisting of the Independent Managers (the "Transaction Committee"). This action was taken to ensure a thorough and fair process with respect to analyzing, developing, and implementing the Debtors' strategic alternatives. In particular, the Independent Managers and the Transaction Committee were authorized to review all matters related to an alternative transaction or a restructuring of the Company's liabilities. Since their appointment, the Independent Managers have met regularly with the Debtors and their advisors to evaluate the merits of proposed transactions, including the Debtors' DIP financing and asset sale process.

        In addition to the foregoing, the Company has worked, and will continue to work, with its employees, customers, suppliers, and financial sources to reduce cash consumption. Additional Employee-focused cash-conserving actions are planned for 2020, including operational productivity improvements and footprint consolidation. In the aggregate, the Company anticipates that these cost-cutting actions will save the Company over $25 million compared to 2018.

## ARTICLE V.
## ADMINISTRATION OF THE CHAPTER 11 CASES

A.      *First Day Pleadings, the Venue Transfer, and Other Case Matters.*

        On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Tennessee (the "Tennessee Bankruptcy Court"). On the Petition Date, the Debtors also filed a number of first day motions and an application (collectively, the "First Day Pleadings") with the Tennessee Bankruptcy Court seeking to, among other things: (a) prevent interruptions to the Debtors' businesses; (b) ease the strain on the Debtors' relationships with certain essential constituents; (c) allow the Debtors to retain their Notice and Claims Agent to assist the Debtors with the administration of the Chapter 11 Cases; and (d) allow the Debtors to have access to postpetition financing and cash collateral.

        Immediately following the Debtors' chapter 11 filing, the Zohar Debtors filed a motion in the Zohar Chapter 11 Cases seeking to transfer these Chapter 11 Cases from the Tennessee Bankruptcy Court to the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court," or the "Bankruptcy Court"). Following discussions between the Debtors and the Zohar Debtors, the parties agreed to transfer these Chapter 11

Cases to the Delaware Bankruptcy Court, and, on November 1, 2019, the Delaware Bankruptcy Court entered an agreed order in the Zohar Chapter 11 Cases to effectuate such transfer as of November 8, 2019, at 12:01 a.m.

Prior to the transfer of these Chapter 11 Cases to the Delaware Bankruptcy Court, on October 21, November 1, and November 5, 2019, the Tennessee Bankruptcy Court entered orders granting the First Day Pleadings on an interim or final basis, as applicable (each, a "First Day Order").  On November 5, 2019, the Tennessee Bankruptcy Court grated certain of the First Day Orders on a final basis, and, on November 19, 2019, the Delaware Bankruptcy Court granted the remaining First Day Orders on a final basis.

    1.   *Administrative Motions.*

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Debtors filed First Day Pleadings seeking orders authorizing the joint administration of the Debtors' Chapter 11 Cases, and establishing certain notice and administrative procedures.

    2.   *Operational Relief.*

The Debtors filed certain motions and applications requesting various types of "first day" and "second day" relief.  The relief granted enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things, orders authorizing the Debtors to:

- continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions;

- pay certain prepetition taxes and fees;

- fulfill and honor all customer obligations the Debtors deemed appropriate in the ordinary course of business and continue, renew, replace, implement new, and/or terminate any customer practices and incur customer obligations as the Debtors deem appropriate;

- pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business;

- pay employees' wage Claims and related obligations in the ordinary course of business and continue certain employee benefit programs;

- make payment on account of prepetition Claims of certain critical domestic and foreign vendors, shippers, lienholders, and 503(b)(9) claimants; and

- establish procedures for utilities to request adequate assurance, pursuant to which the utilities were prohibited from discontinuing service except in certain circumstances.

    3.   *Debtor-In-Possession Financing.*

On the Petition Date, the Debtors filed a motion [Docket No. 19] (the "DIP Motion") seeking authority to enter into a postpetition financing agreement and utilize the cash collateral of their secured lender constituents during these Chapter 11 Cases in accordance with the terms of a DIP credit agreement between the Debtors and the ABL Agent (the "Initial DIP Facility").  On October 18, 2019, the Tennessee Bankruptcy Court entered an order [Docket No. 86] (the "First Interim DIP Order") granting the DIP Motion on an interim basis, thereby allowing $10 million of the Initial DIP Facility to be advanced to the Debtors during the interim period.  Following entry of the First Interim DIP Order, the Debtors reached an agreement with affiliates of Bardin Hill Investment Partners, LP (collectively, the "DIP Lenders") regarding the terms of alternative debtor-in-possession financing.  On November 1, 2019, the

Tennessee Bankruptcy Court entered a second interim order [Docket No. 211] that approved the DIP Facility provided by the DIP Lenders on an interim basis and authorized the Debtors to immediately pay off the Initial DIP Facility and the ABL Facility with certain proceeds of the DIP Facility. On November 19, 2019, the Bankruptcy Court entered an order [Docket No. 340] (the "Final DIP Order") approving the DIP Facility on a final basis.

The DIP Facility provides the Debtors with approximately $48 million in incremental liquidity. In addition to providing the Debtors with incremental liquidity, the DIP Facility provides the Debtors with access to the use of the Cash Collateral on a consensual basis, and will allow the Debtors to fund their business in the ordinary course, which will ensure continued, uninterrupted operations, preserving the value of their Debtors' Estates for the benefit of all stakeholders. As described above, the DIP Facility also refinanced the $35.8 million of obligations outstanding under the ABL Facility and the Initial DIP Facility.

4.  *Automatic Stay.*

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions against the Debtors' and their Estates, the enforcement of Liens, Claims, encumbrances, and interests against property of the Debtors, and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay remains in effect until the Effective Date of the Plan.

B.  *Employment and Compensation of Advisors.*

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed the following applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ certain advisors:  (a) on the Petition Date, the Debtors filed an application to retain Prime Clerk LLC, as their Notice and Claims Agent [Docket No. 8]; (b) on October 29, 2019, the Debtors filed an application to retain Bradley Arant Boult Cummings LLP as their bankruptcy counsel [Docket No. 205]; (c) on November 4, 2019, the Debtors filed an application to retain Kirkland & Ellis LLP as their counsel [Docket No. 230]; (d) on November 5, 2019, the Debtors filed an application to retain Portage Point Partners as their restructuring advisor [Docket No. 238]; (e) on November 8, 2019, the Debtors filed an application to retain Jefferies as their investment banker and financial advisor [Docket No. 274]; (f) on November 19, 2019, the Debtors filed a motion to retain and compensate certain professionals utilized by the Debtors in the ordinary course of the Debtors' business without formal application [Docket No. 343]; and (g) on November 26, 2019, the Debtors filed an application to retain Bayard, P.A. as their co-counsel [Docket No. 362]. Further, the Bankruptcy Court entered an order approving procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases [Docket No. 389].

On October 21, 2019, the Tennessee Bankruptcy Court entered an order approving the retention application of Prime Clerk LLC [Docket No. 130]. On December 3, 2019, the Bankruptcy Court entered orders approving the retention applications of Jefferies [Docket No. 385] and Bradley Arant Boult Cummings LLP [Docket No. 386], and authorizing the retention and compensation of certain professionals utilized in the ordinary course of the Debtors' business without formal application [Docket No. 388]. On December 11, 2019, the Bankruptcy Court entered an order approving the retention application of Portage Point Partners [Docket No. 409]. On January 2, 2020, the Bankruptcy Court entered an order approving the retention application of Bayard, P.A. [Docket No. 508]. On January 6, 2020, the Bankruptcy Court entered an order approving the retention application of Kirkland & Ellis LLP [Docket No. 526].

C.  *Appointment of the Official Committee of Unsecured Creditors.*

On November 1, 2019, the United States Trustee for the Middle District of Tennessee filed the *Appointment and Notice of Appointment of the Official Committee of Unsecured Creditors* [Docket No. 213], notifying parties in interest that the United States Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases. The Committee is currently composed of the following members:  MetalKraft Industries; Lorentson Mfg. Co. SW., Inc.; MultiTech Industries, Inc.; TF-Metal U.S.A., LLC; and Young Technology, Inc. The Committee filed the following applications requesting that the Bankruptcy Court authorize the Committee to retain and employ certain advisors: (a) on November 25, 2019, the  Committee filed an application to retain Dentons

20

US LLP and Bingham Greenbaum Doll LLP as its counsel [Docket No. 354]; (b) on November 25, 2019, the Committee also filed an application to retain Lincoln Partners Advisors LLC as its financial advisor [Docket No. 355]; and (c) on December 10, 2019, the Committee filed an application to retain Benesch, Friedlander, Coplan & Aronoff LLP as its Delaware counsel [Docket No. 406].

On December 19, 2019, the Bankruptcy Court entered an order approving the retention application of Lincoln Partners Advisors LLC [Docket No. 453].  On January 2, 2020, the Bankruptcy Court entered an order approving the retention application of Dentons US LLP [Docket No. 510].  On January 6, 2020, the Bankruptcy Court entered an order approving the retention application of Benesch, Friedlander, Coplan & Aronoff LLP [Docket No. 532].  On January 7, 2020, the Bankruptcy Court entered an order approving the retention application of Bingham Greenbaum Doll LLP [Docket No. 544].

Since the formation of the Committee, the Debtors have consulted with the Committee concerning the administration of the Chapter 11 Cases, and the Committee has been an active participant in these Chapter 11 Cases. The Debtors have kept the Committee informed of, and have conferred with the Committee on, matters relating to the Debtors' business operations and have sought the concurrence of the Committee to the extent that its constituency would be affected by proposed actions or transactions outside of the ordinary course of the Debtors' businesses. The Committee has participated actively with the Debtors' management and professional advisors in reviewing the Debtors' business plans and operations.

