**<u>Exhibit A</u>**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-12378 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ORDER AUTHORIZING THE DEBTORS TO ENTER INTO THE DIP AMENDMENT

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for entry of an order (this "<u>Order</u>") authorizing the Debtors to enter into the DIP Amendment, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "<u>Hearing</u>"); and the Court having

---

[1] The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is: 1780 Pond Run, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

entered the Final DIP Order; and it appearing that the Debtors' proposed entry into the DIP Amendment is a sound and prudent exercise of the Debtors' business judgment; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The DIP Amendment attached hereto as <u>Exhibit 1</u> is hereby approved, and the Debtors are authorized to enter into the DIP Amendment and any amendments to the Credit Documents related thereto without further notice or order of the Court.

3.      Except as modified by the DIP Amendment, the Credit Documents shall remain in full force and effect.

4.      The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order without further notice or order of the Court.

5.      All references to the DIP Facility and the DIP Credit Agreement in the Final DIP Order shall be deemed references to the DIP Facility and the DIP Credit Agreement as amended by this Order and the DIP Amendment.

6.      Notwithstanding the possible applicability of Bankruptcy Rules 6004, 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      The terms and conditions of this Order shall be immediately enforceable upon its entry.

8.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **Exhibit 1**

**DIP Amendment**

## AMENDMENT NO. 1 TO
## SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This Amendment No. 1 (this "Amendment"), dated as of February [●], 2020, to the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of October 24, 2019 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "Credit Agreement"), among DURA AUTOMOTIVE SYSTEMS, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), the Domestic Subsidiaries from time to time party thereto as guarantors thereunder and each, a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (collectively the "Guarantors"), the financial institutions and other investors from time to time lenders thereunder (collectively, the "Lenders"), and CORTLAND CAPITAL MARKET SERVICES LLC, as agent for such Lenders (in such capacity, the "Agent"). Capitalized terms used herein but not defined herein are used as defined in the Credit Agreement.

W I T N E S S E T H:

WHEREAS, Section 9.1 of the Credit Agreement provides that the Credit Documents may be amended or waived with the written consent of the Agent and the Required Lenders; and

WHEREAS, the Borrower has requested that the Agent and the Required Lenders make certain amendments to the Credit Agreement, as more specifically set forth below, and the Agent and Required Lenders have agreed to do so, subject to certain limitations and conditions set forth below;

NOW, THEREFORE the parties hereto agree as follows:

Section 1.    Amendments to the Credit Agreement. The Credit Agreement is, effective as of the date first written above and subject to the satisfaction (or due waiver) of the conditions precedent set forth in Section 2 hereof, hereby amended as follows:

(a)    The Recitals to the Credit Agreement are hereby amended by deleting "$84,000,000" where it appears therein and substituting "$96,000,000" in lieu thereof.

(b)    Section 1.1 of the Credit Agreement is hereby amended by adding the following defined terms in their proper alphabetical order:

"Amendment No. 1" means that certain Amendment No. 1 to this Agreement, dated as of the Amendment No. 1 Effective Date, among the Loan Parties, the Agent and the Lenders party thereto.

"Amendment No. 1 Delayed Draw Commitment" means, (i) with respect to each Term Loan Lender that is a Lender on the Amendment No. 1 Effective Date, the amount set forth opposite such Term Loan Lender's name on Schedule 2.1(a) as such Lender's "Amendment No. 1 Delayed Draw Commitment" and (ii) in the case of any Person that becomes a Term Loan Lender after the Amendment No. 1 Effective Date, the amount specified as such Term Loan Lender's "Amendment No. 1 Delayed Draw

Commitment" in the Assignment Agreement pursuant to which such Lender assumed such Amendment No. 1 Delayed Draw Commitment, in each case as the same may be reduced or increased from time to time pursuant to the terms hereof.  The aggregate amount of the Term Loan Lenders' Amendment No. 1 Delayed Draw Commitments on the Amendment No. 1 Effective Date is $12,000,000.

"<u>Amendment No. 1 Delayed Draw Commitment Percentage</u>" means, with respect to any Term Loan Lender at any time, the ratio of such Term Loan Lender's Amendment No. 1 Delayed Draw Commitment at such time to the aggregate amount of Amendment No. 1 Delayed Draw Commitments of all Term Loan Lenders at such time.

