## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-12378 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

### DECLARATION OF RICHARD W. MORGNER IN SUPPORT OF THE PROPOSED EUROPEAN TRANSACTION AND THE NORTH AMERICAN TRANSACTION

I, Richard W. Morgner, hereby declare under penalty of perjury as follows:

1.     I submit this declaration (this "Declaration") in support of the proposed European Transaction and the North American Transaction pursuant to the terms set forth in the European Purchase Agreement and the North American Purchase Agreement, respectively.[2]

2.     The statements in this Declaration are, except where specifically noted, based on my personal knowledge or views, on information that I have from the Debtors' advisors or employees working directly with me or under my supervision, direction, or control, or from the Debtors' books and records maintained in the ordinary course of business.  I am not being specifically compensated for this testimony other than through payments received by Jefferies LLC ("Jefferies") as a professional retained by the Debtors (including certain transaction

---

[1]     The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are:  Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693).  Dura Automotive Systems, LLC's service address is:  1780 Pond Run, Auburn Hills, Michigan 48326.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the forthcoming *Debtors' Reply in Support of the Proposed European Transaction and North American Transaction* or the *Order (I) Approving Bidding Procedures with Respect to Substantially All Assets, (II) Approving Contract Assumption and Assignment Procedures, (III) Scheduling Bid Deadlines, an Auction, and the Hearings and Objection Deadlines Related Thereto, and (IV) Approving the Form and Manner of Notice Thereof* [Docket No. 339] (the "Bid Procedures Order"), as applicable.

fees).  I am familiar with the Sale Transactions and the Debtors' sale and marketing process.  If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.

### Professional Background and Qualifications

3.      I am a Managing Director and Joint Global Head of the Debt Advisory & Restructuring Group at Jefferies, a global investment banking firm founded over 50 years ago, with its principal office located at 520 Madison Avenue, 17th Floor, New York, New York 10022.  Jefferies is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.  Jefferies, together with its investment banking advisory affiliates, has approximately 3,900 employees located in more than 30 offices around the world.  Jefferies and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.

4.      I have more than 27 years of investment banking and restructuring experience.  During my career, I have personally led an investment banking team or otherwise been involved in the sales of over 100 companies as a going concern, many of which had been experiencing financial distress.  I have also personally led an investment banking team or otherwise been involved in approximately 30 in-court chapter 11 cases over the past 18 years.  Since joining Jefferies in 2009, I have provided investment banking expertise and distressed mergers and acquisition and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings.  Prior to joining Jefferies, I was a Managing Director and Co-Head of the mergers and acquisitions group at Miller Buckfire, where my primary responsibilities included advising

companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations.

### The Postpetition Marketing Process and Consultation With Consultation Parties

5.     The Bid Procedures Order entered by the Court on November 19, 2019 set the dates and deadlines relating to the marketing and sales process, including a bid deadline of January 22, 2020, and also set forth various other consultation rights and procedures relating to the sale and marketing process.

6.     Throughout the sales process, my team regularly reported updates to the independent managers who comprise the Debtors' transaction committee (the "Transaction Committee") and sought their direction where appropriate.  The Transaction Committee held telephone conferences at least weekly, with additional meetings being scheduled as necessary.  In addition, the Debtors and their advisors also regularly consulted with the Consultation Parties regarding the status of the sales process.  My team at Jefferies had a weekly standing telephone conference with the Committee's advisors and an additional separate weekly standing telephone conference with the advisors of the DIP Lender and the Zohars.  Additionally, the Transaction Committee held its own weekly standing telephone conference with the Zohars' independent director.  In total, the Debtors' advisors estimate that they held in excess of 100 telephone conference calls and at least five in-person meetings with the Zohars, the Committee, the DIP Lender, and/or the Debtors' customers to keep parties up to date on the sales process and answer questions as they arose.[3]  Jefferies pursued all available leads that it identified, discussed the

---

[3]     At least two of these meetings included representation from the ad hoc group of customers, the Zohars and the DIP Lender.  At least one meeting also included representation from the Committee.

process with the Consultation Parties, and reached out to additional prospective bidders that were suggested by the Consultation Parties.

