**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-12378 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**DECLARATION OF MARK BERGER,
MANAGING DIRECTOR OF PORTAGE POINT PARTNERS, LLC, IN SUPPORT OF
PROPOSED EUROPEAN TRANSACTION AND NORTH AMERICAN TRANSACTION**

I, Mark Berger, hereby declare under penalty of perjury:

1. I am a Managing Director of Portage Point Partners, LLC ("Portage Point"), a restructuring advisory services firm and the restructuring advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I submit this declaration (the "Declaration") in support of the proposed European Transaction and the North American Transaction.[2]

2. Portage Point is a restructuring consulting firm with extensive experience that provides business advisory, interim management, and restructuring advisory services to debtors and underperforming companies. Specifically, Portage Point's core services include performance

---

[1] The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is: 1780 Pond Run, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the forthcoming *Debtors' Reply in Support of the Proposed European Transaction and North American Transaction* or the *Order (I) Approving the Bidding Procedures with Respect to Substantially All Assets (II) Approving the Contract Assumption and Assignment Procedures, (III) Scheduling Bid Deadlines, an Auction, and the Hearings and Objection Deadlines Related Thereto, and (IV) Approving the Form and Manner of Notice Thereof* (the "Bidding Procedures Order") [Docket No. 339], as applicable.

improvement, turnaround and restructuring advisory services, and interim management services. Portage Point provides a wide range of advisory services targeted at stabilizing and improving companies' financial positions. Additionally, Portage Point provides advice on specific aspects of the turnaround process and helps manage complex constituency relations and communications.

3. I have over fourteen years of experience in assisting companies with the legal and financial complexities of restructuring. This experience includes working with management teams and boards of directors of large companies facing financial challenges similar to those of the Debtors. I have provided restructuring leadership guidance for several large corporations, including Everyware Global, School Specialty, and Tribune Company. I graduated from the University of Iowa with a bachelor's degree in finance.

4. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon my personal knowledge, discussions with members of the Debtors and their advisors, review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or represent my opinions and beliefs based upon my professional experience and knowledge of the Debtors and their operations. In addition, I am familiar with the Debtors' liquidity position and the proposed Sale Transactions. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

### The Debtors' Liquidity Challenges and the Need for Prompt Approval and Closing of the Sale Transactions

5. The Court approved the Debtors' bidding procedures on November 19, 2019. The initial sale milestones in the DIP Facility and the Bidding Procedures Order contemplated the close of a section 363 sale and emergence from chapter 11 in the end of February 2020.

6. Despite the efforts of the Debtors and their advisors, the Debtors were unable to complete a sale by the end of February 2020, and have instead repeatedly extended the sale timelines to provide the Debtors with sufficient time to engage with potential bidders and entice them to put forth their highest and best bids. These extensions to the sale timeline, when combined with the operational and financial headwinds the Debtors suffered in the fourth quarter of 2019, left the Debtors in a precarious financial position.

7. First, the sale process was originally only expected to last four months, and the $84 million DIP Facility was sized accordingly. In order to accommodate the extended sale process, the Debtors concluded that they had no choice but to take all available measures to conserve cash. Initially, this included prudent cost-cutting measures. Additionally, during this time period there were significant operational challenges that disrupted the Debtors' liquidity position and caused concern for prospective bidders and the Debtors' customers. Most notably, premium freight expenses had skyrocketed during this period, particularly at the Debtors' plants in Lawrenceburg and Matamoros, which significantly eroded the Debtors' cash flows, and ultimately contributed to the need for the Debtors to secure additional funding later in the case. Although the Debtors and their advisors worked in early 2020 to bring these premium freight expenses in check, including hiring operational consultants for the affected plants, these material operational disruptions and expenses were alarming for potential bidders and the Debtors' customers. As the financial condition of the Debtors further deteriorated, such measures progressed to the difficult decision to defer certain capital expenditure investments, all in an effort to conserve cash needed to maintain ordinary course operations. This strained liquidity put pressure on the business, and caused concern for the bidders and customers. These financial headwinds also affected the Debtors' bottom line; the Debtors' revised business plan projected approximately $75 million in

adjusted EBITDA for 2020, but by early March (even before the COVID-19 pandemic became widespread and the automotive OEM industry shut down on a global basis) there was substantial doubt about the Debtors' ability to hit that target due to these operational issues. The Debtors currently estimate that adjusted 2020 EBITDA will be approximately $39 million (even after giving effect to the pro forma customer price increases that have been agreed to).

8.      For these and other reasons, the Debtors' liquidity situation has been dire for many months. Most notably, the global COVID-19 pandemic has decimated the Debtors' global supply chain and the demand for the Debtors' products. Beginning in January 2020, the Debtors' businesses experienced serious operational disruptions, at first due to the impact on the Debtors' suppliers that are an integral component of the Debtors' "just in time" business model. Due to health concerns for workers in manufacturing facilities, the global automotive industry has effectively been shut down since late March. Additionally, global demand for automobiles has plummeted as a result of the global pandemic.

