## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-12378 (KBO) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

## PATRIARCH'S LIMITED STATEMENT IN FURTHER SUPPORT OF THE DEBTORS' SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

Ark II CLO 2001-1 Ltd.; Dura Buyer, LLC; Dura Automotive Angels, LLC; Patriarch Partners Management Group, LLC; Patriarch Partners Agency Services, LLC; Patriarch Partners, LLC; and Ms. Lynn Tilton (together, "**Patriarch**"), by and through their undersigned counsel, submit this statement in further support of the matters set forth in the *Notice of Hearing to Approve the Sales of Substantially All of the Debtors' Assets* [Docket No. 949] (the "**Sale Hearing Notice**") filed by the Debtors and in response to the *Zohar Lenders' Reservation of Right Regarding Debtors' Entry Into Sale Agreements* [Docket No. 972] (the "**Zohars' Statement**") and the *Statement of the Official Committee of Unsecured Creditors Concerning Proposed Sales on Basis of Patriarch Issues* [Docket No. 976] (the "**Committee's Statement**," and together with the Zohars' Statement, the "**Statements**").[2]

---

[1]    The debtor entities in these chapter 11 cases, along with the last four digits of each debtor entity's federal tax identification number, are:  Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is:  1780 Pond Run, Auburn Hills, Michigan 48326.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Hearing Notice.

## STATEMENT IN FURTHER SUPPORT

1.      The Zohars' and the Committee's Statements with respect to the Debtors' sale hearing make two things clear.  First, the Debtors' proposed Sale Transactions should be approved without delay for the benefit of Dura's thousands of employees, customers, and vendors.  The Zohars' and Committee's Statements raise no legal arguments whatsoever as to why the sales should not be approved.  Indeed, even though the Zohars manage to spill ink on 23 pages (139 with exhibits), and the Committee another 6 (128 with exhibits), in neither Statement is there a *single* citation to a decision of any court, or to *any* section of the Bankruptcy Code.  Neither the Zohars nor the Committee even try to dress up their Statements as a legal argument against the Sale Transactions.  In fact, it does not appear that either is actually objecting to any aspect of the transactions.  Although both express a wish to modify the purchase agreements to leave "causes of action" against Patriarch behind (*cf.* Zohars' Statement at ¶ 50; Committee's Statement at ¶ 3), they provide no legal basis for why the DIP lender's credit bid does not foreclose their whimsy. The Court should make quick work of these pleadings, as they are not obstacles to the Debtors' Sale Transactions.

2.      Second, by their Statements, the Zohars and the Committee have used – and Patriarch submits *abused* – the sale hearing to engage in yet another smear campaign against Ms. Tilton.  Patriarch agrees with the Debtors' characterization of the Zohars' Statement as a "Greatest Hits collection" of "their old, tired quarrels" with "irrelevant parochial grievances" against, Ms. Tilton.  The Dura chapter 11 cases are, of course, taking place in the backdrop of the larger Zohar chapter 11 cases, and it is obvious that the Zohars seek to attack Ms. Tilton with an almost religious fervor for every aspect of the monetization process overseen by this Court.

3.      But the Dura experience is instructive.  In their zeal to oppose Ms. Tilton at every turn, the Zohars pushed Dura to abandon the Patriarch DIP and stalking horse bid.  That path would

2

have provided the best outcome for other creditors.  Worse yet, the Zohars did so, in part, by misrepresenting to the Debtors, Patriarch, and the Court overseeing these chapter 11 cases, that they would be there with Bardin Hill to backstop a plan of reorganization to pay Dura's trade creditors and customers, in full, thereby providing the same comfort and protections as Ms. Tilton's stalking horse bid.  As explained to the Court at the October 23, 2019 hearing:

> **Dura Debtors' Counsel**: [G]oing to the point about [the Bardin Hill DIP] providing us with the same clarity about the end result here [as the Patriarch DIP and stalking horse bid], recognizing that we place significant value on having a light at the end of the tunnel, so to speak, the Bardin Hill parties and the Zohar debtors are going to provide to us by the end of the week a proposal for a holistic transaction here that we could backstop by the Zohar debtors.
>
> * * *
>
> **Counsel for Zohars' Independent Director**:  I did speak to Mr. Farnan and also Mr. Katzenstein, who's a CRO of Zohar, and we are going to be working with the [Dura] debtors over the next days to come up with our -- and I think we -- you know, it'll involve the equitization of the term loans, the Zohar term loans, but it will be a plan term sheet that can serve as the basis to -- *as effectively the stalking horse. It's basically very similar*.  And *we'll provide, importantly for* -- and for the comfort of *employees and they will be paid and satisfied, same with trade and customers*. So we are supportive of the company.  We're happy with this result, and *we're going to work to not only use the financing to get to the right result here, but also to have a plan term sheet that can serve as effectively a stalking-horse bid*.

