## EXHIBIT A

**Public Version of Document**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*, | Case No. 19-12378-KBO |
| Debtors. | Jointly Administered |
| | **Re: Docket Nos. 894 & 931** |

## ZOHAR LENDERS' RESERVATION OF RIGHTS
## REGARDING DEBTORS' ENTRY INTO SALE AGREEMENTS

Zohar II 2005-1, Limited ("Zohar II") and Zohar III, Limited ("Zohar III," and together with Zohar II, the "Zohar Lenders"[1]) hereby submit this reservation of rights (this "Reservation of Rights") regarding the above-captioned debtors' (collectively, the "Debtors" or "Dura") proposed entry into and approval of (i) the stock and asset purchase agreement for the Debtors' European and "rest of world" assets [Docket No. 894] (the "European Sale Agreement") with DE Buyer, LLC, and (ii) the stock and asset purchase agreement for the Debtors' North American assets [Docket No. 931] (the "North American Sale Agreement," and together with the European Sale Agreement, the "Sale Agreements")[2] with DNA Buyer, LLC (together with DE Buyer, LLC, the "Purchasers"). In support of this Reservation of Rights, the Zohar Lenders respectfully state as follows:

### PRELIMINARY STATEMENT

1.     When the Zohar Lenders' own chapter 11 cases were commenced in March of 2018, Lynn Tilton described Dura as a "Crown Jewel" among the Zohar Funds' portfolio companies. Within a few months, Jefferies was retained to market Dura and, in mid- to late-2018, received eight indications of

---

[1] And collectively with the other debtors and debtors-in-possession in the Zohar Chapter 11 Cases (as defined below), the "Zohar Funds."

[2] At Dura's request, the Zohar Lenders have provided comments to the proposed sale orders with respect to the Sale Agreements. The Zohar Lenders expect these comments will be accepted and/or otherwise negotiated with the Debtors. To the extent not accepted to the Zohar Lenders' satisfaction, the Zohar Lenders reserve their rights to either supplement this Reservation of Rights or raise such concerns at the sale hearing.

interest in a range that, if closed, would have paid the Zohar Lenders' secured term loan claims in full and returned hundreds of millions of dollars to Dura's equity holders (including the Zohar Funds, through their indirect interests). But the Zohar Lenders never realized those hundreds of millions of dollars from a sale of Dura. Instead, the value of their investment in the Dura business has evaporated, and the Zohar Lenders now stand to receive $0.00 from a sale of Dura.

2.      Rather than pursue those bids, Dura—under Ms. Tilton's sole management and control—pursued a failed refinancing, followed by her failed bid to purchase Dura's assets, and, finally, these ill-conceived and failed bankruptcy cases. Ms. Tilton has recently (and unjustifiably) attempted to lay the failure of these cases at the feet of the Zohar Lenders, arguing that their "judgments were awful" and that the "sale process promoted by the Zohars and Bardin Hill appears to have been a complete failure."[3]

3.      Despite her deflection, the record demonstrates that, during the course of the sale process in these chapter 11 cases, Dura's Adjusted EBITDA was subject to two restatements from November 2019 to January 2020 (*i.e.*, with ten and twelve months of performance behind them), reflecting downward adjustments that ***cut the current EBITDA figure presented to potential bidders in its sale materials in half***, with the later adjustment coming two months into the post-petition sale process and just a few weeks prior to the Court-imposed bid deadline, much to the dismay of the Debtors' investment banker. Moreover, Ms. Tilton, as Dura's CEO, controlled what information bidders were allowed (or not allowed) to have access. And during this time, Ms. Tilton collected no less than $485,000 in management fees and her counsel has been paid no less than $1.46 million in legal fees by the Dura estates.

4.      On the other hand, the "awful judgment" allegedly shown by the Zohar Lenders—who have not received any benefit during the sale process—includes:

      a.      brokering an out-of-court rescue financing package for Dura;

---

[3] *Preliminary Objection of Patriarch Regarding the Committee's Derivative Standing Motion* [Docket No. 901] (the "Patriarch Preliminary Objection") at ¶ 1.

b.      revealing to the Tennessee Bankruptcy Court the reality of Dura's orchestrated and ill-advised bankruptcy filing;

c.      consenting to priming of its pre-petition liens to ensure adequate funding of these chapter 11 cases through Bardin Hill;

d.      deferring and/or accruing their adequate protection and professional fee claims in further support of the Debtors' liquidity – receiving *zero payments* of any kind from the Dura estate during these chapter 11 cases;

e.      affirmatively supporting or forbearing from objecting to any motion or fee application in these chapter 11 cases, to date; and

f.      immediately mobilizing and deploying their professional advisors, at significant cost, to facilitate their own bid to save Dura when it became clear no third party bidder would emerge.

The Zohar Lenders' final act in these chapter 11 cases is to support Bardin Hill's strategy to save the Debtors from ruin and stave off the loss of thousands of jobs, despite the colossal financial losses suffered by all of Dura's constituents and Ms. Tilton's attempts to wrongfully cast blame for those losses upon the Zohar Funds and Bardin Hill. For its part, all Bardin Hill has done is standby its commitment to finance these cases through the sale process and step up when *no one else* has proved willing to do so. The Zohar Lenders ask, however, that the Court allow them and the Debtors to reserve their rights so that, after the sale to Bardin Hill is consummated, their claims against the Debtors, their management, and Ms. Tilton can be fully and properly explored, either by the Zohar Lenders, a Chapter 7 Trustee, or another responsible party.[4]

5.      While serious concerns remain regarding the future administration of these chapter 11 cases, the oversight of the sale process and the treatment of all constituents, the Zohar Lenders do not oppose Bardin Hill's proposed acquisitions and will not further risk the 7,000 jobs that Ms. Tilton gambled in filing these cases and eschewing Bardin Hill's out-of-court rescue financing proposal.

---

[4] To this end, the Zohar Lenders request that the Court deny the Debtors' request to include in the proposed sale order a conclusion of law that all "reservation of rights" regarding the Sale Agreements "be denied and overruled on the merits with prejudice." *See* proposed sale orders [Docket Nos. 940-A and 940-B], Conclusions of Law ¶ 3.

## **BACKGROUND**

### I.    **The Zohar Lenders' Chapter 11 Cases**

6.    On March 11, 2018, the Zohar Lenders commenced the chapter 11 cases captioned *In re Zohar III, Corp., et al.*, Case No. 18-10512 (KBO) (Bankr. D. Del.) (the "Zohar Chapter 11 Cases").  In the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* (the "Tilton Declaration") [Zohar Docket No. 2], filed on the first day of the Zohar Chapter 11 Cases, Ms. Tilton—then the Zohar Funds' sole director—explained her rationale for the filing:

> [I]n my capacity as the sole director of each of the Zohar Funds, and after having been advised on relevant matters, I determined it was in the best interest of the Zohar Funds and all the stakeholders to voluntarily file these Chapter 11 Cases to permit the bankruptcy court to oversee an orderly process of unlocking the value in the Zohar Funds through sales and refinancings of the Portfolio Companies. Only through this process will Noteholders be made whole, and will the residual value in the Portfolio Companies inure to me as the Zohar Funds' preference shareholder.

Tilton Decl. ¶ 7.  The Debtors, along with their non-debtor affiliates, are one of the Portfolio Companies referenced by Ms. Tilton and later described in her First Day Declaration as a "crown-jewel" of the Zohar Funds.  *See* Zohar Docket No. 5 ¶¶ 79-90.

7.    Shortly after the outset of the Zohar Chapter 11 Cases, the Zohar Lenders and certain parties-in-interest therein, including Ms. Tilton and the Patriarch Stakeholders, engaged in mediation efforts overseen and facilitated by Judge Kevin Gross.  As a result of the mediation, the parties agreed to a comprehensive resolution of certain litigated contested matters, the terms of which are embodied a settlement agreement (the "Settlement Agreement") [Zohar Docket No. 266, Exhibit A].  Among other things, the Settlement Agreement established a process to unlock the value of the Portfolio Companies, including Dura, through sales or refinancings of the Portfolio Companies in a joint process to be conducted by the Zohar Funds, on the one hand, and Ms. Tilton, on the other.

### II.    **The Various Interests in Dura**

8.    Prior to the Petition Date, the Debtors and certain of their affiliated entities, as borrowers and guarantors, as applicable, entered into: (i) a revolving credit facility with Wells Fargo

(the "Prepetition ABL Loan"), (ii) a $105 million term loan (the "Prepetition Term Loan") with the Zohar Lenders and certain other lenders thereunder, and (iii) two European term loans.

9.        On August 13, 2019, Ark II CLO 2001-1, Ltd. ("Ark II"), an affiliate of Ms. Tilton, Dura's CEO, assumed the Prepetition ABL Loan from Wells Fargo Capital Finance and became the lender thereunder (as assumed, the "Ark ABL"). Evidence before the Tennessee Bankruptcy Court (as defined below) revealed that upon assignment of the Prepetition ABL Loan to Ark II, Ms. Tilton immediately reduced Dura's borrowing capacity from $40 million to $27 million and refused to increase Dura's borrowing capacity thereunder. *See* ¶ 22 *infra*.

10.       The Zohar Lenders also have an indirect interest in the majority of the Debtors' equity because, collectively, they hold 78% of the membership units in Dura Buyer LLC, which, in turn, holds 73% of Dura Automotive, LLC's common interests. As described in more detail below, Zohar II and Zohar III also hold no less than $70.5 million and $34.2 million, respectively, of Dura's secured term loan indebtedness.

## III.    Dura's Prior Sale and Refinancing Efforts

11.       In May of 2018, Dura engaged Jefferies LLC ("Jefferies") as its investment banker to pursue a sale or refinancing in accordance with the Settlement Agreement.

12.       In or about October of 2018, Jefferies received approximately eight indications of interest for the acquisition of Dura and Global Automotive Systems, LLC ("GAS," another of the Group A Portfolio Companies, which, among other things, shares certain management and corporate infrastructure with Dura). Those indications of interest had midpoint valuation ranges of $526 million to $837 million (of which approximately 80% was attributable to Dura and 20% was attributable to GAS).[5]

---

[5] *See* Oct. 23, 2019 Hr'g Tr. at 156:10–156:14 (Cross-Examination of Richard Morgner, Managing Director and Joint Global Head of Debt Advisory & Restructuring Services, Jefferies LLC) (Q: "Just to make sure that the judge is clear, Dura received eight expressions of interest in the range of hundreds of millions of dollars, up to $875 million, correct?" A: "That's correct, sir."). (cleaned up); see also Id. at 152:2-153"3 (Q: "So – and these were expressions of interest for both Dura and [a related portfolio company], correct?" A: "That's correct." Q: "And based on your extensive experience running this process, do you have a view as to what the allocation of value of those bids would be between Dura and [the other portfolio company]?" A: "We did not ask bidders to allocate a value between the two companies. I can testify as to their relative value." Q: "Could

At the direction of Ms. Tilton, however, and contrary to the Zohar Lenders' wishes at the time,[6] Jefferies did not pursue any of the indications of interest and Dura's sale process was suspended.[7]  As Jefferies testified at the hearing held before the United States Bankruptcy Court for the district of Tennessee (the "Tennessee Bankruptcy Court") on October 23, 2019, had *any* of these eight offers to acquire Dura been pursued and closed, the Zohar Lenders' secured term loan claims would have been paid in full and there would have been a return on the Zohar Lenders' indirect equity holdings in the ***hundreds of millions of dollars***.[8]

13.     Rather than accede to the Zohar Lenders' preference that Dura pursue the significant indications of interest for Dura,[9] Ms. Tilton and Jefferies canvassed the market in the United States and Europe for a period of several months in hopes of refinancing Dura's secured indebtedness, including the Zohar Lenders' Term Loan.  Those efforts failed.