D.      *Investigation by Official Committee of Unsecured Creditors.*

Pursuant to the Final DIP Order, the Committee has until March 2, 2020, to commence a challenge to the prepetition financing documents, the prepetition secured obligations, or the prepetition liens (the "Prepetition Liens") of the Term Loan Lenders and the Prepetition ABL Secured Parties.  Promptly after the appointment of the Committee, its advisors undertook an investigation of those liens and such investigation remains ongoing.

Pursuant to its investigation, the Committee filed two motions to compel the production of documents under Bankruptcy Rule 2004 and Local Rule 2004-1.  The Committee filed the first such motion on December 13, 2019, [Docket No. 414] seeking production from the Debtors.  The Debtors and the Committee consensually resolved this motion and the Debtors agreed to produce substantially all requested documents by January 31, 2020.  The Debtors also agreed to provide the Zohar Debtors with all the documents the Debtors provide to the Committee. On December 23, 2019, the Committee filed the second motion for production [Docket No. 466], seeking production of certain documents by the Zohar Debtors.  The Committee and the Zohar Debtors consensually resolved this motion, and the Bankruptcy Court entered an agreed order on January 2, 2020, pursuant to which the Zohar Debtors will make best efforts to complete production by January 31, 2020.

E.      *Zohar Challenge Motion.*

Pursuant to the Final DIP Order, any party in interest with standing could commence a challenge to prepetition liens and certain conduct of prepetition secured lenders prior to December 31, 2019.  The Zohar Debtors filed a motion on December 31, 2019, seeking to extend the challenge period with respect to the Zohar Debtors to March 2, 2020 [Docket No. 503].  The Patriarch Parties filed an objection to this motion [Docket No. 566] and the Debtors filed a limited objection and reservation of rights [Docket No. 565].  The matter is scheduled to be heard by the Bankruptcy Court on February 11, 2020.

F.      *Investigation by the Transaction Committee.*

As noted above, on October 12, 2019, the Debtors appointed the Independent Mangers and established the Transaction Committee.  The Transaction Committee is empowered to review and decide all matters related to a sale or a restructuring of the Company's liabilities.  The Independent Managers are disinterested managers who have no current or former relationship with any of the Patriarch Parties, their affiliates, the Zohar Debtors, their affiliates, or any other party in interest in these Chapter 11 Cases that would compromise their impartiality.  The compensation of the Independent Managers is not contingent upon taking or approving any particular action.

The Plan provides that, notwithstanding the various release and exculpation provisions in the Plan, any proposed Released Party or Exculpated Party shall not be released or exculpated, as applicable, if such party is designated as a Non-Released Party in the Plan Supplement, in their capacities as such. The Transaction Committee, with the assistance of its advisors, is conducting an investigation into potential claims held by the Debtors against proposed Released Parties to determine whether the Debtors hold any claims against such parties, the value of those claims, and whether the Transaction Committee wishes to designate any of such parties as Non-Released Parties. This investigation remains ongoing. In conducting this investigation, the Transaction Committee is interviewing key personnel, including the Debtors' former and current directors, officers, and advisors, and any other parties that the Transaction Committee deems relevant to the investigation, and reviewing various documents and communications. After developing the factual record and conducting a legal analysis, the Transaction Committee will finalize the Schedule of Non-Released Parties and file such schedule with the Plan Supplement.

G.      *Summary of Claims Process, Bar Date and Claims Filed.*

On November 19, 2019, the Debtors filed a motion [Docket No. 345] seeking entry of an order granting a second extension of time through and including December 10, 2019, to file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") and their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 (the "2015.3 Reports"). On December 3, 2019, the Bankruptcy Court entered an order approving this second extension motion [Docket No. 390]. On December 10, 2019, the Debtors filed a motion seeking a third extension of time of time through and including December 15, 2019, to file their Schedules and Statements and 2015.3 Reports. On December 15, 2019, the Debtors filed their Schedules and Statements and Rule 2015.3 Reports [Docket Nos. 420-434]. On January 3, 2020, the Bankruptcy Court entered an order approving the third extension motion [Docket No. 528].

On December 3, 2019, the Bankruptcy Court entered an order [Docket No. 387] (the "Bar Date Order") establishing procedures and setting deadlines for filing Proofs of Claim against the Debtors and approving the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in the Debtors' Chapter 11 Cases is **January 6, 2020, at 5:00 p.m., prevailing Eastern Time** (the "Bar Date"); and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is **April 14, 2020, at 5:00 p.m., prevailing Eastern Time**. The Debtors have published the Bar Date Notice in *The New York Times* (national edition), the *Detroit Free Press*, and the *Tennessean*. The Debtors have served the Bar Date Notice on all Holders of Claims appearing in the Debtors' Schedules of Assets and Liabilities.

The deadline for all requests for payment of Administrative Claims (other than Professional Fee Claims) shall be 30 days after the Effective Date (the "Administrative Claim Bar Date"). With respect to Professional Fee Claims, the deadline for all requests for payment of such claims is 45 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, the Purchaser, or the Liquidating Trustee, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date. For the avoidance of doubt, Holders of DIP Facility Claims shall not be required to File or serve any request for payment of such DIP Facility Claims.

H.      *Exclusivity.*

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a chapter 11 plan. If the debtor files a chapter 11 plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan. Section 1121(d) of the Bankruptcy Code also permits the Bankruptcy Court to extend these exclusivity periods "for cause." Absent further order of the Bankruptcy Court, the Debtors' exclusivity period to file a chapter 11 plan will expire on February 14, 2020, which is 120 days after the Debtors filed for relief under chapter 11 of the Bankruptcy Code.

I.      *Valued Employee Program.*

On November 12, 2019, the Debtors filed a motion [Docket No. 287] seeking authorization to implement a supplemental compensation program for the purpose of retaining non-insider employees that are essential to the Debtors' operations and go-forward business (the "Valued Employee Program").  Following a hearing on December 3, 2019, the Bankruptcy Court entered an order authorizing the Valued Employee Program [Docket No. 395].  The Valued Employee Program will provide one lump-sum cash payment to 37 non-insider participants upon the earlier of: (a) the closing of a sale of substantially all of the Debtors' assets; (b) the consummation of a chapter 11 plan; and (c) March 11, 2020.  On December 26, 2019, the Debtors filed a notice adding an additional non-insider participant to the Valued Employee Program [Docket No. 482].

J.      *The Bidding Procedures Motion and Sale Process.*

On October 23, 2019, the Debtors filed a motion [Docket No. 154] (the "Bidding Procedures Motion") seeking (a) approval of the Bidding Procedures in connection with the sale of substantially all of the Debtors' assets, (b) establishment of certain dates and deadlines, including the bid deadlines and the date of the auction, and the scheduling of a hearing to approve the sale of substantially all of the Debtors' assets to the highest or otherwise best bidder, and (c) establishing deadlines for objections and responses related thereto.

Following a hearing on November 18, 2019, the Bankruptcy Court entered an order approving the Bidding Procedures and related relief requested in the Bidding Procedures Motion (the "Bidding Procedures Order") [Docket No. 339].  The Bidding Procedures Order established certain dates and deadlines in connection with the sale.

On January 2, 2020, the Bankruptcy Court entered an agreed order [Docket No. 514] extending certain of the dates and deadlines established in the Bidding Procedures Order and the milestones for the Sale Transaction and chapter 11 plan established in the Final DIP Order.  The amended dates are:

| Event | Date |
|---|---|
| Deadline to file a plan and disclosure statement | January 17, 2020 |
| Bid deadline | February 21, 2020 |
| Deadline to obtain entry of an order approving a disclosure statement | February 21, 2020 |
| Auction (if necessary) | February 26, 2020 |
| Sale hearing | March 23, 2020 |
| Deadline to confirm a chapter 11 plan | March 31, 2020 |

## ARTICLE VI.
## SUMMARY OF THE PLAN

> **THIS <u>ARTICLE VI</u> IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS <u>ARTICLE VI</u> AND THE PLAN (INCLUDING ATTACHMENTS), THE PLAN SHALL GOVERN.**

The Plan provides for the sale of all or substantially all of the Debtors' assets through the Sale Transaction. The key terms of the Plan are as follows:

A.      *General Settlement of Claims and Interests.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion, proposed by the Debtors, to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to Holders of Allowed Claims and Interests in any Class are intended to be final.

B.      *Sources of Plan Consideration.*

Cash on hand, the Sale Transaction Proceeds (if any), the General Unsecured Claims Amount, the Wind-Down Amount, the Debtors' rights under the Sale Transaction Documentation, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to sections 365 or 1123 of the Bankruptcy Code, the return of any utility deposits as set forth in the Utility Order, and all Causes of Action not previously settled, released, or exculpated under the Plan, if any, shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein.  Unless otherwise agreed in writing by the Debtors and the Purchaser, distributions required by the Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the Purchaser to the extent such Claim is Allowed against the Debtors.