"<u>Amendment No. 1 Delayed Draw Loan</u>" has the meaning stated in Section 2.1(a).

"<u>Amendment No. 1 Effective Date</u>" means the date on which the conditions set forth in Section 2 (Conditions Precedents to the Effectiveness of Amendment No. 1) of Amendment No. 1 are satisfied, which date is February [●], 2020.

"<u>Amendment No. 1 Order</u>" means an order of the Bankruptcy Court, in the form set forth in Exhibit E, authorizing, among other things, Amendment No. 1 and the transactions contemplated thereby, with only such modifications as are reasonably satisfactory to the Borrower and the Required Lenders.

"<u>Amendment No. 1 Delayed Draw Weekly Amount</u>" means, for each week listed on <u>Exhibit F</u>, the amount of the Amendment No. 1 Delayed Draw Commitment permitted to be borrowed by the Borrower for such week; <u>provided</u>, that any unused amounts in any week may be carried forward to the succeeding week and shall increase the amount of the Amendment No. 1 Delayed Draw Commitment permitted to be borrowed during such succeeding week by such amount carried forward (so long as any such amounts carried forward are used in a manner contemplated by and consistent with the Approved Budget).

(c)    The following defined terms appearing in Section 1.1 of the Credit Agreement shall be amended and restated in their entirety as follows:

"<u>DIP Budget</u>" means, from the Amendment No. 1 Effective Date and thereafter, the budget for the period commencing on [the Amendment No. 1 Effective Date] through [March 29, 2020] (the "<u>Budget Period</u>") attached hereto as <u>Exhibit G</u>, setting forth all forecasted cash disbursements, including non-operating, bankruptcy related cash disbursements, of the Credit Parties (the "<u>Total Disbursements</u>").

"<u>Maturity Date</u>" means April 15, 2020.

"<u>Orders</u>" means the Interim Order, the Amendment No. 1 Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

"<u>Term Loan Commitment</u>" means, individually or collectively, as the context may require, the Initial Commitment, the Delayed Draw Commitment or the

Amendment No. 1 Delayed Draw Commitment.  The aggregate amount of (i) the Initial Commitment as of the Amendment No. 1 Effective Date is $0, (ii) the Delayed Draw Commitment as of the Amendment No. 1 Effective Date is $0 and (iii) the Amendment No. 1 Delayed Draw Commitment as of the Amendment No. 1 Effective Date is $12,000,000.

"Term Loan Exposure" means, with respect to any Lender at any time, the sum of (a) the Initial Commitment, the Delayed Draw Commitment and the Amendment No. 1 Delayed Draw Commitment of such Lender at such time and (b) the aggregate principal amount of the Term Loans of such Lender outstanding at such time.

(d)    The definitions of "Cash Receipts", "Cash Operating Disbursements" and "Cash Bankruptcy Disbursements" appearing in Section 1.1 of the Credit Agreement shall be deleted in their entirety.

(e)    Section 2.1(a) of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

(a)    Subject to the terms and conditions hereof and in the Orders, each Term Loan Lender severally agrees to (i) following entry of the Interim Order and the satisfaction (or waiver) of the conditions set forth in Sections 3.1, to make term loans to the Borrower in one or more Borrowings from time to time during the period beginning on the Closing Date and ending on October 30, 2019 in an aggregate principal amount for all such Borrowings not to exceed such Term Loan Lender's Initial Commitment (the "Initial Loans"), (ii) following satisfaction (or waiver) of the conditions to Borrowing set forth in Sections 3.2, to make additional delayed draw term loans to the Borrower in one or more Borrowings from time to time during the period beginning upon entry of the Final Order and ending on the Termination Date (the "Delayed Draw Loans") in an aggregate principal amount for all such borrowings not to exceed such Term Loan Lender's Delayed Draw Commitment and (iii) following entry of the Amendment No. 1 Order and the satisfaction (or waiver) of the conditions set forth in Section 2 of Amendment No. 1, to make delayed draw term loans to the Borrower in multiple Borrowings from time to time beginning on the Amendment No. 1 Effective Date and ending on the Maturity Date (the "Amendment No. 1 Delayed Draw Loans") in an aggregate principal amount not to exceed such Term Loan Lender's Amendment No. 1 Delayed Draw Commitment and in a weekly amount equal to the Amendment No. 1 Delayed Draw Weekly Amount.  Each borrowing of Delayed Draw Loans shall be made by the Term Loan Lenders in accordance with their respective Delayed Draw Commitment Percentage of the requested borrowing (and the aggregate amount of borrowings of Delayed Draw Loans shall in no event exceed the aggregate amount of the Delayed Draw Commitments of the Term Loan Lenders). Following the making of any Delayed Draw Loans, the Delayed Draw Commitment of such Term Loan Lender in respect of the Delayed Draw Loans shall automatically be reduced by the amount of such Delayed Draw Loan so made.  To the extent not terminated earlier, each Term Loan Lender's Delayed Draw Commitment shall terminate immediately and without further action on the