7.      Throughout the process, Jefferies also gave regular updates to an ad hoc group of customers of the Debtors with respect to the restructuring and the sale process.  These efforts commenced on October 31, 2019 with an initial customer briefing in New York City, with various customers also participating by telephone.  Jefferies also participated in various regular telephone conferences with the customers and the Debtors' management and other advisors.  As discussed further below, Jefferies also arranged in-person meetings in New York City with the customers and the potential bidders.

### Initial Marketing Process and Initial Non-Binding Bids

8.      Following the entry of the Bid Procedures Order, Jefferies immediately engaged with potential bidders, including many parties that Jefferies had contacted as part of the prior 2018 marketing process for Dura's assets, which parties were eager to be part of a renewed sales process.[4]   More specifically, the Debtors, led by my team at Jefferies, embarked on a comprehensive months-long marketing and sale process (which was extended multiple times with the consent of each major stakeholder) to maximize value for all stakeholders.  Jefferies contacted 151 possible bidders, including 33 that participated in Jefferies' sale process for Dura in 2018.  Of the 33 prior process participants, 25 chose not to reengage in the postpetition marketing process.  Of the 126 remaining parties, 50 executed non-disclosure agreements and received access to confidential information.[5]  Jefferies maintained a virtual sale dataroom for potential bidders with

---

[4]    In 2018, Dura was marketed for sale along with a non-Debtor affiliate as a combined business.

[5]    Figures include eight participants from the 2018 sale process that did engage in the postpetition marketing process.

2,753 documents relating to key financial, operational, and legal information of the Debtors. Subsequent to receiving confidential information, interested parties engaged in an extended due diligence process, including conducting calls with Jefferies as well as the Debtors' other legal and financial advisors, senior management, and customers, and attending on-site presentations described in further detail below.  In addition, the Debtors responded to numerous detailed due diligence requests over several months in order to advance the efforts of the bidders.  At the time, the Debtors had not yet revised their business plan and were expecting that their adjusted 2019 EBITDA was approximately $80 million, and largely on the basis of that expectation, Jefferies was able to quickly secure three non-binding indications of interest in late 2019, of which at least one indicated the bidder would have paid in full (or assumed) each of the DIP Facility, the Zohar term loan, other funded European debt, and all anticipated administrative and unsecured claims. Following receipt of the indications, Jefferies proceeded to schedule and hold on-site diligence meetings between buyers and management, ahead of the U.S. holidays in late December 2019 and early January 2020, with the goal of selecting a stalking horse bidder.

9.      A key gating issue for the sale process was the lack of a long-term business plan. When the Debtors filed for chapter 11, the prior chief financial officer, Kevin Grady, had not yet revised the long-term business plan, though Mr. Grady had informed the Debtors of his projection that the Debtors would achieve 2019 adjusted EBITDA of approximately $80 million.  In the interest of meeting upcoming case milestones in a timely manner and concluding the sale in the timeframe allotted by the Debtors' then-projected remaining liquidity, Jefferies embarked on due diligence with prospective bidders as management (led by the Debtors' CEO and newly-hired CFO, James Riedy) and concurrently revised the Debtors' business plan.

10.     Thereafter, Jefferies, the Debtors' management and Portage Point Partners, LLC ("Portage Point") worked to revise the business plan, including conducting numerous on-site "all-hands meetings" in connection with management's efforts to develop and finalize a revised business plan.  The Debtors' management team worked tirelessly in the weeks following the Petition Date to update the business plan, which was necessary to market the Debtors' business for sale.  The revised bottoms-up business plan demonstrated that the Debtors' projected adjusted 2019 EBITDA was only approximately $50 million, and actual EBITDA (before adjustments) was *negative*.

11.     The prospective bidders analyzed the revised business plan and appreciated the detailed "bottoms-up" approach that it provided, but due to the significant drop in adjusted EBITDA, the bidders indicated that their initial anticipated purchase prices would drop accordingly.  At this time, it became apparent to Jefferies and the Debtors that given that the revised business plan was distributed to bidders in December 2019, the original bid deadline of January 22, 2020 would not provide bidders with enough time to fully evaluate the business plan and perform the diligence needed to submit their highest and best offers.  Accordingly, on January 2, 2020, the Debtors, at the request of the potential bidders and with the consent of their other major stakeholders, including the DIP Lenders, the Committee, and the Zohars, consensually extended the sales timeline to allow additional time for bidders to evaluate the Debtors' business and submit binding bids.