9.      The Debtors' liquidity challenges have also required the Debtors to actively manage their postpetition trade vendor and other obligations to ensure that the Debtors can maximize enterprise value for all stakeholders. As described further below, the Debtors and their advisors have worked tirelessly in recent weeks to negotiate injections of new liquidity from their DIP Lender and customers to allow the Debtors' operations to restart and provide a bridge to the Sale Transactions. Those efforts notwithstanding, the Debtors' remaining runway is short. Specifically, the Debtors require Court approval of the Sale Transactions on May 12. This will allow the Debtors to consummate the North American Transaction as early as later that week, which is critical because the majority of the Debtors' customers will restart their operations beginning the week of May 18, which requires considerable cash spend the week of May 11.

10.     Due to the Debtors' dire financial condition, the Debtors have repeatedly engaged with their advisors and key stakeholders (including their customers and the DIP Lender) to explore all options for improving their liquidity position. Those discussions culminated in a series of agreements with numerous customers, memorialized in an accommodation agreement approved by the Court on February 28, 2020 (the "First Accommodation Agreement"), pursuant to which the customers agreed to accelerate their payment terms with the Debtors by 28 days and modify their contractual setoff rights in exchange for the Debtors' compliance with various covenants, reporting obligations, and other terms and conditions. Entry into the First Accommodation Agreement temporarily ameliorated the Debtors' near-term liquidity crunch, but the extended sale timeline and impact of COVID-19 continued to strain the Debtors' liquidity position.

11.     In early April, following further discussions with their advisors and stakeholders, the Debtors and the DIP Lender agreed to increase the commitments under the DIP Facility by $3 million to fund the Debtors' continued operations and ensure the Debtors would not begin to incur obligations to their employees and professionals that they may not be able to satisfy. Following Court approval of this incremental financing on April 16, 2020, the Debtors were able to fund their upcoming regular payroll. Absent additional funds, however, the Debtors and their advisors determined that they would be unable to meet additional obligations beginning as early as May 1, 2020. Faced with that stark reality, and in the absence of any further rescue financing or a firm commitment from a buyer to purchase the North American operations, on April 17, 2020, the Debtors determined that they had no choice but to send notices required by the federal WARN Act to notify their North American employees of the potential for mass layoffs on May 1, 2020, absent an immediate alternative path to preserve their operations.

12. The Debtors' deteriorating liquidity position propelled a two-track process forward. ***First***, the Debtors attempted to finalize the purchase agreements that would preserve the Debtors' businesses going forward and save over 7,000 jobs. ***Second***, the Debtors attempted to secure additional liquidity for the Debtors' operations in the short term. As part of this process, the Debtors again reached out to their customers and asked them to provide additional liquidity in the form of more favorable payment terms and pricing. These negotiations resulted in agreements with the Debtors' customers whereby the customers agreed to increased pricing and terms that would allow the Debtors to restart production to meet the customers' production needs. These accommodations have been incorporated into the Debtors' latest cash flow forecasts (the "Cash Flow Forecasts") and are necessary to keep the restart of the Debtors' operations on track.

13. In addition, as part of the negotiations for the North American Transaction, the Debtors sought and received a commitment from the DIP Lender to provide up to an additional $5 million in DIP funding that will be available after the Court's entry of the North American Sale Order. This incremental funding is intended to bridge the period between the approval of the North American Sale and the closing thereof. While the additional liquidity from the DIP Lender and the Debtors' customers allowed the Debtors to complete the negotiation of the Sale Transactions and work towards a closing, the Debtors' remaining liquidity runway is short, and this incremental $5 million is critical to bridge to a closing of the North American Transaction.

14. The Cash Flow Forecasts assume that the Debtors will receive this incremental funding shortly after the hearing to approve the North American Transaction. As demonstrated by the Cash Flow Forecasts, absent this $5 million cash infusion by the DIP Lender, the Debtors will run out of funding by May 15, which will prevent the Debtors from restarting their operations as required by their customers, and the Debtors would be forced to cease operations and immediately

liquidate. The Debtors require Court approval of the Sale Transactions on May 12 to permit the closing of the North American Transaction as early as later that week when the majority of the Debtors' customers will require the Debtors to restart operations. The timely and successful restart of the Debtors' operations is crucial to the survival of their businesses. The Debtors' ongoing liquidity concerns, the COVID-19 crisis, and the related shutdown of the automotive industry have left the Debtors with significant operational risks which will require fast and efficient execution to overcome. Accordingly, I believe that the prompt approval and closing of the Sales Transactions are the only means to avoid an immediate liquidation given the present circumstances.

## Conclusion

15.     For all of these reasons, given the Debtors' liquidity circumstances and cash needs to restart operations in the next few weeks, as described herein, I believe that the prompt closing of the Sales Transactions as early as mid-May represents the best (and only realistic chance) of addressing the Debtors' near-term liquidity needs and thereby preserve the Debtors' operations as a going concern and saving over 7,000 jobs.


*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

| | |
|---|---|
| Dated: May 9, 2020<br>Wilmington, Delaware | */s/ Mark Berger*<br>Mark Berger<br>Managing Director<br>Portage Point Partners, LLC |