(Oct. 23, 2019 Hr'g Tr. at 236: 23-237:4 & 239:17-240:5 (emphasis added).)[3]  Just as their story that Ms. Tilton was trying to "steal" the company was a fiction, so too was their promise to stand behind the Dura Debtors to make other creditors whole.  Recoveries are severely diminished under Barden Hill's credit bid transactions and the customers have been required to provide significant accommodations and capital to facilitate the sale.  Trade creditors, in particular, are in a worse

---

[3]    *See also* Dura Press Release, dated November 19, 2019, available at https://www.businesswire.com/news/home/20191119005700/en/DURA-Automotive-Systems-Secures-84-Million-Financing ("To the extent another bidder is not timely found, Bardin Hill and existing creditors have committed to restructure DURA's funded indebtedness pursuant to *a chapter 11 plan of reorganization that would pay claims of customers, employees, and go-forward suppliers and trade vendors in full in cash at closing* or in the ordinary course of business[.]").

*(cont'd)*

position than they otherwise would have been had the Patriarch stalking horse bid and DIP been accepted, now facing only a partial payment of administrative expenses and no recovery on their prepetition claims.[4]  But according to the Zohars, this is all, somehow, Ms. Tilton's fault.[5]

4.      For its part, the filings in these chapter 11 cases reflect that the Committee has been singularly focused, without meaningful consultation with the Debtors' Transaction Committee, on a multi-million-dollar investigation of legally dubious causes of action against Patriarch, which they do not control, have not been authorized to pursue, and for which apparently no party (other than the DIP lender) has offered even a dollar to separately purchase.  [*See also* Docket No. 980, Frizzley Decl. at ¶ 8.]  It is little wonder that they have joined the Zohars' disinformation campaign against Patriarch to deflect from this blunder.

5.      The Court should rightly ignore the entirety of the Zohars' and Committee's diatribe against Ms. Tilton and Patriarch as irrelevant commentary.  But having inserted such allegations into the public record, Patriarch is compelled to respond.  To the extent the Court considers any of it, Patriarch urges the Court to keep the following in mind:

(a)  ***The claim that Ms. Tilton controlled the Transaction Committee's bankruptcy sales process is false.***  After the Zohars pushed the Patriarch DIP and stalking horse bid to the side, Ms. Tilton responded by simply doing everything she could to run the business and assist the Debtors and their advisors in executing the sales process.  Control of that process was vested solely in the Independent Managers, and they exercised that control actively and conclusively in accordance with the Bid Procedures approved by this Court.  [*See, e.g.*, Docket No. 980, Frizzley Decl. at ¶¶ 5-6; Docket No. 977, Morgner Decl. at ¶¶ 6, 32, 35.]  The Zohar's throw-away suggestion that Ms. Tilton controlled what documents were made available to

---

[4]     The Zohars are not the only ones with unpaid administrative expense claims as a result of the current administrative insolvency.  Patriarch also has unpaid administrative expenses, and in any event the management fees the Zohars complain about (Zohar Statement ¶ 3) covered, among other things, CEO services and legal services.  As the Zohars well know, Ms. Tilton receives no separate salary for serving as Dura's CEO.

[5]     Indeed, in their campaign to smear Ms. Tilton, the Zohars have shown utter disregard for the portfolio companies, their employees, their customers and vendors.  Their attacks on Ms. Tilton appear to take precedence over everything else, including the health and welfare of the companies that are to form the basis of the Zohars' recoveries.  Ms. Tilton recently stepped aside from most of her portfolio company roles in an effort to spare the companies from the effects of this campaign.  But that has not ended the Zohars' crusade.

*(cont'd)*

potential buyers, and withheld necessary information, is also false.[6] Ms. Tilton, as CEO, worked appropriately with the Debtors' advisors to ensure the accuracy of information presented to potential bidders and to address any concerns regarding the disclosure of Dura confidential customer information to parties who had not yet submitted an LOI.