14.     In the Spring and Summer of 2019, Ms. Tilton, the Zohar Funds, and the various constituents in the Zohar Chapter 11 Cases attempted to mediate a resolution to various issues extant among them, including Ms. Tilton's attempted refinancing of Dura's secured indebtedness.  However, no deal was ultimately reached.

---

you do so?"  A:  "Yes.  Back then, we were marketing the combined Dura and [other portfolio company] based upon approximately 152 million of EBITDA.  Approximately 25 million of that EBITDA would have come from [the other portfolio company]."  Q:  "Is it roughly accurate to say that it would be an 80-20 split between the two companies?"  . . . A:  "The preponderance of the value, which [is] in Dura, if you would just do the rough math . . . approximately 80-20 is fine, but there's more value to the Dura."  Q:  "Okay.  85 to 90 we'll say then.").

[6] *See, e.g.*, Deposition of Richard Morgner in the Zohar Chapter 11 Cases, February 11, 2020, a copy of which is attached hereto as Exhibit A (the "Morgner Deposition"), at 44:9-25 (Q: "Do you recall specifically conversations with Mr. Kost about ceasing the marketing process at that time?"  A:  "… in the end of 2018, the view from the Zohars was that they would like to see the management presentations continue, the sale process to continue.").

[7] Oct. 23, 2019 Hr'g Tr. at 157:14–17 (Cross-Examination of Richard Morgner, Managing Director and Joint Global Head of Debt Advisory & Restructuring Services, Jefferies LLC) (Q:  "Okay.  And you said that the sale process was not moved beyond these initial expressions of interest, and why is that?"  A:  "We were directed by Dura CEO, Lynn Tilton, not to proceed with the sale process.").

[8] *Id.* at 157:11-13 (Q:  "And this would be a return to equity of, potentially, hundreds of millions of dollars?"  A:  "That's correct."); *see also id.* at 189:7-10 ("If we were at the low end of all the ranges, that's 400 million less approximately 200 million with that.  That would have been 200 million available for equity less the fees and expenses associated with the process.").

[9] *See* fn. 6, *supra*.

## IV.    Dura's Bankruptcy Filing

15.    In September of 2019, Ms. Tilton notified the Zohar Lenders that the Debtors were experiencing liquidity issues and, absent funding, would potentially need to file bankruptcy.  The Zohar Lenders and Bardin Hill immediately engaged and, over the ensuing month, attempted to work with Dura and Ms. Tilton on out-of-court rescue financing proposals that would be funded by Bardin Hill and would have kept Dura out of bankruptcy.  As noted *infra*, Dura's investment banker would later testify that at this time, bankruptcy was not Dura's best option.

16.    For their part, Dura's management, legal and financial advisors failed to meaningfully engage with the Zohar Lenders and Bardin Hill on these financing proposals, including by failing to provide Bardin Hill with critical diligence and access to information.  Jefferies later testified that their lack of engagement was due, in part, to not receiving sufficient information from Dura to have any understanding about Dura's liquidity needs at the time.[10]  And although Dura's lead investment banker was the primary point of contact with Bardin Hill in the negotiations and testified that all proposals by Bardin Hill were rejected by Dura, he could not (or refused to) identify the person or persons at Dura that made the executive or board-level decision to reject Bardin Hill's proposals.[11]

---

[10]  *See, e.g.*, Oct. 23, 2019 Hr'g Tr. at 171:18–173:2 (Cross-Examination of Richard Morgner, Managing Director and Joint Global Head of Debt Advisory & Restructuring Services, Jefferies LLC) (Q: "And did Bardin Hill get what it asked for?" A: "They did not, basically because the information didn't yet exist" . . . Q: "Is it the kind of information that would ordinarily exist as a company with Dura's management team and back office?"  A: "The information as to the liquidity of the company, the rolling 13-week cash flow, it didn't exist as Mr. Grady was just getting back in his seat after medical leave and Portage Partners had not yet been retained."  Q: "Did the Debtors respond to the Bardin Hill out-of-court restructuring proposal?"  A:  "The debtors encouraged both the second proposal, in particular, and we provided on the first proposal an issues list pertaining to the items which were outside the control of Dura."  Q:  "Was one of the issues the fact that Dura didn't know how much financing it actually needed?"  A:  "On our issues list? No."  Q:  "But was that an issue you identified to Bardin Hill that you were not aware how to size the amount of additional funding that was needed to keep the company out of bankruptcy?"  A:  "During the pendency of these discussions – we did say that we were still trying to figure exactly what the liquidity need was.  That's an accurate statement."  Q:  "And that was as late as October 10th, correct?"  A:  "I don't recall the specific date."  Q:  "Is it true that by September 2019, Dura knew it would run out of cash by the end of October?"  A:  "In September of 2019, Dura had expressed concerns that it could not make payroll in the coming weeks and could be out of cash potentially before the end of October.").

[11]  *See* Morgner Deposition at 134:17-135:17.

17.    Rather than continue efforts to keep Dura out of bankruptcy, on Saturday, October 12, 2019, Ms. Tilton clandestinely appointed two independent managers (the "Independent Managers") to Dura's board of managers and just little more than three business days later, on October 17th (the "Petition Date"), the Debtors precipitously filed these cases in the Tennessee Bankruptcy Court.  Later that day, the Debtors filed a motion [Docket No. 19] (the "DIP Motion") seeking approval of debtor-in-possession financing from Tilton-affiliated Ark II (the "Tilton DIP Proposal"), which (a) rolled up the $26.7 million Ark ABL (which, as noted above, Ark II had assumed from Wells Fargo just a few months prior), (b) granted Ms. Tilton various forms of releases, (c) non-consensually primed the Zohar Lenders' secured term loan claims, (d) required the bankruptcy to be filed in Tennessee, (e) offered $50 million of new money financing, and (f) was conditioned on Ms. Tilton being designated as the stalking horse bidder for substantially all of the Debtors' assets.

18.    On October 18, 2019, the Tennessee Bankruptcy Court held a hearing on the Debtors' various "first day" motions and applications, including the DIP Motion, to which the Zohar Lenders and Bardin Hill objected.  At the conclusion of the hearing, Ms. Tilton agreed to provide the Debtors with interim funding and defer certain aspects of the Tilton DIP Proposal to a further interim hearing date.

19.    A few days later, Ford Motor Company – a critical customer of Dura – expressed its views as to Ms. Tilton's proposed financing as follows:

> As previously stated, this Reservation of Rights is not intended as an attack against Ms. Tilton or the entities that she controls which propose to provide the Dura Debtors with critical case financing.  With that said, however, it is blackletter bankruptcy law that affiliated-party transactions in the bankruptcy context warrant heightened scrutiny.  In this matter, given the litigious historical context that gives rise to the Dura Debtors' bankruptcy proceedings, Ford suggests that this history cannot be ignored when the proposed DIP facility is considered.  Said another way, the terms and provision of the DIP facility are appropriately reviewed with a goal of determining whether such terms and conditions are appropriate market protections for a debtor-in-possession lender, or instead, serve an alternative purpose of shifting leverage for the benefit of a DIP Lender that currently insists upon being a stalking horse purchaser as well.  By way of example only, in an instance where the same individual serves in dual capacities as the principal of the Dura Debtors and the principal of the DIP Lender, it is appropriate to scrutinize whether no less than thirty (30) Events of Default (and the corresponding implications of

each) under the proposed financing are necessary and appropriate under the circumstance of this matter.

Docket No. 144.

20.    The contested first day hearing continued on October 23, 2019, and included live testimony from Jill Frizzley (one of the Debtors' two Independent Managers), Richard Morgner of Jefferies (the Debtors' investment banker), Kevin Grady (then the Debtors' Chief Financial Officer), and Matthew Ray of Portage Point Partners (the Debtors' financial advisor).  That same day, just prior to the start of the hearing, the Debtors filed a sale and bidding procedures motion that described Ms. Tilton's stalking horse bid, which provided no recovery to the Zohar Lenders on account of their secured term loan claims or their indirect equity stake in the Debtors.[12]  At the hearing, Bardin Hill continued to offer the Debtors an alternative DIP financing proposal over the Debtors' and Ms. Tilton's objection.

21.    The unrebutted evidence adduced at the October 23rd hearing in Nashville revealed the following:

a.    In November 2018, the monetization process conducted under the Settlement Agreement approved in the Zohar Chapter 11 Cases resulted in no less than eight initial expressions of interest from non-insider buyers (four strategic and four financial sponsors) with initial expressions ranging in midpoint valuation from $526.5 million to $837 million (with valuation ranges as high as $875 million);[13]

b.    If any one of the initial expressions of interest were to close at the initial valuation expressed — even on the lowest end of value — the transaction would have paid off all of Dura's funded debt (including the Zohar Lenders' $105 million of secured term loan) and trade debt, and yielded hundreds of millions of dollars in equity value for the Zohar Lenders;[14]

---

[12] Docket No. 154.

[13] Oct. 23, 2019 Hr'g Tr. at 154:23-156:5 (Mr. Morgner's testimony outlining the midpoint values of each of the indications of interest received).

[14] *Id.* at 157:11-13 (Mr. Morgner Cross Examination) (Q:  "And this would be a return to equity of, potentially, hundreds of millions of dollars?"  A:  "That's correct.").

c.   After receipt of the initial expressions of interest, the Debtors' investment banker, Jefferies, was "directed by Dura CEO, Lynn Tilton, not to proceed with the sale process."[15]

d.   Shortly after Ms. Tilton unilaterally stopped Dura's prepetition monetization process, which was counter to Jefferies' expectations at the time, she instead focused her attention on attempting to purchase several of the Portfolio Companies, including Dura, for her own benefit using financing offered by Jefferies, Dura's pre- and post-petition investment banker.[16]

e.   During these negotiations, Jefferies attributed a value to Dura in the "hundreds of millions of dollars" and Dura was in the "top three" of the Portfolio Companies from a value perspective.[17]

f.   When Ms. Tilton's attempt to purchase Dura through a sale funded by Jefferies failed, she caused Ark II to assume Wells Fargo's Prepetition ABL Loan in August 2019.[18]

g.   Upon assignment of the Prepetition ABL Loan to Ark II, Ms. Tilton immediately reduced Dura's borrowing capacity from $40 million to $27 million.[19]

h.   Despite the Ark ABL being oversecured by approximately $9 million, Ms. Tilton would not increase Dura's borrowing capacity thereunder and would only lend

---

[15] *Id.* at 157:14-17 (Mr. Morgner Cross Examination) (A: "We were directed by Dura CEO, Lynn Tilton, not to proceed with the sale process.").

[16] *Id.* at 158:22-159:18 (Mr. Morgner Cross Examination) (Q: "Did you ever express to anyone that [ending the sale process] was the wrong decision?"  A: "As I sit here today, I don't recall."  Q: "At that point in time, was it Jefferies plan to recommence the sale process at some point?"  A: "At that point in the fall of 2018, I thought we would recommence the sale process in the spring of 2019."  Q: "In fact, wasn't the plan – wasn't Jefferies' recommendation to Dura to recommence the sale process as early as January 2019?"  A: "Sir, as I sit here today, I just remember recommencing the process in 2019.  My best recollection was spring."  Q: "So you believed it . . . would have been in Dura's best interest to recommence the sale process at some point in the first quarter of 2019?"  A: "My testimony was that back then, I believed that we would recommence the sale process in the first part of 2019, yes."  Q: "Okay.  And what happened when you recommenced the sale process in the first part of 2019?"  A: "The sale process . . . wasn't restarted in 2019."); *see also id.* at 161:19-162:1 (Mr. Morgner Cross Examination) (Q: "Okay.  And your declaration, you testified that in the spring and summer of 2019, Jefferies provided a funding commitment to Patriarch Partners to recapitalize certain of the Zohar portfolio companies which included the debtors as well as certain non-debtors.  Do you recall that testimony?"  A: "I do."  Q: "Okay.  And Patriarch Partners is owned by who?"  A: "My understanding it's owned by Lynn Tilton.").