C.      *Proposed Creditor Recoveries.*

Pursuant to the Plan, the Debtors or the Liquidating Trustee shall pay or provide for payments of Claims and Interests as follows:

- Except to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Administrative Claim, each Holder of an Administrative Claim shall receive payment in full in cash;

- Allowed Other Priority Claims will be paid in full on the Effective Date (or, in the case of Allowed Priority Tax Claims, treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code);

- Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors:

  - (i) payment in full in Cash of such Allowed Other Secured Claim;

  - (ii) the Collateral securing such Allowed Other Secured Claim;

  - (iii) Reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of default; or

  - (iv) such other treatment rendering such Allowed Other Secured Claim Unimpaired;

- Allowed DIP Facility Claims will be paid in full in cash, except to the extent such DIP Facility Claims are credit bid pursuant to the terms of the Sale Transaction Documentation;

- Except to the extent that a Holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Term Loan Claim, each Holder of an Allowed Term Loan Claim will receive either:

  - (i) in the event the Sale Transaction is a Term Loan Credit Bid Transaction, its Pro Rata share of either (w) the equity in the Purchaser; and (x) the Assets, in each case pursuant to the Sale Transaction Documents; or

  - (ii) in the event the Sale Transaction is not a Term Loan Credit Bid Transaction, payment in full in Cash on the Effective Date;

- Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its *pro rata* share (calculated as its *pro rata* portion of all Allowed General Unsecured Claims and all Allowed Affiliate Claims) of the General Unsecured Claims Amount, with such distributions made by the Debtors for any distributions to Holders of Allowed General Unsecured Claims on the Effective Date, and made by the Liquidating Trust for any distributions made after the Effective Date.  For the avoidance of doubt, all General Unsecured Claims that are assumed by the Purchaser pursuant to the Sale Transaction Documentation shall be satisfied by the Purchaser in full in Cash following the Effective Date in the ordinary course of business; *provided* that any Allowed General Unsecured Claim that has been expressly assumed by the Purchaser under the Sale Transaction shall not be an obligation of the Debtors as of or after the Effective Date;

- Except to the extent that a Holder of an Allowed Affiliate Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Affiliate Claim, each Holder of an Allowed Affiliate Claim that is not assumed by the Purchaser pursuant to the Sale Transaction Documentation will

receive its *pro rata* share (calculated as its *pro rata* portion of all Allowed General Unsecured Claims and all Allowed Affiliate Claims) of the General Unsecured Claims Amount, with such distributions made by the Debtors for any distributions to Holders of Allowed Affiliate Claims on the Effective Date, and made by the Liquidating Trust for any distributions made after the Effective Date. For the avoidance of doubt, all Affiliate Claims that are assumed by the Purchaser pursuant to the Sale Transaction Documentation shall be satisfied by the Purchaser in full in Cash following the Effective Date in the ordinary course of business; *provided* that any Allowed Affiliate Claim that has been expressly assumed by the Purchaser under the Sale Transaction shall not be an obligation of the Debtors as of or after the Effective Date;

- Allowed Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date without receiving any distribution under the Plan; and

- Holders of Allowed Dura Interests will receive either:

  o (i) if the Sale Transaction Proceeds are sufficient to pay all Allowed General Unsecured Claims and Affiliate Claims in full, then (a) Holders of Dura Interests shall receive any remaining proceeds of the Sale Transaction Proceeds after all Allowed General Unsecured Claims and Affiliate Claims are paid in full from the Liquidating Trust, and (b) the Dura Interests will be canceled, released, and extinguished, and will be of no further force or effect; *provided* that the Dura Interests shall not be canceled until the entry of a Final Order in these Chapter 11 Cases or the Zohar Chapter 11 Cases directing such cancellation. No holder of Dura Interests shall receive any proceeds from the Debtors or the Liquidating Trust until a Final Order is entered in these Chapter 11 Cases or the Zohar Chapter 11 Cases directing a distribution to the Holders of Dura Interests; or

  o (ii) if the Sale Transaction Proceeds are not sufficient to pay all Allowed General Unsecured Claims and Affiliate Claims in full, then the Dura Interests will be canceled, released, and extinguished, and will be of no further force or effect, and each Holder of a Dura Interest will not receive any distribution on account of such Dura Interest; *provided* that the Dura Interests shall not be canceled until the entry of a Final Order in these Chapter 11 Cases or the Zohar Chapter 11 Cases directing such cancellation.

The Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims and Interests in Class 3 (Term Loan Claims), Class 4 (General Unsecured Claims), Class 5 (Affiliate Claims), and Class 9 (Dura Interests) to vote to accept the Plan.

The recoveries to Holders of Claims and Interests are further described in **Article II.D** of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

D.    *The Sale Transaction.*

The Plan contemplates the sale of substantially all of the assets of the Debtors (the "Sale Transaction") in accordance with the terms and conditions set forth in the Sale Transaction Documentation, the Bidding Procedures Order, and the Plan. Generally, the Sale Transaction contemplates that:

(a)    on the Effective Date, the Purchaser shall assume substantially all obligations owed by the Debtors to their customers and trade vendors that are expected to continue to do business with the Purchaser in the ordinary course of business following the Effective Date. Following such assumption by the Purchaser, the Purchaser shall satisfy such obligations

in cash following the Effective Date, and for the avoidance of doubt, any obligations that are assumed by the Purchaser shall cease to be Claims against the Debtors;

(b)     the Debtors shall, among other things, transfer the Transferred Assets, comprised of the Purchased Assets, the Transferred Causes of Action, and the Interests of any Debtors that are transferred to Purchaser as part of the Sale Transactions, pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code, the Plan and the Confirmation Order;

(c)     Sale Transaction Proceeds will be used to make payments or distributions pursuant to the Plan; and

(d)     the Purchaser shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and the Plan.

E.     *Restructuring Transactions.*

Upon the entry of the Confirmation Order, the Debtors, the Liquidating Trustee, and the Purchaser are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions and the Sale Transaction under or in connection with the Plan, including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the Purchaser's establishment of the EIP Pool; (6) any transaction described in the Description of Transaction Steps; and (7) subject to the occurrence of the Effective Date, the consummation of the transactions contemplated by the Sale Transaction Documentation.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

F.     *Vesting of Assets.*

Except as otherwise provided in the Plan, the Sale Transaction Documentation, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date: (a) the Transferred Assets shall be preserved and shall vest in the Purchaser, free and clear of all Liens, Claims, charges, and other encumbrances (other than the Assumed Liabilities); and (b) the Retained Assets shall vest in the Liquidating Trust for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, and other encumbrances. For the avoidance of doubt, all Transferred Causes of Action shall be transferred to the Purchaser on the Effective Date, and the Retained Causes of Action shall vest in the Liquidating Trust on the Effective Date for prosecution, settlement, or other action as determined by the Liquidating Trustee.

On and after the Effective Date, except as otherwise provided in the Plan and subject in all respects to the Sale Transaction Documentation and the Plan, the Liquidating Trustee may operate the Debtors' businesses and use, acquire, or dispose of property and, as applicable, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. For the avoidance of doubt, following the Effective Date, the Purchaser may operate its businesses and use, acquire, or dispose of property, including the Transferred Assets, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.     *Employee Incentive Plan.*

Solely if the Sale Transaction is a Term Loan Credit Bid Transaction, following the Effective Date, the initial board of directors of the Purchaser shall, in its sole discretion, adopt and implement the Employee Incentive Plan, which shall provide for the terms and conditions under which the EIP Pool may be allocated and distributed to certain participating employees of the Purchaser.

H.     *Wind-Down Amount.*

On or prior to the Effective Date, the Debtors shall retain the Wind-Down Amount in accordance with the terms of the Sale Transaction Documentation.

I.     *Wind-Down.*

On and after the Effective Date, the Debtors shall: (1) continue in existence for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims as provided hereunder, (c) paying Allowed Claims not assumed by the Purchaser as provided hereunder, (d) filing appropriate tax returns, (e) complying with their continuing obligations under the Sale Transaction Documentation, and (f) administering the Plan in an efficacious manner; and (2) thereafter liquidate as set forth in the Plan.

J.     *The Liquidating Trustee.*

On and after the Effective Date, the Liquidating Trustee shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Debtors shall be deemed to have resigned, and a representative of the Liquidating Trustee shall be appointed as the sole manager and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers.  From and after the Effective Date, the Liquidating Trustee shall be the sole representative of, and shall act for, the Debtors.

The Liquidating Trustee shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.  The Liquidating Trustee shall be the exclusive trustee of the Retained Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code § 1123(b)(3)(B).

Among other things, the Liquidating Trustee shall be responsible for:  (1) liquidating, receiving, holding, and investing, supervising, and protecting the Retained Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Wind-Down Amount; (3) making distributions from the Wind-Down Amount as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Debtors; (5) subject to the terms of the Plan, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the Debtors on and after the Effective Date; (7) administering and paying taxes of the Debtors on and after the Effective Date, including filing tax returns; (8) representing the interests of the Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.  Furthermore, the Patriarch Parties shall cooperate with the Debtors or Liquidating Trustee, as appropriate, with respect to tax matters, including providing any necessary information to the Debtors or the Liquidating Trustee with respect to such tax matters.

The Liquidating Trustee's post-Effective Date compensation will be set forth in the Plan Supplement and paid by the Debtors.  The Liquidating Trustee has not yet been selected and shall be selected by (a) the Debtors, and (b) if the Committee does not object to the Plan, the Committee; *provided* that if the Sale Transaction is a Term Loan

Credit Bid Transaction, then the identity of the Liquidating Trustee shall also be subject to the consent of the Term Loan Lenders (such consent not to be unreasonably withheld). The identity and compensation of the Liquidating Trustee shall be set forth in the Plan Supplement.

K.     *The Liquidating Trust.*

On the Effective Date, the Liquidating Trust will be formed to implement the Wind Down, including the liquidation of the Liquidating Trust Assets. The Liquidating Trustee shall be the trustee of the Liquidating Trust and shall have the rights, powers, and obligations set forth in the Liquidating Trust Agreement with respect to such trustee. The Liquidating Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets as more fully set forth in the Liquidating Trust Agreement, the Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets. For all federal income tax purposes, the beneficiaries of the Liquidating Trust will be treated as grantors and owners thereof and it is intended that the Liquidating Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations. Accordingly, for federal income tax purposes, it is intended that the beneficiaries of the Liquidating Trust be treated as if they had received an interest in the Liquidating Trust's assets and then contributed such interests to the Liquidating Trust. The beneficiaries of the Liquidating Trust shall be the Holders of Allowed General Unsecured Claims and Affiliate Claims and, if all Allowed General Unsecured Claims and Affiliate Claims are paid in full, Holders of Allowed Dura Interests; *provided* that no distributions shall be made to Holders of Dura Interests until a Final Order is entered in these Chapter 11 Cases or the Zohar Chapter 11 Cases directing such distribution. The Liquidating Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely distributions to the beneficiaries of the Liquidating Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration. The Liquidating Trust will not be deemed a successor in interest to the Debtors. Upon the termination of the Liquidating Trust, any excess funds shall be paid to Holders of Allowed General Unsecured Claims and Affiliate Claims (unless Holders of Allowed General Unsecured Claims and Affiliate Claims have already been paid in full, in which case any excess funds shall be distributed to the Holders of Allowed Dura Interests until a Final Order is entered in these Chapter 11 Cases or the Zohar Chapter 11 Cases directing such distribution) on a Pro Rata basis as set forth in the Liquidating Trust Agreement.