3

Termination Date.  Each Borrowing of Amendment No. 1 Delayed Draw Loans shall be made by the Term Loan Lenders in accordance with their respective Amendment No. 1 Delayed Draw Commitment Percentage of the requested Borrowing (and the aggregate amount of Borrowings of Amendment No. 1 Delayed Draw Loans shall in no event exceed the aggregate amount of the Amendment No. 1 Delayed Draw Commitments of the Term Loan Lenders).  Following the making of any Amendment No. 1 Delayed Draw Loans, the Amendment No. 1 Delayed Draw Commitment of such Term Loan Lender in respect of the Amendment No. 1 Delayed Draw Loans shall automatically be reduced by the amount of such Amendment No. 1 Delayed Draw Loan so made.  Each Term Loan Lender's Amendment No. 1 Delayed Draw Commitment shall terminate when the Amendment No. 1 Delayed Draw Commitment is reduced to $0.  To the extent not terminated earlier, each Term Loan Lender's Amendment No. 1 Delayed Draw Commitment shall terminate immediately and without further action on the Maturity Date.  Once funded, each Initial Loan, each Delayed Draw Loan and each Amendment No. 1 Delayed Draw Loan shall be a "Loan" and a "Term Loan" for all purposes under this Agreement and the other Credit Documents. Notwithstanding anything herein to the contrary, each of the parties hereto acknowledges and agrees that (i) Initial Loans in the principal amount of $5,100,000 were advanced by the Term Loan Lenders to the Borrower on October 24, 2019 (with the allocation among the Term Loan Lenders as set forth on Schedule 2.1(b)), (ii) Initial Loans in the principal amount of $32,000,000 were advanced by the Term Loan Lenders to the Borrower on October 25, 2019 (with the allocation among the Term Loan Lenders as set forth on Schedule 2.1(b)) and (iii) Initial Loans in the principal amount of $22,500,000 were advanced by the Term Loan Lenders to the Borrower on October 30, 2019 (with the allocation among the Term Loan Lenders as set forth on Schedule 2.1(b)).  Such Initial Loans shall accrue interest from the date so advanced in accordance with the terms of this Agreement.  As of October 30, 2019 (after giving effect to the advance of Initial Loans on such date), the Initial Commitments of the Term Loan Lenders are $0. The aggregate amount of the Delayed Draw Commitments remaining on the Amendment No. 1 Effective Date are $0.

(f)     The introductory paragraph to Section 3.2 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

Conditions to Delayed Draw Borrowing or Amendment No. 1 Delayed Draw Borrowing.  The obligation of each Lender to make any Delayed Draw Loan or any Amendment No. 1 Delayed Draw Loan on any Borrowing Date is subject to the satisfaction, or waiver in accordance with Section 9.1, of the following conditions precedent:

(g)     Section 5.6(h) of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

(h)     Beginning on the Amendment No. 1 Effective Date (and every week thereafter) the Credit Parties shall provide the Agent and Lenders with a weekly

and cumulative variance reporting on a line item basis for Total Disbursements, which reporting shall (i) detail the variance, if any, of actual cash disbursements from the DIP Budget and (ii) provide an explanation of any per line item variance greater than 5.00% (the "Variance Report"). In addition, at the request of the Required Lenders, the Borrower will make its financial professionals available no more than once during each week to participate in a conference call and answer any questions that the Lenders have with respect to any such variances at a time reasonably agreed between Borrower and the Required Lenders.