12.     In late January 2020, Jefferies was able to secure several non-binding letters of intent for the purchase of the Debtors' global operations as a going concern.  Most notably, the Debtors received a non-binding letter of intent from a private equity firm ("Bidder A"), which initially contemplated a purchase price with a range of $175 million to $225 million, but this LOI

contained a number of diligence requirements, conditions, and possible significant price adjustments. There were several other bidders actively involved in the process as well that indicated serious interest in submitting bids, and the Debtors held numerous management meetings and dozens of site visits with these leading bidders over this period to advance the process and help bidders work towards submitting binding bids.

13.     At the same time, there were significant operational issues in late 2019 and early 2020 that disrupted the Debtors' operations and liquidity and caused concern for prospective bidders and the Debtors' customers. Most notably, premium freight costs had skyrocketed during this period, particularly at the Debtors' plants in Lawrenceburg and Matamoros, which significantly eroded the Debtors' cash flows, and ultimately contributed to the need for the Debtors to secure additional funding later in the case. Although the Debtors and their advisors worked in early 2020 to bring these premium freight expenses in check, including hiring operational consultants for the affected plants, these material operational disruptions and expenses were alarming for potential bidders and the Debtors' customers. At the same time, the Debtors also completed their financials for 2019 and communicated to bidders that they had missed the $50 million adjusted 2019 EBITDA target in the business plan; the actual adjusted 2019 EBITDA was instead approximately $45 million, and actual 2019 EBITDA was *negative $33 million*.

**Conclusion of Marketing Process and Revised Non-Binding Bids**

14.     In early February 2020, Jefferies and the Debtors were focused on firming up the non-binding bids that the Debtors had received in advance of the revised bid deadline on February 21, 2020. To best move this process towards binding bids, in early February Jefferies, the Debtors' management team and the Debtors' other advisors hosted a two-day "all hands" meeting in New York with the leading bidders and the Debtors' customers to facilitate crucial

discussions between the bidders and the customers regarding the sale. I am advised that most of the Debtors' customer contracts do not affirmatively require the customers to purchase any parts from the Debtors. Accordingly, Jefferies, the Debtors, and the bidders recognized that customer support for any sale was absolutely critical to ensure that the customers were willing to continue to do business with the purchaser of the Debtors' assets. These two days of meetings were constructive and helped to connect the bidders with the customers, a necessary condition for the bidders being able to submit their highest and best binding offers.

15.     Throughout this time, Bidder A continued to conduct diligence and work towards removing the conditionality from its bid, but over time Bidder A dramatically lowered its offers, first submitting an offer in late February with a debt-free valuation of $165 million, which only included $62 million in cash and implied a significant impairment of the DIP Facility.

16.     At the same time, in late February, various other private equity investors submitted non-binding letters of intent for the Debtors' assets. One bidder ("Bidder B") entered into an arrangement with the Zohars to submit a joint non-binding bid (the "Joint Zohar Bid") that would have paid the DIP Facility in full in cash, and also credit bid the Zohar term loan. The Joint Zohar Bid included significant conditionality, value adjustments, and diligence conditions in the letter of intent, and ultimately the Zohars failed to make any binding bid for the Debtors' assets, and the Zohars withdrew from the process. Two other bidders also submitted non-binding bids during this time period; one would have purchased the Debtors' assets while only paying half of the DIP Facility in cash ("Bidder C"), while rolling the rest of the DIP Facility into equity in the buyer entity, while the other bidder ("Bidder D") sought to purchase the DIP Facility at a discount, as well as purchase the Zohar term loan for pennies on the dollar in order to credit bid the DIP Facility and the Zohar debt. But none of Bidders A, B, C, or D were able to submit a binding bid at this

8

time.  Due to the inability to secure a binding bid during this period, on February 28, 2020, the Debtors again consensually extended the sale timelines to allow additional time for potential buyers to complete their diligence and submit their highest and best bids.