(b) ***The claim that Ms. Tilton harmed Dura by ensuring that its financial forecasts and business plan were accurate and well-developed is false.*** In late 2019 Dura updated its business plan and financial projections, and the new projections were negative relative to the projections prepared by Dura's prior CFO, Mr. Kevin Grady. Although not entirely clear what the Zohars make of the update, they stick to form and blame Ms. Tilton. In reality, towards the end of 2019 Dura's new CFO, Mr. James Reidy, had identified "material concerns regarding some of the key assumptions used by" Dura's previous CFO in the prior projections. Moreover, by the end of 2019 Dura's position had weakened dramatically and potential bidders needed to know that reality. To that end, Ms. Tilton worked tirelessly to assist Mr. Reidy in building up a new and reliable business plan that the Debtors could present to potential bidders. While the Zohars want to cast blame for the fact that this new business plan was constructed, Mr. Reidy has already set the record straight, stating that the "allegations in the Zohar Reservation of Rights regarding the Debtors' business plan are untrue." [Docket No. 978, Reidy Decl. at ¶ 4.]

(c) ***The claim that Ms. Tilton did not act in good faith to meaningfully engage to assist the Debtors in reaching the current sales transactions is false.*** As Dura's situation became truly stark under the effects of the COVID pandemic, the Debtors and their advisors engaged in a desperate attempt to prevent an outright liquidation. But when the final piece of that puzzle – a binding bid for Dura's North American assets – proved elusive, the Debtors asked Ms. Tilton to step in again and make a bid that might bridge the gap. Ms. Tilton said yes, again. And, although the bid could not be accepted because of conditions that the DIP lender would not relax and last minute concessions demanded by the DIP lender of Ms. Tilton, the assertion that Ms. Tilton's final bid was not in good faith, or not helpful, is false. As the Debtors' investment banker explained, Ms. Tilton's bid was "made in good faith and may have provided competitive tension to the process" and was a "contributing factor" to the Debtor reaching the ultimate agreement with the DIP lender for the sales transactions now before the Court. [Docket No. 980, Morgner Decl. at ¶ 24.] And although Ms. Tilton would have proceeded with her bid, she is supportive of the Debtor's sale to the DIP lender to preserve Dura and the jobs of thousands of its employees.

(d) ***The claim that Ms. Tilton unilaterally abandoned the 2018 Dura sales process is false***. In late 2018 Dura delayed its sales process, but not without Ms. Tilton consulting with her advisors, and informing the Zohars and their advisors. Moreover, this was done in close consultation with Dura's investment banker so as to better position the company by allowing it

---

[6]    Indeed, the Zohars attach an email between Ms. Tilton and Jefferies to suggest that Ms. Tilton's common-sense suggestion that updating the business plan was the top priority shows that Ms. Tilton "was the gatekeeper to the dataroom." [Zohars' Statement at ¶¶ 33-34.] The full exchange is attached hereto, and shows that Jefferies agreed with this suggestion. *See* Exhibit A (Jefferies: "Thanks Lynn. We agree that the BP is priority.") [*See also* Docket No. 980, Morgner Decl. at ¶¶ 8, 32.] While the Zohars allege that Ms. Tilton acted inappropriately in connection with information flow to the data room by relying on an email in which Ms. Tilton states "this is overkill," the Zohars fail to note that, in the very same email, she approved uploading the documents at issue to the data room a mere 24 hours after the request (from Sunday afternoon to Monday afternoon).

time to win new battery tray business from a key customer and attempt to improve its financial situation. See Exhibit B. Ms. Tilton kept the Zohars appropriately informed of the company's efforts to refinance its term loan debt and secure the battery tray business. Then, in 2019, Ms. Tilton, with the support of the Zohars' CRO, engaged in a multi-month attempt to structure a global resolution to the Zohar monetization process. Ms. Tilton made it clear that she could not pursue both the global resolution and an individual sale of Dura and several other companies. That effort involved Ms. Tilton making multiple offers, with committed financing, for numerous portfolio companies, at values that would have resulted in not only a full recovery on the Zohar Lenders' term loan, but a meaningful recovery to Dura equity. *Cf.* [Docket No. 901 at ¶ 10.] None of these offers were good enough for the Zohars, and the process ended in late summer 2019.

(e) ***The claim that Ms. Tilton starved Dura of cash leading up to the bankruptcy is false.*** As their story goes, Ms. Tilton acquired Dura's ABL and then reduced Dura's ability to borrow under it to starve Dura of liquidity. Not so. In reality, Dura's ABL was in default because of the maturity of the Zohar term loan. As a result, the prior ABL lender, Wells Fargo, had the ability to immediate cease funding and had only agreed to continue to fund for short periods and with steep fees. It was for this precise reason, coupled with Dura's desperate need for liquidity, that led Ms. Tilton to take assignment of the ABL. Moreover, the full amount of the commitments under the ABL when Wells Fargo was the lender were not available to be drawn by Dura in any event. Once she became the ABL lender, Ms. Tilton not only lent to Dura despite the default, but in fact *removed* a $5 million availability block under the ABL. Indeed, *availability* of cash to Dura under the ABL actually *increased* after assignment of the ABL. Without Ms. Tilton acquiring the ABL, Dura's access to cash would have dried up and forced Dura to file for bankruptcy much sooner. Ms. Tilton also provided another 8 million euros of loans during this period to help support the company's European operations. That loan is now in default with no agreement by the new buyers of repayment. And yet, Ms. Tilton still supports this Sale Transactions for the good of Dura and its employees.