[17] *Id.* at 164:11-165:3 (Mr. Morgner Cross Examination) (Q: "And in the spring of 2019, do you recall roughly what values were attributable to Dura?"  A: "As I sit here today, I don't recall the exact amounts, no."  Q: "Would it be hundreds of millions of dollars?"  A: "It would have been hundreds of millions of dollars, sir."  Q: "When you say Dura – I believe you referred to it as a core asset – so in the groupings of portfolio companies, Dura would be in the top three?" . . . A: "Yes, Dura was one of the key assets.  It was in the top three.").

[18] *Id.* at 84:9-14 (Mr. Ray Cross Examination) (Q: "Are you aware that the company previously had a $40 million line of credit with Wells Fargo?"  A: "Yes."  Q: "And you are aware that Ms. Tilton purchased that in August of 2019."  A: "Yes.").

[19] *Id.* at 84:15-23 (Mr. Ray Cross Examination) (Q: "Are you aware that the maximum commitment under that facility, now operated by Ms. Tilton entity, is $27 million?"  A: "Yes."  Q: "So that's about 13 million less in borrowing capacity than under the Wells Fargo facility."  A: "Correct."  Q: So when Ms. Tilton took this over, the borrowing availability went down."  A: "It appears so.").

additional funds to Dura in connection with a take-it-or-leave-it chapter 11 financing that expressly required a filing in Tennessee.[20]

i.   In September of 2019 – prior to the appointment of any Independent Managers—Ms. Tilton told Jefferies that Dura may need to file bankruptcy.  Jefferies explicitly disagreed that bankruptcy was the best option for Dura.[21]

j.   Ms. Tilton's DIP financing proposal was received by Dura before any Independent Managers were appointed.[22]

k.   Ms. Tilton's original DIP proposal communicated to Dura before any Independent Managers were appointed contained (i) a roll-up of the Ark ABL, (ii) non-consensual priming liens on the Zohar Lenders' term loan priority collateral, and (iii) a requirement that Ms. Tilton be designated as the stalking horse bidder.[23]

l.   Dura's investment banker testified that all of the foregoing items contained in Ms. Tilton's ***original*** insider DIP financing proposal were agreed to by the Independent Managers and, despite testifying that there was "significant negotiations" among Dura and Ms. Tilton, the only concession the banker could identify specifically was an extension of the maturity date by fifteen (15) days.[24]

---

[20] *Id.* at 85:3-16 (Mr. Ray Cross Examination) (Q:  "So with more than $36 million of eligible collateral but only 27 million available to lend, the ABL was pretty significantly oversecured at that point.  Is that right?"  A:  "I have not done a review of the collateral itself, but based on those calculations, it would appear oversecured."  Q:  "And, in fact, the borrowing base certificate showed more than $9 million available under the ABL in what's referred to as suppressed availability.  Is that correct?"  A:  "That is correct."  Q:  "But Ms. Tilton would not loosen any of those restrictions on lending, would she?"  A:  "That is my understanding."  Q:  "She would only lend if Dura went into Chapter 11."  A:  "That is my understanding.").

[21] *Id.* at 169:4-15 (Mr. Morgner Cross Examination) (Q:  "When were you first told that – when did you first learn that Dura may need to file bankruptcy?"  A:  "The September of 2019."  Q:  "And who told you that?"  A:  "Ms. Tilton and Mr. Grady." Q:  "And that was before the independent directors had been installed, correct?"  A:  "That's correct."  Q:  "Did you believe at the time you heard that bankruptcy was the best option for Dura?"  A:  "No.  Because I worked diligently to try to find out-of-court financing to avoid a bankruptcy.").

[22] *Id.* at 174:23-175:3 (Mr. Morgner Cross Examination) (Q:  "Okay.  Let's discuss the DIP proposal.  When did the debtors receive Ark's DIP proposal?"  A:  "I don't recall the specific date."  Q:  "Was it before or after the independent directors were appointed."  A:  "I believe it was before.").

[23] *Id.* at 175:25-176:8 (Mr. Morgner Cross Examination) (Q:  "Do you recall if the original proposal had a roll-up of the ABL?"  A:  "I believe it did."  Q:  "Do you recall if the original proposal called for priming of the Zohars' liens?"  A:  "I believe it did."  Q:  "Do you recall if the original proposal had a requirement that Ms. Tilton be designated as the stalking horse bidder?"  A:  "It did.").

[24] *Id.* at 176:9-22 (Mr. Morgner Cross Examination) (Q:  "Can you give the Court some idea of what significant concessions were given in light of the fact that the major issues that some of the parties that are objecting to this DIP were in the very original proposal submitted by Ark and agreed to by the debtors?"  A:  "As I sit here today, I can recall that we extended the maturity from 120 days to 135 days, that there was pushback on certain controls, fiduciary outs, things along those nature, sir."  Q:  "Okay.  Do you consider 15 days a major concession?"  A:  "I was testifying as to what changed."  Q:  "And the independent managers agreed to all those terms?"  A:  "The independent managers ultimately approved the – moving forward with the DIP term sheet.").

m. Ms. Tilton placed a deadline by which Dura had to accept her financing proposal of approximately 24 to 48 hours, despite the fact that Dura was not prepared to file bankruptcy in that time frame.[25]

n. Dura "shopped" Ms. Tilton's DIP financing proposal to seven (7) potential alternative lenders on a no-names basis for not longer than 2 hours and fifteen minutes in the aggregate.[26]

o. Dura's investment banker testified that (i) in the weeks prior to the Dura bankruptcy filing, Bardin Hill had proposed out-of-court financing to Dura but Dura failed to provide required diligence or a response to the proposal, and (ii) following Dura's bankruptcy filing, Bardin Hill offered an alternative, non-insider DIP financing proposal whose terms were within market without Bardin Hill requiring to be designated as the stalking horse bidder.[27]

---

[25] *Id.* at 176:23-177:19 (Mr. Morgner Cross Examination) (Q: "Did Ark's proposal have any deadline associated with it by which it had to have been accepted by the debtors or expire?" A: "It did." Q: "And what was the deadline?" A: "It was at some point last week. I don't recall whether it was Wednesday or Friday." Q: "Okay. If you don't remember the date, can you tell the Court how many days or hours the debtor was given once it was given this deadline?" A: "I recall, with all the moving pieces and all the negotiations going on, that while I was hopeful that we could find an out-of-court solution, that the DIP financing from Ms. Tilton was going to, you know, terminate within days of the back-and-forth of the previous week." Q: "So sitting here today, Mr. Morgner, you don't remember the amount of time the debtor was given to accept this proposal before it expired?" A: "That's correct." Q: "And you don't have a rough idea of how much time that was?" A: "I testified to, I believe, it was days." Q: "Okay. One day, two days, three days?" A: "Between one and two days, sir.").

[26] *Id.* at 179:17-180:12 (Mr. Morgner Cross Examination) (Q: "You testified in your declaration that the debtors also sought financing for third-party sources prior to the commencement of these cases, and it said – you testified that you talked to seven banks." A: "I reached out to seven financial institutions to see if they would provide a junior DIP to Dura." Q: "What did that involve?" A: "I picked up the phone, called sources of capital that I've known, sources of capital that are – have experience in providing DIP in special situations, financing." Q: "Okay. So of the seven, who did you talk to the longest? Not by name. What's the longest call you had on the seven that you contacted?" A: "These were short calls, probably around 15 minutes in duration." Q: "Did you offer them any due diligence?" A: "I called them on a no-names basis to see if they're – they had interest in providing a junior DIP, and I gave them the company's current leverage levels." Q: "And did they decline?" A: "They declined.").

[27] *Id.* at 170:17-173:3 (Mr. Morgner Cross Examination) (Q: "Okay. So at some time, I think you testified, Bardin Hill made a proposal for what's been referred to as an out-of-court rescue financing." A: "That's correct." Q: "And that was . . . to keep Dura out of bankruptcy, correct?" A: "That's correct." . . . Q: "And did Bardin Hill request diligence in connection with its proposal?" A: "They did." . . . Q: "Did the information in the requests as you recall – did the request – information requested, did it seem reasonable?" A: "There were several lists. Certain lists seemed reasonable, others seemed beyond the scope in my experience." Q: "In what way?" A: "There was one request which looked into information provided as part of a quality earnings exercise of a year ago, but there was many items on the list that were very traditional items that any lender would look to." Q: "And did Bardin Hill get what it asked for?" A: "They did not, basically because the information didn't yet exist." Q: "I'm sorry, could you repeat that?" A: "One of the key issues . . . . They didn't get what they asked for because certain of the information did not exist." Q: "Is it the kind of information that would ordinarily exist at a company with Dura's management team and back office?" A: "The information as to the liquidity of the company, the rolling 13-week cash flow, didn't exist as Mr. Grady was just getting back in his seat after medical leave and Portage Partners had not yet been retained." Q: "Did the debtors respond to the Bardin Hill out-of-court restructuring proposal?" A: "The debtors encouraged both the second proposal, in particular, and we provided on the first proposal an issues list pertaining to the items which were outside the control of Dura." Q: "Was part of – was one of the issues the fact that Dura didn't know how much financing it actually needed?" A: "On our issues list? No." Q: "But was that an issue you identified to Bardin Hill that you were not aware how to size the amount of additional funding that was needed to keep the company out of bankruptcy?" A: "During the pendency of these discussions for – we did say that we were still trying to figure exactly what the liquidity need was. That's an accurate statement." Q: "And that was as late as October 10th, correct?" A: "I don't recall the specific date." Q: "Is it true that . . . by September of 2019, Dura knew it would run out of cash by the end of October?" A: "In September of 2019, Dura had expressed concerns that it could make payroll over the upcoming weeks and could be out of

p. Ms. Tilton's proposed stalking horse bid was valued at approximately $157 million (including assumption of liabilities) which was "significantly less than the numbers we walked through earlier" (referencing the November 2018 expressions of interest) and there would be no recovery to the Zohar Funds under Ms. Tilton's stalking horse bid (which, again, was a requirement under her proposed DIP financing facility).[28]

22.    At the conclusion of evidence, Judge Mashburn requested an off-the-record chambers conference with just Dura's and the Zohar Lenders' counsel; Ms. Tilton's counsel was not permitted to attend.  As a result of the chambers conference, Dura no longer pursued Ms. Tilton's DIP financing proposal and, instead, sought approval of Bardin Hill's proposed DIP facility (the "Bardin Hill DIP Facility").  Burdened with the knowledge that, like her DIP financing proposal, the court would not approve her stalking horse bid, Ms. Tilton withdrew it as well.[29]

23.    On November 1, 2019, the Court entered an agreed order in the Zohar Chapter 11 Cases, transferring the Debtors' chapter 11 cases from the Tennessee Bankruptcy Court to this Court, effective as of November 8, 2019 [Zohar Docket No. 1060].

---

cash potentially before the end of October."); 181:19-182:10 (Mr. Morgner Cross Examination) (Q:  "Do you view Bardin Hill's proposal otherwise as being within market?"  A:  "The terms that a banker looks to – commitment fee, pricing, I can testify to that, that those terms are within market norms, yes."  Q:  "Okay.  So Bardin Hill is putting up what you would consider a market DIP proposal without certain of the features that Ms. Tilton is demanding as a part of her DIP package, correct?"  A:  "I'm not sure what you mean by certain features.  If the question is do they require to be the stalking horse bidder . . . Bardin Hill is not being required to be the stalking horse bidder."  Q:  "And you're aware that Bardin Hill simply wants a transparent, non-insider process, correct?"  A:  "That's correct.").