The Liquidating Trustee shall be the trustee of the Liquidating Trust and shall continue to have all of the rights and powers granted to the Debtors and the Liquidating Trustee as set forth in the Plan and applicable non-bankruptcy law, and the Liquidating Trustee shall also have the rights, powers, and obligations set forth in the Liquidating Trust Agreement. On and after the Effective Date, all references to the Debtors in the Plan shall be deemed references to the Debtors or the Liquidating Trust, as applicable, (except for references to the Debtors in Article VI.Q of the Plan).

L.     *The General Unsecured Claims Amount.*

The General Unsecured Claims Amount shall be used to make distributions on account of Allowed General Unsecured Claims and Affiliate Claims on a Pro Rata basis as set forth in **Error! Reference source not found.**.B.4-5 of the Plan. Distributions to Holders of Allowed General Unsecured Claims and Affiliate Claims that are made on the Effective Date shall be made by the Debtors, and the remaining proceeds of the General Unsecured Claims Amount shall be placed in the Liquidating Trust for the benefit of (a) Holders of Allowed General Unsecured Claims and Affiliate Claims and (b) solely if such proceeds are sufficient to pay in full all Allowed General Unsecured Claims and Affiliate Claims, Holders of Dura Interests, in each case as set forth in greater detail in the Liquidating Trust Agreement. No distributions shall be made to Holders of Dura Interests by the Debtors or the Liquidating Trust until a Final Order is entered in these Chapter 11 Cases or the Zohar Chapter 11 Cases directing a distribution to the Holders of Dura Interests.

M.     *Cancellation of Notes, Instruments, Certificates, and Other Documents.*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of giving rise to any Claim shall be cancelled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder; and (2) the obligations

of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; *provided, however*, that notwithstanding anything to the contrary contained herein, any indenture or agreement that governs the rights of the DIP Agent and the Term Loan Agent shall continue in effect to allow each of them, as applicable, to (A) enforce its rights, Claims, and interests (and those of any predecessor or successor thereto) vis-à-vis any parties other than the Debtors, (B) receive distributions under the Plan and to distribute them to Holders of Allowed DIP Facility Claims and Term Loan Claims, as applicable, in accordance with the terms of such agreements, (C) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed DIP Facility Claims and Term Loan Claims, as applicable, including any rights to priority of payment and/or to exercise charging liens, and (D) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the DIP Agent, the Term Loan Agent, or Holders of DIP Facility Claims and Term Loan Claims under the Plan, as applicable; *provided, further*, that notwithstanding anything to the contrary, no Interests in the Debtors shall be cancelled pending a further Final Order entered in these Chapter 11 Cases or the Zohar Chapter 11 Cases directing such cancellation.

N.    *Corporate Action.*

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan and the Sale Transaction Documentation (including any action to be undertaken by the Debtors or the Liquidating Trustee, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Liquidating Trustee, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, including the creation of the Purchaser, the consummation of the Sale Transaction, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates; *provided, however,* that for the avoidance of doubt, the Purchaser may be formed by a person or entity other than the Debtors, as set forth in the Description of Transaction Steps.

Upon the Effective Date or as soon as reasonably practicable thereafter, after making all distributions provided for under the Plan, the Debtors shall be deemed to have been dissolved and terminated, except as necessary to satisfy their obligations under the Sale Transaction Documentation and the Intercompany Settlement Term Sheet. The directors, managers, and officers of the Debtors and the Liquidating Trustee, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate to implement the provisions of the Plan

The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under applicable nonbankruptcy law.

O.    *Dissolution of the Boards of the Debtors.*

As of the Effective Date, the existing boards of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.

As of the Effective Date, the Liquidating Trustee shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to their affairs other than matters substantially related to the transactions described in **Error! Reference source not found.**.1-2 of the Plan.  Subject in all respects to the terms of the Plan, the Liquidating Trustee shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of the applicable state(s) of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code,

request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Liquidating Trustee of any of the Debtors' certificates of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of any of the Debtors or any of their affiliates.

P.      *Release of Liens.*

Except as otherwise expressly provided herein, on the Effective Date, all Liens on any property of any Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors shall automatically be discharged and released.

Q.      *Effectuating Documents; Further Transactions.*

The Debtors and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

R.      *Exemption from Certain Taxes and Fees.*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, the Sale Transaction or the Sale Transaction Documentation or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

S.      *Causes of Action.*

As of the Effective Date, the Debtors shall assign and transfer to the Purchaser all of the Transferred Causes of Action pursuant to the Sale Transaction Documentation on the Effective Date.  The Transferred Causes of Action shall be set forth and described in the Plan Supplement.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any such Cause of Action against them as any indication that the Purchaser or the Debtors will not pursue any and all available Causes of Actions against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

T.      *Closing the Chapter 11 Cases.*

For the avoidance of doubt, upon the occurrence of the Effective Date, the Liquidating Trustee shall be permitted to close all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Dura and any other Debtor identified in the Description of Transaction Steps as having its Chapter 11 Case remain open until following the Effective Date, and all contested matters relating to each of the Debtors, including objections to Claims, shall be

administered and heard in the Chapter 11 Case of Dura, irrespective of whether such Claim(s) were filed against a Debtor whose Chapter 11 Case was closed.

When all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close any remaining Chapter 11 Cases of the Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules.

U.      *Release, Injunction, and Related Provisions.*[9]

The Plan contains certain releases, as described in **Article II.K** of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"

The Plan provides that (a) all Holders of Claims and Interests that are presumed to accept the Plan *and* who do not opt out of the releases in the Plan, (b) all Holders of Claims and Interests who vote to accept the Plan; and (c) all Holders of Claims or Interests that (x) abstain from voting on the Plan *and* who do not opt out of the releases in the Plan, (y) vote to reject the Plan *and* who do not opt out of the releases in the Plan, or (z) are deemed to reject the Plan *and* who do not opt out of the releases in the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the Debtor Releases and the Third Party Releases. Each such holder will receive notice and a release form with which such holder shall have the opportunity to opt out of being a Releasing Party.

**Importantly, all Holders of Claims and Interests that are not in voting Classes that do not opt out to the inclusion of such holder as a Releasing Party under the provisions contained in Article IX.E of the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the Debtors and the Released Parties. By opting out of the releases set forth in Article IX.E of the Plan you will forgo the benefit of obtaining the releases set forth in Article IX.E of the Plan if you otherwise would be a Released Party thereunder. The releases are an integral element of the Plan.**

Following the Voting Deadline, the Debtors shall file a report (the "Release Report") listing the names of all parties who opted out of the releases. To the extent there is any ambiguity with respect to whether a Holder of a Claim and/or Interest has opted out of the releases, the Debtors shall make note of this ambiguity in the Release Report and the status of resolution with respect thereto.

**It is the Debtors' position that the consideration for the Third Party Releases and the mechanism by which Holders of Claims and Interests who are impaired under the Plan to consent to such releases meet the requirements for third party releases and are consistent with recent Chapter 11 Cases. First, the consideration for the Third Party Releases is the mutual releases provided by Released Parties to all other Released Parties. For example, public investors or shareholders who consent to the Third Party Releases would be released from any potential claims or causes of action that arose in connection with the events leading up to the Debtors' Chapter 11 Cases. The Debtors do not currently believe that the claims being released against or by investors or shareholders have any value. Second, all impaired Holders of Claims and Interests, irrespective of whether they are entitled to vote on the Plan, will receive a Solicitation Package which will include materials allowing such holders to affirmatively consent to the Third Party Releases by choosing not to opt out via a form that can either be mailed, emailed, or hand-delivered to the Debtors' Notice and Claims Agent. In addition, the Debtors believe the Third-Party Release is entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware.** *See Indianapolis Downs, LLC***, 486 B.R. 286, 304–06 (Bankr. D. Del. 2013). The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan.**

---

[9]      NTD:  Scope of third-party release subject to discussion.

The release, exculpation, injunction, and discharge provisions that are contained in <u>Article IX</u> of the Plan are copied in pertinent part below.

    1.   *Release of Liens.*

**Except as otherwise specifically provided in the Plan, the Sale Transaction Documentation or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the Sale Transaction Documentation, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert either (i) to the Debtors and their successors and assigns or (ii) the Purchaser, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. In addition, the Term Loan Agent and the DIP Agent shall execute and deliver all documents reasonably requested by the Debtors or the Liquidating Trustee to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

    2.   *Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the selection or appointment of the Debtors' independent managers, the filing of the Chapter 11 Cases (including the selection of venue in the Middle District of Tennessee), the transfer of venue from the Middle District of Tennessee to the District of Delaware, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence. Notwithstanding the inclusion of any Released Parties as a potential party to any Transferred Causes of Action or Retained Causes of Action, such parties shall remain Released Parties.**

**Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (1) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (2) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (3) release any claims or Causes of Action against any Non-Released Party.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, *and further*, shall constitute the Bankruptcy Court's finding that the releases in the Plan are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases in the Plan; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given**

and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases in the Plan against any of the Released Parties.

       3.   *Releases by Holders of Claims and Interests.*

As of the Effective Date, except as otherwise provided in the Plan, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Sale Transaction, the selection or appointment of the Debtors' independent managers, the filing of the Chapter 11 Cases (including the selection of venue in the Middle District of Tennessee), the transfer of venue from the Middle District of Tennessee to the District of Delaware, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (1) release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (2) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (3) release any Claims or Causes of Action against any Non-Released Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of Holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the release in the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the release in the Plan against any of the Released Parties.