(h)    Section 5.29 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

Section 5.29   Milestones.  The Credit Parties shall ensure the satisfaction of the following milestones (collectively, the "Milestones" and each a "Milestone"), unless waived or extended with the consent of the Required Lenders or the Agent (with the written consent of the Required Lenders):

(a)    no later than five (5) business days after entry of the Interim Order, filing of Bid Procedures in all respects reasonably acceptable to the Required Lenders in their sole discretion;

(b)    no later than 30 days after entry of the Interim Order, entry of the Final Order;

(c)    no later than January 17, 2020, filing of a proposed Acceptable Plan of Reorganization and related disclosure statement;

(d)    no later than March 2, 2020, entry of an order approving the disclosure statement; and

(e)    no later than April 9, 2020, confirmation of an Acceptable Plan of Reorganization.

(i)    Section 5.36 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

Section 5.36   Financial Covenant.  As of any Budget Testing Date, the Borrower will not permit with respect to the Budget Testing Period most recently ended prior to such Budget Testing Date the cumulative Total Disbursements to vary from the DIP Budget by more than 7.50% for each Budget Testing Period (the "Total Disbursement Variance" or the "Permitted Variance").  Within five (5) Business Days of each Budget Testing Date, the Borrower shall deliver a certificate certified by the chief financial officer in form and substance satisfactory to the Required Lenders demonstrating compliance (or non-compliance) with this Section 5.36.

(j)    Section 7.1(mm) of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

(mm)   the closing of an Acceptable 363 Sale shall not have occurred on or prior to March 30, 2020, and the DIP Budget shall not have been modified by the DIP Loan Parties (with the consent of the Required Lenders in their sole and absolute discretion) to reflect and forecast the Credit Parties' Total Disbursements for the two-week period after such closing (subject to variances permitted hereunder);

(k)      Schedule 2.1(a) is hereby deleted in its entirety and replaced with Schedule 2.1(a) appearing on Exhibit A attached hereto.

(l)      The Credit Agreement is hereby amended by adding a new Exhibit E (Amendment No. 1 Order) thereto, which shall be in the form of Exhibit B attached hereto.

(m)      The Credit Agreement is hereby amended by adding a new Exhibit F (Amendment No. 1 Delayed Draw Weekly Amount) thereto, which shall be in the form of Exhibit C attached hereto.

(n)      The Credit Agreement is hereby amended by adding a new Exhibit G (DIP Budget as of the Amendment No. 1 Effective Date) thereto, which shall be in the form of Exhibit D attached hereto.

Section 2.    Conditions Precedent to the Effectiveness of Amendment No. 1. This Amendment shall become effective when each of the following conditions precedent shall have been satisfied or duly waived by the Agent (such date, the "Amendment No. 1 Effective Date"):

(a)      The Lenders shall have received a certificate of the secretary or assistant secretary, the chief executive officer, chief financial officer, the authorized signatory, the manager, the general partner, or other Authorized Officer as the case may be, of each Credit Party with respect to (i) the articles of incorporation or certificate of formation, as the case may be, of such Credit Party (which certificate may certify that no changes have been made to the versions delivered on the Closing Date in lieu of attaching such documents to such certificate), (ii) the regulations, bylaws, operating agreement or limited partnership agreement, as the case may be, of such Credit Party (which may certify that no changes have been made to the versions delivered on the Closing Date in lieu of attaching such documents to such certificate), (iii) the resolutions of the Board of Directors of such Credit Party approving this Amendment and the other documents to be delivered by such Credit Party in accordance with this Amendment and the performance of the obligations of such Credit Party thereunder, and (iv) the names and true signatures of the officers of such Credit Party or such other persons authorized to sign this Amendment and the other documents to be delivered by it thereunder.