17.     Throughout this time period, the Debtors' business continued to decline.  The sale process was originally only expected to last for four months, and the $84 million DIP Facility was sized accordingly.  In order to accommodate the extended sale process, the Debtors concluded that they had no choice but to take all available measures to conserve cash.  Initially, this included prudent cost-cutting measures.  As the financial condition of the Debtors further deteriorated, such measures progressed to the difficult decision to defer certain capital expenditure investments, in an effort to conserve cash needed to maintain ordinary course operations.  These cash conservation measures strained liquidity, put pressure on the business, and caused concern for the bidders and customers.  These financial headwinds also affected the Debtors' bottom line; the Debtors' revised business plan projected approximately $75 million in adjusted EBITDA for 2020, but by early March (even before the COVID-19 pandemic became widespread and the automotive OEM industry shut down on a global basis) there was substantial doubt about the Debtors' ability to hit that target due to these operational issues.  The Debtors currently estimate that adjusted 2020 EBITDA will be approximately $39 million (even after giving effect to the pro forma customer price increases that have been agreed to).

18.     In mid-March, the Debtors and Jefferies were working with Bidder A and Bidder B to try to secure a binding bid for the Debtors' assets.  Both Bidder A and Bidder B's proposed purchase prices at this time implied a significant impairment of the DIP Facility, so Bidder A and Bidder B sought to engage with the DIP Lender to team up and submit a joint bid.  Bidder B submitted a non-binding LOI that contemplated a significant impairment of the DIP Facility.  The

most significant contingency in this LOI from Bidder B was the need for site visits to the Debtors' facilities in Europe. Unfortunately, it was at precisely this time that the COVID-19 pandemic arose; when Bidder B submitted this LOI, later *that same day*, the federal government issued widespread restrictions on travel between the United States and Europe that effectively foreclosed the ability of Bidder B to do this necessary diligence in Europe. Bidder B initially insisted that the Debtors and the DIP Lender enter into exclusive dealings with Bidder B as a condition precedent to moving forward with the process. The Debtors refused, citing their fiduciary duties and their obligations under the Bid Procedures Order. Bidder B nevertheless required that the DIP Lender agree to exclusively support the transaction contemplated by Bidder B for a period of time. This exclusivity arrangement in the LOI submitted by Bidder B prevented the DIP Lender (whose DIP Facility was highly impaired and would need to consent to any transaction that did not satisfy the DIP Facility in full in cash) from exploring or submitting a joint bid with any other party for a period of time, and as a practical matter, required Bidder A to submit a bid that cleared the DIP Facility in order to become the winning bidder. Bidder A declined to do so and its revised non-binding LOI submitted at that time included a purchase price that did not exceed the amount to be paid to the DIP Lender that was contemplated by Bidder B's offer. Neither Bidder A nor Bidder B was willing to submit a binding bid at this time. Each of these non-binding bids implied a significant impairment of the DIP Facility and would have required the DIP Lender to agree to waive its liens and allow its collateral to be sold free and clear of such liens. Although the DIP Lender was engaged in serious discussions with each of the prospective bidders, the DIP Lender never consented to such a significant impairment of its claims—as I understand is its right under the DIP order and its place at the top of the Debtors' capital structure, having injected $87 million in DIP funds that have financed the Debtors' postpetition operations.

19.     The Debtors worked diligently with all of these prospective bidders to provide information and access to their facilities, but at this critical juncture, the Debtors' revenue effectively fell to zero due to the global COVID-19 pandemic that caused the Debtors' customers to temporarily shutter all of their operations and stop ordering parts from the Debtors.   The Debtors' operations were halted just as bidders were preparing to submit binding bids.  Due to the erosion of value over time and the Debtors' dire liquidity situation, the Debtors began to evaluate other strategies to unlock value and preserve their operations as a going concern, including negotiating with multiple parties for separate sales of different geographic segments.

20.     From these discussions, a new path forward emerged.  The DIP Lender indicated its interest in providing a binding bid for the Debtors' equity interests in their non-Debtor European subsidiaries that would preserve those entities' operations as a going concern.  However, the DIP Lender did not have any operational experience.  The DIP Lender indicated to Jefferies that it needed to locate an operational partner with significant automotive experience and OEM relationships, which partner could also invest funding needed to consummate a transaction. Jefferies immediately introduced the DIP Lender to several potential automotive operating partners, and ultimately, the DIP Lender agreed to partner with Chris Charlton and The Charlton Group, Inc. to create a new entity that would bid for the Debtors' assets (the "European Purchaser").   Chris Charlton is a highly experienced senior executive and investor in the automotive industry who can provide operational credibility and help to position Dura's business for continued success following the sale.