(f) ***The claim that Ms. Tilton forced Dura to ignore other financing proposals leading up to the bankruptcy is false.*** The Debtors' professionals, not Ms. Tilton nor at her direction, ran the process to obtain DIP financing. [*see* Docket No. 37, Morgner Decl. at ¶¶ 6-12]. Contrary to the Zohars' feigned surprise at Dura's chapter 11 filings, Dura did receive prepetition proposals for DIP financing from the Zohars and Bardin Hill. But each required *Patriarch* to put up a portion of the financing, and did not contain appropriate and customary lender protections for Patriarch. See Exhibits C and D. Dura was free to, and did consider, financing proposals from others including the Zohars. The reality is, none of those were actionable and, consistent with the Bardin Hill DIP facility, both were significantly more expensive than the Patriarch DIP proposal. [Docket No. 20, Grady Decl. at ¶ 52-53 ("As of the Petition Date, the only actionable proposal available to the Debtors was the DIP proposal from the ABL Lender.").] This testimony was clear and uncontroverted and, tellingly, the Zohars and Bardin Hill elected not to cross examine Mr. Grady's testimony on this point.

(g) ***The claims that causes of action against Patriarch are worth "tens, if not hundreds of millions of dollars" is false.*** Notably, neither the Zohars nor the Committee has objected to the Debtors' decision to accept the purchase price being paid for the causes of action against Patriarch. In connection with the European Transaction, for a credit bid of $50 million of the DIP loan and the assumption of certain liabilities, the European Purchaser is acquiring, among

other things, (a) the capital stock of certain of the Debtors' foreign non-Debtor subsidiaries, (b) other assets, including intellectual property related thereto, and (c) all causes of action of the Debtors of any kind against any party (i.e., not just Patriarch) arising prior to the closing of the sale. [Docket No. 977, Morgner Decl. at ¶ 28.] The Debtors, who conducted a preliminary investigation into the potential causes of action against Patriarch identified by the Committee, have characterized the draft Complaint the Committee sought to pursue as "speculative" and "replete with legally defective claims." [Docket No. 930 at ¶ 4.] Not surprisingly, Ms. Frizzley's declaration states that "[no] potentially interested party has offered, nor is reasonably expected to offer, *any* value . . . to the DIP Lender in exchange for the applicable claims and causes of action." [Docket No. 980, Frizzley Decl. at ¶ 8 (emphasis added).]

\*   \*   \*

6.      Finally, it is worth noting that Ms. Tilton herself has invested over $100 million in Dura loans and equity. To the extent that the Zohars' and general unsecured creditors have been harmed by Dura's downward trajectory, so has Ms. Tilton. It defies logic to contend that Ms. Tilton intentionally or recklessly took actions that caused Dura's demise to her own financial detriment.

7.      Although there is much more that could be said about the meritless allegations made by the Zohars and the Committee, Patriarch is mindful that all of this should rightly be viewed by the Court as a distraction. To the extent claims are ever brought against Ms. Tilton and/or Patriarch, that will be the time and place to address these baseless allegations. Patriarch therefore respectfully requests that the Court excuse the further imposition of this pleading, and that the Court proceed to approve the Debtors' Sale Transactions so that Dura can be set on the best available path forward. As stated in *Patriarch's Limited Statement and Reservation of Rights Regarding the Hearing to Approve the Sales of Substantially All of the Debtors' Assets* [Docket No. 965], Patriarch has reserved the right to introduce evidence and cross-examine witnesses at the Sale Hearing.

Dated: May 11, 2020          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      Wilmington, Delaware

/s/ *Carl T. Tullson*_____
Carl T. Tullson (I.D. No. 6704)
920 N. King Street, P.O. Box 636
Wilmington, Delaware 19801
Telephone:     (302) 651-3000
Facsimile:     (302) 651-3001
Email:          carl.tullson@skadden.com

- and -

Ron E. Meisler (admitted *pro hac vice*)
Albert L. Hogan III (admitted *pro hac vice*)
155 North Upper Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone:     (312) 407-0700
Facsimile:     (312) 407-0411
Email:          ron.meisler@skadden.com
                al.hogan@skadden.com

*Counsel to Patriarch*