[28] *Id.* at 182:24-183:14 (Mr. Morgner Cross Examination) (Q:  "Now, with respect to Ms. Tilton's bid, you're aware that Ark has required that it be the stalking-horse designee, correct?"  A:  "Correct, sir."  Q:  "And what's the consideration under that proposal?"  A:  "The consideration to the Dura debtors would be a credit bid – credit bid of the DIP as well as the assumption of the European indebtedness, plus the trade that would be – trade liabilities would be unimpaired."  Q:  How does that compare to the proposals from November of 2018 that we walked through earlier in your testimony?"  A:  "Just adding up the numbers I have you, Mr. Barry, the DIP is $77 million.  There's approximately $80 million of debt in Europe.  That's approximately $157 million.  Obviously 157 million is significantly less than the numbers we walked through earlier in my testimony.").

[29] At the May 4, 2020 hearing in these cases, counsel to the Debtors stated to the Court that, at this time, the Debtors "could proceed down the path of having the Patriarch DIP stalking horse agreement approved and using that to set the floor for a subsequent auction, or we could terminate those arrangements and, instead, pursue alternative financing from Bardin Hill…The debtors and their advisors and the independent directors made that decision in an effort to bring peace to the case…"  May 4, 2020 Hr'g Tr. at 6:7-19.  The reality is, the Debtors did not have the option of proceeding to have Ms. Tilton's DIP financing and stalking horse bid approved because the Tennessee Bankruptcy Court made it clear to counsel to the Debtors that he would not approve them.  *See* Morgner Deposition at 179:20-180:10 (Q:  "Did you come to have an understanding of what happened in the [conference in Judge Mashburn's chambers]?"  A:  "I did."  Q:  "And what was it?"  A:  ". . . my recollection, having been told by other advisors to Dura . . . that the judge was not going to approve Ms. Tilton's proposal….").

24.      Also on November 1, 2019, the Office of the United States Trustee appointed an official committee of unsecured creditors in these chapter 11 cases (the "Committee").

## V.      The Final DIP Order

25.      On November 19, 2019, the Court entered a final order approving the Bardin Hill DIP Facility [Docket No. 340] (the "Final DIP Order").

26.      Under the Final DIP Order, the Bardin Hill DIP Facility:  (a) provided Dura with up to $84 million in post-petition borrowing, approximately $27 million of which was used to pay off the Ark ABL and Ms. Tilton's initial interim DIP loan (Final DIP Order ¶ 7); (b) granted Bardin Hill, among other things, valid, perfected, first priority, senior priming liens (the "DIP Liens") on all of Dura's property, consensually priming the liens held by the Zohar Lenders, including the Adequate Protections Liens (as defined below) (Final DIP Order ¶ 10); (c) confirmed the Zohar Lenders' claims in an amount not less than $104 million on account of their prepetition term loan to Dura; and (d) granted the Zohar Lenders (i) a superpriority administrative expense claim for adequate protection of its interests in all Prepetition Collateral (as defined in the Final DIP Order), including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Term Loan Agent's interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, junior only to the DIP Liens (the "Adequate Protection Liens"), (ii) adequate protection payments in cash (subject to a monthly cap of $65,000, with all excess amounts being accrued until the DIP Loans are paid in full) of all fees, costs, and expenses of the professionals to the Prepetition Term Loan Lenders and the Prepetition Term Loan Agent and all accrued and unpaid prepetition and postpetition interest due and payable and required to be paid in cash under the Prepetition Term Loan Documents (as defined in the Final DIP Order), and all administrative fees and costs and expenses of the Prepetition Term Loan Agent (Final DIP Order ¶ 15) (the "Professional Fee Claims," and together with the Adequate Protection Liens, the "Adequate Protection Claims").

14

27.    Thus, in order to facilitate the orderly administration of the Dura's chapter 11 bankruptcy cases and to ensure a timely and fulsome sale process, the Zohar Lenders consented to:

      a.    Priming of the prepetition Term Loan Collateral by the Bardin Hill DIP Facility;

      b.    deferral of any payment of adequate protection during these chapter 11 cases to ensure adequate operational liquidity; and

      c.    accrual (but not immediate payment) of any and all professional fees of the Zohar Lenders and minimal payment of $65,000 per month to the Zohar Lenders' term loan agent, Ankura Trust Company.

28.    Also by the Final DIP Order, the Court established December 31, 2019, as the initial end of the Challenge Period applicable to non-Committee parties in interest and January 31, 2020 for the Committee.  Final DIP Order ¶ 20(a).  As to the Prepetition Term Loan, on December 31, 2019, the Challenge Period expired as to all parties other than the Committee and expired as to the Committee on April 9, 2020.

29.    The Challenge Period has not expired as to all parties with respect to the Ark ABL.

## VI.    Dura's Postpetition Sale Process

30.    Dura's postpetition marketing process has, unfortunately, not been nearly as successful as the prepetition process, which, as noted above, resulted in indications of interest that would have returned hundreds of millions of dollars in value to the Zohar Lenders but was suspended at the direction of Ms. Tilton.

31.    On November 19, 2019, the Court held a hearing (the "Bid Procedures Hearing") to consider approval of Dura's proposed bidding and sale procedures.  Related to the sale process, one of Dura's Independent Managers had previously testified in Tennessee that "overseeing a fair and transparent sales process" "would be the ***exclusive domain*** of the independent managers . . . in consultation with Judge Farnan."[30] (emphasis added).  In line with this prior testimony, at the uncontested Bid Procedures Hearing, Dura's counsel represented to the Court that "the debtors with their

---

[30] Oct. 23, 2019 Hr'g Tr. at 209:23-210:5 (direct testimony of Ms. Jill Frizzley, Dura's Independent Manager).

advisors and independent directors have taken ***extraordinary steps*** to set up an important governance structure to ***police the sale process***…"[31] and that the Independent Managers, with the assistance of Jefferies and Portage Point Partners, would manage information flow regarding the sale process "versus Ms. Tilton herself."[32]  Following this hearing, the Court entered the *Order (I) Approving Bidding Procedures with Respect to Substantially all Assets, (II) Approving Contract Assumption and Assignment Procedures, (III)Scheduling Bid Deadlines, an Auction, and the Hearings and Objection Deadlines Related Thereto, and (IV) Approving the Form and Manner of Notice Thereof* [Docket No. 339] (the "Bidding Procedures Order").  The Bidding Procedures Order initially established a January 22, 2020 bid deadline, a January 27, 2020 auction, and a February 11, 2020 sale hearing.

32.      Despite assurances to this Court and Dura's stakeholders that "exclusive dominion" over all aspects of the sale process were vested with the Independent Managers to the exclusion of Ms. Tilton and Ms. Tilton's recent representations to the Court that she "had no control over the marketing and sale process . . . ."[33] the evidence demonstrates that Ms. Tilton retained control over critical aspects of the sale process, including what information was provided to potential bidders and what information was withheld from them.  Moreover, the sufficiency and timing of the information provided to potential bidders appears to have been inadequate and sluggish.

33.      For example, on December 3, 2019 (a month and a half after these chapter 11 cases were filed), Jaspinder Kanwal of Jefferies e-mailed Ms. Tilton requesting her permission to load "non-controversial documents as soon as practicable" into Dura's sale process data room concurrent with preparation of the Debtors' revised business plan.[34]  *See* Exhibit B.  Ms. Tilton responded on December

---

[31] Nov. 18, 2019 Hr'g Tr. at 7:9-14.

[32] Nov. 18, 2019 Hr'g Tr. at 32:12-22.

[33] *Patriarch's Limited Statement and Reservation of Rights* [Docket No. 965] at ¶ 2.

[34] As discussed below, the Debtors' December 2019 revised business plan has independent significance to the success of the sale process.

4, 2019 that "We do not have the bandwidth to do both. We must work on the plan first . . . I will pass along time to the team to address as soon as we are able." Exhibit B.

34.     Among the non-controversial documents Jefferies was seeking—but was denied— permission to load into the data site "as soon as practicable" were the Court-approved bidding procedures, which was not only a public document, but was approved more than two (2) weeks prior. Jefferies similarly requested authority from Ms. Tilton to share with potential bidders legal corporate organizational documents, historical financial data dating back to 2014, borrowing base certificates dating back to 2018 and various employee benefits documents, some of which also dated back to 2014. It is unclear why, two months into Dura's bankruptcy cases and post-petition sale process, these types of "non-controversial" documents were still waiting to be loaded into Dura's sale data room— particularly given that Dura, with Jefferies' assistance, had started its initial marketing process in May of 2018—or why Ms. Tilton was the gatekeeper to the data room.

35.     Again on December 15, 2019, Jefferies contacted Ms. Tilton for permission to load key sale diligence into Dura's sale data room. In that communication, Conor Coleman of Jefferies advised Ms. Tilton that certain materials were "ready to be uploaded pending your sign off." Exhibit C, p. 3. After a brief e-mail exchange, Ms. Tilton stated that "I will approve the documents. But remember, this is a sale in bankruptcy and ***this is overkill on information***." *Id.*, p. 1 (emphasis added). The lead Jefferies banker would later testify that he understood Ms. Tilton's comment to mean that Ms. Tilton thought Jefferies was proposing "too much information" be put in the data room.[35]

36.     Thus, Ms. Tilton was, at a minimum, deciding what information was made available to prospective purchasers. Based on the information being populated into the data site some two months into these chapter 11 cases (and 18 months after the commencement of Dura's pre-petition marketing efforts), the sale data site appears to have been significantly under-populated.

---

[35] Morgner Deposition at 197:13-198:12.

37.     Further troubling, the Debtors' investment banker initially pushed to finalize the critical Confidential Information Memorandum (the "<u>CIM</u>") as soon as possible after the Petition Date.[36]  A "key element to revising the CIM" was Dura's revised business plan which Jefferies expected "would take around a week to revise."[37]  However, rather than one week, Ms. Tilton and the rest of Dura's management team[38] took six weeks or more to revise Dura's business plan—time Dura's sale process could ill-afford to lose.[39]

38.     Acknowledging the criticality of the CIM to the sale process, Jefferies opted not to wait for the revised business plan to update the CIM and instead (while the revised business plan was in process), "went with historical financial information only and produced the CIM in a matter of weeks from the petition date[]" (the "<u>November 2019 CIM</u>").[40]  Accordingly, the November 2019 CIM provided to potential bidders presented, among other things, EBITDA figures based on Dura's financial performance over the prior twelve months.  Adjusted EBITDA is, according to Dura's investment banker, "the key number upon which bidders, generally speaking, formulate their proposals and negotiate around a deal.  Transactions are often quoted as a multiple of EBITDA."[41]  In late December 2019, approximately six weeks after presenting the November 2019 CIM to potential bidders, Dura completed their revised business plan which, according to Dura's investment banker, presented a new, 2019 Adjusted EBITDA figure.  As Dura's investment banker testified, the December 2019 update informed potential bidders that "the 80 to 90 million of historically trailing adjusted EBITDA . . . is now for 2019

---

[36] *Id.* at 201:18-25; *see also id.* at 184:8-185:14 (Mr. Morgner testifying that Jefferies' first order of business was to update the CIM).

[37] *Id.* at 202:1-10.

[38] As testified to by the Debtors' restructuring advisor, Ms. Tilton, as CEO and sole member of the board of directors, with the assistance of the CFO and the COO make almost all of the decisions for the company.  *See* Dec. 03, 2019 Hr'g Tr. at 30:5-18.

[39] Morgner Deposition at 202:11-14.

[40] *Id.* at 202:15-20.