       4.   *Exculpation.*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Sale Transaction, the selection or appointment of the Debtors' independent managers, the filing of the Chapter 11 Cases (including the selection of venue in the Middle District of Tennessee), the transfer of venue from the Middle District of Tennessee to the District of Delaware, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated

in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall exculpate any Person or Entity (a) from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of commercially sensitive confidential information for competitive purposes that causes damages, or ultra vires acts as determined by a Final Order, or (b) with respect to any disputes involving the Zohar Debtors that are unrelated to Dura or the other Debtors, including any disputes involving the Zohar Portfolio Companies or the ownership thereof (including the ownership of Dura's parent entity, Dura Buyer, LLC), the Zohar Settlement Agreement, the Zohar Monetization Process, or related matters (in each case, other than any disputes relating to the Debtors).

5.   *Injunction.*

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan shall be discharged pursuant to the Plan, or are subject to Exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

6.   *The Definitions of "Released Parties" and "Releasing Parties."*

Under the Plan, "<u>Released Parties</u>"[10] means, collectively, and in each case, in their respective capacities as such: (a) the Term Loan Lenders, solely in their capacities as such; (b) the DIP Lenders, solely in their capacities as such; (c) the Term Loan Agent, solely in its capacity as such; (d) the DIP Agent, solely in its capacity as such; (e) the Prepetition ABL Secured Parties, solely in their capacities as such; (f) all Releasing Parties; (g) with respect to each Entity in clause (a) through (f), and each Debtor, each such Debtor's and each such Entity's current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (unless any such Entity or related party has opted out of being a Releasing Party, in which case such Entity or related party, as applicable, shall not be a Released Party); *provided* that notwithstanding the foregoing, no Non-Released Party shall be a Released Party with respect to any capacity of such party as set forth on the Non-Released Party List.

---

[10]   To the extent the Sale Transaction is consummated under the Plan, the Purchaser may be a Releasing Party and Released Party, subject to reaching definitive documentation with the Purchaser with respect to the Sale Transaction.

Under the Plan, "Releasing Parties" means, collectively, and in each case, in their respective capacities as such:  (a) the Term Loan Lenders, solely in their capacities as such; (b) the DIP Lenders, solely in their capacities as such; (c) the Term Loan Agent, solely in its capacity as such; (d) the DIP Agent, solely in its capacity as such; (e) all Holders of Claims or Interests, solely in their capacities as such, that are presumed to accept the Plan *and* who do not opt out of the releases in the Plan; (f) all Holders of Claims or Interests, solely in their capacities as such, who vote to accept the Plan; (g) all Holders of Claims or Interests, solely in their capacities as such, that (x) abstain from voting on the Plan *and* who do not opt out of the releases in the Plan, (y) vote to reject the Plan *and* who do not opt out of the releases in the Plan, or (z) are deemed to reject the Plan *and* who do not opt out of the releases in the Plan; (h) with respect to each Entity in clause (a) through (g), each Debtor, each such Debtor's and each such Entity's current and former  subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (unless any such Entity or related party has opted out of being a Releasing Party, in which case such Entity or related party, as applicable, shall not be a Releasing Party); *provided* that notwithstanding the foregoing, the Term Loan Lenders shall not be Releasing Parties with respect to any of the Patriarch Parties.

7.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Liquidating Trustee), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.  For more detail, see Article IX of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

V.    *Applicability of Insurance Policies.*

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and the occurrence of the Effective Date of the Plan shall not limit or affect the rights of any third-party beneficiary or other covered party of any of the Debtor's insurance policies with respect to such policies (including the D&O Policies), nor shall anything contained herein (a) constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under any insurance policy, applicable law, equity, or otherwise, or (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any insurer.

## ARTICLE VII.
## VOTING AND CONFIRMATION

On [●], 2020, the Bankruptcy Court entered an order approving the adequacy of this Disclosure Statement and the solicitation procedures and deadlines contemplated herein.

A.      *Classes Entitled to Vote on the Plan.*

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim | Status |
|-------|-------|--------|
| 3 | Term Loan Claims | Impaired |
| 4 | General Unsecured Claims | Impaired |
| 5 | Affiliate Claims | Impaired |
| 9 | Dura Interests | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein) or a Ballot. If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein. Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Notice and Claims Agent on behalf of the Debtors, otherwise provide to you.

B.      *Votes Required for Acceptance by a Class.*

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Each Class of Claims entitled to vote on the Plan will have accepted the Plan if: (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan. Each Class of Interests entitled to vote on the Plan will have accepted the Plain if the Holders of at least two-thirds in dollar amount of the Interests actually voting in each Class vote to accept the Plan.

C.      *Certain Factors to Be Considered Prior to Voting.*

There are a variety of factors that all Holders of Claims and Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders within the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Voting Classes.

For a further discussion of risk factors, please refer to **Article VIII** hereof, entitled "Certain Risk Factors to be Considered Before Voting."

D.    *Classes Not Entitled to Vote on the Plan.*

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 7 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

E.    *Solicitation Procedures.*

1.    *Notice and Claims Agent.*

The Debtors retained Prime Clerk LLC ("Prime Clerk") to act, among other things, as the notice and claims agent (the "Notice and Claims Agent") in connection with the solicitation of votes to accept or reject the Plan.

2.    *Solicitation Package.*

Pursuant to the Disclosure Statement Order, Holders of Claims and Interests who are entitled to vote to accept or reject the Plan as of [●], 2020 (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, or appropriate notices and applicable release forms for those parties that are not entitled to vote on the Plan, together with a pre-addressed, postage pre-paid return envelope;  and

- this Disclosure Statement, including the Plan as an exhibit thereto.

3.    *Distribution of the Solicitation Package and Plan Supplement.*

The Debtors will cause the Notice and Claims Agent to distribute the Solicitation Packages to Holders of Claims and Interests in the Voting Classes on or before [●], 2020.

The Solicitation Package (except for the Ballots) may also be obtained:  (a) from Prime Clerk by (i) visiting cases.primeclerk.com/duraautomotive; (ii) writing to Prime Clerk, LLC, re: Dura Automotive Services, LLC, et al., One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; or (b) for a fee via PACER at https://ecf.deb.uscourts.gov.

At least 3 days prior to the Voting Deadline, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at

cases.primeclerk.com/duraautomotive.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a)  free of charge upon request to Prime Clerk (the notice and claims agent retained in these Chapter 11 Cases) by calling (877) 468-4591; (b) by visiting the website maintained in these Chapter 11 Cases at (https://cases.primeclerk.com/DuraAutomotive); or (c) for a fee via PACER at https://ecf.deb.uscourts.gov.

As described above, certain Holders of Claims and Interests may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.  In addition, certain Holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Such Holders will receive only notice of the Confirmation Hearing and a non-voting status notice.  The Debtors are only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the Holders of Claims and Interests entitled to vote to accept or reject the Plan as of the Voting Record Date.

F.    *Voting Procedures.*

If, as of the Voting Record Date, you are a Holder of a Claim or Interest in Class 3, Class 4, Class 5, or Class 9—the Voting Classes—you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it in the envelope provided.  If your Claim or Interest is not included in the Voting Classes you are not entitled to vote and you will not receive a Solicitation Package.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

1.    *Voting Deadline.*

The Voting Deadline is **[●], 2020, at [●] [a.m./p.m.], prevailing Eastern Time**.  To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, or personal delivery, so that the Ballot is **actually** **received** by the Notice and Claims Agent no later than the Voting Deadline.

2.    *Voting Instructions.*

As described above, the Debtors have retained Prime Clerk to serve as the Notice and Claims Agent for purposes of the Plan.  Prime Clerk is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
|---|
| To be counted, all Ballots must be **actually received** by Prime Clerk by the Voting Deadline, which is **[●], 2020, at [●] [a.m./p.m.], prevailing Eastern Time**, at the following address: |
| **If by First Class Mail, Hand Delivery or Overnight Mail, Ballots must be sent to:** |
| Prime Clerk LLC<br>**Re: Dura Automotive Systems, LLC, et al.**<br>Attn: Voting Department<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165 |
| **If by Email, scanned Ballots must be sent to:** |
| duraautoballots@PrimeClerk.com |

<div style="border:1px solid black; padding:10px; text-align:center;">

If you have any questions on the procedure for voting on the Plan, please call the Debtors'
restructuring hotline maintained by Prime Clerk at:
(877) 468-4591 (U.S. and Canada) or (917) 947-2369 (International).

</div>

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to Holders of Claims and Interests that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot; (b) overnight courier; or (c) hand-delivery, so that the Ballots are **actually  received** by Prime Clerk no later than the Voting Deadline at the return address set forth in the applicable Ballot. Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such Holder. By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

3.      *Ballots Not Counted.*

No Ballot will be counted if, among other things: (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed, and for which the applicable claims bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to any party other the Notice and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan**.

G.      *Confirmation Objection Deadline.*

Parties must object to Confirmation of the Plan by **[●], 2020, at 4:00  p.m., prevailing Eastern Time** (the "Confirmation Objection Deadline"). All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest so that they are **actually  received** on or before the Confirmation Objection Deadline.

H.      *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. The Bankruptcy Court has scheduled the Confirmation Hearing for **[●], 2020, at [●] [a.m./p.m.], prevailing Eastern Time.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures. Any objection to the Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served no later than the Confirmation Objection Deadline. Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.

I.      *Confirmation Standards.*

At a Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to Dura Interests, Holders of such Interests will have accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will have either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that:  (i) Holders of Claims specified in sections 507(a)(2) will receive payment in full, in Cash; (ii) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims payment in full, in Cash; and (iii) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim payment in full, in Cash.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial restructuring of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or restructuring.