(b)      The Lenders shall have received a good standing certificate from the applicable Governmental Authority of each jurisdiction of incorporation, organization or formation of each Credit Party, each dated a recent date prior to the Amendment No. 1 Effective Date.

(c)      The Borrower, the Agent and the Required Lenders (which shall include each Lender with an Amendment No. 1 Delayed Draw Commitment) shall have signed a counterpart hereof (whether the same or different counterparts);

(d)      The Agent and the Lenders shall have received a Borrowing Certificate in accordance with Section 2.3 of the Credit Agreement, executed by an Authorized Officer of the Borrower;

(e)      As of the date hereof, after giving effect to any Amendment No. 1 Delayed Draw Loans borrowed on the date hereof, the representations, warranties and covenants of the Credit Parties contained in the Credit Documents (after giving effect to Amendment No. 1) shall be true, correct and complied with, in each case, in all material respects (unless any such representation, warranty or covenant shall already contain a materiality qualifier, in which case it shall be true, correct and complied with in all respects) on and as of the date hereof, as if made on and as of the date hereof;

(f)      As of the date hereof, after giving effect to any Amendment No. 1 Delayed Draw Loans borrowed on the date hereof and Amendment No. 1, no event shall have occurred and be continuing or would result from the consummation of the Amendment No. 1 Delayed Draw Loans that would constitute an Event of Default or a Default;

(g)      After making any Amendment No. 1 Delayed Draw Loans requested on the Amendment No. 1 Effective Date, the aggregate outstanding principal amount of the Amendment No. 1 Delayed Draw Loans shall not exceed the aggregate amount of the Amendment No. 1 Delayed Draw Commitments;

(h)      The Borrower shall have confirmed in writing that the proceeds of the Amendment No. 1 Delayed Draw Loans shall be used in accordance with the provisions of Section 2.5 of the Credit Agreement;

(i)      Since August 31, 2019, no Material Adverse Effect shall have occurred after giving effect to any Amendment No. 1 Delayed Draw Loans borrowed on the date hereof;

(j)      The Bankruptcy Court shall have entered the Amendment No. 1 Order approving the incurrence of the Amendment No. 1 Delayed Draw Loans, and the Amendment No. 1 Order shall be in full force and effect, shall not have been vacated or reversed and shall not be subject to any stay; and

(k)      All fees and out-of-pocket expenses (including attorneys' fees) of the Lenders and the Agent incurred and payable by the Borrower in accordance with the terms of the Credit Documents in connection with this Amendment, the Credit Agreement and the other Credit Documents shall have been paid, or shall be paid substantially concurrently with, the Amendment No. 1 Delayed Draw Loans (which amounts may, at the Borrower's option, be offset against the proceeds of such Loans).

On the date hereof, the Borrower shall be deemed to have represented and warranted that the conditions specified in paragraphs (e) and (i) above have been satisfied.

Upon the occurrence of the Amendment No. 1 Effective Date, notwithstanding anything contained herein to the contrary, the amendments contained in Section 1(d) and 1(e) hereof shall be effective as of December 31, 2019.

Section 3.    <u>Consent of Guarantors and Reaffirmation of Obligations</u>. Each Guarantor hereby consents to this Amendment and agrees that it continues to guarantee the due and punctual payment in full in cash of all Obligations, as modified hereby, when and as the same shall become due, and that the terms hereof shall not affect in any way its obligations and liabilities, as expressly modified hereby, under the Credit Documents.  Each Credit Party hereby reaffirms as of the date hereof (a) all such Obligations, and agrees that such Obligations shall remain in full force and effect, (b) the Liens granted under the Credit Documents, and agrees that such Liens shall continue to secure the Obligations as expressly modified hereby, and (c) the validity and enforceability of the Credit Documents.

Section 4.    <u>Consent of the Agent</u>. The Agent hereby consents to the incurrence by the Borrower of the Amendment No. 1 Term Loan and the completion by the Borrower of the other transactions contemplated hereby and confirms that such actions shall not constitute an Event of Default pursuant to Section 7.1(x) of the Credit Agreement.