21.     First, the European Purchaser agreed to purchase, via a credit bid of a portion of the DIP Facility, the Debtors' equity in their non-Debtor subsidiaries in Europe, Brazil, and India, certain claims and causes of action, and other assets and intellectual property that comprise the

Debtors' operations in Europe, Brazil, and India.  All of the assets were collateral for the new money DIP provided by the DIP Lender.  The Debtors announced the entry into the European Purchase Agreement on April 17, 2020.

22.    But, at the same time, the Debtors' North American operations were low on liquidity and facing imminent liquidation without any binding bid to preserve the business as a going concern.  Given the potential for a liquidation of the Debtors' North American business, the Transaction Committee directed the Debtors to engage with all parties, including Ms. Tilton, to secure a binding bid for North America.  Critically, there were conditions in the European Purchase Agreement that effectively required the sale of the Debtors' North American business in order to close.    Accordingly, the Debtors worked with various bidders (including Ms. Tilton) to immediately obtain a binding North American bid, and provided each of the prospective bidders with the Debtors' estimate of the purchase price that might be sufficient for the DIP Lender to agree to release its liens on its collateral (because the DIP Facility was not going to be paid in cash in full).

23.    First, the Debtors engaged with Bidder B to try to firm up its bid, and the Debtors even entered into a non-binding LOI with Bidder B.  However, Bidder B indicated that it likely had several weeks of diligence and negotiations of a purchase agreement, so while Bidder B continued to work to remove the conditionality from its bid, the Debtors simultaneously approached Ms. Tilton to see if she would be willing to submit a binding bid that would preserve the Debtors' operations in North America and the over 2,000 associated jobs.  Ms. Tilton indicated that she would make a binding bid for the Debtors' North American business operations in order to prevent a liquidation, and she provided a version of purchase agreement that she indicated she was prepared to immediately sign.  However, there were certain contingencies that needed to be

12

negotiated between the European Purchaser and Ms. Tilton in order to split up Dura's assets into Europe and North America, and although I understand that the parties discussed the resolution of those items, no agreement on these issues was reached and the Debtors were unable to sign a binding purchase agreement.

24.     I believe Ms. Tilton's revised bid was made in good faith and may have provided competitive tension to the process.  While it did not result in a binding bid, I believe it was a contributing factor to the DIP Lender indicating that it would be willing to enter into negotiations to submit a binding bid with respect to the Debtors' North American operations, ultimately leading to the North American Transaction and the withdrawal of Ms. Tilton's bid.  The Purchaser quickly negotiated and submitted a binding bid for the purchase of the Debtors' North American and Chinese assets, stock, and certain claims and causes of action, among other things.  The Debtors announced the entry into the North American Purchase Agreement on April 30, 2020.

25.     Even after entering into the North American Purchase Agreement, the Debtors continued to solicit higher and better offers for the Debtors' North American business.  The Debtors and their advisors continued to engage with Bidder B regarding a binding bid for North America.  Although Bidder B continued to negotiate with Debtors and the DIP Lender regarding the terms of a binding bid, there were two primary hurdles that prevented Bidder B from agreeing to a binding bid.  First, the DIP Lender would have had to consent to waive its DIP liens on the transferred assets, and although Bidder B discussed with the DIP Lender regarding the terms on which it would waive such liens, no agreement was reached.  Second, the Debtors' customers have certain consent rights over any potential buyer of the Debtors' assets pursuant to the Accommodation Agreements whereby the customers are providing critical liquidity to the Debtors. The customers consented to a sale of the Debtors' assets to the Purchasers, but in recent days, the

customers have not affirmatively supported a sale of the Debtors' North American business to any party other than the Purchasers, which the customers have indicated is primarily due to the execution risk of having to split Dura's assets into two new companies controlled by two different purchaser groups, which would require the two separate purchasers to immediately negotiate the bifurcation of Dura's assets and management team and negotiate transition service agreements. Even putting aside the formal consent rights in the Accommodation Agreements, customer support of a sale is paramount in the automotive manufacturing industry in which the Debtors operate, where proven automotive management experience (such as that provided by The Charlton Group) provides a level of comfort for the customers that the Purchasers will be able to timely deliver high-quality automotive parts to their customers into the future.