[41] *Id.* at 206:1-6.

approximately 45 million dollars."[42] (i.e., the EBITDA figures presented by Dura were approximately *one-half of the EBITDA figures shown in the November 2019 CIM*).[43]

39.    It is this unexpected and eye-popping negative adjustment in EBITDA that Dura's counsel was presumably referring at the May 4, 2020 hearing in these chapter 11 cases when he said "at the end of the year when we realized the DIP was impaired at that point we had 8-9 binding letters of intent but those letters of intent effectively went away when bidders got under the hood and saw kind of what was going on with the business . . . ."[44]  Indeed, when active bidders "got under the hood" in late December 2019, what they saw was half an engine when, just a week prior, an entire engine was found. If, hypothetically speaking, the complete failure of Dura's sale process can be attributed to any single event, it would be the calamity surrounding the approximate $50 million dollar downward adjustment to Dura's EBITDA presentation three weeks before the bid deadline; something Ms. Tilton, Dura's CEO, would be hard pressed to hang around the neck of any other party, including the Zohar Funds.

40.    Following these revelations concerning Dura's business, on January 2, 2020, the Court entered a consensual revised Bidding Procedures Order, extending the sale process and establishing a February 21, 2020 bid deadline, February 26, 2020 auction, and a March 23, 2020 sale hearing.

41.    Shortly thereafter, Dura's investment banker established January 30, 2020 as the deadline for all parties to submit initial proposals with the goal of procuring a stalking horse bidder in advance of the February 21st bid deadline.  On that date, Dura received just two contingent, unqualified expressions of interest:  one indicating a valuation below the Bardin Hill DIP Facility, and the other proposing to acquire the Bardin Hill DIP Facility and pay the Zohar Lenders a penny on the dollar for their term loan debt.

---

[42] *Id.* at 209:6-9.

[43] *Id.* at 208:23-209:15.

[44] May 4, 2020 Hr'g Tr. at 7:20-8:3.

42.     Facing the reality of their failed sales process,[45] Dura turned to Bardin Hill and the Zohar Lenders.  The Zohar Lenders immediately met with their constituents and engaged in around the clock discussions with Dura, Jefferies, MBIA, the Zohar III Controlling Class and various other parties in interests in an attempt to salvage the now-failed sale process.

43.     On February 6, 2020, the Zohar Lenders filed an emergency motion in the Zohar Chapter 11 Cases requesting that the Court authorize the Zohar Lenders to credit bid on Dura's assets.  Six days later, on February 12th, the Court authorized the Zohar Lenders to engage as a bidder in Dura's cases. Thereafter, the Zohar Lenders engaged in intense diligence and extensive negotiations with potential transaction partners to submit a bid for the totality of Dura's operations.  On February 24, the Zohar Lenders—with the strong encouragement of Dura and their advisors—submitted a joint venture bid with a transaction partner (the "Zohar Transaction Partner"), subject to the Zohar Transaction Partner's confirmatory due diligence.

44.     Just days later, upon further review of Dura's business plan and financial projections, the Zohar Transaction Partner informed the Zohar Lenders that it was no longer prepared to move forward with the February 24th joint venture bid and, like other bidders, believed the valuation of Dura was well inside the Bardin Hill DIP Facility.

45.     As reported to the Court at the May 4, 2020 hearing in these cases, since this time, the only binding proposals that have emerged from the sale process are the Agreements with the Purchasers.

46.     On April 17, 2020, Dura filed that certain *Notice of Debtors' Entry Into Stock and Asset Purchase Agreement for Sale of Debtors' European Business* [Docket No. 894] (the "European Sale Notice").  Pursuant to the European Sale Notice, Dura entered into a sale agreement, subject to Court approval, whereby Dura intends to sell, among other things, (a) the capital stock of certain of the Debtors' foreign non-Debtor subsidiaries, (b) other assets, including intellectual property related to the operations

---

[45] From early February throughout March the Zohar Lenders repeatedly asked Dura to provide the Court with a status report regarding the sale process's failure, but Dura determined doing so was unnecessary.

of the Debtors' foreign non-Debtor subsidiaries, and (c) all of the rights, claims or causes of action of the Debtors of any kind, including those available under the Bankruptcy Code, against any party, including any officer, director or affiliate of, or lender to, any Debtor (and the proceeds of any insurance policies related to any such rights, claims or causes of action) arising at any time prior to the closing of the sale, subject to certain exceptions (as more specifically defined in the European Sale Agreement, the "Claims"), to an affiliate of Bardin Hill in exchange for a credit bid of $50 million.

47.    On April 30, 2020, Dura filed that certain *Notice of Debtors' Entry Into Stock and Asset Purchase Agreement for Sale of Debtors' North American Business* [Docket No. 931] (the "North American Sale Notice").  Pursuant to the North American Sale Notice, Dura intends to sell, among other things, (a) the Debtors' assets comprising the Debtors' North-American operations, (b) the capital stock of certain of the Debtors' foreign non-Debtor subsidiaries, and (c) all of the rights, claims or causes of action of the Debtors of any kind, including those available under the Bankruptcy Code, against any party, including any officer, director or affiliate of, or lender to, any Asset Seller or Transferred Subsidiary or any of their respective Affiliates (other than any Transferred Subsidiaries (as defined in the DE Purchase Agreement)) (and the proceeds of any insurance policies related to any such rights, claims or causes of action) arising at any time prior to the Closing, subject to certain exceptions. (as more specifically defined in the European Sale Agreement, the "Claims"), to an affiliate of Bardin Hill in exchange for a credit bid of $5 million and a cash payment of $11.25 million to fund certain professional fees and related expenses.

48.    The Sale Agreements will result in, among other things:

    a.    an approximately $35 million deficiency claim remaining on the Bardin Hill DIP Facility;

    b.    no recovery on account of the Zohar Lenders' adequate protection claims granted under the Final DIP Order;

    c.    no recovery on account of the Zohar Lenders' $105 million secured term loan facility; and

d.    needless to say, no recovery on account of the Zohar Lenders' indirect equity interests.

## RESERVATION OF RIGHTS

49.    The results of these bankruptcy cases were unimaginable at their inception, much less one-year prior when Ms. Tilton directed Jefferies not to pursue any of the numerous indications of interest that would have paid off Dura's indebtedness in full and returned hundreds of millions of dollars in equity value to the Zohar Lenders.  Dura's recent attribution of their failed sale process to lack of a stalking horse bidder and unstated "macroeconomic" factors is not acceptable, even if true.  The Court and Dura's non-insider constituents were promised a "full, fair, equitable" and "transparent" process,[46] but despite these promises, Ms. Tilton was permitted to determine what information was given to prospective bidders and when that information would be provided (if at all).  The Debtors' vague allusions to "macroeconomic" factors can hardly be described as transparent when they know full well that microeconomic factors—most significantly, the drastic December 2019 revisions to their business plan and Adjusted EBITDA and lack of forethought prior thereto—are significant and identifiable factors in the failure of their sale process.

50.    Nonetheless, as noted above, the Zohar Lenders will not stand in the way of the proposed sales to the Purchasers and fully support Bardin Hill's efforts to preserve Dura's business and thereby save thousands of jobs.  However, in light of the facts and circumstances set forth above, among others that may later be unearthed in discovery, the Zohar Lenders believe that they and the Debtors' estates may hold substantial claims and causes of action arising from the harm suffered by Dura and its stakeholders under Ms. Tilton's control, including, but not limited to, claims relating to breaches of the Settlement Agreement.  The Zohar Lenders hereby reserve all rights as both creditors and equityholders of the Debtors, including, but not limited to, their rights to object to the proposed sales and Sale Agreements, or any terms thereof, at or prior to the hearing thereon, and their rights in connection with

---

[46] Oct. 23, 2020 Hr'g Tr. at 210:8-11.

any and all claims or causes of action related to Dura and its pre-petition and post-petition sale processes, including, but not limited to, claims for breach of the Settlement Agreement, breaches of fiduciary duty, negligence, bad-faith or willful misconduct.

Dated: May 8, 2020
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Joseph Barry*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to the Zohar Lenders*

## **EXHIBIT A**

**Transcript of Morgner Deposition**

CONFIDENTIAL

```
 1        C O N F I D E N T I A L
 2   IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE DISTRICT OF DELAWARE
 3   ---------------------------)
     In re:                     )Chapter 11
 4                              )
     Zohar III, Corp., et al.,  )Case No.
 5                              )18-10512(KBO)
                  Debtors.      )
 6   ---------------------------)Jointly Administered
                                )
 7   BLANK ROME LLP, FFP (CAYMAN))
     LIMITED, MAPLES AND CALDER, )
 8   MAPLESFS LIMITED, MORRIS,   )
     NICHOLS, ARSHT & TUNNEL LLP,)
 9   GARY NEEMS and QUINN EMANUEL)
     URQUHART & SULLIVAN LLP,    )
10                              ) Adversary No.
                  Plaintiffs,  ) 19-50273(KBO)
11                              )
                  v.           )
12                              )
     ZOHAR CDO 2003-1, CORP. and )
13   ZOHAR CDO-2003-1, LIMITED,  )
                                )
14               Defendants,   )
                                )
15               and           )
                                )
16   PATRIARCH PARTNERS XV, LLC  )
     and OCTALUNA, LLC,          )
17                              )
                  [Proposed]   )
18   Defendants-Intervenors.    )
     ---------------------------)
19
20
         DEPOSITION OF RICHARD MORGNER
21
               February 11, 2020
22
23
24
     Reported by: Dawn Matera
25
```

CONFIDENTIAL

1  Plettenberg restructuring, because people
2  were suspicious that they hadn't yet
3  occurred and they could capitalize upon
4  them.
5        That's my best recollection, as
6  I sit here today.
7     Q.   When you say "the Plettenberg
8  restructuring," what are you referring
9  to?
10    A.   I am referring to a Portfolio
11 Company B plant resident in Plettenberg,
12 Germany that was in the process of being
13 shut down at that time or it had just
14 recently been shut down with the business
15 that sat in that plant being moved to
16 other Portfolio Company B facilities in
17 Europe.  And a cessation of operations
18 there given, to the best of my
19 recollection, Plettenberg lost around 30
20 million dollars a year on the EBITDA
21 line.
22    Q.   So when you said that your
23 understanding of one of Ms. Tilton's
24 concerns was that we weren't getting
25 credit for the restructuring of the

1  Plettenberg facility.
2        What did you mean by that?
3     A.   That when we had talked to
4  interested parties, there were
5  significant questions by those parties as
6  to has this really been accomplished,
7  will I get the benefit of it, can I
8  capitalize the savings here on a pro
9  forma basis once I'm the new owner.
10    Q.   And did you agree at the time
11 that these were cogent reasons to wait
12 and restart the marketing process at some
13 later time?
14        MR. LABUDA:  Object to form.
15    A.   Jefferies believed those were
16 cogent reasons.
17    Q.   Did you have any discussions
18 with either Mr. Katzenstein or Mr. Kost
19 regarding the decision to cease the
20 marketing process at that time?
21    A.   I did.
22    Q.   And approximately, how many
23 discussions?
24    A.   As I sit here today, I can't
25 recall, but it was more than one.

1     Q.   Were they by phone or in
2  person?
3     A.   As I sit here today, I can't
4  draw a distinction between we
5  communicated in person or by phone.
6     Q.   And can you summarize your
7  conversation with -- let me focus on
8  Mr. Kost, first.
9        Do you recall specifically
10 conversations with Mr. Kost about ceasing
11 the marketing process at that time?
12    A.   As I sit here today, I can't
13 differentiate, given the amount of time
14 that has gone by, whether I was talking
15 with Mr. Kost or Mr. Katzenstein.
16        I can relay the sum and
17 substance of discussions, but I can't
18 point a specific day, I can't say it was
19 a meeting here or a conversation there.
20        I can summarize, you know,
21 starting, you know, in the end of 2018,
22 the view from the Zohars was that they
23 would like to see the management
24 presentations continue, the sale process
25 to continue.