- The Debtors have paid or the Plan provides for the payment of the required fees pursuant to 28 U.S.C. § 1930.

1.  *Best Interests of Creditors Test—Liquidation Analysis.*

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code beginning on what would have been the Effective Date.  Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7 beginning on the Effective Date.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will be liquidated through the Sale Transaction and the Plan effects a liquidation of the Debtors' remaining assets.  Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to holders of Allowed Term Loan Claims Allowed General Unsecured Claims and Affiliate Claims, and Dura Interests than would a chapter 7 liquidation. Liquidating the Debtors' Estates under the Plan likely provides holders of Allowed Term Loan Claims, Allowed General Unsecured Claims and Affiliate Claims, and Dura Interests with a larger, more timely recovery primarily due to the expectation of materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Effective Date would provide less recovery for creditors than the Plan.  The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee would not have the technical expertise or knowledge of the Debtors' business (or the Company) that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation would be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of the highly technical nature of the Debtors' assets and the time delay associated with the chapter 7 trustee's learning curve for these assets. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with those provided for under the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' technical assets, and these specific Chapter 11 Cases, in order to complete the administration of the Debtors' Estates.  *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

In a chapter 7 liquidation, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case.  Moreover, the conversion to chapter 7 would also require entry of a new bar

date for filing claims that would be more than 90 days following conversion of the case to chapter 7. See Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries relative to those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

2. *Financial Feasibility.*

Section 1129(a)(11) of the Bankruptcy Code requires that a bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial restructuring, unless the plan contemplates such liquidation or restructuring. The Plan provides for the sale of the Debtors' businesses. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

J. *Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of creditors or interests.

Claims in Classes 1, 2, and 5 are Unimpaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. Holders of Claims and Interests in Classes 6 and 7, respectively, will be deemed either impaired or unimpaired.

Claims and Interests in Classes 3, 4, 5 and 9 are Impaired under the Plan, and as a result, the Holders of Claims and Interests in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims and Interests in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described directly below. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan, and Classes of Interests will have accepted the Plan if

the Plan is accepted by at least two-thirds in amount of the Interests of each such Class (other than any Interests of entities designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

K.      *Confirmation Without Acceptance by All Impaired Classes.*

        Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; *provided* that the plan is accepted by at least one impaired class (without regard to the votes of insiders).  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

        If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

        1.      *No Unfair Discrimination.*

        The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent but that such treatment be "fair."  In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

        2.      *Fair and Equitable Test.*

        The fair and equitable test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class receiving more than 100 percent of the amount of the Allowed Claims in such Class, and no Class that is junior to a dissenting Class that will receive or retain any property on account of the Claims or Interests in such junior Class.

        (a)     *Secured Claims*

        The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

        (b)     *Unsecured Claims*

        The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that the plan provides either: (i) that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) no holder of any claim or any interest that is junior to the claims of such class will receive or retain any property under the plan on account of such junior claim or junior interest.

(c)     *Interests*

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that the plan provides that either:  (i)  each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of:  (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (ii) that no holder of any interest that is junior to the interests of such class will receive  or retain any property under the plan on account of such junior interest.

## ARTICLE VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims and Interests entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.     *Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims under the Plan.*

1.     *Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims.*

The estimate of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

2.     *Employee Attrition.*

There can be no guarantee that the Debtors will be able to retain their leadership through the pendency of these Chapter 11 Cases, which in turn could negatively affect the Debtors' business operations.

3.     *The Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Plan.*

To the extent that the Debtors are unable to satisfy the conditions precedent to Consummation of the Plan, the Debtors may be unable to consummate the Plan and parties may terminate their support, financial or otherwise, for the Plan prior to the Confirmation or Consummation of the Plan.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

4.     *The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes.*

The Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Classes that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim may allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement.  In addition, the Debtors are continuing to review the Proofs of Claim filed in their Chapter 11 Cases.  As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review.  Accordingly, because certain Claims under the Plan will be paid on a *pro rata* basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

    5.    *The Debtors Cannot Guaranty Recoveries or the Timing of Such Recoveries.*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, and Other Priority Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing of any recovery on an Allowed Claim.

    6.    *Certain Tax Implications of the Debtors' Bankruptcy.*

Holders of Allowed Claims should carefully review **Article IX** of this Disclosure Statement, "Material United States Federal Income Tax Consequences," in regard to the tax implications of the Plan and the Chapter 11 Cases.

B.    *Certain Bankruptcy Law Considerations.*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes:

    1.    *Parties in Interest May Object to the Plan's Classification of Claims.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim when such Claim is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

    2.    *Failure to Satisfy Vote Requirements.*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

    3.    *The Debtors May Not Be Able to Secure Confirmation of the Plan.*

The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or restructuring is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. If the requisite acceptances are not received, the Debtors may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the Debtors that may not have the support of the Holders of Allowed Claims and Allowed Interests and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the Debtors' proposed procedures for the solicitation of Ballots from Holders of Allowed Claims, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not Confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.    *Failure to Consummate the Plan.*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to Consummation of the Plan will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the Restructuring Transactions completed.

5.    *Nonconsensual Confirmation.*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

6.    *Risk of Non-Occurrence of the Effective Date.*

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur.

7.    *Compliance with the DIP Facility.*

The DIP Facility is scheduled to mature no later than March 23, 2020 (the "DIP Maturity Date"). There can be no assurance that the Plan will be confirmed and consummated by the DIP Maturity Date, and there can be no assurance that the DIP Lenders would extend the DIP Maturity Date or forbear from exercising their rights and remedies under the DIP Facility, which may result in the inability of the Debtors to consummate the Plan.

In addition, the DIP Facility contains financial and other covenants regarding, among other things, the Debtors' liquidity and earnings. There can be no assurance that the Debtors will be able to comply with these covenants. If the Debtors fail to comply with such covenants and terms, the Debtors would be required to obtain

waivers or forbearance from the lenders under the DIP Facility and, if such waivers or forbearance are not obtained, there could be a material adverse effect on the Debtors' financial condition and the Debtors may not be able to consummate the Plan.

8. *Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

9. *The Debtors May Lack Sufficient Liquidity to Satisfy Certain Priority and Administrative Claims in Full in Cash.*

It is possible that Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, Professional Fee Claims and the costs of the wind down may exceed the funding available with respect to such Claims, in which case the Plan will not become effective.

10. *Releases, Injunctions, and Exculpations Provisions May Not Be Approved.*

Article IX of the Plan provides for certain releases, injunctions, and exculpations. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

11. *The Closing Conditions of the Sale Transaction May Not Be Satisfied.*

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction, which would prevent the Debtors from consummating the Plan. A failure to satisfy any of the closing conditions of the Sale Transaction may prevent the Sale Transaction from being consummated, which may lead to the Chapter 11 Cases being converted to cases under chapter 7 or dismissed.

C.    *Risk Factors Relating to Equity in the Purchaser Issued under the Plan.*

This Section VIII.C only applies if the Sale Transaction is a Term Loan Credit Bid Transaction.

1. *Equity in the Purchaser May Lack Liquidity.*

There is currently no market for the equity in the Purchaser, and such a market may not develop because, among other things, Purchaser is under no obligation to list any of its equity on any national exchange. Therefore, there can be no assurance as to the liquidity of equity in the Purchaser at any time after the Effective Date. If an active trading market does not develop or is not sustained, holders of equity in the Purchaser may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such equity could trade at prices higher or lower than the estimated value depending upon many factors including, without limitation, general market or economic conditions, prevailing interest rates, markets for similar equity, industry conditions, and the performance of, and investor expectations for, Purchaser. Accordingly, holders of equity in the Purchaser may bear certain risks associated with holding securities for an indefinite period of time.

    2.    *Dilution.*

Future equity financings or other equity issuances by Purchaser could also have a dilutive effect on and adversely affect the value of equity in the Purchaser issued to the holders of Term Loan Claims on the Effective Date. The amount and dilutive effect of the foregoing could be material.

    3.    *The Trading Price for the Equity in the Purchaser May Be Depressed Following the Effective Date.*

Assuming that the Effective Date occurs, equity in the Purchaser will be issued to Holders of Term Loan Claims if the Sale Transaction is a Term Loan Credit Bid Transaction. Following the Effective Date, equity in the Purchaser may be sold to satisfy withholding tax requirements. In addition, Holders of Term Loan Claims that receive equity in the Purchaser may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of available for trading could cause the trading price for the shares of equity in the Purchaser to be depressed, particularly in the absence of an established trading market for the equity in the Purchaser.

D.    *Disclosure Statement Disclaimer*

    1.    *The Financial Information Contained in this Disclosure Statement Has Not Been Audited.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

    2.    *Information Contained in this Disclosure Statement Is for Soliciting Votes.*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

    3.    *This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

    4.    *This Disclosure Statement May Contain Forward Looking Statements.*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

    5.    *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims, or any other parties in interest.

6.    *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7.    *No Waiver of Right to Object or Right to Recover Transfers and Assets.*

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified in this Disclosure Statement.

8.    *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

9.    *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.    *No Representations Outside this Disclosure Statement Are Authorized.*

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors.

E.    *Liquidation under Chapter 7.*

If no chapter 11 plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation could have on the recoveries of Holders of Claims and Interests and the Debtors'

liquidation analysis is set forth in **Article VII.I.1** of this Disclosure Statement entitled "Best Interests of Creditors Test—Liquidation Analysis."

## ARTICLE IX.
## MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain United States ("U.S.") federal income tax consequences of the consummation of the Plan to the Debtors, the Purchaser, and to certain Holders of Claims and Interests. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims or Interests in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims or Interests, or the equity in the Purchaser or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  Furthermore, this summary assumes that Holders of Claims hold only Claims in a single Class and holds Claims or Interests as "capital assets" (within the meaning of section 1221 of the IRC).  This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan).  This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors and Holders of Claims or Interests described below also may vary depending on the nature of any Restructuring Transactions that the Debtors engage in.