Section 5.    <u>Consent of the Required Lenders</u>. The Required Lenders hereby consent to the modification of the Orders to permit the incurrence by the Borrower of the Amendment No. 1 Term Loan and the completion by the Borrower of the other transactions contemplated hereby and confirm that (i) such actions shall not constitute an Event of Default pursuant to Section 7.1(kk) of the Credit Agreement and (ii) this Amendment shall constitute the consent required by Section 5.32 of the Credit Agreement with respect to the amendment of the Orders.

Section 6.    <u>Effect on the Credit Documents</u>. As of the Amendment No. 1 Effective Date, this Amendment shall constitute a Credit Document, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import and each reference in the other Credit Documents to the Credit Agreement (including, without limitation, by means of words like "thereunder," "thereof," "therein" and words of like import) shall refer to the Credit Agreement as modified hereby, and this Amendment and the Credit Agreement shall be read together and construed as a single agreement.  The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, (a) waive or modify any right, power or remedy under, or any other provision of, any Credit Document or (b) commit or otherwise obligate the Agent or any Lender to enter into or consider entering into any other waiver or modification of any Credit Document.  Except as specifically amended above, all of the terms and provisions of the other Credit Documents are and shall remain in full force and effect and are hereby ratified and confirmed.

Section 7.    <u>Execution in Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.  Delivery of an executed counterpart of this Amendment by facsimile or other electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Amendment.

Section 8.    <u>Governing Law; Miscellaneous</u>. THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY

CODE.  The provisions of Sections 9.11 and 9.12 of the Credit Agreement shall apply to this Amendment *mutatis mutandis*.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers and general partners thereunto duly authorized as of the date first written above.

**DURA AUTOMOTIVE SYSTEMS, LLC**

By:_____
Name:
Title:

**DURA OPERATING, LLC**

By:_____
Name:
Title:

**DURA MEXICO HOLDINGS, LLC**

By:_____
Name:
Title:

**NAMP, LLC**

By:_____
Name:
Title:

**DURA AUTOMOTIVE SYSTEMS CABLE OPERATIONS, LLC**

By:_____
Name:
Title:

**DURA FREEMONT, L.L.C.**


By:_____
Name:
Title:

**DURA G.P.**


By:_____
Name:
Title:

**CORTLAND CAPITAL MARKET SERVICES LLC**, as the Agent


By:_____
Name:
Title:

**[LENDER]**


By:_____
Name:
Title:

EXHIBIT A TO AMENDMENT NO. 1

**SCHEDULE 2.1(A)**

**COMMITMENTS**

Initial Commitment

| Term Loan Lender | Initial Commitment |
|---|---|
| Halcyon Loan Trading Fund LLC | $40, 711,159.11 |
| HCN LP | $13,548,481.32 |
| Praetorium Fund I ICAV | $3,595,819.14 |
| Halcyon Eversource Credit LLC | $1,744,540.43 |
| **Total:** | **$59,600,000** |

Delayed Draw Commitment

| Term Loan Lender | Delayed Draw Commitment |
|---|---|
| Halcyon Loan Trading Fund LLC | $16,666,984.61 |
| HCN LP | $5,546,693.70 |
| Praetorium Fund I ICAV | $1,472,113.86 |
| Halcyon Eversource Credit LLC | $714,207.83 |
| **Total:** | **$24,400,000** |

Amendment No. 1 Delayed Draw Commitment

| Term Loan Lender | Amendment No. 1 Delayed Draw Commitment |
|---|---|
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| **Total:** | **$12,000,000** |

EXHIBIT B TO AMENDMENT NO. 1

**EXHIBIT E**

**AMENDMENT NO. 1 ORDER**

**(See attached.)**

EXHIBIT C TO AMENDMENT NO. 1

**EXHIBIT F**

**AMENDMENT NO. 1 DELAYED DRAW WEEKLY AMOUNT**

| Week | Amendment No. 1 Delayed Draw Weekly Amount |
|---|---|
| Week beginning February 16, 2020 | $5,000,000 |
| Week beginning February 23, 2020 | $2,500,000 |
| Week beginning March 1, 2020 | $2,500,000 |
| Week beginning March 8, 2020 | $2,000,000 |
| Week beginning March 15, 2020 | $0 |
| Week beginning March 22, 2020 | $0 |
| Week beginning March 29, 2020 | $0 |

EXHIBIT D TO AMENDMENT NO. 1

**EXHIBIT G**

**DIP BUDGET AS OF AMENDMENT NO. 1 EFFECTIVE DATE**

(See attached.)