**The North American Purchase Agreement and the European Purchase
Agreement Represent the Highest and Best Offer for the Debtors' Assets**

26.     Based on the extensive marketing efforts described above and my experience as a restructuring professional, I believe that the terms of the European Purchase Agreement and the North American Purchase Agreement represent the highest and best offers for the Debtors' assets.

27.     The Debtors, having conducted a thorough postpetition marketing process, only received one binding bid for their European assets and one binding bid for their North American assets:  the European Transaction and the North American Transaction.  Despite the extensive marketing efforts by the Debtors and their advisors described above, including executing approximately 75 non-disclosure agreements, receiving non-binding indications of interest from 12 parties, hosting various meetings with the Debtors' management, bidders, and key customers, as well as coordinating various site visits for potential bidders, and receiving various non-binding letters of intent, no other parties were willing to submit a binding bid (aside from Ms. Tilton's bid, which was withdrawn when the DIP Lender indicated that it would not consent to waive its DIP

liens for such transaction). The European Transaction and the North American Transaction are the only binding bids that will preserve the Debtors' operations as a going concern and are the only actionable alternative to the immediate liquidation of the Debtors' business.

28. The European Transaction contemplates a credit bid of $50 million of the loans under the DIP facility and should, subject to Court approval, preserve the Debtors' operations in Europe, Brazil, and India, and obviate the need for the Debtors to provide any further funding to their European operations. Specifically, the European Transaction provides for the purchase and sale of, among other things, (a) the capital stock of certain of the Debtors' foreign non-Debtor subsidiaries, (b) other assets, including intellectual property related to the operations of the Debtors' foreign non-Debtor subsidiaries, and (c) all of the rights, claims or causes of action of the Debtors of any kind, including those available under the Bankruptcy Code, against any party, including any officer, director or affiliate of, or lender to, any Debtor (and the proceeds of any insurance policies related to any such rights, claims or causes of action) arising at any time prior to the closing of the sale. In addition, the European Transaction includes the assumption of approximately $75 million of funded debt of the Debtors' European subsidiaries, as well as the assumption of ordinary course trade and other liabilities of these subsidiaries.

29. The North American Transaction contemplates the sale of the Debtors' assets comprising their North American operations for a credit bid of $5 million of the loans under the DIP facility and a cash payment of $11.25 million to fund certain professional fees and related expenses. The purchase includes, among other things, (a) the Debtors' assets comprising the Debtors' North American operations, (b) the capital stock of certain of the Debtors' foreign non-Debtor subsidiaries (including the stock of their Mexican subsidiaries), and (c) certain claims and causes of action, including against the Debtors' directors and officers. The North American

Purchaser has also agreed to pay the post-petition amounts due to the Debtors' vendors that continue to do business with the Purchaser post-sale.

30.     Notably, the Purchasers insisted from the very outset of their negotiations of a purchase agreement that the Debtors must agree to transfer all of their claims and causes of action to the Purchasers, including, most notably, (a) claims against Ms. Tilton and her affiliated entities, and (b) chapter 5 claims and causes of action against vendors (so that the Purchasers can waive such claims against vendors that continue to provide goods or services to the Purchasers following the sale).

31.     Additionally, I understand that Global Automotive Systems, LLC ("GAS") has agreed to purchase a Tesla 2013 Model S Signature Performance Sedan (the "Vehicle") owned by Dura Automotive Systems, LLC ("Dura") for a price of $30,360, which represents the midpoint of its Kelley Blue Book Value.  While Jefferies has previously advised GAS as part of the 2018 process, Jefferies is not advising GAS in connection with this or any other matter.  GAS additionally agreed to assume responsibilities for payment of Dura's obligations arising under a certain lease agreement, dated January 30, 2017, for the lease of an apartment (the "Apartment Lease") located at 34977 Woodward Avenue, Birmingham, Michigan 48009, which I understand Ms. Tilton uses as her residence when in Michigan for business.  The North American Purchaser consented to the sale of the Vehicle and the assignment of the Apartment Lease because neither the Vehicle nor the Apartment Lease were part of the go-forward business plans of the North American Purchaser.  I believe that the midpoint of Kelley Blue Book Value is a fair equivalent for market value, and because the Debtors will have no employees following the Sale Transactions, the Apartment Lease has zero value to the Debtors.