1     Q.   Do you know what steps debtors'
2  representatives took -- strike that.
3        Did debtors' representatives
4  take any steps to instruct Jefferies to
5  continue the marketing process at that
6  time?
7     A.   As I just testified to, they
8  expressed their desire to see the process
9  continue to move forward.
10       As I sit here today, I can't
11 recall anything else.
12    Q.   At that time, what was the plan
13 for recommencing the marketing process?
14    A.   At that time, the plan was to
15 recommence the process in 2019.
16    Q.   Did Portfolio Company B pursue,
17 in approximately January of 2019, a
18 refinancing of their debt obligations?
19    A.   In the first part of 2019, I
20 don't recall the specific month,
21 Jefferies and Portfolio Company B looked
22 to refinance their upcoming, their
23 upcoming maturity.
24    Q.   What assistance did Jefferies
25 provide in that process?

12 (Pages 42 - 45)

CONFIDENTIAL

Page 134

1 transaction.
2    Q.    So is it the case that Kirkland
3 & Ellis and Jefferies rejected this
4 proposal?
5        MS. LOSEMAN:  Object to form.
6        MR. LABUDA:  Object to form.
7    A.    No.
8    Q.    Did you ever consult with
9 Ms. Tilton regarding this proposal?
10    A.    The proposal that she made?
11    Q.    Yes.
12    A.    I'm sure I talked to her about
13 it?
14    Q.    And what did she say?
15    A.    That she was hopeful to keep
16 the company out of bankruptcy.
17    Q.    Did she instruct you to reject
18 Bardin Hill's proposal?
19    A.    I never rejected Bardin Hill's
20 proposal.
21    Q.    Did she negotiate on behalf of
22 portfolio -- we have a group B portfolio,
23 right?  Excuse me.  Did she negotiate on
24 behalf of Company B on behalf of, in
25 connection with the Bardin Hill proposal?

Page 135

1        MS. LOSEMAN:  Object to form.
2    A.    My recollection, as I sit here
3 today, is that Kirkland & Ellis'
4 financing team went through the Zohar
5 proposal and prepared an issues list.  An
6 issues --
7        MR. ARNAULT:  I am just going to
8    interject not to reveal any
9    attorney-client privileged
10    information.  So discussions with
11    Kirkland, work product at Kirkland
12    that was prepared, it sounds like you
13    were going there.  I just want to make
14    sure you are careful.
15    A.    Based upon the comments of
16 counsel, I don't know how I can
17 continuing answering the prior question.
18    Q.    So you also testified, I
19 believe, that you couldn't recall
20 Ms. Tilton instructing you to not provide
21 Bardin Hill with its diligence.
22        Do you recall that?
23    A.    I do.
24    Q.    And you recall testifying in
25 relation to the CIM, that in order to

Page 136

1 build up that type of information that
2 has to come from management of the
3 company?
4    A.    I recall my testimony, sir.
5    Q.    And is the information that
6 Bardin Hill was requesting in relation to
7 its rescue financing proposal the variety
8 of information that would come from
9 management?
10    A.    That's correct.
11    Q.    So in order to provide Bardin
12 Hill with the due diligence items that it
13 was requesting, you would have had to get
14 that from Dura management?
15    A.    That's generally correct, yes.
16    Q.    So were you in possession of
17 the information that Bardin Hill was
18 requesting as a part of its diligence
19 requests?
20    A.    Jefferies was not in
21 possession.
22    Q.    Who was?
23    A.    As I testified to previously, a
24 lot of the information that was being
25 requested didn't yet exist.

Page 137

1    Q.    Okay.  So it wasn't that
2 Ms. Tilton wasn't, was instructing you
3 not to provide it, it was that it
4 actually didn't exist?
5    A.    I believe that was my testimony
6 earlier today.
7    Q.    Was there any information that
8 did exist that they requested?
9    A.    Mr. Barry, I have to look at a
10 list and go through it.
11        As I sit here all these months
12 removed, I can't recall.
13    Q.    You testified that you had been
14 retained by the company since May of
15 2018, correct?
16    A.    I testified that in May of 2018
17 Dura -- excuse me, Portfolio Company B
18 and Portfolio Company C retained us for a
19 sell-side transaction.
20    Q.    And the rescue financing
21 proposals occurred during what period of
22 time?
23    A.    In September and October of
24 2019.
25    Q.    So four to five months after

35 (Pages 134 - 137)

CONFIDENTIAL

Page 178

1          MS. LOSEMAN:  Object to form.
2     A.   I was told by people who
3 participated in those meetings what
4 happened, but I was not included in
5 those.
6     Q.   What were you told happened in
7 chambers?
8          MR. LABUDA:  I object to the
9 extent it's going to reveal
10 conversations from counsel from
11 Kirkland.
12          MR. ARNAULT:  I wonder if there
13 is any sensitivity around revealing
14 what was discussed in chambers given,
15 obviously, the judge didn't want to
16 discuss it on the record and I wasn't
17 there, but.  There may be some
18 sensitivity around that.
19          MR. BARRY:  I understand that.
20 I think -- this is widely known
21 amongst the parties to this.
22          MR. ARNAULT:  That's fair.  It's
23 all under the protective order.
24          MR. BARRY:  And I would also say
25 the judge had, the judge's instruction

Page 179

1 was to tell people what happened.
2     Q.   Do you have an understanding of
3 what happened in chambers?
4          MS. LOSEMAN:  For the record, I
5 don't think it is widely known.  For
6 example, Gibson Dunn was not counsel
7 to any parties in that proceeding.
8 So, for the record.
9          MR. BARRY:  That's fine.  I
10 don't know if Gibson Dunn has an
11 understanding as to what happened in
12 chambers or not.  You don't -- it's
13 not a question.  Just an observation.
14          MR. ARNAULT:  In any event, this
15 will be sealed and we all can figure
16 out whether it's disclosed publically.
17     A.   Mr. Barry, can you please
18 repeat the question.  The back and forth,
19 it's not front and center in my mind.
20     Q.   Understood.  Did you come to
21 have an understanding of what happened in
22 that chambers conference?
23     A.   I did.
24     Q.   And what was it?
25     A.   As I sit here today, I don't

Page 180

1 recall all of the specifics of what was
2 said in chambers, but my recollection,
3 having been told by other advisors to
4 Dura, Portfolio Company B, that the judge
5 was not going to approve Ms. Tilton's
6 proposal.  That the judge found her to be
7 wearing too many hats as both the CEO,
8 the DIP lender and the stalking horse
9 bidder.  And he encouraged the parties to
10 move forward with the Bardin Hill DIP.
11     Q.   Have you ever discussed your
12 testimony in Nashville with Ms. Tilton?
13     A.   Briefly.
14     Q.   What did she say?
15     A.   She told me she was unhappy
16 with my testimony.
17     Q.   What specifically did she say,
18 if you recall?
19     A.   I don't recall anything.  She
20 didn't point out anything specifically.
21     Q.   You don't recall anything
22 specifically Ms. Tilton told you about
23 that conversation?
24     A.   My apologies.  I misspoke.  We
25 started talking over each other.

Page 181

1          Would you please ask the
2 question again.  I talked too quickly.
3     Q.   What did Ms. Tilton say to you
4 about your testimony in Nashville?
5     A.   That she was unhappy with it.
6     Q.   What specifically did she say?
7     A.   She did not say.
8     Q.   Did she convey that she
9 disagreed with your testimony?
10     A.   Ms. Tilton said that she was
11 unhappy with my testimony.  She didn't
12 point to any specifics.  She was unhappy
13 with the performance of the
14 professionals, including my testimony.
15 She let Kirkland and Jefferies know she
16 wasn't happy with our collective
17 performance.
18     Q.   Was that because she believed
19 your testimony was inaccurate?
20          MR. LABUDA:  Object to form.
21          MS. LOSEMAN:  Object to form.
22     A.   I have no idea.  You would have
23 to ask Ms. Tilton.
24     Q.   So you have no idea why she was
25 unhappy with your testimony in Nashville?

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1    A.   That's correct.
2    Q.   Okay.  You ever had any
3  conversations with Ms. Tilton's counsel
4  about your testimony in Nashville?
5    A.   Ms. Tilton's counsel in
6  Nashville, Skadden Arps, also conveyed to
7  me that Ms. Tilton was unhappy with my
8  testimony.
9    Q.   And did they tell you
10 specifically why she was unhappy?
11   A.   They did not.
12   Q.   Did she tell you that she
13 thought your testimony was inaccurate?
14   A.   They did not.
15   Q.   Okay.  Now, I think Ms. Loseman
16 asked you about the current sale process
17 for Dura.
18      You testified about the current
19 sale process that's being undertaken.
20   A.   I recall questions about the
21 current sale process, yes.
22   Q.   And is Ms. Tilton involved in
23 this process?
24      MS. LOSEMAN:  Object to form.
25   A.   Ms. Tilton remains the CEO.

Page 183

1  Ms. Tilton is also a potential bidder.
2  As such, her involvement has been
3  limited.
4    Q.   And she continues to oversee
5  the day-to-day operations of Dura?
6    A.   She continues to oversee the
7  operations of Portfolio Company B, yes.
8    Q.   And is she what you would refer
9  to as a hands on CEO?
10   A.   I am not sure I am capable of
11 answering that question.  I am not an
12 employee of the company.  I come in and
13 prepare materials for the sale process,
14 meet with the management team.  I can't
15 speak to her management style.
16   Q.   Without giving any names, can
17 you just -- can you just roughly describe
18 the Dura sale process through the end of
19 December?
20   A.   Through the end of December of
21 2019?
22   Q.   Correct.
23   A.   Sure.
24      MS. LOSEMAN:  Object to form.
25 Sorry, just a point of clarification,

Page 184

1  when you're asking about -- asking him
2  to roughly describe the Dura sale
3  process, are you talking about
4  information publically available
5  regarding that process, such as the
6  timeline or are you asking something
7  in particular?
8      MR. BARRY:  I would like to
9  know, Rich testified earlier about the
10 process that they went through leading
11 up to the launch and the subsequent
12 marketing process in 2018.
13      And I just want to understand if
14 they went through a similar process
15 through the end of December, the
16 production of the CIM, et cetera, et
17 cetera.
18      I don't -- so.
19      MR. ARNAULT:  So just focused on
20 post bankruptcy?
21      MR. BARRY:  Post bankruptcy,
22 yes.
23   A.   Mr. Barry, from the time of the
24 petition date through December, Jefferies
25 was engaged in, you know, several work

Page 185

1  streams.
2      The first was revising the
3  confidential information memorandum.
4      In addition, we started in an
5  outreach to parties who were either
6  interested before or who had expressed
7  interest to us when it became public that
8  we were the investment banking firm to
9  Portfolio Company B.
10      We received very early in that
11 process, based upon limited information,
12 the CIM did not have financial
13 projections in it.  We were still waiting
14 on the formulation of a business plan.
15      Portfolio Company B has a new
16 CFO now.  And the new CFO had to produce
17 a new business plan.  We were under, at
18 the time of the petition date, belief
19 that we would have a business plan in the
20 matter of days or week.  It took around
21 six weeks to produce the business plan,
22 which was something that we hadn't
23 anticipated at the petition date.
24      Nevertheless, with the
25 information that we had, we revised the

47 (Pages 182 - 185)

CONFIDENTIAL

Page 194

1 progression.
2    Q.    So then flip back forward to
3 the front of this e-mail.  It says --
4 this is from Ms. Tilton to Mr. Kanwal,
5 Mr. Fennimore.  It says "We do not have
6 the bandwidth to do both.  We must work
7 the plan first.  We are all engaged, but
8 I will pass along time to the team to
9 address as soon as we are able."
10       Do you see that?
11    A.    I do.
12    Q.    So again, this appears to me
13 Ms. Tilton giving a consent, right, as to
14 what goes in the data room?
15       MS. LOSEMAN:  Object to form.
16    A.    The e-mail says that we're
17 finishing the business plan and then
18 we'll get to the data room.
19    Q.    To your knowledge, on December
20 -- excuse me, Ms. Tilton's e-mail is
21 December 4th.
22       To your knowledge, on December
23 4th, were these materials loaded to the
24 data room?
25    A.    To my knowledge, based upon

Page 195

1 reading the e-mail, they would not have
2 been.
3    Q.    I am going to hand you another
4 e-mail.
5       [The e-mail, Bates stamped
6    JEFFERIES_ZOH000607, was hereby
7    marked as Zohar Exhibit 5 for
8    identification, as of this date.]
9    Q.    I would ask, Rich, that you
10 turn to the second-to-last page.  It's
11 stamped JEFFERIES_ZOH000607.
12    A.    I am there.
13    Q.    The bottom, this is an e-mail
14 from Conor Coleman to Lynn Tilton and
15 Project.COMO.All@Jefferies?
16       Who is Conor Coleman?
17    A.    Conor Coleman is an investment
18 banker manager at Jefferies working on
19 this matter.
20    Q.    And presumably
21 Project.COMO.All@Jefferies is the team?
22    A.    Yes.
23    Q.    And Project COMO is Portfolio
24 Company B?
25    A.    That's correct.