For purposes of this discussion, a "U.S. Holder" is a Holder that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities)

that are Holders of Claims or Interests should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.    *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Purchaser.*

1.    *In General.*

Dura is treated as a partnership for U.S. tax purposes and the other Debtors, which are directly or indirectly owned by Dura, are currently treated as disregarded entities for U.S. federal income tax purposes. Accordingly, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by the Debtors, but by Dura's partners (i.e., the Holders of Dura Interests).

2.    *Taxable Sale.*

Regardless of whether the Sale Transaction is a Term Loan Bid Transaction, the Debtors will recognize gain or loss upon a transfer of all or a portion of their assets in an amount equal to the difference between the aggregate fair market value of the assets transferred by the Debtors and the Debtors' aggregate tax basis in such assets. Such gain or loss will be allocated to the Holders of Dura Interests.

Purchaser will take a fair market value basis in the acquired assets, and Purchaser will not inherit any income tax attributes of the Debtors.

3.    *Cancelation of Debt Income.*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the IRC, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b), to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

Under section 108(d)(6) of the IRC, when an entity that is a flow-through entity (such as each of the Debtors) realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level. Accordingly, the Holders of Dura Interests will be treated as receiving their allocable share, if any, of the COD Income realized by the Debtors. Holders of Dura Interests will only be able to exclude COD Income to the extent they themselves meet the Bankruptcy Exception or the Insolvency Exception.

4.    *Tax Consequences of the Liquidating Trust.*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of General Unsecured Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

B.      *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Class 3 Term Loan Claims, Class 4 General Unsecured Claims, Class 5 Affiliate Claims, and Class 9 Dura Interests.*

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.  *Consequences to Holders of Class 3 Term Loan Claims.*

If the Sale Transaction is a Term Loan Credit Bid Transaction then, pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Class 3 Term Loan Claims, each Holder thereof will receive its *pro rata* share of: (a) equity in the Purchaser, and (b) all other proceeds of the Debtors' assets that constitute Collateral of the Holders of Term Loan Claims and are not Transferred Assets.  If the Sale Transaction is not a Term Loan Credit Bid Transaction, Holders of such Claims will receive Cash.

A U.S. Holder of a Term Loan Claim who receives Cash should recognize gain or loss equal to (a) the amount of any Cash received, minus (b) the Holder's adjusted tax basis in its Term Loan Claim.

In a Term Loan Credit Bid Transaction, Holders of Term Loan Claims should be treated as exchanging such Term Loan Claim for Interests in the Purchaser. If the Sale Transaction is a Term Loan Credit Bid Transaction and the Purchaser is a partnership, or a corporation initially formed by Debtors, the exchange of Term Loan Claims for Purchaser Stock will be treated as a taxable exchange pursuant to section 1001 of the IRC.  Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), each U.S. Holder of Term Loan Claims would recognize gain or loss equal to the different between (1) the fair market value of Purchaser Stock, and (2) such U.S. Holder's adjusted basis, if any, in such Term Loan Claims (other than possibly any tax basis attributable to accrued but unpaid interest).  A holder of Term Loan Claims will have interest income to the extent of the value of any Purchaser Stock allocable to accrued but unpaid interest not previously included in income. *See* (B).5 — Accrued Interest (and OID) below.  A U.S. holder's tax basis in the Purchaser Stock received should equal the fair market value of such consideration as of the Effective Date.  A U.S. Holder's holding period for the Purchaser Stock received should begin on the day following the Effective Date.

If the Sale Transaction is a Term Loan Credit Bid Transaction and the Purchaser is a a corporation formed initially by the Holders, who exchange their Term Loan Claims for Purchaser stock, the exchange of Term Loan Claims for Purchaser stock will likely not be a taxable transaction. Accordingly, Purchaser's basis in the Term Loan Claims will be the same as the Holders' bases in the Term Loan Claims.  Subsequently, Purchaser will sell the Term Loan Claims to Debtors in exchange for Debtors' assets.  This exchange will be taxable, and Purchaser will recognize any gain or loss on the exchange equal to (a)  the fair market value of assets received, minus (b) the Purchaser's adjusted tax basis in the Term Loan Claims. The Holders will not recognize any gain or loss on the transaction.

2.  *Consequences to Holders of Class 4 General Unsecured Claims.*

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Class 4 General Unsecured Claims, each Holder of an Allowed General Unsecured Claim that is not assumed by the Purchaser pursuant to the Sale Transaction Documentation will receive its *pro rata* share of the General Unsecured Claims Amount, with such distributions made by the Debtors for any distributions to Holders of Allowed General Unsecured Claims on the Effective Date, and made by the Liquidating Trust for any distributions made after the Effective Date.

For the avoidance of doubt, all General Unsecured Claims that are assumed by the Purchaser pursuant to the Sale Transaction Documentation shall be satisfied by the Purchaser in full in Cash following the Effective Date in the ordinary course of business.

A U.S. Holder of a General Unsecured Claim who is subject to this treatment should recognize gain or loss equal to (a) the sum of any Cash received plus the fair value of interests in the Liquidating Trust, minus (b) the Holder's adjusted tax basis in its General Unsecured Claim.

3.  *U.S. Federal Income Tax Consequences to U.S. Holders of Class 9 Dura Interests.*

Pursuant to the Plan, holders of Dura Interests may receive proceeds from the Sale Transaction.  After the Sale Transaction all Dura Interests will be cancelled.  As discussed in Section (A)(2)(a)(ii) above, in the event the Sale Proceeds are sufficient to pay all Allowed General Unsecured Claims in full, then any remaining Sale Transaction Proceeds will be placed in the Dura Interest Reserve and be distributed in a taxable exchange under section 1001 of

the IRC. A Dura Interest holder should recognize gain or loss equal to (a) the sum of Dura Interest Reserve proceeds received minus (b) the holder's tax basis in the Dura Interest.

    4.   *Character of Gain or Loss.*

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim or Interest in such Holder's hands, whether the Claim or Interest constitutes a capital asset in the hands of the Holder, whether a Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long term capital gain if the Holder held its Claim or Interest for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below.

    5.   *Accrued Interest (and OID).*

To the extent that any amount received by a U.S. Holder of a surrendered Claim under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the surrendered Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). Conversely, a U.S. Holder of a surrendered Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID). The holding period for such non-cash consideration should begin on the day following the receipt of such property.

The extent to which the consideration received by a U.S. Holder of a surrendered Claim will be attributable to accrued interest on the debt constituting the surrendered Claim is unclear. Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The Plan provides that amounts paid to Holders of Claims will be allocated first to unpaid principal and then to unpaid interest. The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims are urged to consult their tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

U.S. federal income tax laws enacted in December 2017 added section 451 of the IRC. Under this new provision, accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) generally would be required to include certain items of income such as OID (but not market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

    6.   *Market Discount.*

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Claim.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instruments were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the surrendered Claims that were acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as

may occur here), any market discount that accrued on such debt instruments but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

Section 451 of the IRC (as discussed above) generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the IRC) to include certain items of income such as market discount no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed regulations confirming that taxpayers may continue to defer income — including market discount income — for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. Holders should consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and non-Cash consideration received therefor.

7.  *Consequences of Holding Equity in the Purchaser.*

The consequences of holding equity in the Purchaser will depend on whether the Purchaser is treated as a corporation or a partnership for tax purposes.

(a)    Treatment if Purchaser is treated as a corporation for tax purposes.

Any distributions made on account of the equity in the Purchaser will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Purchaser as determined under U.S. federal income tax principles. Certain qualified dividends received by a non-corporate taxpayer are taxed at preferential rates. To the extent that a Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares. Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

(b)    Treatment if Purchaser is treated as a partnership for tax purposes.

Under applicable Treasury Regulations, a limited liability company with at least two members may either be treated as an association taxable as a corporation or as a partnership for U.S. federal income tax purposes. If a limited liability company does not make an election to be an association taxable as a corporation, it will be treated as a partnership for U.S. federal income tax purposes by default.

Under the "publicly traded partnership" provisions of the IRC, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation. It is anticipated that any Purchaser LLC Agreement will prohibit certain transfers of Purchaser Interests (and, in particular, any such transfer that would jeopardize the status of the Purchaser as a partnership for U.S. federal income tax purposes). Any purported transfer in violation of such provisions will be null and void and would not be recognized by the Purchaser.

If the Purchaser is treated as a "publicly traded partnership," the Purchaser will be treated as if it had transferred all of its assets, subject to liabilities, to a newly formed corporation, on the first day of the year in which it was a "publicly traded partnership," in return for stock in that corporation, and then distributed that stock to the unitholders in liquidation of their interests in the Purchaser. This deemed contribution and liquidation, in certain circumstances, could be taxable to a Holder of Purchaser Interests (an "Equityholder"). Thereafter, the Purchaser would be treated as a corporation for U.S. federal income tax purposes.

As a partnership, the Purchaser itself will not be subject to U.S. federal income tax. Instead, the Purchaser will file an annual partnership information return with the IRS which will report the results of the Purchaser's operations. Each Equityholder will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of the Purchaser's income, gain, loss, deduction and credit for each taxable year of the Purchaser ending with or within the Equityholder's taxable year. Each item generally will have the same character as if the Equityholder had realized the item directly. Equityholders will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from the Purchaser for such taxable year, and thus may incur income tax liabilities in excess of any cash distributions from the Purchaser.

An Equityholder is allowed to deduct its allocable share of the Purchaser's losses (if any) only to the extent of such Equityholder's adjusted tax basis (discussed below) in its Purchaser Interests at the end of the taxable year in which the losses occur. In addition, various other limitations in the IRC may significantly limit an Equityholder's ability to deduct its allocable share of deductions and losses of the Purchaser against other income.