**Dura Automotive Systems LLC**
**Dura U.S. Cash Flow Forecast**
*$USD in Thousands*

| | Estimate | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending --> | 1/26/20 | 2/2/20 | 2/9/20 | 2/16/20 | 2/23/20 | 3/1/20 | 3/8/20 | 3/15/20 | 3/22/20 | 3/29/20 | Proceeding |
| Cash Flow Week --> | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| *Collections* | | | | | | | | | | | |
| Operating Receipts - Production | $ 3,818 | $ 5,831 | $ 5,831 | $ 4,489 | $ 4,489 | $ 4,489 | $ 4,489 | $ 4,489 | $ 5,381 | $ 5,381 | $ 48,689 |
| Operating Receipts - Tooling | - | - | - | - | - | - | - | - | - | - | - |
| Related Party Receipts | 125 | 125 | - | 125 | - | 125 | 230 | 125 | - | 125 | 980 |
| **Total Collections** | $ 3,943 | $ 5,956 | $ 5,831 | $ 4,614 | $ 4,489 | $ 4,614 | $ 4,719 | $ 4,614 | $ 5,381 | $ 5,506 | $ 49,669 |
| *Disbursements* | | | | | | | | | | | |
| Payroll | $ 12 | $ 2,150 | $ - | $ 2,150 | $ - | $ 2,150 | $ - | $ 2,150 | $ - | $ 2,150 | $ 10,762 |
| 401k | 204 | 1 | 134 | - | 134 | - | 137 | - | 137 | - | 745 |
| Pension | 2 | - | - | - | - | - | - | - | - | - | 2 |
| Healthcare Benefits | 297 | 155 | 114 | 114 | 114 | 114 | 100 | 100 | 100 | 100 | 1,308 |
| Rent | - | - | 70 | - | - | - | 70 | - | - | - | 141 |
| Operating Leases | - | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 63 |
| Dura De Mexico Transfer - Maquila | 453 | 453 | 447 | 634 | 195 | 216 | 447 | 400 | 400 | 400 | 4,045 |
| Management Fee | - | - | 100 | - | - | - | 100 | - | - | - | 200 |
| Taxes | - | - | - | 58 | 0 | 273 | - | - | - | - | 331 |
| Insurance Policies / Renewals | - | - | - | 315 | - | - | - | 315 | - | - | 629 |
| Utilities | 19 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 542 |
| Materials | 3,120 | 2,715 | 3,144 | 3,083 | 2,828 | 2,894 | 2,740 | 2,802 | 2,953 | 2,953 | 29,229 |
| Freight / Shipping | 1,182 | 467 | 566 | 563 | 130 | 3 | 69 | 69 | 83 | 83 | 3,215 |
| General Admin | 85 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 1,027 |
| Other G&A | 0 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 540 |
| IT | 513 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 1,664 |
| Other | - | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 419 |
| **Total Disbursements** | $ 5,887 | $ 6,346 | $ 4,979 | $ 7,321 | $ 3,805 | $ 6,053 | $ 4,067 | $ 6,239 | $ 4,076 | $ 6,089 | $ 54,861 |
| **Operating Cash Flow** | $ (1,944) | $ (390) | $ 852 | $ (2,706) | $ 685 | $ (1,439) | $ 653 | $ (1,625) | $ 1,305 | $ (583) | $ (5,192) |
| Cumulative Operating Cash Flow | (1,944) | (2,334) | (1,482) | (4,188) | (3,503) | (4,942) | (4,290) | (5,914) | (4,609) | (5,192) | (5,192) |
| Net Capital Expenditures [1] | - | - | 701 | 51 | 2,930 | - | - | - | - | - | 3,681 |
| *Restructuring Costs* | | | | | | | | | | | |