32.     I believe that the Debtors adequately marketed the Debtors' assets and conducted the sale process in compliance with the Bid Procedures and the Bid Procedures Order, that the bidding process was conducted in an appropriate manner, and that the Debtors and their advisors have afforded potential purchasers an appropriate opportunity to participate in the bidding process for the Debtors' assets and make higher or better offers.

33.     I believe that the European Purchaser and the North American Purchaser acted in compliance with the Bid Procedures and the Bid Procedures Order and conducted themselves in a noncollusive, fair, and good-faith manner, as evidenced by, among other things, the extensive marketing process and the Debtors' efforts during arm's-length negotiations with all interested parties.  Moreover, I believe that the European Purchase Agreement and the North American Purchase Agreement constitute the highest and best offers for the Debtors' assets.  I further believe that the European Purchase Agreement and the North American Purchase Agreement represent fair and reasonable terms for the purchase of the Debtors' assets based on the extensive marketing process described herein.

34.     I also believe that the European Purchase Agreement and the North American Purchase Agreement were negotiated, proposed, and entered into by the Debtors and the European Purchaser and the North American Purchaser, respectively, without collusion, in good faith, and from arm's-length bargaining positions, and the purchase price was not controlled by any agreement among bidders.  Among other things, I believe that:  (i) the European Purchaser and the North American Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Transferred Assets; (ii) the European Purchaser and the North American Purchaser complied with the provisions of the Bid Procedures Order; (iii) the European Purchaser and the North American Purchaser agreed to subject their bids to the competitive bidding

procedures set forth in the Bid Procedures Order; and (iv) all payments to be made by the European Purchaser or the North American Purchaser and other agreements or arrangements entered into by the European Purchaser or the North American Purchaser in connection with the European Transaction or the North American Transaction, as applicable, have been disclosed. Accordingly, I believe that the European Purchaser and the North American Purchaser are purchasing the Debtors' assets in good-faith and for value, and that the European Purchaser and the North American Purchaser are good-faith purchasers.

35.     I believe that the Bid Procedures were reasonable and appropriate and represented the best available method for conducting the sale process in a manner that maximizes value for the benefit of the Debtors' estates.

36.     I am not aware of any facts indicating that the European Purchase Agreement and the North American Purchase Agreement were entered into for the purpose of hindering, delaying, or defrauding creditors. I believe that the consideration provided by the European Purchaser and the North American Purchaser for the Debtors' assets pursuant to the European Purchase Agreement and the North American Purchase Agreement (i) are fair and reasonable, (ii) are the highest and best offer for the Debtors' assets, and (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative. Moreover, I am not aware of any facts indicating that the Debtors, the European Purchaser, or the North American Purchaser are fraudulently entering into the transactions contemplated by the European Purchase Agreement or the North American Purchase Agreement.

37.     I believe that the assumption and assignment of the Transferred Contracts pursuant to the terms of the European Sale Order and the North American Sale Order are integral to the European Purchase Agreement and the North American Purchase Agreement, respectively. I

further believe that the assumption and assignment of the Transferred Contracts (i) is necessary to sell the Debtors' assets to the European Purchaser and the North American Purchaser, (ii) allows the Debtors to realize the value of the Debtors' assets, including the Transferred Contracts, (iii) limits the losses suffered by counterparties to the Transferred Contracts, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Transferred Contracts.

38.     I believe that the European Transaction and the North American Transaction provide a superior alternative to a liquidation of the Debtors' business operations because, pursuant to these transactions, certain vendors will receive cure payments, professionals will be paid from a $11.25 million escrow account, and certain postpetition claims will be assumed by the Purchasers.  Alternatively, the only value that creditors would receive pursuant to a liquidation is the notably limited value of the Debtors' technical and specialized equipment.

## Conclusion

39.     Accordingly, for all these reasons, given the exhaustive months-long marketing process that the Debtors and their advisors undertook, as described herein, I believe that the European Transaction and the North American Transaction represent the highest, the best (and indeed, the only) binding offers that would preserve the Debtors' business operations as a going concern.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 9, 2020
Wilmington, Delaware

*/s/ Richard W. Morgner*

Richard W. Morgner
Managing Director and Joint Global Head of
the Recapitalization & Restructuring Group
Jefferies LLC