Page 196

1    Q.    Okay.  This says "Lynn, I hope
2 you're having a good day.  We have been
3 working with the Company B team on due
4 diligence request items.  Please find
5 attached updated diligence tracker
6 reflecting all documents received to
7 date.  While we continue to work through
8 the remaining requests, we would like to
9 upload the documents that we have
10 received thus far to the sale data room
11 in order to be as responsive as possible.
12 Items marked in rows in the attached are
13 documents or responses in the
14 'notes/commentary' section that we have
15 received from the company and are ready
16 to be uploaded pending your sign-off."
17       Do you see that?
18    A.    I did.
19    Q.    Do you have an understanding as
20 to what "pending your sign-off" is?
21    A.    Pending your approval.
22    Q.    And this is dated December
23 15th, correct?
24    A.    That's correct.
25    Q.    And so this is approximately 11

Page 197

1 days after the e-mail we just walked
2 through, correct?
3       MS. LOSEMAN:  Object to form.
4    A.    The 4th to the 15th is 11 days.
5    Q.    And by December 15th, Portfolio
6 Company B had been in bankruptcy for
7 approximately two months?
8    A.    That's correct.
9    Q.    And if you could do me a favor
10 and just flip through the thread that's
11 in this document to the very front.
12    A.    I've gone through it.
13    Q.    So the very last e-mail at the
14 top is from Ms. Tilton to Mr. Coleman and
15 to Mr. Fennimore and to the project
16 e-mail address.  And it says "I will
17 approve the documents but remember this
18 is a sale in bankruptcy and this is
19 overkill on information."
20       Do you see that?
21    A.    I do.
22    Q.    What's your understanding of
23 the word "overkill" in this e-mail?
24    A.    Too much information.
25    Q.    So Jefferies is making a

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

1 recommendation in this e-mail as to what
2 documents to put in the data room?
3          MR. LABUDA:  Object to form.
4          MS. LOSEMAN:  Object to form.
5     A.   In these series of e-mails, we
6 are asking to upload more information to
7 the data site.  Running through what
8 we're asking to put up.  Ms. Tilton says
9 she'll approve it, but she thinks we are
10 putting too much up there.
11    Q.   Do you share that view?
12    A.   No, I do not.
13    Q.   Jefferies is free to put in the
14 data room what it sees as an appropriate
15 fit?
16         MR. LABUDA:  Object to form.
17    A.   The transaction committee
18 comprised of Ms. Frizzley and
19 Mr. Beilinson are free to put in the data
20 room what they see fit.
21    Q.   Does the Jefferies team run by
22 Mr. Beilinson and Ms. Frizzley what it's
23 putting in the data room?
24    A.   In the ordinary course, for
25 quality control purposes, we run things

Page 199

1 by the CFO of the company Jim Riedy,
2 Ms. Tilton also will sign off.  If we, in
3 addition have information that, given
4 where Lynn sits today, Ms. Tilton sits
5 today, excuse me, we went to the
6 transaction committee for approval to
7 upload some documents.  Because it's not
8 just Jefferies' decision.  We work as
9 part of a team.
10    Q.   Prior to last night, did
11 Jefferies ask for the independent
12 managers' sign-off on documents be put in
13 the data room?
14    A.   To my knowledge, we never had
15 an issue getting stuff up in the data
16 room.  Maybe it took a little bit long,
17 but we were able to get information to
18 the data site.
19         And last night, to be clear, no
20 one told us not to.  Just the transaction
21 committee thought, at this point in time,
22 it was best to act unilaterally.
23    Q.   And you, when you say it took a
24 little longer, what do you mean?
25    A.   I mean you could see from the

Page 200

1 e-mails we are pushing to put stuff in
2 the data room.  The information was
3 compiled, put up on the data site.  And
4 in these situations, you always want to
5 do things as soon as humanly possible.
6 And with competing agendas on management
7 resources, because we didn't have a
8 business plan.
9     Q.   So when you say waiting a
10 little longer, you mean waiting for
11 Ms. Tilton to approve?
12         MS. LOSEMAN:  Object to form.
13    A.   That's not what I said.
14    Q.   Other than e-mail where
15 Ms. Tilton is suggesting Jefferies is
16 putting too much information in the data
17 room, did she have any other complaints
18 or criticisms of what was going in the
19 data room?
20         MS. LOSEMAN:  Object to form.
21    A.   I don't recall any other.
22    Q.   Are there other areas of the
23 sale process that's currently ongoing in
24 which Jefferies requests Ms. Tilton's
25 sign-off?

Page 201

1     A.   We requested Ms. Tilton's
2 sign-off on the confidential information
3 management.  She also reviewed a draft of
4 the management presentation.
5     Q.   So you freely communicate --
6 the Jefferies team freely communicates
7 with the other management of Dura?
8     A.   We do, very frequently.
9     Q.   So you testified regarding the
10 preparation of the CIM and the business
11 plan.  Do you recall that, in connection
12 with the 2019/2020 bankruptcy sale
13 process?
14    A.   I have given testimony, yes, to
15 revising the CIM and the status of the
16 business plan during the pendency of the
17 case so far.
18    Q.   Now, I want to get a little
19 more specific regarding some of your
20 earlier testimony regarding that.
21         When do you recall Jefferies
22 was targeting to finalize the CIM?
23    A.   As soon as practicable after
24 the petition date, when Mr. Grady was the
25 CFO.

51 (Pages 198 - 201)

CONFIDENTIAL

1      At that juncture, I recall
2  conversations with Mr. Grady saying that
3  the business plan would take -- they're
4  updating the financial forecast, rather,
5  slash business plan would take around a
6  week to revise.  And that was the key
7  element to revising the CIM.  But
8  Mr. Grady was no longer around.  I have
9  no idea what business plan did or did not
10 exist.
11     But Mr. Jim Riedy had to
12 produce a business plan on a bottoms-up
13 basis.  That took around six weeks, is my
14 recollection.
15     We didn't want to wait six
16 weeks to produce the CIM.  So we went
17 with historical financial information
18 only and produced the CIM in a matter of
19 weeks from the petition date.  I don't
20 recall the exact date, sir.
21    Q.   Okay.  So I just, I want to
22 make sure I understand your testimony
23 correctly.
24     As of the time you were
25 preparing -- and when I refer to CIM now,

1  I am referring to the CIM that was
2  prepared in December of 2019 and related
3  to the sale process.  Can we agree on
4  that?
5    A.   I don't have a copy of that CIM
6  in front of me.  It might have been dated
7  sooner than December.
8    Q.   I just want to make sure we
9  understand, I am talking about the first
10 post bankruptcy CIM that Jefferies
11 prepared with the company.  Let's talk
12 about that one.
13   A.   That's fine.  I understand
14 that.  I was not sure it was dated
15 December.  It might have been dated in
16 November.  That's my only point.
17   Q.   And that CIM was prepared using
18 historical financials, you said, correct?
19   A.   That's correct.
20   Q.   And in anticipation of the
21 preparation of a business plan, correct?
22   A.   Correct.
23   Q.   And I think you said the
24 business plan would be a key element to
25 update the CIM, right?

1    A.   Absolutely, yes.
2    Q.   And I think you testified that,
3  you said -- you said at that point in
4  time you weren't sure what business plan
5  existed; is that right?
6    A.   I am not sure what, at what
7  point in time it refers to, Mr. Barry.
8    Q.   Well, your testimony that you
9  just gave regarding the CIM that was
10 prepared in the November 2019 time frame,
11 that had historical financials in it?
12   A.   That's correct.
13     And actually, my testimony
14 related to Mr. Jim Riedy becoming the new
15 CFO.  And when he got into that seat, as
16 an experienced CFO, he said I need to
17 re-create the business plan, business
18 model, financial forecast on a bottoms-up
19 basis.  It doesn't really exist or it
20 doesn't exist.  That's my testimony.
21   Q.   That's what I was asking.
22     Before his involvement, you
23 weren't sure what business plans existed?
24   A.   I took Mr. Kevin Grady at face
25 value when he said I could update the

1  financial forecasts in around a week.
2    Q.   And do you recall, did the CIM
3  that was prepared using historical
4  numbers predating the business plan have
5  -- did it present an adjusted EBITDA
6  number?
7    A.   It did.
8    Q.   And do you recall what that
9  was?
10   A.   It was between 80 and 90
11 million dollars.
12   Q.   Can you explain what adjusted
13 EBITDA is?
14   A.   Adjusted EBITDA is -- EBITDA,
15 first, stands for earnings before
16 interest, taxes, depreciation and
17 amortization.
18     It is a proxy.  It's a non-GAAP
19 term for operating cash flow.
20     Adjusted means changes to that
21 EBITDA to reflect either the addition of
22 one time charges, new business to give
23 the reader or the person evaluating the
24 EBITDA a sense as to where the business
25 cash flow currently stands.