The Purchaser will provide each Equityholder with the necessary information to report its allocable share of the the Purchaser's tax items for U.S. federal income tax purposes. However, no assurance can be given that the Purchaser will be able to provide such information prior to the initial due date of the Equityholder's U.S. federal income tax return and Equityholders may therefore be required to apply to the IRS for an extension of time to file their tax returns.

The Purchaser's board will decide how items will be reported on the Purchaser's U.S. federal income tax returns, and all Equityholders will be required under the IRC to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the Purchaser's income tax returns are audited by the IRS, the tax treatment of the Purchaser's income and deductions generally will be determined at the Purchaser level in a single proceeding, rather than in individual audits of the Equityholders. The Purchaser's "tax matters partner" or "partnership representative" (as those terms are used in the IRC) will have considerable authority under the IRC and the Purchaser's LLC Agreement to make decisions affecting the tax treatment and procedural rights of the Equityholders.

An Equityholder generally will not recognize gain or loss on the receipt of a distribution of cash or property from us (provided that the Equityholder is not treated as exchanging such Equityholder's share of the Purchaser's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the IRC, and together "ordinary income items") for other partnership property). An Equityholder, however, will recognize gain on the receipt of a distribution of cash and, in some cases, marketable securities, from the us (including any constructive distribution of money resulting from a reduction of the Equityholder's share of the Purchaser's indebtedness) to the extent such distribution or the fair market value of such marketable securities distributed exceeds such Equityholder's adjusted tax basis in its Purchaser Interests. Such distribution would be treated as gain from the sale or exchange of the Purchaser Interests, which is described below.

An Equityholder's adjusted tax basis in its Purchaser Interests generally will be equal to such member's initial tax basis (discussed above), increased by the sum of (i) any additional capital contribution such Equityholder makes to us, (ii) the Equityholder's allocable share of the income of the Purchaser, and (iii) increases in the Equityholder's allocable share of the Purchaser's indebtedness, and reduced, but not below zero, by the sum of (i) the Equityholder's allocable share of the Purchaser's losses, and (ii) the amount of money or the adjusted tax basis of property distributed to such Equityholder, including constructive distributions of cash resulting from reductions in such Equityholder's allocable share of the Purchaser's indebtedness.

A sale of all or part of the Purchaser Interests will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution)

and such member's adjusted tax basis for the portion of the Purchaser Interests disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the Purchaser Interests have been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a member's allocable share of certain of the Purchaser's ordinary income items and such proceeds exceed the Equityholder's adjusted tax basis attributable to such ordinary income items and (ii) of previously allowed bad debt or ordinary loss deductions. An Equityholder's ability to deduct any loss recognized on the sale of its Purchaser Interests will depend on the Equityholder's own circumstances and may be restricted under the IRC.

        8.   *Sale, Redemption, or Repurchase of Non-Cash Consideration.*

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of non-Cash consideration received pursuant to the Plan. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the Holder held the applicable non-Cash consideration for more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. Under the recapture rules of section 108(e)(7) of the Code, a U.S. Holder may be required to treat gain recognized on such dispositions of the equity in the Purchaser of Interests as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for equity in the Purchaser or Interests.

For a description of certain limitations on the deductibility of capital losses, see the section entitled "Limitation on Use of Capital Losses" below.

        9.   *Limitations on Use of Capital Losses.*

A U.S. Holder of a Claim or Interest who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

      10.   *Medicare Tax.*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of stock.

C.     *Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 Term Loan Claims, Class 4 General Unsecured Claims, Class 5 Affiliate Claims, and Class 9 Dura Interests.*

The following discussion includes only certain U.S. federal income tax consequences to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding

the U.S. federal, state, and local and the foreign tax consequences to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

1.    *Gain Recognition.*

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year in which the Sale Transaction occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide properly executed original copies of IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.    *Interest Payments; Accrued but Untaxed Interest.*

Payments to a Non-U.S. Holder that are attributable to either (a) interest on (or OID accruals with respect to) debt received under the Plan, or (b) accrued but untaxed interest on their Allowed Claim generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtor obligor on a Claim (in the case of consideration received in respect of accrued but unpaid interest) or Purchaser, with respect to the debt received under the Plan (in the case of interest payments with respect thereto);

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the IRC);

- the Non-U.S. Holder is a bank receiving interested described in section 881(c)(3)(A) of the IRC; or

- such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent), the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that

are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on (a) interest on debt received under the Plan and (b) payments that are attributable to accrued but untaxed interest on such Non-U.S. Holder's Allowed Claim. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

3.    *Sale, Redemption, or Repurchase of Non-Cash Consideration.*

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other disposition (including a cash redemption) of its *pro rata* share of the non-Cash consideration received under the Plan unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- in the case of the sale of equity in the Purchaser, Purchaser is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its equity in the Purchaser under the Foreign Investment in Real Property Tax Act ("FIRPTA"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the equity in the Purchaser will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, *provided* that the Non-U.S. Holder properly and timely files a tax return with the IRS. In general, the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period and (b) such interest is regularly traded on an established securities market. In the event equity in the Purchaser is regularly traded on an established securities market, the withholding obligation described above would not apply, even if a Non-U.S. Holder is subject to the substantive FIRPTA tax.

In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a

trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest.  [At this time the Debtors do not anticipate that Purchaser, if it is treated as a corporation, will be a USRPHC for U.S. federal income tax purposes on the Effective Date.  However, the Debtors cannot provide a guarantee of that result, nor can the Debtors guarantee that Purchaser will not become a USRPHC in the future.]

4.    *Consequences of Holding Equity in the Purchaser.*

The consequences of holding equity in the Purchaser will depend on whether the Purchaser is treated as a corporation or a partnership for tax purposes.

(a)    Treatment if Purchaser is a corporation for tax purposes.

Any distributions made with respect to equity in the Purchaser will constitute dividends for U.S. federal income tax purposes to the extent of the issuer's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares.  Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange).  Except as described below, dividends paid with respect to equity in the Purchaser held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to withholding at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to equity in the Purchaser held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  Distributions to a Non-U.S. Holder treated as capital gain from a sale or exchange may also be subject to taxation under FIRPTA (as discussed above).

(b)    Treatment if Purchaser is treated as a partnership for tax purposes.

Non-U.S. Holders treated as engaged in a U.S. trade or business are subject to U.S. federal income tax at the graduated rates applicable to U.S. persons on their net income that is considered to be effectively connected with such U.S. trade or business.  Non-U.S. Holders that are corporations may also be subject to a 30% branch profits tax on such effectively connected income.  The 30% rate applicable to branch profits may be reduced or eliminated under the provisions of an applicable income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is organized.

If Purchaser's method of operation will result in a determination that the Purchaser is engaged in a U.S. trade or business with the result that some portion of the Purchaser's income is properly treated as effectively connected income with respect to Non-U.S. Holders.  If a Non-U.S. Holder were treated as being engaged in a U.S. trade or business in any year because of an investment in Purchaser Interests in such year, such Non-U.S. Holder generally would be (i) subject to withholding on its distributive share of the Purchaser 's income effectively connected with such U.S. trade or business, (ii) required to file a U.S. federal income tax return for such year reporting its allocable share, if any, of income or loss effectively connected with such trade or business and (iii) required to pay U.S. federal income tax at regular U.S. federal income tax rates on any such income.  Moreover, a Non-U.S. Holder who is a corporation might be subject to a U.S. branch profits tax on its allocable share of its effectively connected income.

61

Any amount so withheld would be creditable against such Non-U.S. Holder's U.S. federal income tax liability, and such Non-U.S. Holder could claim a refund to the extent that the amount withheld exceeded such Non-U.S. Holder's U.S. federal income tax liability for the taxable year. Finally, if the Purchaser were treated as being engaged in a U.S. trade or business, a portion of any gain recognized by a Non-U.S. Holder on the sale or exchange of its Purchaser units could be treated for U.S. federal income tax purposes as effectively connected income, and hence such Non-U.S. Holder could be subject to U.S. federal income tax on the sale or exchange. Furthermore, all or a portion of a Non-U.S. Holder's Purchaser Interests may be attributable to U.S. real property, in which case gain on sale or exchange of such New Membership Units could be treated for U.S federal income tax purposes as effectively connected income, even if the Purchaser were not otherwise treated as engaged in a U.S. trade or business.

Non-U.S. Holders may have to supply certain beneficial ownership statements to the Purchaser (which would be available to the IRS) to obtain reductions in U.S. federal withholding tax on interest and to obtain benefits under U.S. income tax treaties, to the extent applicable.

In general, different rules from those described above apply in the case of Non-U.S. Holder subject to special treatment under U.S. federal income tax law, including a Non-U.S. Holder (i) who has an office or fixed place of business in the United States or is otherwise carrying on a U.S. trade or business; (ii) who is an individual present in the United States for 183 or more days or has a "tax home" in the United States for U.S. federal income tax purposes; or (iii) who is a former citizen or resident of the United States.

Non-U.S. Holders are urged to consult their tax advisors with regard to the U.S. federal income tax consequences to them of acquiring, holding and disposing of the Purchaser Interests, as well as the effects of state, local and non-U.S. tax laws, as well as eligibility for any reduced withholding benefits.

5.    *FATCA.*

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of equity in the Purchaser), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include equity in the Purchaser and the Claims). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occur after December 31, 2018. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of the Claims or the equity in the Purchaser.

D.    *Information Reporting and Withholding.*

The Debtors, Purchaser, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).

Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders of Claims subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE X.
## RECOMMENDATIONS OF THE DEBTORS

**In the opinion of the Debtors, the Plan is extremely preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a larger distribution to the Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.**  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  **Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.**

[*Balance of Page Intentionally Left Blank*]

Respectfully submitted,

Dated: January 17, 2020

Dura Automotive Systems, LLC
on behalf of itself and all other Debtors

_____

Name: [•]
Title: Independent Manager
Company: Dura Automotive Systems, LLC