| Debtor Advisors | $ 1,746 | $ 1,431 | $ - | $ - | $ 1,825 | $ 150 | $ - | $ - | $ 750 | $ - | $ 5,902 |
| Secured Lender Advisors | - | 170 | - | - | - | - | - | - | - | - | 170 |
| UCC Counsel & Advisor Fees | - | - | - | - | 1,500 | - | - | - | - | - | 1,500 |
| Other Professional Fees & Contingencies | - | 541 | - | 50 | - | 75 | - | 50 | - | 75 | 791 |
| Critical Vendor Motion | 656 | 600 | 600 | - | - | - | - | - | - | - | 1,856 |
| Shippers Motion | 947 | - | - | - | - | - | - | - | - | - | 947 |
| Utility Fee Deposit | - | - | - | - | - | - | - | - | - | - | - |
| Insurance - D&O | - | - | - | - | - | - | - | - | - | - | - |
| KEIP / KERP | - | - | - | - | - | - | - | - | - | - | - |
| Tax - Past Due Payments | - | - | - | - | - | - | - | - | - | - | - |
| **Total Restructuring Costs** | $ 3,349 | $ 2,741 | $ 600 | $ 50 | $ 3,325 | $ 225 | $ - | $ 50 | $ 750 | $ 75 | $ 11,166 |
| Total Receipts | $ 3,943 | $ 5,956 | $ 5,831 | $ 4,614 | $ 4,489 | $ 4,614 | $ 4,719 | $ 4,614 | $ 5,381 | $ 5,506 | $ 49,669 |
| Total Disbursements | 9,236 | 9,788 | 5,629 | 10,301 | 7,130 | 6,278 | 4,067 | 6,289 | 4,826 | 6,164 | 69,709 |
| **Pre-Financing Cash Flow** | $ (5,293) | $ (3,832) | $ 201 | $ (5,687) | $ (2,641) | $ (1,664) | $ 653 | $ (1,675) | $ 555 | $ (658) | $ (20,040) |
| *Draw / Repayment* | | | | | | | | | | | |
| DIP Financing | - | - | - | 5,000 | 2,500 | 2,500 | 2,000 | - | - | - | 12,000 |
| **Total** | - | - | - | 5,000 | 2,500 | 2,500 | 2,000 | - | - | - | 12,000 |
| *Interest Expense* | | | | | | | | | | | |
| DIP Financing | - | 800 | - | 100 | 50 | 946 | 40 | - | - | 960 | 2,896 |
| **Total** | - | 800 | - | 100 | 50 | 946 | 40 | - | - | 960 | 2,896 |
| Beginning Book Cash | $ 10,979 | $ 5,686 | $ 1,054 | $ 1,255 | $ 469 | $ 278 | $ 168 | $ 2,781 | $ 1,106 | $ 1,661 | $ 10,979 |
| Pre-Financing Cash Flow | (5,293) | (3,832) | 201 | (5,687) | (2,641) | (1,664) | 653 | (1,675) | 555 | (658) | (20,040) |
| Interest & Fees - DIP | - | (800) | - | (100) | (50) | (946) | (40) | - | - | (960) | (2,896) |
| Draw / (Repayment) - ABL Facility & DIP | - | - | - | 5,000 | 2,500 | 2,500 | 2,000 | - | - | - | 12,000 |
| **Ending Book Cash** | $ 5,686 | $ 1,054 | $ 1,255 | $ 469 | $ 278 | $ 168 | $ 2,781 | $ 1,106 | $ 1,661 | $ 43 | $ 43 |
| Ending DIP Balance | 84,000 | 84,000 | 84,000 | 89,000 | 91,500 | 94,000 | 96,000 | 96,000 | 96,000 | 96,000 | 96,000 |
| Available DIP Balance | 12,000 | 12,000 | 12,000 | 7,000 | 4,500 | 2,000 | - | - | - | - | - |
| **Total Liquidity** | $ 17,686 | $ 13,054 | $ 13,255 | $ 7,469 | $ 4,778 | $ 2,168 | $ 2,781 | $ 1,106 | $ 1,661 | $ 43 | $ 43 |

1. Incremental Capital Expenditure needs within DIP period (totaling $7 million) are assumed to be funded via cash flows from European operations, given U.S. liquidity constraints under DIP facility.