52 (Pages 202 - 205)

Page 206

1    Q.    And why is it used in a CIM?
2    A.    It's the key number upon which
3  bidders, generally speaking, formulate
4  their proposals and negotiate a
5  deal.  Transactions are often quoted as a
6  multiple of EBITDA.
7    Q.    And does the determination of
8  adjusted EBITDA require some subjective
9  judgments by the person calculating it?
10    A.    Again, it depends on the facts
11  and circumstances of the situation.
12    Q.    Who was responsible for
13  calculating the adjusted EBITDA used in
14  the November 2019 CIM?
15    A.    In November 2019, we had
16  historical financial information.  We
17  walked through the company the add-backs.
18        Mr. Riedy then produced the
19  business plan going forward which
20  calculated adjusted EBITDA for 2019 as
21  well as the go-forward years.
22    Q.    Who determined the add-backs?
23    A.    Jefferies worked with
24  Mr. Riedy, but it's a company number.
25    Q.    But we're talking about the CIM

Page 207

1  predating Mr. Riedy's involvement,
2  predating the business?
3    A.    The CIM and Mr. Riedy, that was
4  based on historical financial
5  information.  Those were add-backs that
6  were consistent with the add-backs
7  produced in the prior CIM that I
8  testified to earlier today.
9    Q.    Do you know who historically
10  determined the add-backs?
11    A.    The add-backs were done at the
12  company, Jefferies diligenced them.  Our
13  goal is to present the highest EBITDA
14  that we reasonably can so a bidder can
15  see the greatest amount of cash flow
16  available to service its debt, but
17  ultimately, we may go to monetize this
18  business, capitalize that business at the
19  greatest debt enterprise value.
20    Q.    Did any individual determine
21  the add-backs?
22    A.    It's a collective effort.
23    Q.    Does anybody have final
24  sign-off on the add-backs?
25    A.    Moreover, Ernst & Young

Page 208

1  prepared a quality of earnings which
2  examined all of the add-backs on a
3  historical basis.
4        And then ultimately, you know,
5  Ms. Tilton, the company, will sign off on
6  the CIM before it goes out.  So we had
7  the benefit of a lot of the add-backs
8  kind of being blessed, as part of a Q of
9  E, which was produced previously.
10    Q.    So in the November 2019 CIM,
11  did Ms. Tilton sign off on the final
12  add-backs?
13    A.    She signed off on the CIM.  I
14  don't recall specifically if she signed
15  off on that one number.
16    Q.    Are you aware of what input she
17  had on the add-backs?
18    A.    The add-backs to the historical
19  numbers?
20    Q.    Yeah.
21    A.    I am not aware, one way or
22  another.
23    Q.    Did any of the -- without
24  revealing names -- did any of the
25  potential bidders that you discussed that

Page 209

1  are currently in the bankruptcy process,
2  any of them discuss adjusted EBITDA with
3  you?
4    A.    Yes.
5    Q.    What did they say?
6    A.    That as we sit here today, the
7  80 to 90 million of historically trailing
8  adjusted EBITDA, you know, is now for
9  2019 approximately 45 million dollars.
10    Q.    So the November 2019 CIM had
11  adjusted EBITDA of 80 to 90?
12    A.    For a prior historical period.
13  For the full year for 2019, the
14  comparable number is approximately 45
15  million.
16    Q.    Jefferies recently prepared an
17  analysis of historical EBITDA for
18  Portfolio Company B, didn't it?
19    A.    Excuse me?
20    Q.    Jefferies recently prepared an
21  analysis of the historical adjusted
22  EBITDA at the Company B, didn't it?
23    A.    Actually, the company prepared
24  it, and we sent it to Mr. Katzenstein.
25    Q.    Okay.  Are you familiar with

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# **EXHIBIT B**

**Tilton-Kanwal Emails**

| Message | |
|---|---|
| **From:** | Lynn Tilton [Lynn.Tilton@PatriarchPartners.Com] |
| **Sent:** | 12/4/2019 1:29:29 AM |
| **To:** | Jaspinder Kanwal [Jaspinder Kanwal <jkanwal@jefferies.com>] |
| **CC:** | Thomas Fennimore [Thomas Fennimore <tfennimore@jefferies.com>]; Project.COMO.All [Project.COMO.All <Project.COMO.All@jefferies.com>] |
| **Subject:** | Re: Dura - Sale Dataroom Initial Upload |

[External Message]

We do not have the bandwidth to do both. We must work the plan first. We are all engaged but I will pass along time to the team to address as soon as we are able.



*Lynn Tilton*
**Chief Executive Officer**
**Patriarch Partners, LLC**
One Liberty Plaza, 35th Floor
New York, NY 10006
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web:www.patriarchpartners.com



On Dec 3, 2019, at 7:09 PM, Jaspinder Kanwal <jkanwal@jefferies.com> wrote:

Hi Lynn,

Understanding the focus is on completing the business plan by the end of the week, we continue to receive diligence requests from parties who have signed NDAs and now have reviewed the CIM.

-       We think it will go a long way in maintaining process momentum to continue the production of diligence material through (i) the invitation, and (ii) initial upload of diligence materials, to a sale dataroom.

-       We propose uploading the following non-controversial documents as soon as practicable (as it will also take some time to get respective email addresses and provide access to the interested parties).

Please let us know whether you have objections to any of the following documents as an initial upload:

1)      **Transaction Documents**
a.      Bid Procedures
b.      [ Form APA (once-final) for interested parties to redline ]

2)      **General Corporate**

a. Legal Corporate Org Chart (as of July 2019)
b. Corporate Org Docs & LLC Agreements
c. Independent Director Retention Agreements

3) **Financial**
a. Audited Financials (2014 – 2018)
b. Consolidating Financials by Month (2014 – 09.2019)
c. [ Historical EBITDA Adjustment Overview (once-final) ]
d. [ Financial Projections (once-final) ]
e. Borrowing Base Certificates (2018 and 2019)
f. Outstanding Payables (as 10/14/19)
g. DIP Budget Forecast corresponding to filed DIP Budget (10.31)

4) **Key Contracts**
a. GAS Shared Services Agreement / Memo
b. Intercompany & Other Related Party Agreements

5) **Employees, HR & Benefits**
a. Employee Benefit Documents
i. <!--[if !supportLists]--><!--[endif]-->Dura Combined Pension Plan Agreement
ii. <!--[if !supportLists]--><!--[endif]-->401k Plan
iii. <!--[if !supportLists]--><!--[endif]-->Safe Harbor Plan
iv. <!--[if !supportLists]--><!--[endif]-->Employee Benefit Plan Annual Returns; Form 5500 (2014 – 2018)
b. Employee Manuals


I hope all else is well.

Best,
Jas
--
Jaspinder Kanwal
Investment Banking
Jefferies LLC
520 Madison Avenue, 7th Floor
New York, NY 10022
646-805-5447 | Office
646-786-5838 | eFax
347-501-0241 | Cell
jkanwal@jefferies.com

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited. In the United Kingdom, Jefferies operates as Jefferies International Limited; registered in England: no. 1978621; registered office: 100 Bishopsgate, London EC2N 4JL. Jefferies International Limited is authorized and regulated by the Financial Conduct Authority.

Jefferies-ZOH-0000554

## EXHIBIT C

**Tilton-Coleman Emails**

Message

| | |
|---|---|
| **From:** | Lynn Tilton [Lynn.Tilton@PatriarchPartners.Com] |
| **Sent:** | 12/16/2019 3:49:23 PM |
| **To:** | Conor Coleman [Conor Coleman <ccoleman1@jefferies.com>] |
| **CC:** | Thomas Fennimore [Thomas Fennimore <tfennimore@jefferies.com>]; Project.COMO.All [Project.COMO.All <Project.COMO.All@jefferies.com>] |
| **Subject:** | RE: DURA Diligence Items |

I will approve the documents.  But remember this is a sale in bankruptcy and this is overkill on information.



*Lynn Tilton*
Chief Executive Officer
Patriarch Partners, LLC
One Liberty Plaza, 35th Floor
New York, NY 10006
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com



**From:** Conor Coleman <ccoleman1@jefferies.com>
**Sent:** Monday, December 16, 2019 9:46 AM
**To:** Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com>
**Cc:** Thomas Fennimore <tfennimore@jefferies.com>; Project.COMO.All <Project.COMO.All@jefferies.com>
**Subject:** RE: DURA Diligence Items

Thanks Lynn – let me know whenever works for you this morning.

Best,
Conor

Conor J. Coleman
Investment Banking
Jefferies LLC
520 Madison Avenue
New York, New York 10022
Office: 212.284.2580
Mobile: 602.384.1209
ccoleman1@jefferies.com

**From:** Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com>
**Sent:** Sunday, December 15, 2019 9:58 PM
**To:** Conor Coleman <ccoleman1@jefferies.com>
**Cc:** Thomas Fennimore <tfennimore@jefferies.com>; Project.COMO.All <Project.COMO.All@jefferies.com>
**Subject:** Re: DURA Diligence Items

Let's talk tomorrow morning.

*Lynn Tilton*
**Chief Executive Officer**
**Patriarch Partners, LLC**
One Liberty Plaza, 35<sup>th</sup> Floor
New York, NY 10006
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
**Web:**www.patriarchpartners.com


On Dec 15, 2019, at 9:37 PM, Conor Coleman <ccoleman1@jefferies.com> wrote:


Tom –

Unfortunately, I am not in Detroit tomorrow.  Jas and Cara from our side will be there.

Lynn - I am happy to hop on the phone anytime tomorrow that works for you to discuss.

Best,
Conor

Conor J. Coleman
Investment Banking
Jefferies LLC
520 Madison Avenue
New York, New York 10022
Office: 212.284.2580
Mobile: 602.384.1209
ccoleman1@jefferies.com

**From:** Thomas Fennimore <tfennimore@jefferies.com>
**Sent:** Sunday, December 15, 2019 9:04 PM
**To:** Conor Coleman <ccoleman1@jefferies.com>
**Cc:** Lynn Tilton <Lynn.Tilton@patriarchpartners.com>; Project.COMO.All <Project.COMO.All@jefferies.com>
**Subject:** Re: DURA Diligence Items

Conor, are you in Detroit tomorrow?  Could you do it live w Lynn?


On Dec 15, 2019, at 8:02 PM, Conor Coleman <ccoleman1@jefferies.com> wrote:

Jefferies-ZOH-0000606

Hi Lynn –

Happy to hop on the phone to walk through.  I am available tonight or tomorrow morning, whichever is easiest for you.

Best,
Conor

Conor J. Coleman
Investment Banking
Jefferies LLC
520 Madison Avenue
New York, New York 10022
Office: 212.284.2580
Mobile: 602.384.1209
ccoleman1@jefferies.com

**From:** Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com>
**Sent:** Sunday, December 15, 2019 7:43 PM
**To:** Conor Coleman <ccoleman1@jefferies.com>
**Cc:** Project.COMO.All <Project.COMO.All@jefferies.com>
**Subject:** RE: DURA Diligence Items

[External Message]

I think it might be easier to walk through.  Let me know when you have time for a call.

<image001.jpg>
Lynn Tilton
Chief Executive Officer
Patriarch Partners, LLC
One Liberty Plaza, 35th Floor
New York, NY 10006
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

**From:** Conor Coleman <ccoleman1@jefferies.com>
**Sent:** Sunday, December 15, 2019 1:03 PM
**To:** Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com>
**Cc:** Project.COMO.All <Project.COMO.All@jefferies.com>
**Subject:** DURA Diligence Items

Lynn –

I hope you are having a good day.  We have been working with the DURA team on due diligence request items.  Please find attached updated diligence tracker reflecting all documents received to date.  While we continue to work through the remaining request, we would like to upload the documents we have received thus far to the sale data room in order to be as responsive as possible.

The items marked in Rose in the attached are documents or responses in the "notes / commentary" section that we have received from the Company and are ready to be uploaded pending your sign-off.

As always, please let us know of any questions or concerns.  Happy to hop on the phone to discuss, if easier.  Thanks again for all the help.

Best,
Conor

Conor J. Coleman
Investment Banking
Jefferies LLC
520 Madison Avenue
New York, New York 10022
Office: 212.284.2580
Mobile: 602.384.1209
ccoleman1@jefferies.com

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited. In the United Kingdom, Jefferies operates as Jefferies International Limited; registered in England: no. 1978621; registered office: 100 Bishopsgate, London EC2N 4JL. Jefferies International Limited is authorized and regulated by the Financial Conduct Authority.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited. In the United Kingdom, Jefferies operates as Jefferies International Limited; registered in England: no. 1978621; registered office: 100 Bishopsgate, London EC2N 4JL. Jefferies International Limited is authorized and regulated by the Financial Conduct Authority.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited. In the United Kingdom, Jefferies operates as Jefferies International Limited; registered in England: no. 1978621; registered office: 100 Bishopsgate, London EC2N 4JL. Jefferies International Limited is authorized and regulated by the Financial Conduct Authority.