**<u>EXHIBIT A</u>**

**Second Revised Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1] | ) | Case No. 19-12378 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**ORDER (I) APPROVING THE NORTH AMERICAN**
**STOCK AND ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE**
**OF SUBSTANTIALLY ALL OF THE DEBTORS' NORTH AMERICAN ASSETS**
**FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND**
**(III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Upon the motion [Docket No. 154] (the "Bid Procedures Motion")[2] of the above-captioned

debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "North

American Sale Order"): (a) approving the stock and asset purchase agreement for the Debtors'

North American assets and certain related assets and stock (the "North American Purchase

Agreement"),[3] attached to this North American Sale Order as **Exhibit 1**, as it may be amended,

modified, or supplemented in accordance with the terms thereof; (b) authorizing and approving

---

[1]   The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax
identification number, are: Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems,
LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura
Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is: 1780
Pond Run, Auburn Hills, Michigan 48326.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bid Procedures
Motion, the Bid Procedures Order, or the North American Purchase Agreement, as applicable; provided, that
"Prepetition Term Loan Agent", "Prepetition Term Loan Lenders", "Prepetition Term Loan Secured Parties",
"Prepetition Term Loan Obligations" and "DIP Lenders" have the meanings ascribed to them in the Final DIP
Order. To the extent there is a conflict between a capitalized term in the Bid Procedures Order and a capitalized
term in the North American Purchase Agreement, the meaning ascribed to such term in the North American
Purchase Agreement shall control and govern.

[3]   In addition to the North American Purchase Agreement, as defined herein, the Debtors have entered into the
European Purchase Agreement and have sought Court approval of the European Sale (each as defined in the
European Sale Order).

the sale of the Transferred Assets pursuant to the terms of the North American Purchase Agreement (the "North American Sale") free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the North American Purchase Agreement; (c) authorizing the assumption and assignment of the Transferred Contracts as set forth in the North American Purchase Agreement; and this Court having entered an order on November 19, 2019 [Docket No. 339] (the "Bid Procedures Order") approving the bid procedures in connection with the sale of all or substantially all of the Debtors' assets, attached as Exhibit 1 to the Bid Procedures Order (the "Bid Procedures"); and the Debtors having determined after an extensive marketing and sale process, that DNA Buyer LLC (together with those permitted assignees of DNA Buyer LLC pursuant to the North American Purchase Agreement, the "North American Purchaser"), has submitted the highest or otherwise best bid with respect to the Transferred Assets; and upon due, adequate, and sufficient notice of the North American Sale, the North American Purchase Agreement, and all other related transactions contemplated thereunder and in this North American Sale Order; and all interested parties having been afforded an opportunity to be heard with respect to the North American Sale, and all relief related thereto; and the Court having reviewed and considered the North American Purchase Agreement, the North American Sale, and all relief related thereto and any objections and other responses thereto, and the arguments of counsel made, and the uncontroverted evidence adduced, including the declarations of Jill Frizzley [Docket No. 980], Richard W. Morgner [Docket No. 977], James E. Riedy [Docket No. 978], and Mark Berger [Docket No. 979] (collectively, the "Declarations"), at the Sale Hearing and the entire record of the Sale Hearing; and this Court having conducted the Sale Hearing to consider entry of this North American Sale Order on May 12, 2020; and upon the full record in support of the relief requested by the Debtors in the Bid Procedures Motion; and this Court having core jurisdiction over this

matter; and that this Court may enter a final order on the North American Sale consistent with Article III of the United States Constitution; and this Court having found that venue of the chapter 11 cases in this district is proper; and it further appearing that the legal and factual bases set forth at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in this North American Sale Order is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and upon the full record of these chapter 11 cases and all other pleadings and proceedings; and after due deliberation thereon, and good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**[4]

## I.    Jurisdiction, Final Order, and Statutory Predicates.

A.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b)(l) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  This Court may enter a final order with respect to the North American Sale and all related relief, in each case, consistent with Article III of the United States Constitution.  Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief requested with respect to the North American Sale are sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014.

C.    This North American Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent

---

[4]    All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the North American Sale are hereby incorporated herein.

necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this North American Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

## II.     Notice.

D.      Actual written notice of this proposed North American Sale, the assumption and assignment of the Initial Transferred Contracts, and the Sale Hearing, and a reasonable opportunity to object or be heard with respect to the North American Sale and the relief requested therein and to the entry of this North American Sale Order under the circumstances of these cases, has been afforded to interested persons and entities, including, but not limited to, the following parties (the "Notice Parties"):  (i) the U.S. Trustee; (ii) the Committee; (iii) counsel to the Prepetition Term Loan Secured Parties; (iv) counsel to the agent under the Debtors' debtor-in-possession financing facility; (v) the offices of the attorneys general for the states in which the Debtors operate; (vi) the United States Attorney's Office for the District of Delaware; (vii) the Internal Revenue Service; (viii) all parties to the Initial Transferred Contracts; (ix) all parties who have expressed a written interest in some or all of the Transferred Assets; (x) all known holders of liens, encumbrances, and other claims secured by the Transferred Assets; (xi) all applicable state and local taxing authorities; (xii) each governmental agency that is an interested party with respect to the North American Sale and transactions proposed thereunder; and (xiii) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002, as evidenced by the affidavits of service filed with the Court [Docket Nos. 350, 352 417, 605, 638, 714, 744, 753, 765, 964, 967, and 975].

E.      With respect to persons or entities whose identities are not reasonably ascertainable by the Debtors, publication of the *Notice of Auction for the Sale of Substantially All Assets of the*

*Debtors Free and Clear of Any and All Claims, Interest, and Encumbrances* in *The New York Times (National Edition)*, *The Detroit Free Press,* and the *Tennessean* on November 26, 2019, as evidenced by the affidavit of publication previously filed with the Court [Docket No. 398], was sufficient and reasonably calculated under the circumstances to reach all such persons or entities.

F.      As further evidenced by the affidavits of service previously filed with the Court [Docket Nos. 350, 352, 417, 605, 638, 714, 744, 753, 765, 964, 967, and 975], and based on the representations of counsel at the Sale Hearing, notice of the Sale Hearing, the North American Sale, and the assumption and assignment of those Transferred Contracts that are identified in the North American Purchase Agreement attached hereto as <u>Exhibit 1</u> (the "<u>Initial Transferred Contracts</u>")[5] as being assumed and assigned to the North American Purchaser at Closing pursuant to this North American Sale Order was due, proper, timely, adequate, fair, equitable and sufficient under the circumstances.

G.      Notice of the Sale Hearing, the North American Sale, and the assumption and assignment of the Initial Transferred Contracts to be assumed and assigned to the North American Purchaser at Closing pursuant to this North American Sale Order was reasonably calculated to provide the Notice Parties and all other interested parties with timely and proper notice under the circumstances of these chapter 11 cases, and no other or further notice with respect to such matters is, or shall be, required.

H.      A reasonable opportunity to object and be heard with respect to the North American Sale, and the relief requested therein, including but not limited to the assumption and assignment

---

[5]     For the avoidance of doubt, no executory contract or unexpired lease between a Debtor and QAD Inc. is an Initial Transferred Contract.

of the Initial Transferred Contracts and the Cure Claims, has been afforded to all interested Persons

(as defined in the North American Purchase Agreement), including the Notice Parties.

III.    **Compliance with the Bid Procedures and the Bid Procedures Order.**

I.      As demonstrated by the uncontroverted testimony and other evidence proffered or

adduced at the Sale Hearing, including the Declarations, and the representations of counsel made

on the record at the Sale Hearing, the Debtors have adequately marketed the Transferred Assets

and conducted the sale process in compliance with the Bid Procedures and the Bid Procedures

Order, and the bidding process was conducted in an appropriate, noncollusive, fair, and good-faith

manner.  The Debtors and their professionals conducted the sale process in compliance with the

Bid Procedures and the Bid Procedures Order and have afforded potential purchasers a full and

fair opportunity to participate in the bidding process for the Transferred Assets and make higher

or better offers.  The North American Purchaser acted in compliance with the Bid Procedures and

the Bid Procedures Order and conducted itself in a noncollusive, fair, and good-faith manner, as

evidenced by, among other things, the extensive marketing process and the Debtors' efforts during

arm's-length negotiations with all interested parties.  In accordance with the Bid Procedures and

the Bid Procedures Order, the Debtors determined that the bid submitted by the North American

Purchaser and memorialized by the North American Purchase Agreement is the Successful Bid for

the Transferred Assets.

IV.    **Good Faith of North American Purchaser.**

J.      The North American Purchase Agreement was negotiated, proposed, and entered

into by the Debtors and the North American Purchaser without collusion, in good faith, and from

arm's-length bargaining positions.

K.      The Debtors and the North American Purchaser have not engaged in any conduct

in connection with the North American Sale that would cause or permit the North American

Purchase Agreement or the consummation of the North American Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.  The North American Purchaser has not acted in a collusive manner with any Person, and the purchase price was not controlled by any agreement among bidders, all of whom acted in good-faith, at arm's length, and in a noncollusive manner.  Among other things:  (i) the North American Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Transferred Assets; (ii) the North American Purchaser complied with the provisions of the Bid Procedures Order; (iii) the North American Purchaser agreed to subject its bid to the competitive bidding procedures set forth in the Bid Procedures Order; and (iv) all payments to be made by the North American Purchaser and other agreements or arrangements entered into by the North American Purchaser in connection with the North American Sale have been disclosed.  The North American Purchaser is purchasing the Transferred Assets in good-faith and for value, and the North American Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The North American Purchaser is therefore entitled to the full rights, benefits, privileges, and protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and nonbankruptcy law.

## V.     Highest and Best Offer.

L.     The Bid Procedures are reasonable and appropriate and represent the best available method for conducting the sale process in a manner that maximizes value for the benefit of the Debtors' estates.

M.     The Debtors' marketing and sales process with respect to the Transferred Assets in accordance with the Bid Procedures afforded a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Transferred Assets.  The Debtors conducted a marketing process in accordance with, and have otherwise complied in all respects

with, the Bid Procedures and the Bid Procedures Order.  A reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Transferred Assets.

N.       The North American Purchase Agreement constitutes the highest and best offer for the Transferred Assets, and the Debtors' determination that the North American Purchase Agreement maximizes value for the benefit of the Debtors' estates and constitutes the highest and best offer for the Transferred Assets each constitutes a valid and sound exercise of the Debtors' business judgment and is in accordance and compliance with the Bid Procedures and the Bid Procedures Order.  The North American Purchase Agreement represents fair and reasonable terms for the purchase of the Transferred Assets.

O.       Approval of the North American Sale and the North American Purchase Agreement and the prompt consummation of the transactions contemplated thereby will maximize the value of each Debtor's estate and are in the best interests of the Debtors, their chapter 11 estates, their creditors, and other parties in interest.

**VI.      No Merger, No Successorship or Transferee Liability.**

P.       The North American Purchaser shall not be deemed, as a result of the North American Sale,  to be a successor to or a mere continuation of the Debtors or their estates, and there is no continuity of enterprise or common identity between the North American Purchaser and the Debtors as a result of the North American Sale.  The North American Purchaser shall not be deemed to be holding itself out to the public as a successor to or a continuation of the Debtors or their estates based on the North American Sale.  The North American Purchaser is not a successor to any of the Debtors or their estates by reason of any theory of law or equity, and the North American Sale does not amount to a consolidation, succession, merger, or *de facto* merger of North American Purchaser and the Debtors.  The transfer of the Transferred Assets to the North American Purchaser, and the assumption of the Assumed Liabilities by the North American

Purchaser, except as otherwise explicitly set forth in the North American Purchase Agreement, does not, and will not, subject the North American Purchaser to any liability whatsoever, with respect to the Debtors or the operation of the Debtors' businesses prior to the Closing or by reason of such transfer, including under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any, or any theory of, successor, vicarious, antitrust, environmental (to the greatest extent allowed by applicable law), revenue, pension, ERISA, tax, labor (including any WARN Act), employment or benefits, de facto merger, business continuation, substantial continuity, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or products liability or law, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or theory of liability, whether legal, equitable, or otherwise (collectively, the "Successor or Other Liabilities").  Pursuant to the North American Purchase Agreement, the North American Purchaser is not purchasing all of the Debtors' assets in that the North American Purchaser is not purchasing any of the Excluded Assets or assuming any Liabilities other than the Assumed Liabilities.

**VII.    Validity of Transfer.**

Q.    The North American Sale to the North American Purchaser will be a legal, valid, enforceable, and effective sale and transfer of all of the Debtors' right, title, and interest in the Transferred Assets and the Assumed Liabilities and will vest the North American Purchaser with all legal, equitable, and beneficial right, title, and interest of the Debtors to the Transferred Assets free and clear of all Interests (as defined below) (other than Assumed Liabilities and Permitted Obligations (as defined below)) of any kind or nature whatsoever, including rights or claims based on any Successor or Other Liabilities.

R.     The North American Purchase Agreement is a valid and binding contract between the Debtors and the North American Purchaser and shall be enforceable pursuant to its terms. The North American Purchase Agreement, the North American Sale, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases (or subsequently converted cases), and shall not be subject to rejection or avoidance by the foregoing parties or any other Person. The North American Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia, or foreign jurisdiction. The consideration provided by the North American Purchaser for the Transferred Assets pursuant to the North American Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Transferred Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and any foreign jurisdiction (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and similar laws and acts). Neither the Debtors nor the North American Purchaser is entering into the transactions contemplated by the North American Purchase Agreement fraudulently for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer claims.

S.     The transfer of each of the Transferred Assets to the North American Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer of all of the Debtors' right, title, and interest in the Transferred Assets, which transfer vests or will vest the North American Purchaser with all right, title, and interest of the Debtors to the Transferred Assets free and clear

of (i) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and Encumbrances (as defined in the North American Purchase Agreement) relating to, accruing, or arising any time prior to the Closing Date (collectively, the "Liens"), and (ii) all debts (as defined in section 101(12) of the Bankruptcy Code) arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, deeds of trust, security interests or similar interests, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter ego liability, suits, credits, allowances, options, limitations, causes of action, choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return, proxy, voting trust or agreement or transfer restriction under any shareholder or similar agreement or encumbrance, title defects, easements, rights of way, encroachments, Liabilities (as defined in the North American Purchase Agreement), and matters of any kind and nature, whether arising prior to or subsequent to the Petition Date, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether imposed by agreement, understanding, law, equity, or otherwise (including rights with respect to Claims (as defined below) and Liens (A) that purport to give to any party a right or option to effect a setoff (except for setoffs exercised prior to the Petition Date) against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the North American Purchaser's interests in the

Transferred Assets, or any similar rights, if any, or (B) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including any restriction of use, voting, transfer, receipt of income, or other exercise of any attribute of ownership) collectively, as defined in this clause (ii), the "Claims," and together with the Liens and other interests of any kind or nature whatsoever, the "Interests"; provided that for the avoidance of doubt, any sale free and clear of Interests shall not affect the Liabilities of the Transferred Subsidiaries, which shall remain Liabilities of the Transferred Subsidiaries after the Closing), relating to, accruing, or arising any time prior to entry of this North American Sale Order, with the exception of any such Interests that are expressly assumed by the North American Purchaser under the North American Purchase Agreement, including, for the avoidance of any doubt, the Assumed Liabilities, the Permitted Encumbrances, Cure Claims or any other obligations arising under the Transferred Contracts to the extent set forth in the North American Purchase Agreement (collectively, the "Permitted Obligations").  Any and all valid and perfected Interests in the Transferred Assets shall attach to the proceeds (if any) of the North American Sale with the same validity, force, and effect, if any, and in the same order of priority, that they have now as against the Transferred Assets, subject to any rights, claims, and defenses with respect thereto, provided, however, that nothing set forth herein is intended to, nor shall it, affect, modify, impair or alter in any manner any rights, protections or claims granted to the DIP Lenders or any other party in (or any stipulations or waivers by the Debtors set forth in) the Final DIP Order or any rights, claims or defenses of any other party in interest with respect to any of the foregoing in this proviso; provided, further that notwithstanding the foregoing, the sale of the Transferred Assets is free and clear of any liens, rights, protections or claims granted to the DIP Lenders or any other party in the Final DIP Order against the Transferred Assets.

## VIII.    **Section 363(f) Is Satisfied.**

T.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied; therefore, the Debtors may sell the Transferred Assets free and clear of all Interests (other than the Permitted Obligations).

U.      The North American Purchaser would not have entered into the North American Purchase Agreement and would not consummate the transactions contemplated thereby if (i) the sale of the Transferred Assets to the North American Purchaser were not free and clear of all Interests (other than Permitted Obligations) of any kind or nature whatsoever, or (ii) if the North American Purchaser would, or in the future could, be liable for any of the Interests (other than the Permitted Obligations).  The North American Purchaser will not consummate the transactions contemplated by the North American Purchase Agreement unless this Court expressly orders that none of the North American Purchaser its Affiliates, its present or contemplated members or shareholders, or the Transferred Assets (as to each, solely with respect to its role as the North American Purchaser and not in any other capacity or respect, including as a debt or equity holder of the Debtors, if applicable), will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, or by payment, setoff (except for setoffs exercised prior to the Petition Date) or otherwise, directly or indirectly, any Interests (other than Permitted Obligations), including rights or claims based on any Successor or Other Liabilities. The total consideration to be provided under the North American Purchase Agreement reflects the North American Purchaser's reliance on this North American Sale Order to provide it, pursuant to section 363 of the Bankruptcy Code, with title to and possession of the Transferred Assets free and clear of all Interests (other than Permitted Obligations) of any kind or nature whatsoever (including any potential Successor or Other Liabilities).

V.      Not transferring the Transferred Assets free and clear of all Interests (other than Permitted Obligations) of any kind or nature whatsoever, including rights or claims based on any successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state, federal, or foreign law or otherwise, would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Transferred Assets other than pursuant to a transfer that is free and clear of all Interests (other than Permitted Obligations) of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

W.      The Debtors may sell the Transferred Assets free and clear of all Interests (other than Permitted Obligations) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Interests who did not timely object to the North American Sale or withdrew objections to the North American Sale are deemed to have consented to the North American Sale pursuant to section 363(f)(2) of the Bankruptcy Code. All other holders of Interests (except to the extent that such Interests are Permitted Obligations) fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code. Because any and all valid and perfected Interests in the Transferred Assets shall attach to the proceeds (if any) of the North American Sale with the same validity, force, and effect, if any, and in the same order of priority, that they have now as against the Transferred Assets, subject to any rights, claims, and defenses with respect thereto, all holders of Interests are adequately protected; provided, however, that nothing set forth herein is intended to, nor shall it, affect, modify, impair or alter in any manner any rights, protections or claims granted to the DIP Lenders or any other party in (or any stipulations or waivers by the Debtors set forth in) the Final DIP Order, or any rights, claims or defense of any other party in interest with respect to any of the foregoing in this proviso; provided, further that notwithstanding the foregoing, the sale of the

Transferred Assets is free and clear of any liens, rights, protections or claims granted to the DIP

Lenders or any other party in the Final DIP Order against the Transferred Assets.

**IX.     Cure Claims and Adequate Assurance of Future Performance.**

X.      The assumption and assignment of the Transferred Contracts pursuant to the terms

of this North American Sale Order is integral to the North American Purchase Agreement and is

in the best interests of the Debtors and their estates, their creditors, and other parties in interest,

and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

The assumption and assignment of the Transferred Contracts (i) is necessary to sell the Transferred

Assets to the North American Purchaser, (ii) allows the Debtors to maximize the value of the

Transferred Assets, including the Transferred Contracts, (iii) limits the losses suffered by

counterparties to the Transferred Contracts, and (iv) maximizes the recoveries to other creditors of

the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection

of the Transferred Contracts.   For these reasons, the Debtors have exercised sound business

judgment in assuming and assigning the Transferred Contracts and such assumption and

assignment is in the best interests of the Debtors' estates.

Y.      Pursuant to section 365(f) of the Bankruptcy Code, each Transferred Contract

required to be assumed and assigned under the North American Purchase Agreement shall be

assigned and transferred to, and remain in full force and effect for the benefit of, the North

American Purchaser, notwithstanding any provision in such contract or other restrictions

prohibiting its assignment or transfer.  No section of any of the Transferred Contracts that would

prohibit, restrict, or condition, whether directly or indirectly, the use, assumption, or assignment

of any of the Transferred Contracts in connection with the North American Sale shall have any

force or effect.

Z.       Except as expressly assumed by the North American Purchaser under the North American Purchase Agreement, the transfer of the Transferred Assets to the North American Purchaser and the assignment to the North American Purchaser of the Transferred Contracts will not subject the North American Purchaser to any liability whatsoever which may become due or owing under the Transferred Contracts prior to the Closing Date (other than Cure Claims), or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or foreign jurisdiction, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any Successor or Other Liabilities.

AA.     Upon the Closing, the North American Purchaser shall have:  (i) to the extent necessary, cured or provided adequate assurance of cure of, any default existing prior to the date hereof under the Transferred Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code by paying the Cure Claims set forth in the cure notices filed with the Court [Docket Nos. 407, 748] or such other amount that has been agreed to by the North American Purchaser and the counterparty to the Transferred Contract or is ordered by the Court; and (ii) to the extent necessary, provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under the Transferred Contracts, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(B) of the Bankruptcy Code.  The North American Purchaser's obligation to pay the Cure Claims and to perform the obligations under the Transferred Contracts in accordance with the terms of the North American Purchase Agreement shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived expressly in writing by the counterparties to the respective Transferred Contracts.

## X.    Not a Sub Rosa Plan.

BB.    The North American Sale does not constitute a sub rosa chapter 11 plan for which approval has been sought without the protection that a disclosure statement would afford. The North American Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a liquidating plan for the Debtors.

## XI.    Compelling Circumstances for an Immediate Sale.

CC.    Good and sufficient reasons for approval of the North American Purchase Agreement, all documents related to the North American Sale that are contemplated by, or executed in connection with, the North American Purchase Agreement, and consummation of the transactions contemplated thereby (including the North American Sale) (collectively, the "Transaction Documents"), and the North American Sale have been articulated, and the Debtors' decision to enter into the North American Purchase Agreement, the Transaction Documents, and the transactions contemplated thereby represents an exercise of sound business judgment. The evidence provided at the Sale Hearing demonstrates that the sale of the Transferred Assets must be approved and consummated promptly in order to preserve the value of the Transferred Assets. The relief requested with respect to the North American Sale is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Debtors' evidence at the Sale Hearing has demonstrated both (i) good, sufficient, and sound business purposes and justifications for approving the North American Purchase Agreement and (ii) compelling circumstances for the immediate approval and consummation of the transactions contemplated by the North American Purchase Agreement and the Transaction Documents outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization, in that the prompt consummation of the North American Sale to the North American Purchaser is necessary and appropriate to maximize the value of the Debtors' estates and the North American

Sale will provide the means for the Debtors to maximize distributions to creditors. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with respect to the transactions contemplated by this North American Sale Order.

**THE COURT HEREBY ORDERS THAT:**

I.    **General Provisions.**

1.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are adopted as such. The findings of fact and conclusions of law set forth herein shall be the Court's determinations or rulings, as applicable, to the maximum extent permitted by or available under applicable law.

2.    The North American Sale and the transactions contemplated by the North American Purchase Agreement and the Transaction Documents are approved, in each case as set forth herein and on the record of the Sale Hearing, which is incorporated herein as if fully set forth in this North American Sale Order.

3.    All objections to, reservations of rights regarding, or other responses to the North American Purchase Agreement, the Transaction Documents, the North American Sale, the entry of this North American Sale Order, or the relief granted herein, including any objections to Cure Claims to the extent relating to Initial Transferred Contracts or relating to the cure of any defaults under any of such Initial Transferred Contracts or to the assumption and assignment of any of such Initial Transferred Contracts to the North American Purchaser by the Debtors, that have not been withdrawn, waived, or settled, or that have not otherwise been resolved pursuant to the terms hereof, as announced to the Court at the Sale Hearing, or by stipulation filed with the Court, are

hereby denied and overruled on the merits with prejudice. Those parties who did not timely object to the North American Sale or the entry of this North American Sale Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes, including pursuant to section 363(f)(2) of the Bankruptcy Code.

## II.    Approval of the North American Purchase Agreement.

4.      The North American Purchase Agreement and the Transaction Documents, including, in each case, any amendments, supplements, and modifications thereto disclosed as of the date of this North American Sale Order, and all of the terms and conditions thereof, are hereby approved.

5.      Pursuant to sections 363(b) and (f) and 365 of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to, and the North American Purchaser is directed to, (a) consummate the North American Sale pursuant to and in accordance with the terms and conditions of the North American Purchase Agreement and the Transaction Documents, (b) close the North American Sale as contemplated in the North American Purchase Agreement and this North American Sale Order, and (c) execute and deliver, perform under, consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of their obligations as contemplated by the North American Purchase Agreement or the Transaction Documents, in each case without further notice to or order of this Court, including documenting the assumption and assignment to the North American Purchaser of the Transferred Contracts. The North American Purchase Agreement and the Transaction Documents shall be binding in all respects upon the Debtors, their estates, the North American Purchaser, and all successors and assigns of each of the foregoing, including any trustee subsequently appointed in these chapter 11 cases or upon conversion to chapter 7 under the Bankruptcy Code. This North American Sale Order shall be binding in all respects upon the

Debtors, their estates, all creditors, all holders of equity interests in any Debtor, all holders of

Claims (whether known or unknown) against the Debtors, any holders of Liens or other Interests

against, in, or on all or any portion of the Transferred Assets, all counterparties to any executory

contract or unexpired lease of the Debtors (including all non-Debtor parties to the Transferred

Contracts), the North American Purchaser, and all successors and assigns of each of the foregoing,

including any trustee subsequently appointed in these chapter 11 cases or upon a conversion to

chapter 7 under the Bankruptcy Code of any of the Debtors' chapter 11 cases or any purchaser.

This North American Sale Order and the North American Purchase Agreement shall inure to the

benefit of the Debtors, their estates and creditors, the North American Purchaser, and the respective

successors and assigns of each of the foregoing, including any trustee subsequently appointed in

these chapter 11 cases or upon conversion to chapter 7 under the Bankruptcy Code, and any Person

seeking to assert rights on behalf of any of the foregoing or that belong to the Debtors' estates.

**III.    Transfer of the Transferred Assets.**

6.      Pursuant to sections 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the

Debtors shall transfer the Transferred Assets, including the Transferred Contracts, to the North

American Purchaser on the Closing Date (or such later date as the Court may order) in accordance

with the terms of the North American Purchase Agreement and the Transaction Documents; such

transfer shall constitute a legal, valid, binding, and effective transfer of all of the Debtors' right,

title, and interest in such Transferred Assets; and the North American Purchaser shall take title to

and possession of such Transferred Assets free and clear of all Interests of any kind or nature

whatsoever (except as expressly set forth in the North American Purchase Agreement with respect

to Permitted Obligations).  Any and all valid and perfected Interests in the Transferred Assets shall

attach to the proceeds (if any) of the North American Sale with the same validity, force, and effect,

if any, and in the same order of priority, that they have now as against the Transferred Assets,

subject to any rights, claims, and defenses with respect thereto; provided, however, that nothing set forth herein is intended to, nor shall it, affect, modify, impair or alter in any manner any rights, protections or claims granted to the DIP Lenders or any other party in (or any stipulations or waivers by the Debtors set forth in) the Final DIP Order, or any rights, claims or defenses of any other party in interest with respect to any of the foregoing in this proviso; provided, further that notwithstanding the foregoing, the sale of the Transferred Assets is free and clear of any liens, rights, protections or claims granted to the DIP Lenders or any other party in the Final DIP Order against the Transferred Assets.  Upon and as of the Closing, the North American Purchaser shall be deemed to be substituted for the applicable Debtor as the sole obligor for the Permitted Obligations and the Debtors and their estates shall be relieved from any liability or obligation with respect to the Permitted Obligations.

7.      The Debtors are hereby authorized to take any and all actions necessary to consummate the North American Purchase Agreement and the Transaction Documents, including any actions that otherwise would require further approval by shareholders, members, or its board of managers, as the case may be, without the need of obtaining such approvals.

8.      Each and every federal, state, local, and other governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the North American Purchase Agreement and the Transaction Documents.  The North American Purchaser may, but shall not be required to, file a certified copy of this North American Sale Order in any filing or recording office in any federal, state, county, or other territory or jurisdiction in which any of the Debtors is incorporated or has real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to unconditionally

release, discharge, and terminate any of the Interests as set forth in this North American Sale Order as of the Closing Date.

9.      If any Person that has filed a financing statement, mortgage, mechanic's lien, lis pendens, or other statement, document, or agreement evidencing an Interest against or in any portion of the Transferred Assets (other than statements or documents with respect to Permitted Obligations) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases, and/or other similar documents necessary for the purpose of documenting the release of all Interests that such Person has against or in the Transferred Assets, then (i) the North American Purchaser or the Debtors (at the request of the North American Purchaser) are hereby authorized to file, register, or otherwise record a certified copy of this North American Sale Order that, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Interests of any kind or nature against or in the Transferred Assets and (ii) the North American Purchaser or the Debtors (at the request of the North American Purchaser) may seek in this Court, or any other court of appropriate jurisdiction, to compel the appropriate parties to execute termination statements, instruments of satisfaction, releases, and/or other similar documents with respect to all Interests that such Person has against or in the Transferred Assets.  This North American Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

10.      Notwithstanding the foregoing, the provisions of this North American Sale Order authorizing the sale and assignment of the Transferred Assets free and clear of Interests shall be self-executing, and neither the Debtors nor the North American Purchaser shall be required to

execute or file releases, termination statements, assignments, consents, or other instruments or documents in order to effectuate, consummate, and implement the provisions of this North American Sale Order.

11.     All Persons that are in or come into possession of any portion of the Transferred Assets, at any time, are hereby directed to surrender possession of such Transferred Assets to the North American Purchaser on the Closing Date or such later date as requested by the North American Purchaser. Subject to the terms, conditions, and provisions of this North American Sale Order, all Persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Transferred Assets to the North American Purchaser in accordance with the terms of the North American Purchase Agreement, the Transaction Documents, and this North American Sale Order.

12.     This North American Sale Order is and shall be binding upon and govern the acts of all Persons (including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons or entities) who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing Persons shall accept for filing any and all of the documents and instruments necessary and appropriate to release, discharge, and terminate any of the Interests or to otherwise consummate the transactions contemplated by the North American Purchase Agreement, the Transaction Documents, and this North American Sale Order.

13.     To the extent permitted under applicable law, the North American Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Transferred Assets, and all such licenses, permits, registrations, and governmental authorizations or approvals are deemed to have been, and hereby are, directed to be transferred to the North American Purchaser as of the Closing Date.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Transferred Assets on account of the filing or pendency of these chapter 11 cases or the consummation of the transactions contemplated by the North American Purchase Agreement, including the North American Sale and the assumption and assignment of the Transferred Contracts.

## IV.     Assumption and Assignment of Transferred Contracts.

14.     Pursuant to section 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the North American Sale, the Debtors' assumption and assignment to the North American Purchaser, and the North American Purchaser's assumption of the Transferred Contracts, on the terms set forth in the North American Purchase Agreement, is hereby approved, and the requirements of section 365(b)(1) with respect thereto are hereby found and deemed to be satisfied.

15.     The Debtors are hereby authorized and, unless the Debtors and the North American Purchaser otherwise agree, directed in accordance with sections 363 and 365 of the Bankruptcy Code to (a) assume and assign to the North American Purchaser, effective upon the Closing Date (or such later date as the Court may order), the Transferred Contracts free and clear of all Interests of any kind or nature whatsoever (other than the Permitted Obligations) and (b) execute and deliver to the North American Purchaser such documents or other instruments as North American

Purchaser deems may be necessary to assign and transfer the Transferred Contracts to the North American Purchaser.

16.    With respect to the Transferred Contracts:  (a) the Debtors may assume each of the Transferred Contracts in accordance with section 365 of the Bankruptcy Code; (b) the Debtors may assign each Transferred Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Transferred Contract that prohibit or condition the assignment of such Transferred Contract or allow the party to such Transferred Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Transferred Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (c) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the North American Purchaser of each Transferred Contract have been satisfied; and (d) effective upon the Closing, the Transferred Contracts shall be transferred and assigned to, and from and following the Closing remain in full force and effect for the benefit of, the North American Purchaser, notwithstanding any provision in any Transferred Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability or obligation with respect to the Transferred Contracts after such assumption and assignment to the North American Purchaser, except as provided in the North American Purchase Agreement.  To the extent any provision in any Transferred Contract assumed and assigned pursuant to this North American Sale Order (i) prohibits, restricts, or conditions, or purports to prohibit, restrict, or condition, such assumption and assignment (including any "change of control" provision), or (ii) is modified, breached, or terminated, or deemed modified, breached,

or terminated by any of the following:  (A) the commencement of these chapter 11 cases, (B) the insolvency or financial condition of any of the Debtors at any time before the closing of these chapter 11 cases, (C) the Debtors' assumption and assignment of such Transferred Contract, (D) a change of control or similar occurrence, or (E) the consummation of the North American Sale, then such provision shall be deemed modified so as not to entitle the non-Debtor party thereto to prohibit, restrict, or condition such assumption and assignment, to modify, terminate, or declare a breach or default under such Transferred Contract, or to exercise any other default-related rights or remedies with respect thereto, including any such provision that purports to allow the non-Debtor party thereto to terminate or recapture such Transferred Contract, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith.  All such provisions constitute unenforceable anti-assignment provisions that are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

17.    All defaults or other obligations of the Debtors under the Transferred Contracts arising or accruing prior to the Closing of the North American Sale, or required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Transferred Contracts shall be cured by the North American Purchaser.

18.    All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the North American Purchaser of the Transferred Contracts have been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the North American Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Transferred Contracts, and each Transferred Contract shall be fully enforceable by the North American Purchaser in accordance

with its respective terms and conditions, except as limited or modified by this North American Sale Order.  To the extent provided in the North American Purchase Agreement, the Debtors shall cooperate with, and take all actions reasonably requested by, the North American Purchaser to effectuate the foregoing.

19.      Upon the Debtors' assignment of the Transferred Contracts to the North American Purchaser under the provisions of this North American Sale Order and North American Purchaser's payment of the Cure Claims pursuant to the terms hereof or the North American Purchase Agreement, no default or other obligations arising prior to the Closing shall exist under any Transferred Contract, and each non-Debtor party to a Transferred Contract is forever barred, estopped, and permanently enjoined from (a) declaring a default by the Debtors or the North American Purchaser under such Transferred Contract for acts or omissions occurring prior to the Closing Date, (b) raising or asserting against the Debtors or the North American Purchaser, or the property of either of them, any assignment fee, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to the Transferred Contracts that occurred prior to the Closing Date, or (c) taking any other action against the North American Purchaser as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Transferred Contract.  Each non-Debtor party to a Transferred Contract hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or the North American Purchaser, or the property of any of them, any default or Claim arising out of any indemnity or other obligation or warranties for acts or occurrences arising prior to or existing as of the Closing of the North American Sale, or, against North American Purchaser, any counterclaim, setoff (except for setoffs exercised prior to the Petition Date), or any other Claim asserted or assertable against the Debtors and (ii) imposing or charging against North American

Purchaser or its affiliates any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment to North American Purchaser of the Transferred Contracts.

20.    Any party that may have had the right to consent to the assumption or assignment of a Transferred Contract is deemed to have consented to such assumption and assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code if such party failed to object timely to the assumption or assignment of such Transferred Contract in accordance with the Bid Procedures Order, and the North American Purchaser shall be deemed to have demonstrated adequate assurance of future performance with respect to such Transferred Contract pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

21.    To the extent a counterparty to a Transferred Contract failed to timely object to the Cure Claims for such Transferred Contract in accordance with the Bid Procedures Order, such Cure Claims shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Claims at any time; provided, however, that notwithstanding anything to the contrary in this North American Sale Order, on the Closing Date the Debtors shall file a notice of assumption of the Transferred Contracts to be assumed as of the Closing Date and serve such notice on the counterparties to such Transferred Contracts, and any applicable counterparty to a Transferred Contract on such notice shall have fourteen (14) days from the date such notice is served to seek additional amounts on account of any defaults occurring between the deadline to object to the Cure Claims set forth in the prior notice of proposed assumption and assignment and the assumption of the Transferred Contract, and to the extent an agreement is not reached, the Court shall resolve the dispute.

22.     Upon and as of the Closing (except for any Transferred Contracts that are designated for assignment after the Closing pursuant to the procedures set forth herein, which shall be effective as of the date of such assignment), the North American Purchaser shall be deemed to be substituted for the applicable Debtor as a party to the applicable Transferred Contracts and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Transferred Contracts.

23.     All counterparties to the Transferred Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the North American Purchaser, and shall not charge the Debtors or the North American Purchaser for any instruments, applications, consents, or other documents that may be required or requested by any public authority or other party or entity to effectuate the applicable transfers in connection with the North American Sale of the Transferred Assets.

24.     Notwithstanding anything in this North American Sale Order, the Debtors may, pursuant to Section 6.13 of the North American Purchase Agreement, assume and assign a Contract to the North American Purchaser after the date of this North American Sale Order (including after the Closing) by filing a notice on the Court's docket designating such Contract a Transferred Contract with the applicable Cure Claim the Debtors are proposing and serving the same on the counterparty to such Contract.  If no objections are received with respect to the proposed Cure Claim or the assumption and assignment within fourteen (14) days from the date such notice is served, the Debtors may submit an order to the Court, under certification of counsel, authorizing the assumption and assignment of such Contract to the North American Purchaser, with the applicable Cure Claim to be paid by the North American Purchaser at the time of such assignment (and upon such assumption and assignment, such Contract shall be deemed a

29

"Transferred Contract" for purposes of this North American Sale Order).  If an objection is received within fourteen (14) days from the date such notice is served and the parties are not able to resolve the dispute, the Court shall resolve the dispute at a hearing upon notice.

25.    Notwithstanding anything to the contrary in the Bid Procedures, the Bid Procedures Order, the North American Purchase Agreement, the Assumption and Assignment Procedures, any Assigned Contracts Schedule or cure notice, or this North American Sale Order: (a) all insurance policies that have been issued at any time to any of the Debtors providing directors', members', trustees', officers', or managers' liability coverage, and all agreements, documents or instruments relating thereto (the "Chubb D&O Policies") by ACE American Insurance Company, Westchester Fire Insurance Company, Federal Insurance Company, Great Northern Insurance Company and any of their U.S.-based affiliates and successors (collectively, the "Chubb Companies") are hereby assumed in their entirety by the Debtors, and the Debtors shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such Chubb D&O Policies; and (b) nothing shall permit or otherwise effect a sale, an assignment or any other transfer at this time of (i) any other insurance policies that have been issued by the Chubb Companies, and all agreements, documents or instruments relating thereto (collectively, and exclusive of the Chubb D&O Policies, the "Chubb Insurance Contracts"), and/or (ii) any rights, benefits, claims, rights to payments and/or recoveries under such Chubb Insurance Contracts, unless and until a further order is entered by this Court, at a subsequent hearing, or as submitted under certification of counsel by agreement of the Debtors, the North American Purchaser and the Chubb Companies, with the rights of the parties fully preserved pending entry of such further order. Such further order, upon such certification of counsel, may provide, among other things, that (x) subject to the execution of an assumption agreement by the

Debtors, the North American Purchaser and the Chubb Companies, in form and substance satisfactory to each of the parties (the "Chubb Assumption Agreement"), the Debtors are authorized to assume and assign the Chubb Insurance Contracts to the North American Purchaser and the North American Purchaser shall assume and shall be liable for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under the Chubb Insurance Contracts; (y) the Debtors are authorized to enter into the Chubb Assumption Agreement; and/or (z) such other and further relief as may be requested by the Chubb Companies, the Debtors and/or the North American Purchaser.

26.     Notwithstanding any other provision of this North American Sale Order, the North American Purchase Agreement or the Transaction Documents, no agreement between the Debtors on the one hand, and Oracle America, Inc. ("Oracle") on the other hand (the "Debtor Oracle Documents"), will be assumed, assigned, or transferred, and no shared or concurrent use of Oracle's products and services by the Transferred Subsidiaries or the North American Purchaser or their affiliates on account of the Debtor Oracle Documents will be authorized, absent further Court order or Oracle's prior written consent, it being understood that to the extent any Transferred Subsidiary has an agreement with Oracle, the foregoing shall not prevent such Transferred Subsidiary from using Oracle's products and services pursuant to such agreement and applicable law.

## V.     Customer Contracts and Obligations.

27.     Notwithstanding anything to the contrary (including anything that purports to be supervening) in this North American Sale Order or any related Transaction Documents between any of the Debtors and the North American Purchaser, the Debtors and the North American Purchaser agree as follows with respect to the original equipment manufacturers and their affiliated North American entities (collectively, "OEMs") and each OEM's tiered suppliers that use or

incorporate goods or services supplied by any of the Debtors to provide production to any of the OEMs (collectively, "<u>Customers</u>" and each individually a "<u>Customer</u>"):

(i)      Pursuant to various award letters, purchase agreements, release agreements, purchase orders, development agreements, and/or other related documents (each with and subject to the applicable Customers' general terms and conditions, as amended from time to time) (collectively, "<u>Contract Documents</u>"), the Debtors and/or one or more Transferred Subsidiary of the Debtors are obligated to supply goods and services (collectively, "<u>Items</u>") to each Customer. Pursuant to 11 U.S.C. §§ 363(f) and 365, the Debtors are deemed to assume all of the Contract Documents to which a Debtor is a counterparty, other than those Contract Documents that relate primarily to the operations of the Debtors' non-Debtor subsidiaries in Europe, Brazil, or India (the "<u>North American Contract Documents</u>"), in their entirety without modification of any kind, and further shall be deemed to assign the North American Contract Documents, in their entirety without modification of any kind, to the North American Purchaser as of the Closing Date; <u>provided</u> that notwithstanding the foregoing, (a) upon the Debtors' assumption and assignment to the North American Purchaser of the North American Contract Documents between the applicable Debtors and FCA US LLC and certain of its subsidiaries and affiliates (collectively, the "<u>FCA Contracts</u>"), the relevant FCA Contracts shall be deemed cured pursuant to 11 U.S.C. § 365(b)(1) so that the North American Purchaser shall have no liability or Obligations (as defined below) related to the FCA Excluded Warranty Claims,[6] and (b) the Debtors shall neither assume nor

---

[6]      "FCA Excluded Warranty Claims" means claims, whether arising prior to or after the Closing Date, pursuant to the warranty provided by certain of the Debtors and/or their subsidiaries to FCA US LLC and certain of

assign any North American Contract Documents relating to the GM Excluded Warranty Claims.[7]

(ii)     The North American Purchaser hereby agrees and accepts said assignment as of the Closing Date, and assumes and agrees to pay, perform and discharge, regardless of when due, any and all of the liabilities, responsibilities, and obligations under the North American Contract Documents including, but not limited to, warranty, recall and product liability for all Items (collectively, "Obligations"); provided that notwithstanding the foregoing the North American Purchaser shall not assume nor have any Obligations relating to the GM Excluded Warranty Claims or the FCA Excluded Warranty Claims.

(iii)    The assumption and assignment of North American Contract Documents and sale of the Debtors' right, title and interest in substantially all of its assets pursuant to this North American Sale Order shall in all cases be subject to (and not free and clear of) each applicable Customer's claims, defenses, rights, and interests as set forth in the North American Contract Documents or existing under applicable law, including, without limitation, Customer's tooling, returnable dunnage, intellectual property rights, rights of setoff and recoupment, warranty rights and claims, and confidential information.

(iv)     For the avoidance of doubt, and notwithstanding any contrary designation in the North American Asset Purchase Agreement or otherwise, it is hereby

---

its subsidiaries and affiliates with respect to the parts identified in Case 3278 Dura Recall v34 on account of the Dodge Dart.

[7]     "GM Excluded Warranty Claims" means the warranty provided by certain of the Debtors and/or their subsidiaries to General Motors Company and certain of its subsidiaries and affiliates on account of the K2XX heated power slider for the following part numbers: 84641171/2, 84641173, 84819602/3, 23490454, and 84819605.

acknowledged and agreed that, due to the nature of the sale transaction as a stock sale with respect to Transferred Subsidiaries: (a) references to "Transferred Contracts" shall not include any North American Contract Documents between any Customer and a Transferred Subsidiary ("Subsidiary Contracts"); and (b) all rights, claims, encumbrances, interest and Obligations of the counterparties to Subsidiary Contracts shall not be impacted, impaired or otherwise altered in any manner.

**VI.    No Successor Liability; Prohibition of Actions Against the North American Purchaser.**

28.    Except as provided in the North American Purchase Agreement and without limiting other applicable provisions of this North American Sale Order, the North American Purchaser is not, by virtue of the consummation of the North American Sale, assuming, nor shall it be liable or responsible for, as a successor or otherwise (including with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity, including the Successor or Other Liabilities, whether known or unknown as of the Closing Date, now existing or hereafter raised, which may be asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors, or any of their predecessors or Affiliates or any obligations of the Debtors or their predecessors or Affiliates prior to the Closing Date, for any liabilities, debts, commitments, or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed, or otherwise) in any way whatsoever relating to or arising from the Debtors, the Transferred Assets, or the Debtors' operation of their businesses or use of the Transferred Assets on or prior to the Closing Date or any such liabilities, debts, commitments, or obligations that in any way whatsoever relate to periods on or prior to the Closing Date or are to be observed, paid, discharged, or performed on or prior to the Closing Date (in each case, including any liabilities that result from, relate to, or arise out of tort or product liability

claims), or any liabilities calculable by reference to the Debtors or their assets or operations (including by reference to the Debtors' experience or similar ratings), or relating to continuing conditions existing on or prior to the Closing Date, including with respect to any of the Debtors' predecessors or Affiliates, which liabilities, debts, commitments, and obligations are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, commitments, or obligations has delivered to the North American Purchaser a release thereof.  The North American Purchaser has given substantial consideration under the North American Purchase Agreement.  Upon consummation of the North American Sale, the North American Purchaser shall not be deemed to (i) be the successor to the Debtors or their estates, (ii) have, de facto or otherwise, merged with or into the Debtors, or (iii) be a mere continuation, alter ego, or substantial continuation of the Debtors.

29.    Following the Closing Date, no holder of an Interest in the Debtors shall interfere with the North American Purchaser's title to or use and enjoyment of the Transferred Assets and the Transferred Contracts based on or related to such Interest or any actions that the Debtors may take in these chapter 11 cases.

**VII.    Pension Matters.**

30.    Notwithstanding any provision to the contrary except for the last sentence of this paragraph, no provision contained in the North American Purchase Agreement or this North American Sale Order shall be construed as altering any rights or obligations with respect to the Dura Combined Pension Plan ("Defined Benefit Pension Plan") under applicable law, government policy, or regulatory provision, including discharging, releasing, exculpating or relieving any Person, from any Liability with respect to the Defined Benefit Pension Plan under any law, government policy, or regulatory provision.  The Pension Benefit Guaranty Corporation ("PBGC") and the Defined Benefit Pension Plan shall not be enjoined or precluded from enforcing such

Liability or responsibility against any Person.  Notwithstanding the foregoing, neither the North American Purchaser nor its officers, directors, agents (as to the officers, directors and agents, solely in such capacity), affiliates, subsidiaries, nor the Transferred Assets shall have any Liability on account of the Defined Benefit Pension Plan or the Defined Benefit Pension Plan's treatment pursuant to the North American Sale or European Sale; provided, however, that notwithstanding the foregoing, solely with respect to the Transferred Subsidiaries, nothing shall be construed as altering any rights or obligations with respect to the Defined Benefit Pension Plan under applicable law, government policy, or regulatory provision, including discharging, releasing, exculpating or relieving any Transferred Subsidiary from any Liability with respect to the Defined Benefit Pension Plan under any law, government policy, or regulatory provision; provided further that, any Transferred Subsidiary reserves all rights with respect to the foregoing.

31.     To the extent the Transferred Assets contain records of the Defined Benefit Pension Plan or employment records of Defined Benefit Pension Plan participants, the North American Purchaser shall store, and preserve any such records until the PBGC has completed its investigation regarding the Defined Benefit Pension Plan and shall make such documents available to PBGC for inspection and copying.  Such records include, but are not limited to, any Defined Benefit Pension Plan governing documents, actuarial documents, and employment records (collectively, the "Defined Benefit Pension Plan Documents").  The Debtors shall retain and not abandon any Defined Pension Plan Documents that are not Transferred Assets and shall make such documents available to the PBGC for inspection and copying.

## VIII.   Global Automotive Systems Matters.

32.     Debtor Dura Automotive Systems, LLC ("Dura") shall assume and assign as soon as practicable (the date of such assignment, the "Assignment Date") that certain lease agreement, dated January 30, 2017, by and between Dura and Catalyst Development Company 8, LLC (the

"<u>Landlord</u>"), for the lease of an apartment located at 34977 Woodward Avenue, Birmingham, Michigan 48009 (such lease agreement, collectively with all amendments, exhibits, modifications, renewals, schedules, and supplements thereto, the "<u>Michigan Lease</u>") to Global Automotive Systems, LLC ("<u>GAS</u>").  GAS shall be responsible for all of Dura's obligations (and the Debtors shall have no further obligations) arising and/or coming due under the Michigan Lease after the Assignment Date, including any indemnity obligations, and the payment of any and all accruing but unbilled obligations with respect to any year-end adjustments or reconciliations when billed in accordance with the terms of the Michigan Lease (including for rents, utilities, taxes, insurance, fees, common area or other maintenance charges, promotional funds, and percentage rent) that become due and owing after the Assignment Date.  The Michigan Lease has no value to the Debtors' estates following the Closing Date.  No defaults exist under the Michigan Lease as of the Assignment Date that would need to be cured pursuant to section 365(b) of the Bankruptcy Code in order for Dura to assume and assign the Michigan Lease.  The Landlord consents to the assumption and assignment of the Michigan Lease by Dura to GAS as set forth in this North American Sale Order, and consents to a Cure Claim of $0.00 for the Michigan Lease.  Following the Assignment Date, any proof of claim or scheduled claim filed by or on behalf of the Landlord with respect to the Michigan Lease shall be deemed withdrawn with prejudice and of no further force or effect.

33.     The Debtors are authorized to sell and shall as soon as practicable (the "<u>Vehicle Sale</u>"), pursuant to section 363(b) of the Bankruptcy Code, that certain Tesla 2013 Model S Signature Performance Sedan owned by the Debtors (the "<u>Vehicle</u>") to GAS for a purchase price of $30,360 (the "<u>Vehicle Purchase Price</u>"), which is the applicable Kelley Blue Book Private Party Value.  The Debtors are authorized to sign over the title of the Vehicle and deliver the Vehicle to

GAS in exchange for the Vehicle Purchase Price, and take any and all other acts or actions as may be reasonably necessary or appropriate with respect to the Vehicle Sale, in each case without further notice to or order of this Court.  The Vehicle Sale shall constitute a legal, valid, binding, and effective transfer of the Vehicle, and pursuant to section 363(f) of the Bankruptcy Code, GAS shall take title to and possession of the Vehicle free and clear of all Interests of any kind or nature whatsoever; provided that any and all valid and perfected Interests in the Vehicle shall attach to the Vehicle Purchase Price with the same validity, force, and effect, if any, and in the same order of priority, that they have now as against the Vehicle, subject to any rights, claims, and defenses with respect thereto.  The Vehicle Purchase Price shall be paid to the North American Purchaser upon the closing of the Vehicle Sale, pursuant to a credit bid by the DIP Lenders of postpetition financing obligations in the amount of $30,360.  The Debtors may sell the Vehicle free and clear of all Interests because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Interests who did not timely object to the entry of this North American Sale Order are deemed to have consented to the Vehicle Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  All other holders of Interests fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.  Because any and all valid and perfected Interests in the Vehicle shall attach to the Purchase Price with the same validity, force, and effect, if any, and in the same order of priority, that they have now as against the Vehicle, subject to any rights, claims, and defenses with respect thereto, all holders of Interests are adequately protected.  The Vehicle Sale is entered into without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Vehicle Sale shall not affect the validity of the Vehicle Sale, unless such authorization and consummation of the

Vehicle Sale are duly stayed pending such appeal. GAS is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code. As a good-faith purchaser of the Vehicle, GAS has not entered into an agreement with any other potential bidders and has not colluded with any potential or actual bidders, and therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against GAS with respect to the Vehicle Sale, and the Vehicle Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code. The consideration provided by GAS to the Debtors for the Vehicle is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration, including under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and under the laws of the United States, any state, territory, possession, the District of Columbia, or any foreign jurisdiction.

## IX.    Other Provisions.

34.    The Committee's objections to the North American Sale and European Sale are resolved as follows and with the insertion of Paragraph 32 in the European Sale Order,[8] which are hereby ordered by the Court. Notwithstanding anything, including but not limited to, the other provisions of this North American Sale Order or the European Sale Order:

        a.    <u>Claims and Causes of Action</u>.

        (1)    Subject to Paragraph 34(a)(3), causes of action under chapter 5 of the Bankruptcy Code and similar causes of action under state or other applicable law (including related defenses, the "<u>Avoidance Actions</u>") against trade vendors

---

[8]    "<u>European Sale Order</u>" means the Court's *Order (I) Approving the European Stock and Asset Purchase Agreement, (II) Authorizing the Sale of Substantially All of the Debtors' European Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* entered in these cases.

shall be Transferred Assets pursuant to the North American Purchase Agreement. The North American Purchaser agrees it shall not initiate, and shall cause its Affiliates or any Transferred Subsidiary not to initiate, any civil or administrative proceeding related to Avoidance Actions against any non-Seller party to any Transferred Contract or other party whose claims are assumed by the North American Purchaser pursuant to Section 2.3(c) of the North American Purchase Agreement (the "Released Vendor Claims").

(2)     Transferred Assets shall also include:

(i)     Claims and causes of action first arising and accruing after the execution of the North American Purchase Agreement or the European Purchase Agreement against any party, including a Patriarch Party,[9] the Zohar Debtors or the Prepetition Term Loan Agent, related to either purchase agreement, the transactions contemplated thereunder or the closing of the transactions (and for the avoidance of doubt, other than any claims or causes of action arising out of or related to any breach, default (whether monetary or non-monetary), act or omission that occurred on or prior to execution of the North American Purchase Agreement or the European Purchase Agreement);

---

[9]     "Patriarch Parties" means Patriarch Partners, LLC, Dura Buyer, LLC, Patriarch Partners Management Group, LLC, Patriarch Partners Agency Services, LLC, Ark II CLO 2001-1 Ltd, Dura Automotive Angels, LLC, Lynn Tilton (in any capacity, personal or otherwise), any and all non-Debtor entities that are Affiliates of or controlled either directly or indirectly by any of the foregoing (other than the Zohar Debtors and any Transferred Subsidiary), as well as the current and former directors, officers, managers, employees, representatives, and agents of any of the foregoing, as to each such current or former role of an individual, in such capacity (each, a "Patriarch Party"); provided, however, that the "Patriarch Parties" shall not include Marc Beilinson, Jill Frizzley, James Riedy, Michael Beckett, Dave Pettyes, Sanjay Singh, Jamie Zinser, Charles Clevenger, Kirkland & Ellis LLP, Portage Point Partners, LLC, Jefferies LLC, and Prime Clerk LLC, each, in any capacity.

(ii)    Claims and causes of action against (A) any current officer, manager (including, without limitation, the members of the Transaction Committee, who for the avoidance of doubt are not a Patriarch Party), director or employee of any Asset Seller (other than any Patriarch Party); (B) current or former officer, manager, director or employee of a Transferred Subsidiary (other than any Patriarch Party); (C) the Debtors' estate-retained restructuring professionals (including, for the avoidance of doubt, Kirkland & Ellis LLP, Portage Point Partners, LLC, Jefferies LLC, and Prime Clerk LLC); (D) the DIP Agent (and its affiliates and representatives); (E) the DIP Lenders and its Affiliates and representatives; and, subject to the provisions of Paragraph 34(e), (F) the Zohar Debtors, the Prepetition Term Loan Agent, and their respective representatives,[10] which, as to each of (A) through (F) in this Paragraph 34(a)(2)(ii), shall be acquired by the North American Purchaser or the European Purchaser and shall be treated in accordance with Section 2.1(b) of the North American Purchase Agreement and 2.1(g) of the European Purchase Agreement;

(iii)    Any rights, claims and causes of action (for the avoidance of doubt, other than Excluded Actions) directly concerning the operations of the respective Business, or which may be necessary to defend against any action brought against DIP Lenders, the DIP Agent, the Transferred Subsidiaries or the applicable Purchaser (or their respective post-closing

[10] For the avoidance of doubt, in all circumstances, the representatives of the Zohar Debtors and the Prepetition Term Loan Agent shall not include the Patriarch Parties.

affiliates and representatives), including without limitation, warranty claims, claims for refunds, rebates, and intercompany claims; and

(iv)     Any rights, defenses, claims and causes of action which may give rise to a claim for indemnity (or the like) against the North American Purchaser or European Purchaser (collectively, the "Purchasers") or Transferred Subsidiaries shall be Transferred Assets unless (i) any such claim for indemnity is fully covered by one or more of the insurance policies that are Transferred Assets (ii) the Person bringing such right, claim or cause of action holds Purchaser and the Transferred Subsidiaries harmless with security to backstop any liability on the indemnity for exposure outside of insurance coverage that is reasonably acceptable to Purchaser, and (iii) any Person bringing such right, claim or cause of action limits its remedy in such a way to eliminate all or a portion of the ability to claim indemnity for exposure outside of insurance coverage.  Any rights, defenses, claims and causes of action that are not Transferred Assets under this subsection (iv) because they meet the requirements above shall constitute Excluded Assets (collectively, the "Excluded Cover Actions").  The applicable Purchaser shall provide such Person copies of all insurance policies that are Transferred Assets, as well as all other reasonably requested information that concerns such Person's compliance with this subsection (iv).  The applicable Purchaser and such Person shall confer in good faith prior to such Person bringing any such claim or cause of action concerning compliance with this subsection (iv).  Nothing in the North American Sale Order or

European Sale Order is intended to alter or affect, and nothing shall be interpreted as in any way altering or affecting, any indemnification obligations the Transferred Subsidiaries have to their past and present directors, managers, officers and employees (as to each, solely in such capacity), or the rights of such directors, managers, officers and employees (as to each, solely in such capacity) to bring or pursue claims under applicable insurance policies. All such indemnification rights and rights related to insurance of the Transferred Subsidiaries' past and present directors, managers, officers and employees (as to each, solely in such capacity), as well as all Transferred Subsidiaries' rights and defenses with respect to any such claims for indemnification, shall be unaffected by the North American Sale Order or European Sale Order.

(3)    Transferred Assets shall <u>not</u> include Avoidance Actions against any Person that no longer provides goods or services to Sellers or the Business as of the Closing, instead such Avoidance Actions shall constitute Excluded Assets (collectively, the "<u>Excluded Avoidance Actions</u>").  The North American Purchaser shall work in good faith with the Zohar Debtors and the Committee (or a chapter 7 trustee) to identify such Persons within 60 days after Closing; <u>provided</u> that with respect to the foregoing in this sentence, the Committee shall recuse itself from any discussion or decision relating to a member of the Committee; <u>provided</u> <u>further</u>, no Excluded Avoidance Action may be brought or continued against any Person that the North American Purchaser deems important to the post-Closing Business (or that would put the Business at material risk as a consequence of the prosecution or

43

continued prosecution of such Excluded Avoidance Action) as it reasonably determines (such determination not to be unreasonably made, delayed or conditioned).

(4)     Reserved.

(5)     Transferred Assets shall <u>not</u> include rights, defenses, claims and causes of action against Patriarch Parties (except to the extent such claims are Transferred Assets pursuant to Paragraphs 34(a)(2)(i) or 34(a)(2)(iv) of this North American Sale Order), instead such rights, defenses, claims and causes of action shall constitute Excluded Assets (collectively, the "<u>Excluded Patriarch Actions</u>" and, together with the Excluded Avoidance Actions and the Excluded Cover Actions, the "<u>Excluded Actions</u>").

(6)     The DIP Lenders and the DIP Agent hereby subordinate their liens, claims and rights to recovery to the Debtors' pre-Conversion Date general unsecured creditors in the amount of and as to 10% of each $1 of net proceeds, on a first dollar basis, available for distribution from any recovery on Excluded Actions or any other post-Closing assets of the Debtors or their estates (including chapter 7 estates).

b.     <u>Modification to Section 2.3(c) of the North American Purchase Agreement</u>. Section 2.3(c) of the North American Purchase Agreement is hereby modified to read as follows: "[Assumed Liabilities include …]: (c) trade and vendor accounts payable incurred in the operation of the Business in the ordinary and usual course consistent with past practice of the Sellers and Transferred Subsidiaries, as such practice and custom is, or may have been, modified as a result of the Bankruptcy Case, between October 17, 2019 and the

Closing for vendors willing to provide goods and services to the Business from and after the Closing (i) on terms consistent with past practice and (ii) that are not resourced on or before May 12, 2020."

c.        Modification of the Purchase Consideration.  The DIP Lenders shall (and shall direct the DIP Agent to the extent necessary) increase their aggregate Credit Bid Amount under the North American Purchase Agreement and European Purchase Agreement by $10 million.  The DIP Lenders shall allocate such increase in their discretion; *provided*, *however*, that in the event a Closing (in this instance, as defined in the North American Purchase Agreement or the European Purchase Agreement, as applicable) occurs on only one of the North American Purchase Agreement or European Purchase Agreement, the $10 million increase in the Credit Bid Amount shall apply and be allocated to such purchase agreement.

d.        Chapter 7 Motion.  As soon as practicable following the entry of the North American Sale Order and the European Sale Order, the Debtors shall convert their cases to chapter 7, and to do so shall as soon as practicable file and use reasonable commercial efforts to prosecute a motion and proposed order, each in form and substance reasonably acceptable to the Committee, the Prepetition Term Loan Agent and the Prepetition Term Loan Secured Parties (as defined in the Final DIP Order), to convert the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code (the "Conversion Motion").  The Debtors, the Committee, the Prepetition Term Loan Agent, the Zohar Debtors and the Purchasers each agree that the date the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code (the "Conversion Date") shall not occur until after each of the following (absent their collective consent prior to the Conversion Date), that they

shall not request any relief to the contrary, and that they shall use commercially reasonable efforts to object to and have the Bankruptcy Court overrule any objection, request for relief or assertion to the contrary:  (a) the occurrence of a Closing (in this instance, as defined in the North American Purchase Agreement or the European Purchase Agreement, as applicable) on the North American Purchase Agreement and European Purchase Agreement (as modified pursuant to the North American Sale Order and the European Sale Order, as applicable); (b) approval on a final basis of all final fee applications filed by the Debtors and the Committee's respective professionals retained pursuant to sections 327, 328, and/or 1103 of the Bankruptcy Code; (c) entry of one or more orders (which may include the order approving the Conversion Motion) authorizing the Debtors to reject all executory contracts or unexpired leases that were not designated as a Transferred Contract (in this instance, as defined in the North American Purchase Agreement or the European Purchase Agreement, as applicable) by the North American Purchaser or European Purchaser following the applicable Closing Date as set forth in the North American Sale Order or the European Sale Order; and (d) prior entry of one or more orders adjudicating fully and on a final basis the Committee's (and a chapter 7 trustee's post-Conversion Date) standing to bring a Prepetition ABL Challenge (as defined below) (for the avoidance of doubt, all parties' rights are reserved with respect to such requested standing).  The Debtors, the Committee, the Prepetition Term Loan Agent, the Zohar Debtors and the Purchasers each agree that they shall use commercially reasonable efforts to propose and have the Bankruptcy Court enter an order approving the Conversion Motion that is in form and substance reasonably acceptable to each of them and provides, at a minimum, for each of the following (absent their collective consent prior to the Conversion Date), that they

shall not request any relief to the contrary of the terms of the agreed order proposed to approve the Conversion Motion, and that they shall use commercially reasonable efforts to object to and have the Bankruptcy Court overrule any objection, request for relief or assertion to the contrary: (a) confirmation of the chapter 7 trustee's standing and right to prosecute all Estate Actions, and that the chapter 7 trustee shall succeed to all privileges, as well as rights concerning confidentiality, of Debtors, the estates and the Committee; (b) confirmation of the chapter 7 trustee's standing and right to file any claims objections regardless of anything in Paragraph (e) below or whether a claim or cause of action against a creditor of the estates constitutes a Transferred Asset; and (c) rejection of all executory contracts and unexpired leases not previously rejected, with rejection effective on the date set forth in Paragraph 34(h).

      e.      _Estate Actions_.  The Debtors, the Committee, the Prepetition Term Loan Agent, the Zohar Debtors and the Purchasers each agree, and the Debtors stipulate, that the Estate Actions (as defined below) are the property of the Debtors' estates.  No Challenge Period (as defined in the Final DIP Order) or Challenge deadline applies to the Estate Actions (for the avoidance of doubt, the Challenge Period shall apply to any Challenge against the Prepetition ABL Secured Parties (solely in such capacities, and in no other capacity) or the Prepetition ABL Obligations (as each is defined in the Final DIP Order)). The "Estate Actions" means the Excluded Actions, the Debtors' and their estates' right, title, and interest with respect to any Challenge (as defined in the Final DIP Order), right, defense, claim, and/or cause of action held by the Debtors or their estates as of the date of this North American Sale Order, as well as those that arise or accrue prior to the Conversion Date to the extent that any such Challenge, right, defense, claim, or cause of action is not

a Transferred Asset pursuant to the North American Purchase Agreement or European
Purchase Agreement (as each may be modified by the North American Sale Order and the
European Sale Order, as applicable), including, but not limited to, any Challenge, right,
defense, claim, or cause of action identified in or concerning the subject matter of the
*Agreed Order Regarding the Motion of the Official Committee of Unsecured Creditors for
Entry of an Order Extending the Challenge Period and Granting Related Relief* [Docket
No. 852] as well as the *Motion of the Official Committee of Unsecured Creditors for Entry
of an Order Granting Derivative Standing and Authority to Prosecute and Settle Claims
on Behalf of the Estate* [Docket No. 853] (the "Standing Motion") and the proposed
complaint attached thereto [Docket No. 853, Exhibit B], other than a Challenge against the
Prepetition ABL Secured Parties (solely in such capacities, and in no other capacity) or the
Prepetition ABL Obligations (as each is defined in the Final DIP Order) (the "Prepetition
ABL Challenge") absent the entry of a subsequent order of the Court prior to the
Conversion Date that the Committee has standing to prosecute a Prepetition ABL
Challenge, at which point the Prepetition ABL Challenge shall become an Estate Action;
provided that the rights of the Debtors, the Prepetition ABL Secured Parties, the
Committee, the Zohar Debtors, and other parties in interest with respect to the Prepetition
ABL Challenge pursuant to the Standing Motion are fully reserved and preserved,
including under the Final DIP Order (for the avoidance of doubt, and notwithstanding
anything to the contrary herein, nothing in this North American Sale Order amends or
modifies Paragraph 7 of the Final DIP Order or the Payoff Letter (as defined in and attached
to the Final DIP Order)).  For the avoidance of doubt, each of the Debtors, the Committee,
the Prepetition Term Loan Agent, the Zohar Debtors and the Purchasers agree that a chapter

7 trustee may file any claims objections regardless of the foregoing in this paragraph (e) or whether a claim or cause of action against a creditor of the estates constitutes a Transferred Asset.

f.      Standstill.  The Debtors shall maintain the Estate Actions in their estates and use commercially reasonable efforts preserve their value until the Conversion Date. Absent the consent of the Committee, the DIP Lenders, the Prepetition Term Loan Agent and the Zohar Debtors, the Excluded Actions shall not be commenced, continued, impaired, or modified prior to the Conversion Date.

g.      [Reserved]

h.      Rejection of Executory Contracts and Unexpired Leases.  The Debtors shall file as soon as practicable and prosecute on a reasonable commercial efforts basis a motion to reject all executory contracts and unexpired leases that the Purchaser indicates it may or does not want to take assignment of as Transferred Contracts.  Such agreements for which such determination has already been made by the Purchaser shall be rejected as of the effective date of the filing of such motion, and for those agreements that the Purchaser needs more time to evaluate, rejection shall be effective as of the date of the Purchaser's decisions not to take assignment of such agreement as a Transferred Contract.

i.      No Liability Creation.  To the extent the Purchaser designates a Transferred Asset as an Excluded Asset pursuant to the North American Purchase Agreement or European Purchase Agreement, the Debtors shall not take any action that would cause the Debtors' estates to incur a Liability that is not a Liability of the Debtors' estates prior to such exclusion.  Purchaser shall not take an action with respect to a Transferred Asset prior to designating it as an Excluded Asset that causes the Debtors' estates to incur a Liability

that is not a Liability of the Debtors' estates prior to such designation, provided that, the designation of a Transferred Asset as an Excluded Asset shall not be deemed to cause the Debtors' estates to incur a Liability.

j.      Preservation of Defenses.  Nothing in this North American Sale Order shall preclude any valid defenses held by applicable parties with respect to the Transferred Assets, including recoupment, but for the avoidance of doubt such defenses do not include setoffs except for setoffs exercised prior to the Petition Date.

35.      Notwithstanding anything to the contrary in this North American Sale Order or the North American Purchase Agreement, the statutory tax liens held by Cameron County to secure payment of the 2020 taxes to be assessed against the Debtors shall continue on the applicable assets following the Closing until such time as such 2020 taxes are paid by the North American Purchaser.

36.      Notwithstanding anything to the contrary in the DIP Credit Agreement or the Orders (as defined in the DIP Credit Agreement), no Event of Default (as defined in the DIP Credit Agreement) shall occur due to the entry of this North American Sale Order or the consummation of the North American Sale.

37.      Pursuant to the terms of the North American Purchase Agreement, the amendment to the DIP Facility[11] attached hereto as Exhibit 2, which provides for the further upsize of the DIP Facility by up to $5 million on the terms set forth therein, is hereby approved (the "Second DIP Amendment"), and the Debtors are authorized to enter into the Second DIP Amendment on or after the date of this North American Sale Order without further notice or order of the Court.  Except as

---

[11]    Capitalized terms used in this paragraph that are not defined in this North American Sale Order have the meanings ascribed to such terms in the Final DIP Order.

modified by the Second DIP Amendment and this North American Sale Order, the Credit Documents shall remain in full force and effect.  Subject in all respects to the Carve-Out, the obligation to repay the amount drawn on account of the Second DIP Amendment shall be senior in right of payment to all other DIP Obligations outstanding as of the date of this North American Sale Order (other than any DIP Obligations payable to the DIP Agent in respect of fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders).  The findings of fact and conclusions of law in the Final DIP Order shall apply to the Second DIP Amendment, *mutatis mutandis*.  The Debtors are authorized and empowered to take all actions necessary to implement the Second DIP Amendment without further notice or order of the Court.

38.     Notwithstanding anything to the contrary in this North American Sale Order or the North American Purchase Agreement, the bank accounts of the Asset Sellers shall be Excluded Assets and Cash and Cash Equivalents shall be Transferred Assets.

39.     The consideration provided by the North American Purchaser to the Debtors pursuant to the North American Purchase Agreement for the Transferred Assets is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration, including under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and under the laws of the United States, any state, territory, possession, the District of Columbia, or any foreign jurisdiction.

40.     The transactions contemplated by the North American Purchase Agreement and this North American Sale Order are undertaken by the North American Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the North American Sale shall not affect the validity of the North American Sale

(including the assumption, assignment, and/or transfer of the Transferred Contracts), unless such authorization and consummation of the North American Sale are duly stayed pending such appeal. The North American Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code.  As a good-faith purchaser of the Transferred Assets, the North American Purchaser has not entered into an agreement with any other potential bidders and has not colluded with any potential or actual bidders, and therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the North American Purchaser, and the North American Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

41.    To the extent permitted under applicable law, including section 1146 of the Bankruptcy Code, the North American Sale of the Transferred Assets and the transactions contemplated thereby shall be exempt from any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or similar fees for Taxes, governmental charges, and recording charges (including any interest and penalty thereon), which may be payable by reason of the North American Sale of the Transferred Assets or the transactions contemplated thereby. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the North American Sale of the Transferred Assets.

42.    Nothing in this North American Sale Order or the North American Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any valid police or regulatory liability, including but not limited to, environmental liability to a governmental unit that the purchaser or any other entity would be subject to as the post-Closing owner or operator of property after the Closing Date.  Nothing in this North American Sale Order or the North American

Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law, including but not limited to, environmental law.  Nothing in this North American Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law, including but not limited to environmental law, to interpret this North American Sale Order or to adjudicate any defense asserted under this North American Sale Order. Notwithstanding the foregoing, nothing in this North American Sale Order shall:  (i) be interpreted to deem the North American Purchaser the successor to the Debtors under any state or federal law successor liability doctrine with respect to any liabilities under environmental statutes, laws, or regulations for penalties for days of violation prior to the Closing Date or for liabilities relating to off-site disposal of wastes by the Debtors prior to the date of the Closing Date; (ii) deem the North American Purchaser to have assumed or be liable for any liability or obligation of the Debtors not expressly assumed other than any valid police or regulatory liability, including but not limited to, environmental liability, to a governmental unit that the purchaser or any other entity would be subject to as the post-Closing owner or operator of property after the Closing Date; (iii) be construed as a waiver by any party, including the North American Purchaser, of any applicable rights or defenses under non-bankruptcy law; or (iv) be construed to create for any governmental unit any substantive right that does not already exist under law.

43.    The Carve Out Reserves (as defined in the Final DIP Order) shall be funded in cash by the DIP Lender on or prior to the Closing (in this instance, as defined in the North American Purchase Agreement or the European Purchase Agreement, as applicable) of the first to occur of the North American Sale or the European Sale through the deposit by DIP Lenders or an affiliate

thereof (including the North American Purchaser or European Purchaser), of $11.25 million into an account to be maintained in trust by an escrow agent solely for the benefit of the professionals to the Debtors and the professionals to the Committee, in each case, retained under section 327, 328 and/or 1102 of the Bankruptcy Code (the "Carve Out Account"), which shall satisfy (a) the obligation of the North American Purchaser pursuant to the North American Purchase Agreement to deposit the same amount into the Professional Fee Escrow Account (as defined in the North American Purchase Agreement) and (b) the condition precedent in the European Purchase Agreement for the same amount to be funded into the Professional Fee Escrow Account (as defined in the European Purchase Agreement) prior to closing.  The DIP Agent and DIP Lenders shall be deemed to have satisfied their obligations with respect to the Carve Out (as defined in the Final DIP Order) and the Carve Out Reserves as set forth in the Final DIP Order upon such funding. Except as set forth in this paragraph, nothing in this Order shall impair, modify, or otherwise affect the Carve Out.  The creation and funding of the Carve Out Account is approved pursuant to section 363(b) of the Bankruptcy Code.  The Debtors are authorized, without further notice or relief from this Court, to enter into an escrow agreement acceptable to counsel to the Debtors and counsel to the Committee, which shall govern the distributions from the Carve Out Account (the "Carve-Out Agreement,") take any and all actions that are necessary or appropriate in the exercise of their business judgment to implement the Carve-Out Agreement, including engaging applicable escrow agents and to make or authorize the payments contemplated in connection therewith.  Such funds (including any residual funds) may be released and applied in accordance with the terms of the Carve-Out Agreement, upon Court order approving the payment of any fees and expenses of any professional retained by the Debtors or the Committee (including pursuant to the Interim Compensation Order or any order of the Court allowing professional fees and expenses on an

interim basis or a final basis); *provided*, *that*, prior to the date on which the DIP Obligations (as defined in the Final DIP Order) are paid in full, in cash, the DIP Agent shall retain its liens on the Carve-Out Account and shall have a claim on the proceeds of the Carve-Out Account, which liens and claim shall be junior to, and subordinated to, the claims of professionals retained by the Debtors and the Committee (as well as any Committee member expenses reimbursable pursuant to the Carve Out). Except as expressly set forth in this North American Sale Order, nothing herein shall otherwise impair, modify, or affect the Final DIP Order.

44.     Notwithstanding anything to the contrary in the European Purchase Agreement or the North American Purchase Agreement, but subject to Paragraph 34 of this North American Sale Order in all respects, to the extent that the closing of the North American Sale occurs prior to the closing of the European Transaction, upon the closing of the North American Sale, (a) the European Purchase Agreement shall be deemed amended to revise Section 2.1(g) thereof to read in its entirety as follows:

> subject to Section 6.6, all of the rights, claims or causes of action of the Asset Sellers of any kind, including those available under the U.S. Bankruptcy Code, against any party, including any officer, director or Affiliate of, or lender to, any Asset Seller (and the proceeds of any insurance policies related to any such rights, claims or causes of action) arising at any time prior to the Closing solely to the extent arising in the ordinary course of the business of the Sellers utilizing the Purchased Assets; provided that any rights, claims or causes of action included in this Section 2.1(g) shall not include any such rights or claims arising in the ordinary course of the operation of the business of the Sellers utilizing the Excluded Assets; provided further that neither Buyer nor any Person claiming by, through or on behalf of the Buyer (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence an Action based on, assert, sell, convey, assign or file any Claim that relates to any rights, claims or causes of action transferred under this Section 2.1(g) against any other Asset Seller, any Transferred Subsidiary (except for amounts owing under Section 2.1(d)), or any officer, director, employee, manager, adviser, or other Representative of any Asset Seller or Transferred Subsidiary (in each case, other than Lynn Tilton, or any other director or officer of an Asset Seller or Transferred Subsidiary who is or has been a director, officer, equityholder, manager, Affiliate, member or Representative of Patriarch Partners, LLC or any of its Affiliates (Dura Automotive Systems, LLC and its Subsidiaries shall not be included in the definition of Affiliates of Patriarch Partners, LLC for purposes of this Section 2.1(g) and

Section 6.6 only) (the "Specified Persons") and nothing herein shall limit the right of the Buyer (or any assignee or transferee thereof) to bring any claims or causes of action against a Specified Person);

and (b) the North American Purchase Agreement shall be deemed amended to revise Section 2.1(b) thereof to read in its entirety as follows:

subject to Section 6.6, all of the rights, claims or causes of action of the Asset Sellers of any kind, including those available under the Bankruptcy Code, against any party, including any officer, director, employee, manager or Affiliate of, or lender to, any Asset Seller or Transferred Subsidiary or any of their respective Affiliates (and the proceeds of any insurance policies related to any such rights, claims or causes of action) arising at any time prior to the Closing; provided that any rights, claims or causes of action included in this Section 2.1(b) shall not include any such rights or claims arising in the ordinary course of the operation of the DE Business or that constitute "Transferred Assets" pursuant to the DE Purchase Agreement; provided further that neither the Buyer nor any Person claiming by, through or on behalf of the Buyer (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence an Action based on, assert, sell, convey, assign or file any Claim that relates to any rights, claims or causes of action transferred under this Section 2.1(b) against any Asset Seller, or any officer, director, employee, manager, adviser, or other Representative of any Asset Seller or Transferred Subsidiary (in each case, other than Lynn Tilton, or any other director or officer of an Asset Seller or Transferred Subsidiary who is or has been a director, officer, equityholder, manager, Affiliate, member or Representative of Patriarch Partners, LLC or any of its Affiliates (Dura Automotive Systems, LLC and its Subsidiaries shall not be included in the definition of Affiliates of Patriarch Partners, LLC for purposes of this

Section 2.1(b) and Section 6.6 only) (the "Specified Persons") and nothing herein shall limit the right of the Buyer (or any assignee or transferee thereof) to bring any claims or causes of action against a Specified Person);

45.     Notwithstanding anything in the North American Sale Agreement, in addition to the Purchaser's assumption of liability therefor, every one of the Debtors shall remain obligated to pay quarterly fees arising under 28 U.S.C. § 1930 (a)(6) to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

46.     For cause shown, pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014, this North American Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the stays provided in Bankruptcy Rules 6004(h) and 6004(d) are hereby expressly waived and shall not apply.  Accordingly, the Debtors and North American Purchaser are authorized and empowered to close the North American Sale immediately upon entry of this North American Sale Order.

47.     The failure to include or specifically reference any particular provision of the North American Purchase Agreement or the other Transaction Documents in this North American Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the North American Purchase Agreement and the other Transaction Documents be authorized and approved in their entirety.

48.     To the extent that there are any inconsistencies between the terms of this North American Sale Order, on the one hand, and the North American Purchase Agreement or any Transaction Documents, on the other hand, the terms of this North American Sale Order shall control and govern.

49.     The North American Purchase Agreement and the Transaction Documents may be modified, amended, or supplemented in a writing signed by the parties thereto and in accordance with the terms thereof, without further notice to or order of the Court; *provided that* notice of any such modification, amendment, or supplement to the North American Purchase Agreement or the Transaction Documents shall be provided to counsel to the Committee, counsel to the Zohar Debtors, counsel to the Prepetition Term Loan Agent, counsel to the Patriarch Parties, counsel to the U.S. Trustee, counsel to the agent for the DIP Lenders and counsel to the DIP Lenders, each of whom shall have five business days from the date of such notice within which to object in writing to material modifications, amendments, or supplements, and in the event of an unresolved objection, such material modifications, amendments, or supplements may only be entered into upon a further order of the Court, it being understood that non-material authorizations, amendments, waivers, consents, or other modifications will not be subject to the foregoing notice period of five business days; *provided*, *further*, that the foregoing notice period of five business days may be waived so long as counsel to each of the parties referenced in the immediately preceding proviso consents in writing to such waiver (which writing may be via e-mail); provided further that any modification, amendment or supplement to the North American Purchase Agreement or the Transaction Documents that is materially adverse to the Debtors shall not be made except pursuant to further order of the Court, by motion on notice to all parties entitled to notice under Local Rule 2002-1(b).

50.     The Court shall retain exclusive jurisdiction to, among other things, (i) interpret, implement, and enforce the terms and provisions of this North American Sale Order, the North American Purchase Agreement, the Transaction Documents, and any amendments thereto and any waivers and consents given thereunder, and to adjudicate, if necessary, any and all disputes

concerning or in any way relating to the North American Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Transferred Assets to the North American Purchaser, (b) interpret, implement, and enforce the provisions of this North American Sale Order, including but not limited to the injunctions and limitations of liability set forth in this North American Sale Order, (c) protect the North American Purchaser against any Interests in or against the Debtors or the Transferred Assets of any kind or nature whatsoever, attaching to the proceeds of the North American Sale, and (d) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Transferred Assets and the Transferred Contracts.

51.     From time to time, as and when requested by any party to the North American Purchase Agreement, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as may reasonably be necessary or desirable to consummate the North American Sale in accordance with this North American Sale Order, including, such actions as may be necessary to vest, perfect or confirm, or record or otherwise, in the North American Purchaser its right, title, and interest in and to the Transferred Assets and the Transferred Contracts.

52.     To the extent that this North American Sale Order is inconsistent with any prior order or pleading with respect to the North American Sale in these chapter 11 cases, the terms of this North American Sale Order shall govern.

## EXHIBIT 1

**North American Purchase Agreement**

**<u>Execution Copy</u>**

**STOCK AND ASSET PURCHASE AGREEMENT**

by and among

**DURA AUTOMOTIVE SYSTEMS, LLC,**

**DURA OPERATING, LLC,**

**DURA MEXICO HOLDINGS, LLC,**

**NAMP, LLC,**

**DURA AUTOMOTIVE SYSTEMS CABLE OPERATIONS, LLC,**

**DURA FREMONT L.L.C.,**

**AND**

**DURA G.P.,**

as the Sellers,

**DNA BUYER LLC**

as the Buyer,

and

solely for the purpose of Section 10.1, the Guarantors named herein

Dated as of April 29, 2020

## TABLE OF CONTENTS

**Page**

Article I.
DEFINITIONS

Section 1.1    Certain Defined Terms...................................................................................2
Section 1.2    Table of Definitions ....................................................................................12


Article II.
PURCHASE AND SALE

Section 2.1    Purchase and Sale ......................................................................................14
Section 2.2    Excluded Assets .........................................................................................17
Section 2.3    Assumed Liabilities ...................................................................................18
Section 2.4    Excluded Liabilities ...................................................................................19
Section 2.5    Consents to Certain Assignments or Transfers..........................................19
Section 2.6    Consideration .............................................................................................21
Section 2.7    Closing. ......................................................................................................21
Section 2.8    Tax Allocation ...........................................................................................23
Section 2.9    Designated Buyer(s)...................................................................................23
Section 2.10   Exclusion of Transferred Assets ...............................................................24
Section 2.11   Withholding ...............................................................................................24


Article III.
REPRESENTATIONS AND WARRANTIES
OF THE SELLERS

Section 3.1    Organization...............................................................................................25
Section 3.2    Authority ....................................................................................................25
Section 3.3    No Conflict; Required Filings and Consents. ............................................25
Section 3.4    Transferred Assets; Sufficiency of Assets ................................................26
Section 3.5    Transferred Subsidiaries............................................................................26
Section 3.6    Financial Statements; No Undisclosed Liabilities. ...................................27
Section 3.7    Absence of Certain Changes or Events .....................................................28
Section 3.8    Compliance with Law; Permits..................................................................29
Section 3.9    Litigation....................................................................................................29
Section 3.10   Employee Benefit Plans.............................................................................29
Section 3.11   Employees..................................................................................................30
Section 3.12   Real Property. ............................................................................................31
Section 3.13   Intellectual Property...................................................................................32
Section 3.14   Tax Matters ...............................................................................................33
Section 3.15   Environmental Matters ..............................................................................34
Section 3.16   Material Contracts ......................................................................................35
Section 3.17   Certain Payments .......................................................................................35
Section 3.18   Insurance....................................................................................................36
Section 3.19   Brokers.......................................................................................................36
Section 3.20   Affiliate Transactions.................................................................................36
Section 3.21   Exclusivity of Representations and Warranties .........................................36

i

**TABLE OF CONTENTS**

Article IV.
REPRESENTATIONS AND WARRANTIES OF THE BUYER

Section 4.1    Organization..................................................................37
Section 4.2    Authority .......................................................................37
Section 4.3    No Conflict; Required Filings and Consents. .................37
Section 4.4    Investment Intent ...........................................................38
Section 4.5    Brokers ..........................................................................38
Section 4.6    Buyer's Investigation and Non-Reliance ........................38

Article V.
BANKRUPTCY COURT MATTERS

Section 5.1    Bankruptcy Actions .......................................................38
Section 5.2    Sale Order ......................................................................39

Article VI.
COVENANTS

Section 6.1    Conduct of Business Prior to the Closing ......................40
Section 6.2    Covenants Regarding Information...................................43
Section 6.3    Notification of Certain Matters ......................................45
Section 6.4    Employee Matters...........................................................45
Section 6.5    Consents and Filings; Further Assurances......................47
Section 6.6    Certain Director and Officer Matters..............................49
Section 6.7    Refunds and Remittances...............................................51
Section 6.8    Public Announcements ...................................................52
Section 6.9    Name Change..................................................................52
Section 6.10   Intellectual Property Matters.........................................52
Section 6.11   Transition Services Matters ...........................................53
Section 6.12   Non-Competition Agreement.........................................53
Section 6.13   Post-Closing Assignment of Contracts ..........................54

Article VII.
TAX MATTERS

Section 7.1    Transfer Taxes ...............................................................54
Section 7.2    Tax Cooperation.............................................................54
Section 7.3    Bulk Sales ......................................................................54

Article VIII.
CONDITIONS TO CLOSING

Section 8.1    General Conditions ........................................................55
Section 8.2    Conditions to Obligations of the Sellers ........................55
Section 8.3    Conditions to Obligations of the Buyer ..........................56

US 167746098v12
US 167746098v16

## TABLE OF CONTENTS

**Page**

Article IX.
TERMINATION

Section 9.1    Termination.................................................................................................57
Section 9.2    Effect of Termination...................................................................................60

Article X.
GENERAL PROVISIONS

Section 10.1    Guaranty.....................................................................................................60
Section 10.2    Nonsurvival of Representations, Warranties and Covenants................................61
Section 10.3    Fees and Expenses .....................................................................................61
Section 10.4    Transition of Permits...................................................................................61
Section 10.5    Amendment and Modification ...................................................................62
Section 10.6    Waiver.........................................................................................................62
Section 10.7    Notices .......................................................................................................62
Section 10.8    Interpretation..............................................................................................63
Section 10.9    Entire Agreement .......................................................................................64
Section 10.10   Parties in Interest........................................................................................64
Section 10.11   Governing Law ...........................................................................................64
Section 10.12   Submission to Jurisdiction .........................................................................64
Section 10.13   Disclosure Generally...................................................................................65
Section 10.14   Personal Liability .......................................................................................65
Section 10.15   Assignment; Successors.............................................................................65
Section 10.16   Enforcement...............................................................................................66
Section 10.17   Currency.....................................................................................................66
Section 10.18   Severability.................................................................................................66
Section 10.19   Waiver of Jury Trial....................................................................................66
Section 10.20   Counterparts...............................................................................................66
Section 10.21   Facsimile or .pdf Signature .......................................................................66
Section 10.22   No Presumption Against Drafting Party .....................................................67
Section 10.23   Limitation on Damages...............................................................................67
Section 10.24   No Recourse................................................................................................67
Section 10.25   Time of Essence .........................................................................................67

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF SALE ORDER

EXHIBIT B    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
AGREEMENT

US 167746098v12
US 167746098v16

## STOCK AND ASSET PURCHASE AGREEMENT

**STOCK AND ASSET PURCHASE AGREEMENT**, dated as of April 29, 2020 (this "Agreement"), by and among (i) Dura Automotive Systems, LLC, a Delaware limited liability company ("Seller Parent"), Dura Operating, LLC, a Delaware limited liability company ("Dura Operating"), Dura Mexico Holdings, LLC, a Delaware limited liability company ("Dura Mex LLC"), NAMP, LLC, a Delaware limited liability company ("NAMP"), Dura Automotive Systems Cable Operations, LLC, a Delaware limited liability company ("DASCO"), Dura Fremont L.L.C., a Michigan limited liability company ("Dura Fremont"), and Dura G.P., a Delaware general partnership ("Dura GP") (Seller Parent together with the foregoing entities, each a "Seller" and collectively, the "Sellers"), (ii) DNA Buyer LLC, a Delaware limited liability company, or one of its assignees (the "Buyer"), and, (iii) solely for the purposes of and subject to the terms and conditions of Section 10.1, (x) Bardin Hill Event-Driven Master Fund LP, HCN LP, Halcyon Vallee Blanche Master LP, Halcyon Eversource Credit LLC, Bardin Hill WC Fund LP, Brown Cayman I, CAZ Halcyon Strategic Opportunities Fund, L.P., CAZ Halcyon Offshore Strategic Opportunities Fund, L.P., HLDR Fund I NUS LP, HLDR Fund I TE LP, HLDR Fund I UST LP and Praetorium Fund I ICAV (each, a "Bardin Hill Guarantor" and collectively, the "Bardin Hill Guarantors") and (y) Charlton Holdings LLC (the "Charlton Guarantor", the Charlton Guarantor, each Bardin Hill Guarantor, and any other Person otherwise joining this Agreement in accordance with Section 10.1, each a "Guarantor", and the Charlton Guarantor, the Bardin Hill Guarantors, and together with any other Person otherwise joining this Agreement in accordance with Section 10.1, collectively, the "Guarantors").

## RECITALS

A.    The Sellers directly and indirectly through their Subsidiaries, including the Transferred Subsidiaries, are engaged in the business of designing, engineering, and manufacturing of automotive mobility products in Canada, the United States, Mexico, China and Japan (and not in Europe, India and Brazil and excluding the DE Business (as defined below)) (the "Business").

B.    Sellers are party to an Asset Purchase Agreement, dated as of April 16, 2020 (the "DE Purchase Agreement"), by and between Sellers and DE Buyer, LLC ("DE Buyer"), pursuant to which DE Buyer will acquire from Sellers certain assets relating to the business of Sellers and their Subsidiaries in Europe, India, and Brazil and the Battery Tray Business (collectively, the "DE Business"), on the terms and conditions, and as more fully, set forth therein.

C.    Seller Parent owns, directly or indirectly, all of the issued and outstanding shares of capital stock and other equity interests (collectively, the "Transferred Stock") of certain entities organized in jurisdictions outside the United States, which are set forth on Schedule 1.1(a) (such entities, together with their respective Subsidiaries, if any, the "Transferred Subsidiaries").

D.    Seller Parent and the other Sellers filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Middle District of Tennessee, which cases were subsequently transferred to the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and are being jointly administered for procedural purposes as *In re Dura*

*Automotive Systems, LLC, et. al.*, case number 19-12378 (KBO) (collectively, the "<u>Bankruptcy Case</u>").

E.    The Sellers are parties to that certain Superpriority Senior Debtor-in-Possession Loan and Security Agreement (the "<u>DIP Credit Agreement</u>"), dated as of October 24, 2019, among Seller Parent, the other borrowers and guarantors party thereto, the lenders party thereto, and Cortland Capital Market Services LLC, as agent (the "<u>Agent</u>").

F.    Subject to the Permitted Liens (as described in the Financing Order), if any, the Agent holds valid, binding and perfected first-priority senior secured priming liens securing all of the DIP Credit Agreement Indebtedness on substantially all of the assets of Sellers (collectively, the "<u>Encumbered Assets</u>").

G.    Buyer, as duly appointed subagent of Agent, desires to credit bid, for the benefit of and on behalf of the holders of the outstanding Credit Agreement Indebtedness, certain outstanding Credit Agreement Indebtedness in the amount of $5,000,000, subject to adjustment by mutual agreement of the Parties prior to the Closing (the "<u>Credit Bid Amount</u>"), pursuant to section 363(k) of the Bankruptcy Code and the Sale Order with respect to the assets that are Encumbered Assets.

H.    The Sellers desire to sell to the Buyer all of the Transferred Stock and Transferred Assets and the Buyer desires to purchase from the Sellers the Transferred Stock and Transferred Assets in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order.

I.    The execution and delivery of this Agreement and the Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, sections 363 and 365 of the Bankruptcy Code, as further set forth herein. The Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.1    <u>Certain Defined Terms</u>. For purposes of this Agreement:

"<u>Accommodation Agreements</u>" means the agreements between Seller Parent and its North American customers providing for, among other things, accelerated payment terms and certain price accommodations, each in form and substance reasonably satisfactory to the Buyer.

2

"Action" means any claim, charge, investigation, audit, complaint, action, suit, arbitration or proceeding by or before any Governmental Authority, other than an Avoidance Action.

"Advisors" means, with respect to any Person, the accountants, attorneys, consultants, advisors, investment bankers, or other representatives of such Person.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, of a material portion of the Transferred Assets (including, for the avoidance of doubt, the Transferred Subsidiaries), in a transaction or series of transactions with one or more Persons other than the Buyer.

"Ancillary Agreements" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the Assignment Agreement, the Transition Services Agreement, the IP Assignment Agreement, the IP License and the Noncompete.

"Antitrust Law" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Agreement.

"Asset Sellers" means Seller Parent, Dura GP, Dura Operating, Dura Mex LLC, NAMP, DASCO and Dura Fremont.

"Avoidance Actions" means any and all claims for relief of the Sellers under chapter 5 of the Bankruptcy Code or state fraudulent conveyance, fraudulent transfer, or similar Laws.

"Bardin Hill Professional Fee Escrow Guarantee Portion" means the Professional Fee Escrow Amount less the Charlton Professional Fee Escrow Guarantee Portion.

"Battery Tray Business" means the business of designing, engineering, and manufacturing of battery tray products worldwide.

"Bidding Procedures Order" means the Order entered by the Bankruptcy Court on November 19, 2019 [Docket No. 339], governing the bidding procedures for the auction.

3

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the city of New York.

"Business Employees" means all (i) Transferred Subsidiary Employees and (ii) individuals employed by the Sellers immediately prior to the Closing Date who are not Transferred Subsidiary Employees and whose duties relate primarily to the Business regardless of the company payroll on which such individuals are listed.

"Buyer Group" means Buyer, DE Buyer, any Affiliate of Buyer and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns; provided that the Buyer Group shall not include any Seller, any Subsidiary of any Seller or any of their respective former, current or future officers, directors, employees, partners, members, managers, agents, Advisors, Representatives, successors or assigns.

"Buyer Material Adverse Effect" means any event, change, occurrence or effect that would materially and adversely affect the ability of the Buyer to perform its obligations under this Agreement or the Ancillary Agreements or to consummate the transactions contemplated hereby or thereby.

"Cash and Cash Equivalents" means all of any Sellers' cash (including petty cash and checks received on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"Charlton Professional Fee Escrow Guarantee Portion" means $5,000,000.00.

"Claims" means all claims, defenses, cross claims, counter claims, debts, suits, remedies, liabilities, demands, rights, obligations, damages, expenses, rights to refunds, reimbursement, recovery, indemnification or contribution, attorneys' or other professionals' fees and causes of action whatsoever, whether based on or sounding in or alleging (in whole or in part) tort, contract, negligence, gross negligence, strict liability, bad faith, contribution, subrogation, respondeat superior, violations of federal or state securities laws, breach of fiduciary duty, any other legal theory or otherwise, whether individual, class, direct or derivative in nature, liquidated or unliquidated, fixed or contingent, whether at law or in equity, whether based on federal, state or foreign law or right of action, foreseen or unforeseen, mature or not mature, known or unknown, disputed or undisputed, accrued or not accrued, contingent or absolute (including all causes of action arising under Sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws, including fraudulent conveyance claims, and all other causes of action of a trustee or debtor-in-possession under the Bankruptcy Code) or rights of set-off.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the Non-Disclosure Agreement entered into between one or more Sellers and The Charlton Group, Inc. or one of its Affiliates with respect to Sellers and the transactions contemplated hereby.

4

US 167746098v12
US 167746098v16

"Contract" means any contract, agreement, insurance policy, lease, license, sublicense, sales order, purchase order, instrument, or other commitment, that is binding on any Person or any part of its assets or properties under applicable Law.

"Controlled Group Liability" means any and all Liabilities of Sellers and their ERISA Affiliates (a) under Title IV of ERISA, (b) under Section 302 of ERISA, (c) under Sections 412 or 4971 of the Code, (d) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code and (e) under corresponding or similar provisions of foreign laws or regulations.

"Credit Agreement Indebtedness" means all DIP Credit Agreement Indebtedness outstanding as of the Closing Date, including all interest due and owing thereunder and all accrued and unpaid fees and expenses.

"Cure Claims" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Transferred Contracts to be assumed and assigned to the Buyer.

"Customer Purchase Order" means any purchase order from a customer of the Business to purchase products manufactured by or services provided by the Business.

"DE Closing" means the Closing as defined in the DE Purchase Agreement

"DIP Credit Agreement Indebtedness" has the meaning set forth in the Financing Order.

"Employee Benefit Plans" means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Asset Seller or Transferred Subsidiary is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based compensation, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other employment, consulting or other individual agreement, plan, practice, policy, contract, program, and arrangement, in each case, (a) that is sponsored or maintained or contributed to by any Asset Seller or Transferred Subsidiary or any of their Affiliates in respect of any current or former employees, directors, workers, independent contractors, consultants or leased employees of any Asset Seller or Transferred Subsidiary or (b) with respect to which any Asset Seller or Transferred Subsidiary has any actual or contingent Liability (including any such plan or arrangement formerly maintained by any Transferred Subsidiary or any current or former Affiliates thereof).

"Encumbrance" means any charge, claim, mortgage, lien, encumbrance, option, pledge, hypothecation, security interest or similar interest, preemptive right, right of first refusal, conditional sale or title retention agreements or other similar restriction.

US 167746098v12
US 167746098v16

"Environmental Claim" means any action, cause of action, claim, suit, proceeding, investigation, Order, demand or notice by any Person alleging Liability (including Liability for investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Materials; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which liability is imposed under Environmental Laws.

"Environmental Law" means any Law relating to pollution, the protection of, restoration or remediation of the environment or natural resources, or the protection of human health and safety (regarding exposure to Hazardous Materials), including Laws relating to: (a) the exposure to, or Releases or threatened Releases of, Hazardous Materials; (b) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Materials; or (c) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"Environmental Permit" means any Permit required under or issued pursuant to any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and regulations promulgated thereunder.

"ERISA Affiliate" means any entity which is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (c) an affiliated service group (as defined under Section 414(m) of the Code) or (d) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Asset Seller or Transferred Subsidiary.

"Excluded Benefit Plan" means each Employee Benefit Plan sponsored, maintained, contributed to or required to be contributed to by any Asset Seller (a) that is subject to Title IV of ERISA or Section 412 of the Code or to the minimum funding standards of Section 302 of ERISA or that is a nonqualified deferred compensation plan that is linked to any such plan, (b) that is a retiree medical arrangement, (c) that is an equity, equity-based, or phantom incentive plan, or (d) individual employment or offer letter agreements that provide for benefits or severance upon a termination of employment.

"Excluded Subsidiary" means any Subsidiary of the Sellers other than a Transferred Subsidiary.

"Fundamental Representations" means the representations and warranties set forth in Section 3.1, Section 3.2, Section 3.4, Section 3.5 and Section 3.19.

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

6

"<u>Governmental Authority</u>" means any United States or non-United States national, federal, state or local governmental, regulatory or administrative authority, agency, court, tribunal or commission or any other judicial or arbitral body, including the Bankruptcy Court.

"<u>Hazardous Materials</u>" means any material, substance, chemical, or waste (or combination thereof) that (a) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Law relating to pollution, hazardous or toxic waste, or protection of the environment; or (b) forms the basis of any Liability under any Law relating to pollution, hazardous or toxic waste, or protection of the environment.

"<u>Indemnification Arrangements</u>" means any agreement or arrangement to which any Transferred Subsidiary is a party and pursuant to which any present or former director or officer of any Transferred Subsidiary or any agent, Affiliate or Representative of any Transferred Subsidiary receives indemnification from a Transferred Subsidiary, including pursuant a separate Contract (other than insurance policies) but excluding such Transferred Subsidiary's Organizational Documents.

"<u>Intellectual Property</u>" means all intellectual property and intellectual property rights and rights in confidential information of every kind and description throughout the world, including all U.S. and foreign (a) trade names, trademarks and service marks, business names, corporate names, domain names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("<u>Trademarks</u>"); (b) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof ("<u>Patents</u>"); (c) copyrights and copyrightable subject matter (whether registered or unregistered) ("<u>Copyrights</u>"); (d) rights in computer programs (whether in source code, object code, or other form), firmware, software, models, algorithms, methodologies, databases, compilations, data, all technology supporting the foregoing, and all documentation, including user manuals and training materials, programmers' annotations, notes, and other work product used to design, plan, organize, maintain, support or develop, or related to any of the foregoing; (e) confidential or proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies; (f) rights of publicity, privacy rights, and rights to personal information; (g) all rights in the foregoing and in other similar intangible assets; (h) all applications and registrations for any of the foregoing; and (i) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation relating to any of the foregoing.

"<u>Inventory</u>" means all raw materials, works-in-progress, finished goods, supplies, packaging materials and other inventories owned by the Asset Sellers for use primarily in the Business or by the Transferred Subsidiaries.

"<u>IRS</u>" means the Internal Revenue Service of the United States.

"<u>Knowledge</u>" with respect to the Sellers means the actual (but not constructive or imputed) knowledge of Michael Beckett, James Riedy and Jamie Zinser as of the date of this Agreement (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of

7

delivery of such certificate) after reasonable inquiry of such person's direct reports having responsibility for the applicable subject matter.

"Law" means any statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order of any Governmental Authority.

"Lease" means a lease, sublease, license, or other use or occupancy agreement with respect to the real property to which a Transferred Subsidiary is a party as lessee, sublessee, tenant, subtenant or in a similar capacity.

"Leased Real Property" means the leaseholder interests under a Lease.

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any event, change, condition, occurrence or effect that individually or in the aggregate has had, or would reasonably be expected to have, a material adverse effect on (a) the business, properties, liabilities, financial condition or results of operations of the Business, including the Transferred Subsidiaries and the Transferred Assets, taken as a whole, or (b) the ability of the Sellers to consummate the transactions contemplated hereby or thereby, in each case of the preceding clauses (a) and (b), other than any event, change, condition, occurrence or effect to the extent arising out of, attributable to or resulting from, alone or in combination, (i) general changes or developments in the industry in which the Business operates, (ii) changes in general domestic or foreign economic, social, political, financial market or geopolitical conditions (including the existence, occurrence, escalation, outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts, whether or not pursuant to the declaration of an emergency or war), (iii) natural disasters or calamities, including the onset or continuation of any global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Authority), viral outbreak (including the "Coronavirus" or "COVID-19") or any quarantine or trade restrictions related thereto, (iv) changes in any applicable Laws or GAAP or interpretations thereof, (v) the execution, existence, performance, announcement, pendency or consummation of this Agreement or the transactions contemplated hereby, (vi) the pendency of the Bankruptcy Case (and any limitations therein pursuant to the Bankruptcy Code, any Order of the Bankruptcy Court, or the DIP Credit Agreement (or limitations of funding thereunder)) or any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby, (2) the reorganization of the Sellers and any related plan of reorganization or disclosure statement, (3) the Sale Motion, (4) the assumption of any Transferred Contract or (5) any actions approved by the Bankruptcy Court, (vii) any action taken by the Sellers or the Transferred Subsidiaries at the written request of Buyer or that is required by this Agreement, (viii) the identity of Buyer or any of its Affiliates, (ix) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (x) the effect of any action taken by Buyer or its Affiliates with respect to the transactions contemplated by this Agreement or the financing thereof; provided, however, that changes or developments set forth in clauses (i), (ii), (iii) or (iv) may be taken into account in

8

determining whether there has been or is a Material Adverse Effect if such changes or developments have a disproportionate impact on the Business, taken as a whole, relative to the other participants in the industries and markets in which the Business operates. For the avoidance of doubt, the initiation of any criminal investigation or proceeding against any Transferred Subsidiary or insolvency proceeding of any character, including bankruptcy, receivership, reorganization, composition, administration or arrangement with creditors, voluntary or involuntary, of any Transferred Subsidiary or directly with respect to any of their material assets or properties, shall constitute a Material Adverse Effect.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business in the ordinary and usual course consistent with past practice of the Sellers and Transferred Subsidiaries, as such practice and custom is, or may have been, modified as a result of the Bankruptcy Case, in each case subject to (a) the filing of the Bankruptcy Case, (b) any Orders of the Bankruptcy Court, and (c) the conduct of the process as contemplated by the bidding procedures approved by the Bankruptcy Court.

"Organizational Documents" means (i) with respect to any corporation, its certificate or articles of incorporation, its bylaws, and any shareholder or stockholder agreement, (ii) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (iii) with respect to any general partnership, any statement of partnership and its partnership agreement, (iv) with respect to any limited liability company, its certificate of formation or articles of organization and its operating agreement, (v) with respect to any other form of entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and any agreement amongst its members, (vi) any documents equivalent to any of the foregoing applicable to non-U.S. jurisdictions, and (vii) any amendment to any of the foregoing.

"Owned Real Property" means any real property primarily used in the Business that is owned by the Sellers or a Transferred Subsidiary, including all improvements, fixtures and structures thereon and appurtenances belonging thereto.

"Party" or "Parties" means, individually or collectively, the Buyer and the Sellers.

"Permitted Encumbrance" means (a) statutory liens for current Taxes not yet due and payable or the validity or amount of which is being contested in good faith by appropriate proceedings only (i) with respect to the assets of the Transferred Subsidiaries or (ii) to the extent such lien is a Prior Senior Lien under the Final Financing Order (as defined in the DIP Credit Agreement), (b) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the Ordinary Course of Business relating to obligations (i) as to which there is no default on the part of the Seller or the Transferred Subsidiaries, (ii) for a period with respect to amounts not yet overdue (provided that such amounts arising or accruing prior to Closing remain the Sellers' Liabilities) and (iii) that are not individually or in the aggregate material to the continued use, value or operation of the Transferred Assets in the conduct of the Business taken as a whole as currently conducted, or pledges, deposits or other liens securing the performance of

9

bids, trade Contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation), (c) as to any Lease, any Encumbrance affecting solely the interest of the landlord thereunder and not the interest of the tenant thereunder that does not materially impair the value or the current use of such Lease, (d) with respect to the Real Property, minor title defects or irregularities that do not, individually or in the aggregate, materially impair the value or the current use of such Real Property, (e) other exceptions, restrictions, easements, imperfections of title, charges, rights-of-way and encumbrances that do not materially interfere with the use or value of the Owned Real Property subject to such encumbrances, (f) zoning, building codes and other land use Laws regulating the use or occupancy of the Owned Real Property or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over the Owned Real Property which are not violated by the current use or occupancy of such Owned Real Property, and (g) any Encumbrances that will be removed or released by operation of the Sale Order.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Proceeding" means any charge, investigation, audit, complaint, action, suit, arbitration or proceeding by or before any Governmental Authority, other than an Avoidance Action.

"Products" means all products and services, offered, available for offer, or in development by any Asset Seller or Transferred Subsidiary as of Closing, in connection with the Business.

"Qualified Leave Recipient" means any Business Employee who is not a Transferred Subsidiary Employee and who is absent from active employment as of immediately prior to the Closing Date as a result of an approved leave of absence, including (a) those on military leave and family and medical leave, (b) those on other approved leaves of absence, but only to the extent they have reemployment rights under federal or state Law, under any applicable collective bargaining agreement or under any leave of absence policy of the Asset Sellers and (c) those on short-term disability under the Asset Sellers' short-term disability program.

"Real Property" means the Leased Real Property and the Owned Real Property.

"Release" means any release, spill, emission, discharge, leaking, pouring, dumping or emptying, pumping, injection, deposit, disposal, dispersal, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including soil, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the migration of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"Representatives" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Motion" means the motion of the Sellers in the Bankruptcy Case seeking approval of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, the form of which Order is attached hereto as Exhibit A, with such changes as may be required by the Bankruptcy Court that are in form and substance acceptable to the Buyer and the Sellers.

"Seller Related Parties" means Sellers, any Affiliate of Seller, and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, Representatives, holders of equity interests, successors and assigns; provided that the Seller Related Parties shall not include any member of the Buyer Group.

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

"Tax Law" means any statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order of any Governmental Authority relating to Taxes.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, information statement or other information or filing relating to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"Taxes" means (a) any and all U.S. federal, state and local, foreign, and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, unclaimed property, escheat, withholding, payroll, employment, fringe, fringe benefits, excise, estimated, severance, stamp, occupation, premium, property, windfall profits, wealth, net wealth, net worth, export and import fees and charges, registration fees, tonnage, vessel, deposits, or other taxes, fees, assessments, customs, duties, levies, tariffs, imposts, tolls, or charges of any kind whatsoever imposed by any Governmental Authority, together with any interest, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed thereon, with respect thereto, or related thereto, wherever and whenever imposed, (b) any and all liability for the payment of any items described in clause (a) above arising from, through, attributable to, or with respect to a place of business, permanent establishment, or a branch or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary, or other similar group (or being included) in any Tax Return related to such group, (c) any and all liability for the payment of any amounts as a

11

result of any successor or transferee liability, in respect of any items described in clause (a) or (b) above, and (d) any and all liability for the payment of any items described in clause (a) or (b) above as a result of, or with respect to, any express or implied obligation to indemnify any other Person pursuant to any tax sharing, tax indemnity or tax allocation agreement or similar agreement or arrangement with respect to taxes.

"Transferred Subsidiary Benefit Plan" means each Employee Benefit Plan that is solely sponsored or maintained by a Transferred Subsidiary.

"Transferred Subsidiary Employees" means all employees employed by the Transferred Subsidiaries.

"Treasury Regulations" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

Section 1.2    Table of Definitions.  The following terms have the meanings set forth in the Sections referenced below:

| Definition | Location |
| --- | --- |
| Agent | 2 |
| Agreement | 1 |
| Allocation | 23 |
| Antitrust Authority | 48 |
| Applicable Cash | 21 |
| Assigned Benefit Plans | 47 |
| Assignment Agreement | 22 |
| Assumed Liabilities | 18 |
| Balance Sheet Date | 27 |
| Bankruptcy Case | 2 |
| Bankruptcy Code | 1 |
| Bankruptcy Court | 1 |
| Bardin Hill Guarantor | 1 |
| Bardin Hill Guarantors | 1 |
| Business | 1 |
| Buyer | 1 |
| Buyer Plan | 46 |
| Charlton Guarantor | 1 |
| Closing | 21 |
| Closing Date | 21 |
| Contract Documents | 40 |
| Copyrights | 7 |
| Credit Bid Amount | 2 |
| Customer | 40 |
| DASCO | 1 |
| DE Business | 1 |
| DE Buyer | 1 |

12

DE Purchase Agreement ................................................................................................................ 1
Designated Buyer ....................................................................................................................... 23
DIP Credit Agreement .................................................................................................................. 2
Disclosure Limitations ............................................................................................................... 43
Disclosure Schedules ................................................................................................................. 24
Dura Fremont ................................................................................................................................ 1
Dura GP ......................................................................................................................................... 1
Dura Mex LLC ............................................................................................................................... 1
Dura México ............................................................................................................................... 20
Dura Operating .............................................................................................................................. 1
Employment Offer ...................................................................................................................... 45
Encumbered Assets ....................................................................................................................... 2
Enforceability Exceptions .......................................................................................................... 25
Estate Professionals .................................................................................................................... 55
Excluded Assets .......................................................................................................................... 17
Foreign Competition Laws ......................................................................................................... 25
Guarantor ....................................................................................................................................... 1
Guarantors ...................................................................................................................................... 1
HSR Act ...................................................................................................................................... 25
IP Assignment Agreement .......................................................................................................... 22
IP License .................................................................................................................................... 53
Items ............................................................................................................................................ 40
Legal Restraint ............................................................................................................................ 55
México Closing ........................................................................................................................... 20
México Condition ....................................................................................................................... 20
NAMP ............................................................................................................................................ 1
Noncompete ................................................................................................................................ 53
Obligations .................................................................................................................................. 40
OEMs ........................................................................................................................................... 40
Outside Date ............................................................................................................................... 58
Patents ........................................................................................................................................... 7
Permits ........................................................................................................................................ 29
Pro Rata Portion ......................................................................................................................... 60
Professional Fee Claims ............................................................................................................. 55
Professional Fee Escrow Account .............................................................................................. 55
Professional Fee Escrow Amount ............................................................................................... 56
Purchase Price ............................................................................................................................ 21
Registered IP ............................................................................................................................... 32
Securities Act .............................................................................................................................. 38
Seller .............................................................................................................................................. 1
Seller Financial Statements ........................................................................................................ 27
Seller Parent .................................................................................................................................. 1
Sellers ............................................................................................................................................ 1
Shared Assets .............................................................................................................................. 16
Specified Persons ........................................................................................................................ 15
Trademarks ..................................................................................................................................... 7

13

Transfer Taxes ................................................................................................................. 54
Transferred Assets ........................................................................................................... 14
Transferred Contracts....................................................................................................... 15
Transferred Employee....................................................................................................... 45
Transferred Stock............................................................................................................... 1
Transferred Subsidiaries ................................................................................................... 1
Transition Services Agreement....................................................................................... 53

# ARTICLE II.
# PURCHASE AND SALE

Section 2.1    Purchase and Sale.  Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, upon the terms and subject to the conditions of this Agreement, at the Closing, the Sellers shall sell, assign, transfer, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to the Buyer, and Buyer shall purchase, all right, title and interest of Sellers, in, to or under the Transferred Assets free and clear of any and all Encumbrances (other than Permitted Encumbrances).  Subject in all cases to Section 5.2(b), "Transferred Assets" shall mean all right, title and interest of the Asset Sellers to or under the properties and assets of the Asset Sellers related primarily to the Business, of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, including all right, title and interest of the Asset Sellers in, to or under the following to the extent related primarily to the Business (but excluding in each case any Excluded Assets):

(a)    all rights, claims or causes of action of the Asset Sellers against any party arising out of events occurring prior to the Closing related primarily to the Business, including, for the avoidance of doubt, arising out of events occurring prior to the commencement of the Bankruptcy Case, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to the Asset Sellers, in each case, relating to the Business or the Transferred Subsidiaries;

(b)    subject to Section 6.6, all of the rights, claims or causes of action of the Asset Sellers of any kind, including those available under the Bankruptcy Code, against any party, including any officer, director, employee, manager or Affiliate of, or lender to, any Asset Seller or Transferred Subsidiary or any of their respective Affiliates (other than any Transferred Subsidiaries (as defined in the DE Purchase Agreement)) (and the proceeds of any insurance policies related to any such rights, claims or causes of action) arising at any time prior to the Closing; provided that any rights, claims or causes of action included in this Section 2.1(b) shall not include any such rights or claims arising in the ordinary course of the operation of the DE Business or that constitute "Transferred Assets" pursuant to the DE Purchase Agreement; provided further that neither the Buyer nor any Person claiming by, through or on behalf of the Buyer (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence an Action based on, assert, sell, convey, assign or file any Claim that relates to any rights, claims or causes of action transferred under this Section 2.1(b) against any Asset Seller, or any officer, director, employee, manager, adviser, or other Representative of any Asset Seller or Transferred Subsidiary (in each case, other than Lynn Tilton, or any other director or officer of an Asset Seller or Transferred Subsidiary who is or has been a director,

14

officer, equityholder, manager, Affiliate, member or Representative of Patriarch Partners, LLC or any of its Affiliates (Dura Automotive Systems, LLC and its Subsidiaries shall not be included in the definition of Affiliates of Patriarch Partners, LLC for purposes of this Section 2.1(b) and Section 6.6 only) (the "Specified Persons") and nothing herein shall limit the right of the Buyer (or any assignee or transferee thereof) to bring any claims or causes of action against a Specified Person);

(c)     all Leased Real Property relating to the Business and all Leases underlying such Leased Real Property;

(d)     all Owned Real Property;

(e)     all tangible property, accounts, machinery, equipment, Inventory and tenant improvements, in each case, relating primarily to the Business, including such assets that are located at or associated with the facilities of the Business;

(f)     all IT, and related systems and equipment, relating primarily to the Business;

(g)     (i) Accommodation Agreements, (ii) Customer Purchase Orders, (iii) the Contracts identified by the Buyer in a written notice delivered to Seller Parent prior to the Closing, and (iv) all collective bargaining agreements (collectively this Section 2.1(g), the "Transferred Contracts"); provided that any applicable Cure Claims shall either be waived by the contract counterparty or paid by or on behalf of Buyer or its designee in an amount and on terms agreed upon between the Buyer and contract counterparty;

(h)     subject to the IP License, (i) all Intellectual Property (other than Trademarks) relating primarily to the Business, (ii) all Trademarks owned, held for use in, or registered or applied to be registered in Canada, the United States or Mexico and relating primarily to the Business, including in respect of Products, and (iii) social media accounts and domain names relating primarily to the Business;

(i)     all goodwill associated with the Transferred Assets, Transferred Subsidiaries or the Business;

(j)     subject to Section 2.2(f), all credits, prepaid expenses, security deposits, other deposits, prepaid assets or charges, rebates and setoffs of the Business, including all deposits of Sellers as security for rent, electricity, telephone, bonds or other sureties or other expenses (including all prepaid rent and all prepaid charges, expenses and rent under any personal property leases);

(k)     all bank and lock box accounts of the Business;

(l)     all account receivables of the Business and all cash receipts received from customers of the Business after the Closing;

(m)     all books and records related primarily to the Business or to the extent related to any other Transferred Asset;

15

(n)     all personnel files for Transferred Employees except as prohibited by Law; provided, however, that Sellers have the right to retain copies at Sellers' expense to the extent required by Law;

(o)     all telephone and facsimile numbers of the Business and all email addresses of customers and suppliers of the Business;

(p)     all Permits held by Sellers and relating primarily to the Business, but only to the extent such Permits may be transferred under applicable Law;

(q)     any other assets and properties of the Sellers relating primarily to the Business or the rights, claims and causes of action described in Section 2.1(b); provided that the Parties agree to act (and to cooperate with DE Buyer) in good faith and use commercially reasonable efforts (i) to identify with more particularity and set forth on Section 2.1(q) of the Disclosure Schedules prior to Closing such assets and properties (including Intellectual Property) of the Sellers that are used primarily in the Business, (ii) to identify such assets and property as may be "shared assets" (e.g., assets used to a similar extent or relating to common customers, suppliers, or other business relations and Intellectual Property) ("Shared Assets") between the Business and the DE Business and determine the appropriate ownership thereof or other arrangements with respect thereto, and (iii) to enter into arrangements such that Buyer may have access to and/or use of Excluded Assets and/or such Shared Assets and DE Buyer may have access to and/or use of Transferred Assets and/or such Shared Assets, in each case, as may be reasonably necessary in connection with their respective businesses;

(r)     the Transferred Stock;

(s)     any amounts owing from any Transferred Subsidiary to Sellers;

(t)     all rights and obligations under or arising out of all insurance policies (except as set forth in Section 2.2(h)) relating to the Business or any of the Transferred Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to any Seller, with respect to any cancelled insurance policies);

(u)     all assets under each Transferred Subsidiary Benefit Plan (to the extent assets under such plans are held by the Asset Sellers) and each Assigned Benefit Plan, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts) but, in each case, excluding each Excluded Benefit Plan;

(v)     all bank account(s) of the Asset Sellers (other than the Professional Fee Escrow Account and one (1) additional bank account of the Sellers to be mutually agreed for the Sellers' estate to use in connection with wind-down); and

(w)     all Tax refunds, rebates, credits, abatements or recoveries (together with interest due thereon or penalty rebate arising therefrom) or claims thereto, and Tax attributes of the Asset Sellers applicable to Tax jurisdictions in Canada, the United States, Mexico, China and Japan that are transferrable pursuant to applicable Tax Law.

Section 2.2    <u>Excluded Assets</u>.    Notwithstanding anything contained in <u>Section 2.1</u> to the contrary, but subject in all cases to <u>Section 5.2(b)</u>, the Asset Sellers are not selling, and the Buyer is not purchasing, any right, title or interest in, to or under the following assets of the Asset Sellers, all of which shall be retained by the Asset Sellers (collectively, the "<u>Excluded Assets</u>"):

(a)    all assets expressly excluded or excepted from the definition of Transferred Assets pursuant to <u>Section 2.1</u>;

(b)    the Asset Sellers' documents, written files, papers, books, reports and records (i) prepared in connection with this Agreement or the transactions contemplated hereby, (ii) relating to the Bankruptcy Case and not relating to the Business or (iii) that any Asset Seller is required by Law to retain; <u>provided</u> that Buyer shall be entitled to copies of all or any portions of such documents;

(c)    (i) Intellectual Property relating primarily to the Battery Tray Business and (ii) subject to the IP License, (1) Intellectual Property (other than Trademarks) relating primarily to the DE Business, and (2) all Trademarks owned, held for use in, or registered or applied to be registered in Europe, India or Brazil and relating primarily to the DE Business;

(d)    all rights, claims and causes of action to the extent relating to any Excluded Asset (and not relating to any Transferred Asset);

(e)    shares of capital stock or other equity interests of any Asset Seller or any Subsidiary that is not a Transferred Subsidiary or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Asset Seller or any Subsidiary that is not a Transferred Subsidiary;

(f)    all retainers or similar prepaid amounts paid to the accountants, attorneys, consultants, advisors, investment bankers or other professional service providers of the Sellers;

(g)    the assets of the Asset Sellers listed in <u>Section 2.2(g)</u> of the Disclosure Schedules;

(h)    all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case, solely to the extent payable to or on behalf of, or in respect of amounts payable by any Seller or Subsidiary of and Seller to, any individuals covered by such policies;

(i)    each Contract of any Seller that is not a Transferred Contract;

(j)    all books and records (i) to the extent related to any of the other Excluded Assets or Liabilities of the Sellers other than Liabilities assumed by the Buyer pursuant to <u>Section 2.3</u>; (ii) all minute books, Organizational Documents, stock registers and such other books and records of any Seller or any Excluded Subsidiary, as pertaining to ownership, organization or existence of such Seller or Excluded Subsidiary, Tax Returns (and any related work papers) of any Seller or any Excluded Subsidiary, and corporate seal of any Seller or any Excluded Subsidiary;

17

and (iii) that any Seller is required by Law to retain; <u>provided</u> that, to the extent not prohibited by applicable Law, Buyer shall have the right to make copies of any portions of such documents;

(k)    all books and records prepared or received by any Seller or any of its Affiliates or Representatives relating to the sale (or potential sale) of the Transferred Assets and/or the Excluded Assets (whether to Buyer or any other Person(s)), this Agreement, or the transactions contemplated hereby, including (i) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets and (ii) all privileged materials, documents and records of a Seller or any of its Affiliates; <u>provided</u> that any privileged materials, documents and records of any Transferred Subsidiaries shall continue to be property of such Transferred Subsidiaries and shall not be Excluded Assets (or Transferred Assets) hereunder;

(l)    all Tax refunds and Tax attributes of the Asset Sellers that are not transferred by the operation of applicable Tax Law, except for Tax refunds and Tax attributes applicable to Tax jurisdictions in Canada, the United States and Mexico (but not in Europe, India and Brazil) that are transferrable pursuant to applicable Tax Law;

(m)    all Cash and Cash Equivalents;

(n)    all Transferred Assets (as defined in the DE Purchase Agreement);

(o)    all assets under any Excluded Benefit Plan, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts); and

(p)    all rights of the Asset Sellers under this Agreement and the Ancillary Agreements.

Section 2.3    <u>Assumed Liabilities</u>.  In connection with the purchase and sale of the Transferred Assets pursuant to this Agreement, but subject in all cases to <u>Section 5.2(b)</u>, at the Closing, the Buyer shall assume and pay, discharge, perform or otherwise satisfy only the following Liabilities (the "<u>Assumed Liabilities</u>"):

(a)    all Liabilities of the Asset Sellers under the Transferred Contracts and the transferred Permits that are to be performed on or after, or in respect of periods following, the Closing, <u>provided</u> that, for the avoidance of doubt, in no event shall the Buyer assume any Liability related to any warranty claim under any Accommodation Agreement, Customer Purchase Order or Transferred Contract to the extent such claim arises out of actions or omissions occurring prior to the Closing;

(b)    all Liabilities relating to or arising out of the ownership and operation of the Transferred Assets or the Business from and after the Closing;

(c)    trade and vendor accounts payable incurred in the Ordinary Course of Business between October 17, 2019 and the Closing for vendors continuing to provide goods and services to the Business from and after Closing;

(d)    Liabilities for all unpaid fees payable under 28 U.S.C. § 1930(a);

18

(e)        all Cure Claims associated with Transferred Contracts that are agreed to by Buyer;

(f)        any Liabilities of the Sellers for any amounts owing to any Transferred Subsidiary;

(g)        all Liabilities arising out of, resulting from, or relating to (i) the employment or termination of employment of the Transferred Employees by Buyer or its Affiliates following the Closing Date or (ii) any Transferred Subsidiary Benefit Plans or Assigned Benefit Plans, including sponsorship thereof, in the case of either (i) or (ii), excluding any Controlled Group Liability;

Section 2.4    Excluded Liabilities.  Subject in all cases to Section 5.2(b), Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, the Sellers or relating to the Transferred Assets or the Transferred Subsidiaries, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, except for the Assumed Liabilities.  Notwithstanding the foregoing, Buyer hereby acknowledges and agrees that no Liability of any Transferred Subsidiary shall be an excluded Liability pursuant to the immediately preceding sentence and that all Liabilities of any Transferred Subsidiary as of the Closing shall continue to be the Liabilities of such Transferred Subsidiary following the Closing except to the extent Buyer acquires, pursuant to Section 2.1(s), the right to any such Liability and subsequently cancels, settles, or otherwise terminates or amends such Liability with such Transferred Subsidiary.

Section 2.5    Consents to Certain Assignments or Transfers.

(a)        Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, this Agreement and the Ancillary Agreements shall not constitute an agreement to transfer or assign any asset, permit, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any agreement or Law to which any Seller is a party or by which it is bound, or materially and adversely affect the rights of the Sellers or, upon transfer, the Buyer under such asset, permit, claim or right, unless the applicable provisions of the Bankruptcy Code permits and/or the Sale Order authorizes the assumption and assignment of such asset, permit, claim, or right irrespective of the consent or lack thereof of a third party.  If, with respect to any Transferred Asset, such consent is not obtained or such assignment is not attainable pursuant to the Bankruptcy Code or the Sale Order, then such Transferred Asset shall not be transferred hereunder, and the Closing shall proceed with respect to the remaining Transferred Assets and the Sellers shall, through the earlier of such time as such consent or assignment is so obtained and six (6) months following the Closing (or the remaining term of any such binding agreement or the closing of the Bankruptcy Case, if shorter), use their reasonable best efforts, and the Buyer shall cooperate with the Sellers, to obtain any such consent and to resolve the impracticalities of assignment after the Closing.

19

(b)      If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the reasonable best efforts of the Sellers, any consent is not obtained prior to Closing and as a result thereof the Buyer shall be prevented by a third party from receiving the rights and benefits with respect to a Transferred Asset intended to be transferred hereunder or (ii) any Transferred Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Sellers shall, until the closing of the Bankruptcy Case and subject to any approval of the Bankruptcy Court that may be required and at the request of the Buyer, cooperate with Buyer in any lawful and commercially reasonable arrangement under which the Buyer would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer.  Sellers or Seller Parent shall as promptly as practicable pay to the Buyer when received all monies received by the Asset Sellers attributable to such Transferred Asset from and after the Closing Date, and Buyer shall pay, or cause to be paid, all monetary amounts due with respect to (and in accordance with any applicable terms of) such Transferred Asset from and after the Closing Date.

(c)      In the event that the condition set forth in <u>Section 8.1(b)</u>, to the extent applicable as a matter of the Antitrust Laws of Mexico (the "<u>México Condition</u>"), is not satisfied with respect to Dura de México, S.A. de C.V. and Autopartes Excel de México S.A. de C.V., corporations organized under the laws of Mexico and each a Transferred Subsidiary (jointly referred to as "<u>Dura México</u>"), and the applicable Governmental Authority(ies) in Mexico at the time that the Closing is otherwise to occur in the accordance with the terms and conditions of this Agreement, the Parties shall otherwise proceed with the Closing in all respects in accordance with this Agreement without any reduction in the Purchase Price or the Professional Fee Escrow Amount, except that:

(i)      the Transferred Stock and/or Transferred Assets (if any and as applicable) of Dura México will not be transferred to the Buyer, either directly or indirectly, until such time as the México Condition is satisfied;

(ii)      the Parties will continue to use their reasonable best efforts to satisfy the México Condition with respect to Dura México in accordance with this Agreement;

(iii)      as promptly as possible following the satisfaction of the México Condition, the Parties will cause the Transferred Stock and/or Transferred Assets (if any and as applicable) of Dura México and any remaining Applicable Cash to be transferred to Buyer (the "<u>México Closing</u>") and no additional consideration shall be delivered by the Buyer at the México Closing;

(iv)      until the México Closing, Sellers will cause Dura México to, and Buyer will, cooperate with each other such that Dura México and Buyer will continue to operate, interact, and provide each other services in a manner consistent in all material respects with the operation of the Business as of the date hereof, it being understood that until satisfaction of the México Condition, the Buyer and Dura México shall continue to operate otherwise independently and nothing shall confer the Buyer the right to manage, even indirectly, the business of Dura

20

México (including determining the commercial strategies and day-to-day business decisions of Dura México);

(v)     until the México Closing, (A) Sellers shall continue to receive and collect the cash proceeds of the businesses of Dura México (the "Applicable Cash") in the Ordinary Course of Business and shall segregate the Applicable Cash from any other assets of Sellers, and (B) solely to the extent of the Applicable Cash from time to time, Sellers shall continue to fund the cash needs of the businesses of Dura México consistent in all material respects (but only to the extent of Applicable Cash) with past practice, it being understood that Sellers shall have no obligation to provide any funding to Dura México other than with and only to the extent of actual Applicable Cash from time to time and that Applicable Cash will not be used by Sellers for any other purpose; and

(vi)     if at any time from time to time the Applicable Cash proceeds are insufficient to fund the cash needs of Dura México as contemplated by Section 2.5(c)(v), Sellers and Buyer shall consult in good faith to determine potential arrangements for funding such cash needs; provided that the decision to participate in, provide, and/or accept any such arrangements shall be made at the sole discretion of each of Sellers, Buyer, and Dura México, with no such Person having any obligation or control with respect to any other such Person regarding such decisions and without any such decisions conferring any rights over, or ability to interfere with, the business of Dura México.

Section 2.6    Consideration.  The consideration for the sale and transfer of the Transferred Stock and the other Transferred Assets from the Sellers to the Buyer (collectively, the "Purchase Price") shall be (a) the Credit Bid Amount, (b) the assumption of the Assumed Liabilities, (c) the payment by or on behalf of Buyer or its designee of the Professional Fee Escrow Amount and (d) satisfaction by or on behalf of Buyer or its designee of Cure Claims to be paid, if any, hereunder.

Section 2.7    Closing.

(a)     The sale and purchase of the Transferred Stock and the other Transferred Assets contemplated by this Agreement shall take place at a closing (the "Closing") to be held by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 300 North LaSalle Drive, Chicago, Illinois 60654) at 10:00 a.m. Central Time on the fourth (4th) Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of all conditions to the obligations of the Parties set forth in Article VII (other than such conditions as may, by their terms, only be satisfied at the Closing or on the Closing Date, but subject to the satisfaction or waiver of such conditions), or at such other place or at such other time or on such other date as the Sellers and the Buyer mutually may agree in writing.  The day on which the Closing takes place is referred to as the "Closing Date."

(b)     At or prior to the Closing, the Sellers shall deliver or cause to be delivered to the Buyer:

21

(i)    the bill of sale, assignment and assumption agreement substantially in the form of <u>Exhibit B</u> (the "<u>Assignment Agreement</u>"), duly executed by the applicable Sellers;

(ii)    an intellectual property assignment agreement in customary form for recordation with the applicable Governmental Authority and reasonably acceptable to Buyer and Sellers (the "<u>IP Assignment Agreement</u>"), duly executed by the applicable Sellers;

(iii)    a certified copy of the Sale Order;

(iv)    certificates evidencing the Transferred Stock, duly endorsed in blank (or with stock powers in form and substance reasonably satisfactory to Buyer, acting in good faith, duly executed by the Sellers), or instruments of transfer reasonable and customary for the jurisdiction applicable to such Transferred Stock, in each case free and clear of all Encumbrances (except for Encumbrances under applicable securities Laws);

(v)    to the extent a Seller (as determined for U.S. federal income Tax purposes) is a "United States person" within the meaning of Section 7701(a)(30) of the Code, such Seller shall deliver a certificate to Buyer satisfying the requirements of Treasury Regulations Section 1.1445-2(b);

(vi)    an Internal Revenue Service Form W-9, duly executed by Seller Parent;

(vii)    possession of each Owned Real Property, together with quitclaim deeds in recordable form for all Owned Real Property conveying the Owned Real Property subject only to Permitted Encumbrances duly executed by the applicable Sellers such ordinary and customary documents (including customary affidavits) as may be reasonably required by any title company or title insurance underwriter to enable Buyer to obtain customary title policies insuring Buyer's fee simple title to the Owned Real Property (without expanding or supplementing any of the representations and warranties hereunder or Buyer's remedies with respect thereto);

(viii)    such other documents as Buyer may reasonably request that are not inconsistent with the terms of this Agreement and reasonably necessary to effectuate or consummate the transactions contemplated by this Agreement (without expanding or supplementing any of the representations and warranties hereunder or Buyer's remedies with respect thereto); and

(ix)    a duly executed certificate of a duly authorized officer of Seller Parent certifying the satisfaction of the conditions set forth in <u>Section 8.3(a)</u>, <u>Section 8.3(b)</u> and <u>Section 8.3(c)</u>.

(c)    At or prior to the Closing, the Buyer shall deliver or cause to be delivered to the Sellers:

(i)    the Assignment Agreement, duly executed by the Buyer;

(ii)    the IP Assignment Agreement, duly executed by the Buyer;

(iii)    satisfaction of the Purchase Price as to the Credit Bid Amount by discharging Sellers, and Sellers shall be deemed to be discharged, from the DIP Credit Agreement Indebtedness in an aggregate amount equal to the Credit Bid Amount;

(iv)    funding of the Professional Fee Escrow Amount in accordance with Section 8.2(c);

(v)    such other documents as Seller Parent may reasonably request that are not inconsistent with the terms of this Agreement and reasonably and necessary to effectuate or consummate the transactions contemplated by this Agreement (without expanding or supplementing any of the representations and warranties hereunder or Sellers' remedies with respect thereto); and

(vi)    a duly executed certificate of an executive officer of the Buyer certifying the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b).

Section 2.8    Tax Allocation.  The portion of the Purchase Price paid to any Seller (plus any other amounts, to the extent properly taken into account under the Code), shall be allocated among the applicable Transferred Assets and the applicable Transferred Stock (and, to the extent necessary under applicable Tax Law, to the assets of any applicable Transferred Subsidiary) in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (any such allocation, an "Allocation").  Each Allocation shall be prepared by the Buyer and delivered to the Sellers as promptly as reasonably practicable following the Closing Date.  The Buyer and the Sellers agree to, and to cause their respective Affiliates to, (a) timely file with each relevant Governmental Authority all forms and Tax Returns required to be filed in connection with the applicable Allocation, (b) be bound by the applicable Allocation for the purpose of determining Taxes, (c) prepare and file, and cause their respective Affiliates to prepare and file, all Tax Returns on a basis consistent with the applicable Allocation, and (d) not take any position, or cause their respective Affiliates to take any position, inconsistent with the applicable Allocation in any Tax Return, in any audit or proceeding relating to Taxes before any Governmental Authority or in any report made for Tax purposes; provided, however, that notwithstanding anything in this Section 2.8 to the contrary, each of the Parties shall be permitted to settle, solely on its own behalf, any Tax audit or proceeding on terms proposed by a Governmental Authority or take a position inconsistent with the applicable Allocation if required to do so by a determination within the meaning of Section 1313 of the Code.

Section 2.9    Designated Buyer(s).

(a)    In connection with the Closing, without limitation by the terms of Section 10.15, the Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.9, one (1) or more Affiliates to exercise certain of the Buyer's rights and assume certain of the Assumed Liabilities, including to (i) purchase specified Transferred Stock or Transferred Assets (including specified Transferred Contracts) and pay the Cure Claims, as applicable, (ii) assume specified Assumed Liabilities, and/or (iii) employ specified Transferred Employees on and after the Closing Date (any such Affiliate of the Buyer that shall be properly designated by the Buyer in accordance with this Section 2.9, a "Designated Buyer"); provided that no such designation would impede or materially delay the Closing or affect the

23

timely receipt of any regulatory approval.  At and after the Closing, the Buyer shall, or shall cause its Designated Buyer(s) to, honor the Buyer's obligations at the Closing.  After the Closing, any reference to the Buyer made in this Agreement in respect of any purchase, assumption or employment referred to in this Agreement shall include reference to the appropriate Designated Buyer(s), if any.  After the Closing, all obligations of the Buyer and its Designated Buyer(s) under this Agreement shall be several and not joint and the only Party with Liability as to a particular Assumed Liability is the Buyer or the Designated Buyer assuming such obligation at the Closing and no other Buyer or Designated Buyer.

(b)    The designation of a Designated Buyer in accordance with Section 2.9(a) shall be made by the Buyer by way of a written notice to be delivered to the Sellers in no event later than two (2) Business Days prior to Closing, which written notice shall (i) contain appropriate information about the Designated Buyer(s), (ii) indicate which Transferred Subsidiaries, Transferred Assets, Assumed Liabilities and Transferred Employees the Buyer intends such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder and (iii) include a signed counterpart to this Agreement pursuant to which the Designated Buyer(s) agree to be bound by the terms of this Agreement as it relates to such Designated Buyer(s) and which authorizes the Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder. Notwithstanding the foregoing, prior to the consummation of the Closing, Buyer shall not undertake a designation pursuant to Section 2.9(a) unless in connection therewith Buyer assigns to such Designated Buyer(s) the necessary right and authority to make and satisfy the Credit Bid Amount.

Section 2.10   Exclusion of Transferred Assets.  At any time on or prior to the Closing, the Buyer may, in its discretion effective upon written notice to the Sellers designate any of the Transferred Assets (including any Transferred Contract) as additional Excluded Assets, which notice shall set forth in reasonable detail the Transferred Asset(s) so designated; provided that there shall be no reduction in the Purchase Price if the Buyer elects to designate any Transferred Asset as an Excluded Asset.  Notwithstanding any other provision hereof, the Liabilities of the Sellers under or related to any Transferred Asset excluded under this paragraph will remain Liabilities of the Sellers.

Section 2.11   Withholding.  Notwithstanding anything in this Agreement to the contrary, the Buyer and any Affiliate or agent of the Buyer shall be entitled to deduct and withhold from any amount (or portion thereof) payable under this Agreement such Taxes as may be required to be deducted and withheld from such amount under the Code or any other applicable provision of U.S. or foreign Tax Law.  To the extent that any amounts are so deducted or withheld, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

# ARTICLE III.
# REPRESENTATIONS AND WARRANTIES
# OF THE SELLERS

Except as set forth in the Disclosure Schedules attached hereto (collectively, the "Disclosure Schedules"), each of the Sellers jointly and severally represents and warrants to the Buyer as follows:

24

Section 3.1    <u>Organization</u>.  Each Seller and each Transferred Subsidiary (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

Section 3.2    <u>Authority</u>.  Subject to required Bankruptcy Court approvals, (a) each Seller has the corporate (or equivalent) power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, (b) the execution, delivery and performance by such Seller of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate (or equivalent) action and (c) this Agreement has been, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will have been, duly executed and delivered by such Seller and, assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which such Seller will be a party will constitute, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law) (the "<u>Enforceability Exceptions</u>").

Section 3.3    <u>No Conflict; Required Filings and Consents.</u>

(a)    Except as set forth on <u>Section 3.3(a)</u> of the Disclosure Schedule and assuming that (w) requisite Bankruptcy Court approvals are obtained, (x) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Section 3.3(b)</u> of the Disclosure Schedule are made, given or obtained (as applicable), (y) the requirements of the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>"), and any other applicable antitrust, competition or merger control Laws promulgated by any Governmental Authority ("<u>Foreign Competition Laws</u>") are complied with, and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by the Sellers of this Agreement and the consummation by the Sellers of the transactions contemplated hereby, do not: (i) violate the Organizational Documents of the Sellers or the Transferred Subsidiaries; (ii) violate any Law applicable to the Sellers or the Transferred Subsidiaries or by which any Transferred Asset or any property or asset of the Transferred Subsidiaries is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance) on any Transferred Asset under, any Transferred Contract or any Contract to which any Transferred Subsidiary is party; except, in each

US 167746098v12
US 167746098v16

case, for any such violations, breaches, defaults or other occurrences that are not material to the Business or the Transferred Subsidiaries taken as a whole.

(b)     Except as set forth on Section 3.3(b) of the Disclosure Schedule, no Seller nor any Transferred Subsidiary is required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Sellers of this Agreement or the consummation by the Sellers of the transactions contemplated hereby, except (i) requisite Bankruptcy Court approvals, (ii) any filings required to be made under the HSR Act and any Foreign Competition Laws, (iii) such filings as may be required by any applicable federal or state securities or "blue sky" Laws, (iv) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not material to the Business taken as a whole, or (v) as may be necessary as a result of any facts or circumstances relating to Buyer or any of its Affiliates.

Section 3.4     Transferred Assets; Sufficiency of Assets.    Subject to requisite Bankruptcy Court approvals and except as a result of the commencement of the Bankruptcy Case:

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Business, each Asset Seller, as applicable, has indefeasible title to, and owns and possesses all rights and interests in, including the right to use, each of the Transferred Assets, or with respect to leased Transferred Assets, valid leasehold interests in, or with respect to licensed Transferred Assets, valid licenses to use.

(b)     This Agreement and the instruments and documents to be delivered by the Sellers to the Buyer at the Closing shall be adequate and sufficient to transfer (i) Asset Sellers' entire right, title and interest in and to the Transferred Assets and (ii) to the Buyer, good title to the Transferred Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), claims and interests, other than Assumed Liabilities, subject to entry of the Sale Order.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business taken as a whole and except for any Business Employees that do not become Transferred Employees, the Transferred Assets to be conveyed to the Buyer hereunder at Closing, together with the services to be provided to the Buyer under the Transition Services Agreement, the IP License, and the properties, rights and other assets and personnel owned, leased or employed by the Transferred Subsidiaries constitute (i) all the properties, rights and other assets and personnel necessary, and are sufficient, to carry on the Business as it is currently conducted by the Asset Sellers and the Transferred Subsidiaries and (ii) except for the Excluded Assets, all of the assets owned by the Sellers or any of their Subsidiaries, including the Transferred Subsidiaries, held for use by the Asset Sellers and their Subsidiaries primarily in the conduct of the Business.

Section 3.5     Transferred Subsidiaries.

(a)     To the extent such legal concepts exist in the applicable jurisdiction, each Transferred Subsidiary is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.

26

(b)      All of the outstanding shares of capital stock of (or comparable interest in) each Transferred Subsidiary (i) are owned directly or indirectly by Seller Parent, (ii) are free and clear of any Encumbrance (other than Permitted Encumbrances) and (iii) have been validly issued and are fully paid and, as applicable, non-assessable.  Section 3.5(b) of the Disclosure Schedule lists all of the Transferred Subsidiaries and the outstanding shares of capital stock or voting securities of, or other equity securities therein and, in each case, the owner(s) thereof.  There are no accumulated but unpaid dividends or distributions with respect to any of the Transferred Stock. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Transferred Stock (other than this Agreement) obligating any Seller or any Transferred Subsidiary to issue or sell any shares of capital stock of, or any other comparable interest in, a Transferred Subsidiary (other than this Agreement).  No Transferred Subsidiary owns, directly or indirectly, any capital stock, membership interest, partnership interest, joint venture interest or other equity interest in any other Person (other than a Transferred Subsidiary).  There are no voting trusts or other agreements or understandings with respect to the equity interests of the Transferred Subsidiaries.

(c)      No insolvency proceeding of any character, including bankruptcy, receivership, reorganization, composition, administration or arrangement with creditors, voluntary or involuntary, of any Transferred Subsidiary or directly with respect to any of their assets or properties, is pending or, to the Knowledge of the Sellers, threatened.  No Seller and no Transferred Subsidiary has taken any action in preparation for the institution of any such insolvency proceedings, and the execution, delivery and performance by the Sellers of this Agreement and the consummation by the Sellers of the transactions contemplated hereby, do not, and will not, result in or give rise to any rights or claims with respect to any such insolvency proceeding.

(d)      A copy of each Organizational Document or Indemnification Arrangement has been provided to the Buyer prior to the date of this Agreement.  No Organizational Document or Indemnification Arrangement of any Transferred Subsidiary has been amended, modified, terminated or otherwise revised in any respect, and no new Organizational Documents have been adopted and no new Indemnification Arrangements have been entered into, in all cases since December 31, 2017.  The Transferred Subsidiaries are not party to any Indemnification Arrangement.

Section 3.6      Financial Statements; No Undisclosed Liabilities.

(a)      (i) The audited consolidated balance sheets of Seller Parent as of December 31, 2018 and 2017, together with the related consolidated statements of income, stockholders' equity and cash flows ended December 31, 2018 and 2017 (provided that there is no signed auditor letter with respect to the 2018 audit), (ii) unaudited consolidated balance sheets of Seller Parent as of December 31, 2019, together with the related consolidated statements of income, stockholders' equity and cash flows ended December 31, 2019, and (iii) the unaudited consolidated balance sheets of Seller Parent as of February 29, 2020 (the "Balance Sheet Date"), together with the related consolidated statements of income, stockholders' equity and cash flows for the two months ended February 29, 2020 ((i), (ii) and (iii) collectively, the "Seller Financial Statements") have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects

27

the consolidated financial position of Seller Parent and its Subsidiaries and the Business at the respective dates thereof and the results of their operations and cash flows for the periods indicated.

(b)    No Transferred Subsidiary nor any of their Subsidiaries has any Liabilities, whether required by GAAP to be disclosed or reflected on or reserved against a consolidated balance sheet (or the notes thereto) of Seller Parent and its Subsidiaries, except for Liabilities (i) reflected or reserved against in the Seller Financial Statements, (ii) incurred in the Ordinary Course of Business since the Balance Sheet Date, (iii) incurred pursuant to the transactions contemplated by this Agreement and (iv) that have not, or would not reasonably be expected to have, a Material Adverse Effect.

Section 3.7    <u>Absence of Certain Changes or Events</u>.  Since the Balance Sheet Date through the date of this Agreement, there has not (i) been any event, change, condition, occurrence or effect that, individually or in the aggregate, has had, or would be reasonably expected to have, a Material Adverse Effect or (ii) without limiting the generality of the foregoing, except (x) for the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Transferred Assets, the negotiation and execution of this Agreement, (y) for the preparation and commencement of the Bankruptcy Case and Sellers' debtor-in-possession financing in the Bankruptcy Case, or (z) as set forth on <u>Section 3.7</u> of the Disclosure Schedule or as expressly contemplated by this Agreement, from the Balance Sheet Date until the date hereof, no Seller nor any Transferred Subsidiary has:

(a)    amended or modified the Organizational Documents, or amended, modified or entered into any new Indemnification Arrangements, of any Transferred Subsidiary;

(b)    adopted a plan of liquidation, dissolution, merger, consolidation or other reorganization, other than in the Bankruptcy Case;

(c)    entered into any material agreement or conducted any material transaction with any Affiliate of Seller Parent that is not a direct or indirect wholly-owned Subsidiary of Seller Parent, with respect to the Business or the Transferred Assets;

(d)    transferred, assigned, sold or otherwise disposed of any of the assets of the Transferred Subsidiaries or used in the Business except in the Ordinary Course of Business;

(e)    (i) made or granted any cash compensation increase to any former or current officer, employee or worker of any Transferred Subsidiary except in the Ordinary Course of Business or as required by any collective bargaining or labor agreement; (ii) increased the benefit under any Employee Benefit Plan or adopted, amended or terminated any Employee Benefit Plan, except for increases in benefits required under existing Employee Benefit Plans in the Ordinary Course of Business and except as approved by the Bankruptcy Court with respect to the Sellers generally or as required by any collective bargaining or labor agreement; or (iii) provided any non-contractual benefits to any officer, employee or worker of any Transferred Subsidiary;

(f)    changed, made or revoked any Tax election, changed any method of accounting with respect to Taxes, filed any amended Tax Return, surrender or compromised any right to claim a Tax refund, settled or compromised any claim, notice, audit, assessment or other proceeding related to Taxes, entered into any agreement affecting any Tax liability or any refund

or filed any request for rulings or special Tax incentives with any Governmental Authority, entered into any Tax allocation, sharing or indemnity agreement, extended or waived the statute of limitations period applicable to any Tax or Tax Return or took or caused (or caused any other Person to take or cause) any action which could increase the Buyer's or any of its Affiliates' Liability for Taxes with respect to the Transferred Subsidiaries, the Transferred Assets or the Business;

(g)     hired or extended an offer of employment or engagement to any officer, worker or employee in connection with the Business with a base salary in excess of US$300,000 (or the equivalent in a country outside the United States); or

(h)     agreed or committed in writing to do any of the foregoing.

Section 3.8     Compliance with Law; Permits.

(a)     (i) The Business is being conducted in material compliance with, and Sellers and the Transferred Subsidiaries have in all material respects complied with, all applicable Laws relating to the operation of the Business and the Transferred Assets and (ii) there are no pending or, to the Knowledge of the Sellers, threatened, claims from any Governmental Authority relating to any material non-compliance of the Business, the Transferred Subsidiaries or the Transferred Assets, except, in each case of (i) and (ii), that would not reasonably be expected to be material to Seller Parent and Transferred Subsidiaries taken as a whole.

(b)     The Asset Sellers and the Transferred Subsidiaries are in possession of all material permits (including work permits and visas), licenses, franchises, approvals, certificates, consents, waivers, concessions, exemptions, orders, registrations, notices or other authorizations of any Governmental Authority (the "Permits") necessary for them to own, lease and operate their assets and properties, to employ or engage officers, workers and employees who are not citizens of the country where they are carrying out their duties or performing their services and to carry on the Business as currently conducted.  All material Permits held by the Asset Sellers and the Transferred Subsidiaries: (i) are valid and in full force and effect and no Asset Seller or Transferred Subsidiary is in default under, or in violation of, any such Permit, except for such defaults or violations which would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with the Buyer's ability to operate the Business as currently operated and no suspension or cancellation of any such Permit is pending (other than pursuant to its terms) or, to Sellers' Knowledge, threatened and (ii) subject to entry of the Sale Order, each such Permit may be transferred or reissued to the Buyer in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Court).

Section 3.9     Litigation.  Except for the Bankruptcy Case, and any Order entered in the Bankruptcy Case, there is no Action by or against any Asset Seller or Transferred Subsidiary in connection with the Business or the Transferred Assets pending, or to the Knowledge of the Sellers, threatened other than any Action pursuant to which no injunctive or equitable relief is sought and where the monetary damages are covered by insurance or would not reasonably be expected to be material to the Sellers or the Transferred Subsidiaries taken as a whole.

Section 3.10     Employee Benefit Plans.

29

(a)    (i) Each of the Employee Benefit Plans has been operated and administered in all material respects in accordance with applicable Law, with the express and implied terms of the Employee Benefit Plan concerned to the extent compatible with applicable Law and with administrative or governmental rules and regulations, and with any applicable collective bargaining agreement and all other agreements or instruments applicable to any Employee Benefit Plan, and (ii) there are no pending or threatened actions, suits or claims by, on behalf of or against any Employee Benefit Plan or any administrator or fiduciary thereof (other than routine claims for benefits) that would reasonably be expected to result in material liability to the Business.

(b)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not, alone or in combination with any other event, (i) entitle any Business Employee to severance pay, unemployment compensation or any other compensation (other than from a Governmental Authority), (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any Business Employee or (iii) cause any individual to accrue or receive additional benefits, service or accelerated rights to payment of benefits under any Employee Benefit Plan or employment agreement, (iv) directly or indirectly cause the Sellers or any Affiliate of the Sellers to transfer or set aside any assets to fund or otherwise provide for benefits for any individual, or (v) result in any payment or benefit that would constitute an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code) or subject any Person to Liability for tax under Section 4999 of the Code or cause the loss of a deduction to any Transferred Subsidiary or Asset Seller under Section 280G of the Code.

(c)    All contributions and premiums required by Law or by the terms of any Employee Benefit Plan have been timely made to any funds or trusts established thereunder or in connection therewith in all material respects.

(d)    Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination or opinion letter as to such qualification from the IRS and, to the Knowledge of the Sellers, and has, in operation, been qualified under the Code from the effective date of such Employee Benefit Plan.  No event has occurred, either by reason of any action or failure to act, which would reasonably be expected to cause the loss of any such qualification.

(e)    None of the Sellers or any of their ERISA Affiliates has ever maintained, sponsored, contributed to, or had an obligation to maintain, sponsor or contribute to, or has any Liability with respect to (i) a "defined benefit plan," as defined in Section 3(35) of ERISA, (ii) a plan subject Title IV of ERISA or Sections 412 or 430 of the Code or to the minimum funding standards of Section 302 of ERISA, (iii) a "multiemployer plan," as defined in Section 3(37) of ERISA, or (iv) any "voluntary employee beneficiary association" within the meaning of Section 501(c)(9) of the Code or any other "welfare benefit fund" as defined in Section 419 of the Code.

Section 3.11    Employees.

(a)    Except as set forth on Section 3.11 of the Disclosure Schedules, no Seller nor any Transferred Subsidiary is a party to or bound by a collective bargaining agreement and to the Sellers' Knowledge, no employees of the Sellers or any of the Transferred Subsidiaries are

represented by a labor union or other labor organization with respect to their employment with the Sellers or any of the Transferred Subsidiaries. There is no unfair labor practice charge or complaint pending or, to the Sellers' Knowledge, threatened against the Sellers or any of the Transferred Subsidiaries before the National Labor Relations Board or any similar foreign, state or local body. No labor union, labor organization, works council or group of Business Employees has a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Sellers, threatened to be brought or filed with any labor relations tribunal or authority pertaining to the Business Employees. To the Knowledge of the Sellers, during the prior two (2) years, the Sellers and the Transferred Subsidiaries have not experienced any union organizing or certification activities, work stoppage, slowdowns or other material labor disputes, and, to the Knowledge of the Sellers, no such activities or disputes are threatened in writing. There is no material grievance or arbitration proceeding pending against the Sellers or any of the Transferred Subsidiaries.

(b)     Each Asset Seller and Transferred Subsidiary is in compliance in all material respects with all applicable Laws respecting labor, labor relations, employment and employment practices pertaining to the Business Employees, including but not limited to all Laws respecting collective bargaining, the terms and conditions of employment, wages, hours, equal employment opportunity, employment discrimination, worker classification (including the proper classification of workers as independent contractors and consultants, and employees as exempt or non-exempt for overtime pay), immigration, work authorization, occupational health and safety, workers' compensation, vacation pay, the payment of social security and other employment Taxes, disability rights or benefits, plant closures and layoffs, affirmative action, labor relations, employee leave issues and unemployment insurance. As of the Closing Date, the Seller has not incurred liabilities, penalties or other charges under the WARN Act.

(c)     The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any breach or other violation of any collective bargaining agreement, employment agreement, consulting agreement or any other labor-related any other labor-related agreement to which the Asset Sellers or the Transferred Subsidiaries are a party that is applicable to the Business Employees.

(d)     The Sellers have in their files a U.S. citizenship and Immigration Services Form I-9 that was validly and properly completed and, if necessary, that has been properly updated, in accordance with applicable Law for each Business Employee with respect to whom such form is required to be maintained by Sellers under applicable Law. Sellers have not knowingly hired or continued to employ unauthorized workers. No Seller has used the services of any individual through a staffing agency, contract or subcontract knowing that the individual was an unauthorized worker.

Section 3.12    Real Property.

(a)     Each Asset Seller or Transferred Subsidiary, as applicable, has good and valid fee simple title to the Owned Real Property it owns that is, subject to the entry of the Sale Order, free and clear of all Encumbrances, other than Permitted Encumbrances.

31

(b)    The Asset Seller or Transferred Subsidiary party thereto has a valid leasehold estate in all Leased Real Property, that is, subject to the entry to the Sale Order, free and clear of all Encumbrances, other than Permitted Encumbrances.

(c)    No Asset Seller or Transferred Subsidiary is a party to or obligated under any option, right of first refusal or other contractual right to sell, dispose of or lease any of the Real Property or any portion thereof or interest therein to any Person other than the Buyer.

Section 3.13    Intellectual Property.

(a)    A true, correct and complete list of all U.S. and foreign (i) issued Patents and pending Patent applications, (ii) registered Trademarks and applications to register any Trademarks, (iii) registered Copyrights and applications for registration of Copyrights, and (iv) domain name registrations, in each case which are owned by or registered to an Asset Seller or owned by or registered to a Subsidiary of the Sellers (the "Registered IP") is set forth on Section 3.13(a) of the Disclosure Schedules.  The Asset Sellers or its Subsidiaries, as applicable, are the sole and exclusive beneficial and record owners of all Registered IP, and all material items of such Registered IP are subsisting and, to the Knowledge of the Sellers, valid and enforceable (and in the past three (3) years there has been no Action asserted or, to the Knowledge of the Sellers, threatened challenging the scope, validity or enforceability of any such Intellectual Property).

(b)    The conduct of the Business (including the Products) and the use, practice or exploitation of the Registered IP and other Intellectual Property as currently used, practiced or exploited by the Asset Sellers and the Transferred Subsidiaries in the conduct of the Business do not infringe, misappropriate or otherwise violate (and, in the past three (3) years has not infringed, misappropriated or otherwise violated) in any material respect any Person's Intellectual Property rights, and in the past three (3) years there has been no such Action asserted or, to the Knowledge of the Sellers, threatened against any Seller or Transferred Subsidiary or, to the Knowledge of the Sellers, any other Person.

(c)    The rights in Intellectual Property acquired by Buyer hereunder, together with the rights in Intellectual Property licensed to Buyer pursuant to the IP License, constitute all rights in Intellectual Property owned by an Asset Seller or a Transferred Subsidiary and used in and necessary for the conduct the Business as currently conducted.

(d)    To the Knowledge of the Sellers, no Person is infringing, misappropriating or otherwise violating in any material respect any Intellectual Property owned by or exclusively licensed to the Asset Sellers that is a Transferred Asset or is used in or relates to the Business or any Intellectual Property owned by or exclusively licensed to the Transferred Subsidiaries, and in the past three (3) years no such Actions have been asserted or threatened against any Person by any Asset Seller or Transferred Subsidiary or, to the Knowledge of the Sellers, any other Person.

(e)    Sellers have taken commercially reasonable steps to safeguard and maintain the confidentiality of all trade secrets and other confidential or proprietary information related to the Business.

32

Section 3.14   <u>Tax Matters</u>.  Except as set forth in <u>Section 3.14</u> of the Disclosure Schedules:

(a)     All material Tax Returns required to be filed by or with respect to the Transferred Subsidiaries, or with respect to the Transferred Assets or the Business have been timely filed, and all such Tax Returns are true, correct and complete in all material respects.  All Taxes due and payable by or with respect to the Transferred Subsidiaries, or with respect to the Transferred Assets or the Business, in each case whether or not shown as due on any Tax Return, have been timely paid in full to the proper Governmental Authority.

(b)     All Taxes relating to or arising in connection with the Transferred Assets or the Business, or of or with respect to the Transferred Subsidiaries, in each case that are required to be withheld and paid under applicable Law (including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or other third party), have been timely withheld and remitted to the appropriate Governmental Authority.  Each of the Transferred Subsidiaries has timely collected all material sales, use and value added Taxes required to be collected by them, and has timely remitted all such Taxes to the appropriate Governmental Authority.

(c)     There is no action, suit, claim, assessment, or audit pending, proposed (tentatively or definitively), contemplated, asserted or threatened by any Governmental Authority with respect to Taxes or Tax Returns of or with respect to the Transferred Subsidiaries or with respect to the Transferred Assets or the Business, and no Governmental Authority has indicated an intent to investigate, commence or open such an action, suit, claim or audit with respect to any such Tax or Tax Return.

(d)     There are no Encumbrances for Taxes upon the Transferred Assets or any of the assets of the Transferred Subsidiaries, in each case other than Permitted Encumbrances.

(e)     Neither the Business nor any of the Transferred Assets or Transferred Subsidiaries is subject to any Tax allocation, indemnity or sharing agreement or similar agreement, arrangement or understanding, other than any such agreement entered into in the Ordinary Course of Business the principal purpose of which is not to address Taxes.

(f)     No Tax election has been made by or with respect to the Transferred Subsidiaries or with respect to any of the Transferred Assets or the Business, in each case that has, or may have, continuing effect after the Closing Date.

(g)     No agreement, waiver, extension or consent regarding the application of the statute of limitations with respect to any Taxes or Tax Returns of or with respect to the Transferred Subsidiaries, or with respect to the Transferred Assets or the Business is outstanding, nor is there pending any request for such an agreement, waiver, extension or consent.  No power of attorney has been granted with respect to any matter relating to Taxes payable by or with respect to the Transferred Subsidiaries, or with respect to any of the Transferred Assets or the Business, in each case that is currently in force.

(h)     Each of the Transferred Subsidiaries is in compliance with the requirements for any Tax exemption, Tax holiday, Tax concession or other Tax reduction agreement or

33

arrangement with or granted by any Governmental Authority to which such Transferred Subsidiary is subject, and the transactions contemplated by this Agreement will not have a materially adverse effect on the continued validity and effectiveness of any such Tax exemption, Tax holiday, Tax concession or other Tax reduction agreement or arrangement, as applicable.

(i)     No claim has been made by any Governmental Authority in a jurisdiction in which a Transferred Subsidiary does not file Tax Returns or pay Taxes to the effect that such Transferred Subsidiary is or may be subject to taxation by, or required to file any Tax Return in, such jurisdiction.  No Transferred Subsidiary currently has or has had a permanent establishment (within the meaning of an applicable Tax treaty) or other office or fixed place of business, nor has any Transferred Subsidiary ever engaged in a trade or business, in any country other than the country in which it is organized and resident.  No Transferred Subsidiary currently has or has had nexus (within the meaning of the applicable Law of any applicable state) in any state where Seller does not currently, or did not at the applicable time, file Tax Returns and pay Taxes with respect to such Transferred Subsidiary.

(j)     None of the Transferred Subsidiaries has entered into, participated in or engaged in any "listed transaction" (as defined in Treasury Regulations Section 1.6011-4(b) or any similar provision under any state, local or foreign Tax Law).

(k)     None of the Transferred Subsidiaries (i) is or has been a member of a group filing an affiliated, consolidated, combined or unitary Tax Return, nor has any Transferred Subsidiary been included in any similar arrangement for relief under applicable Law, such as a loss sharing regime, or (ii) has any liability for Taxes of another Person under Treasury Regulations section 1.1502-6 (or any analogous, comparable or similar provision of state, local or non-U.S. Law).

(l)     No Transferred Asset that will be transferred by any Seller (other than Seller Parent) pursuant to this Agreement is a "United States real property interest" under Section 897 of the Code.

Section 3.15   Environmental Matters.  Except as would not be reasonably be expected to be material to the Business, taken as a whole:

(a)     The Asset Sellers, the Transferred Subsidiaries, the Transferred Assets and the Business are, and have for the three (3) years prior to the date hereof been, in compliance with all applicable Environmental Laws, which compliance includes the possession of, and compliance with the terms of, with all Environmental Permits required in connection with the conduct or operation of the Business and the ownership or use of the Transferred Assets.  There is no claim or action currently pending or, to the Knowledge of the Sellers, threatened, that is or would reasonably be expected to result in the cancellation, revocation or other adverse or limiting modification of any such Environmental Permit.

(b)     There is no Environmental Claim pending or, to the Knowledge of the Sellers, threatened against or affecting any Asset Seller, Transferred Subsidiary, Transferred Asset or the Business.  There are no environmental conditions, including the presence of any Hazardous Material at the Real Property, which would be reasonably likely to form the basis of any Liability

of the Business, any Transferred Asset or any Transferred Subsidiary or of any Environmental Claim against or affecting any Asset Seller, Transferred Subsidiary or the Business.

Section 3.16    <u>Material Contracts</u>.

(a)    Except as set forth on <u>Section 3.16(a)</u> of the Disclosure Schedule, none of Sellers or any Transferred Subsidiary is a party to any:

(i)    agreement that materially prohibits any Transferred Subsidiary from freely engaging in business anywhere in the world;

(ii)    agreement relating to any acquisition or disposition by any Transferred Subsidiary of any business (whether by asset or stock purchase or otherwise) or any merger, consolidation or similar business combination transaction, in each case, pursuant to which a Transferred Subsidiary has an outstanding obligation to pay any purchase price thereunder or other material obligation;

(iii)    agreement of any Transferred Subsidiary or related to the Business relating to any joint venture or partnership;

(iv)    material agreement or arrangement relating to the holding, storage or maintenance of, or any other undertaking by, any Transferred Subsidiary with respect to assets owned by customers that are held, stored or maintained on premises owned or leased by the Transferred Subsidiaries; or

(v)    agreement in writing to enter into any of the foregoing.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law and except as a result of the commencement of the Bankruptcy Case, each Transferred Contract, material Contract of the Transferred Subsidiaries and each of the Leases is in full force and effect and is a valid, binding and enforceable obligation of the applicable Seller or Transferred Subsidiary and, to the Knowledge of the Sellers, each of the other Parties thereto, except as may be limited by the Enforceability Exceptions.  Except as set forth on <u>Section 3.16(b)</u> of the Disclosure Schedule, or as would not reasonably be expected to be material to the Business, taken as a whole, neither the Sellers nor any of its Transferred Subsidiaries, as applicable, is in default, or is alleged in writing by the counterparty thereto to have breached or to be in default, under any Lease, Transferred Contract or Contract of the Transferred Subsidiaries, and, to the Knowledge of the Sellers, the other party to each Lease, Transferred Contract or Contract of the Transferred Subsidiaries is not in default thereunder.  No Leases, Transferred Contract or Contract of the Transferred Subsidiaries has been canceled or otherwise terminated, and none of the Sellers nor any Transferred Subsidiary, has received any written notice from any Person regarding any such cancellation or termination.

Section 3.17    <u>Certain Payments</u>.  Since January 1, 2017, none of the Asset Sellers or the Transferred Subsidiaries (nor, to the Knowledge of the Sellers, any of their respective Representatives) (a) has used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity; (b) has used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic

35

governmental officials or employees; (c) has violated or is violating any provision of the Foreign Corrupt Practices Act of 1977; (d) has established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties; or (e) has made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature.

Section 3.18    <u>Insurance</u>.  Each material insurance policy maintained by Sellers or the Transferred Subsidiaries on the properties, assets, products, business or personnel of the Transferred Subsidiaries is legal, valid, binding, enforceable by Sellers or the Transferred Subsidiaries, as applicable, and in full force and effect, and all premiums with respect thereto covering all periods up to and including the date hereof have been paid, and no notice of cancellation or termination has been received with respect to any such insurance policy.

Section 3.19    <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Sellers or the Transferred Subsidiaries.

Section 3.20    <u>Affiliate Transactions</u>.  No Affiliate of any Transferred Subsidiary (other than any Seller or any other Transferred Subsidiary), or any officer or director of the Sellers or the Transferred Subsidiaries (a) is a party to any agreement or transaction with the Transferred Subsidiaries having a potential or actual value or a contingent or actual liability exceeding $250,000 (other than Employee Benefit Plans adopted in the Ordinary Course of Business), (b) has any material interest in any material property used by the Transferred Subsidiaries or (c) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a material supplier or customer of the Transferred Subsidiaries.

Section 3.21    <u>Exclusivity of Representations and Warranties</u>.  None of the Sellers, the Transferred Subsidiaries or any of their Affiliates or Representatives is making, and none of the Buyer or any of its Affiliates or Representatives is relying on, any representation or warranty of any kind or nature whatsoever, oral or written, express or implied (including any relating to financial condition or results of operations of the Business or maintenance, repair, condition, design, performance, value, merchantability or fitness for any particular purpose of the Transferred Assets), except as expressly set forth in this <u>Article III</u> (as modified by the Disclosure Schedules), and the Sellers hereby disclaim all Liability and responsibility for, and none of the Buyer or any of its Affiliates or Representatives is relying on, any such other representations or warranties, including any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing in any form, medium or manner) to Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant or Representative of Sellers or any of their Affiliates).

**ARTICLE IV.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Sellers as follows:

Section 4.1    <u>Organization</u>.  The Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all necessary corporate (or equivalent) power and authority to perform its obligations hereunder and under any Ancillary Agreement.

Section 4.2    <u>Authority</u>.  The Buyer has the corporate power and authority to execute and deliver this Agreement and each of the Ancillary Agreements to which it will be a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action and this Agreement has been, and upon its execution each of the Ancillary Agreements to which the Buyer will be a party will have been, duly executed and delivered by the Buyer and assuming due execution and delivery by each of the other parties hereto and thereto, this Agreement constitutes, and upon its execution each of the Ancillary Agreements to which the Buyer will be a party will constitute, the legal, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with its respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 4.3    <u>No Conflict; Required Filings and Consents.</u>

(a)    Assuming that (x) requisite Bankruptcy Court approvals are obtained, (y) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Section 3.3(b)</u> of the Disclosure Schedule are made, given or obtained (as applicable) and (z) any filings required by any applicable federal or state securities or "blue sky" Laws are made, the execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer will be a party, and the consummation of the transactions contemplated hereby and thereby, or compliance by the Buyer with any of the provisions hereof, do not and will not:

(i)    conflict with the Organizational Documents of such Buyer;

(ii)    conflict with or violate any Law applicable to such Buyer or by which any property or asset of such Buyer is bound or affected;

(iii)    conflict with or violate any Order of any Governmental Authority; or

(iv)    conflict with, result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give rise to a right of termination, modification, notice or cancellation or require any consent of any Person pursuant to, any Contract to which such Buyer is a party;

except, in the case of clause (ii), (iii) or (iv), for any such conflicts, violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

37

(b)      The Buyer is not required to file, seek or obtain any notice, authorization, approval, order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which it will be a party or the consummation of the transactions contemplated hereby or thereby, except (i) for any filings required to be made under the HSR Act or Foreign Competition Laws or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

Section 4.4      <u>Investment Intent</u>.  The Buyer acknowledges that neither the offer nor the sale of the Transferred Stock has been registered under the Securities Act of 1933 (together with the rules and regulations promulgated thereunder, the "<u>Securities Act</u>") or under any state or foreign securities Laws.  The Buyer is acquiring the Transferred Stock for its own account for investment, without a view to, or for a resale in connection with, the distribution thereof in violation of the Securities Act or any applicable state or foreign securities Laws and with no present intention of distributing or reselling any part thereof.

Section 4.5      <u>Brokers</u>.  No broker, finder or investment banker is entitled to any fee, commission or expense from the Buyer that would be payable by the Sellers in connection with the transactions contemplated hereby.

Section 4.6      <u>Buyer's Investigation and Non-Reliance</u>.    The Buyer is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Business, the Transferred Subsidiaries, the Transferred Assets and the transactions contemplated hereby, which investigation, review and analysis was conducted by the Buyer together with expert advisors, including legal counsel, that it has engaged for such purpose to Buyer's satisfaction.  None of the Sellers or any of their Affiliates or Representatives has made, and none of the Buyer or any of its Affiliates or Representatives is relying on, any representation or warranty, express or implied, as to the accuracy or completeness of any information concerning the Business, the Transferred Subsidiaries or the Transferred Assets or made available (orally or in writing in any form, medium or manner) to Buyer or any of its Affiliates, except as expressly set forth in this <u>Article III</u>.  The Buyer acknowledges that, should the Closing occur, the Buyer shall acquire the Business, the Transferred Subsidiaries and the Transferred Assets without any surviving representations or warranties, on an "as is" and "where is" basis.

## ARTICLE V.
## BANKRUPTCY COURT MATTERS

Section 5.1      <u>Bankruptcy Actions</u>.

(a)      As promptly as practicable after the date hereof, the Sellers shall, pursuant to the Bidding Procedures Order, seek approval of the form of this Agreement and the Sellers' authority to enter into this Agreement.

(b)      Buyer shall promptly take all actions as are reasonably requested by Seller Parent to assist in obtaining the Bankruptcy Court's entry of the Sale Order.

(c)     Each of Seller Parent and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by any Seller from the Bankruptcy Court or any third party and/or any Governmental Authority with respect to the transactions contemplated by this Agreement.

Section 5.2    <u>Sale Order</u>.

(a)     The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Sellers of this Agreement, (ii) the sale of the Transferred Assets to Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Permitted Encumbrances), and (iii) the performance by the Sellers of their respective obligations under this Agreement; (b) find that Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, find that the Buyer is not a successor to any Seller, and grant Buyer and, to the extent allowable by applicable Law, the Buyer Group the full rights, benefits, privileges, and protections afforded under section 363(m) of the Bankruptcy Code; (c) find that Buyer shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Transferred Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (d) authorize and empower Sellers to assume and assign to Buyer the Transferred Contracts; (e) find that Buyer has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption and assignment of the Transferred Contracts; (f) find that Buyer and the Buyer Group shall have no Liability for any Liability that is not an Assumed Liability; and (g) find that each of the Buyer and the Buyer Group acted in compliance with the Bid Procedures and the Bid Procedures Order and conducted itself in a noncollusive, fair, and good faith manner. Sellers agree that they will promptly take such actions as are reasonably requested by Buyer to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of demonstrating that to the Knowledge of Sellers, (x) Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) neither Buyer nor the Buyer Group has not engaged in any conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code. Any and all Orders of the Bankruptcy Court relating to this Agreement shall be in form and substance acceptable to Buyer. If any Order of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby, including but not limited to the Sale Order, shall be appealed by any Person other than Buyer or, with Buyer's approval, a third party (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing, or reargument shall be filed with respect to any such Order), or a stay pending appeal is requested with respect to any such Order, Sellers shall promptly (i) notify Buyer of such appeal, petition, motion, or stay request, (ii) provide to Buyer a copy of the related notice and related pleadings or Order of stay, and (iii) provide Buyer with written notice of any motion, application, or other pleading filed in connection with any appeal from such Order. Sellers shall (at Buyer's expense) diligently defend against such appeal, petition, motion, or stay request and shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition, or motion; <u>provided</u> that Sellers shall

39

consult with Buyer regarding the status of any such actions. Sellers further covenant and agree that, after the Closing, any Chapter 11 plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall be a plan of liquidation.

(b)     In addition, notwithstanding anything to the contrary (including anything that purports to be supervening) in this Agreement or any Ancillary Agreement or any other related transaction documents between any of Sellers and Buyer, the Sellers and Buyer agree, and the Sale Order will provide, as follows in this Section 5.2(b) with respect to the original equipment manufacturers and their affiliated North American entities (collectively, "OEMs") and each OEM's tiered suppliers that use or incorporate goods or services supplied by any of the Sellers to provide production to any of the OEMs (collectively, "Customers" and each individually a "Customer").

(i)     Pursuant to various award letters, purchase agreements, release agreements, purchase orders and/or other related documents (each with and subject to the applicable Customers' general terms and conditions, as amended from time to time) (collectively, "Contract Documents"), the Sellers are obligated to supply goods and services (collectively, "Items") to each Customer. Pursuant to 11 U.S.C. §§ 363(f) and 365, the Sellers are deemed to assume all of the Contract Documents in their entirety without modification of any kind, and further shall be deemed to assign the Contract Documents to Buyer as of the Closing Date; provided that notwithstanding the foregoing, (A) the Contract Documents between the applicable Sellers and FCA US LLC and certain of its subsidiaries and affiliates shall be amended as of the Closing Date with the consent of FCA US LLC and its affiliates to provide that the Buyer shall have no liability or Obligations (as defined below) related to the FCA Excluded Warranty Claims as defined in the Sale Order, and (B) the Sellers shall neither assume nor assign any Contract Documents relating to the GM Excluded Warranty Claims as defined in the Sale Order.

(ii)     The Buyer hereby agrees and accepts the assignment described in Section 5.2(b)(i) as of the Closing Date, and assumes and agrees to pay, perform and discharge, regardless of when due, any and all of the liabilities, responsibilities, and obligations under the Contract Documents including, but not limited to, warranty, recall and product liability for all Items (collectively, "Obligations"); provided that notwithstanding the foregoing the Buyer shall not assume nor have any Obligations relating to the GM Excluded Warranty Claims or the FCA Excluded Warranty Claims.

(iii)     The sale of the Sellers' right, title and interest in substantially all of its assets pursuant to this Sale Order shall in all cases be subject to each applicable Customer's rights and interests as set forth in the Contract Documents including Customer's tooling, returnable dunnage, intellectual property rights, and confidential information.

## ARTICLE VI.
## COVENANTS

Section 6.1     Conduct of Business Prior to the Closing. From the date of this Agreement until the Closing Date or earlier termination of this Agreement,

(a)	except (1) as otherwise expressly contemplated by this Agreement, (2) as required by Law or any Order, (3) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or the DIP Credit Agreement, or (4) with the prior written consent of the Buyer, from the date of this Agreement until the Closing Date or earlier termination of this Agreement, the Sellers shall, and shall cause the Transferred Subsidiaries to use commercially reasonable efforts to conduct the Business in the Ordinary Course of Business and preserve the material business relationships with customers, suppliers, distributors and others with whom the Sellers or the Transferred Subsidiaries deal in the Ordinary Course of Business; and

(b)	the Sellers shall not, and shall cause the Transferred Subsidiaries not to, without the prior written consent of the Buyer:

(i)	sell, transfer, lease, sublease, encumber or otherwise dispose of (1) any material Transferred Assets or (2) any assets of a Transferred Subsidiary, in each case other than immaterial dispositions thereof and Inventory sold or disposed of in the Ordinary Course of Business;

(ii)	issue, sell, grant, pledge, dispose or transfer any equity interests in any Seller or Transferred Subsidiary;

(iii)	acquire any corporation, partnership, limited liability company, other business organization or division thereof;

(iv)	merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(v)	split, combine, consolidate, subdivide or reclassify any of their capital stock, other equity interests or voting securities, or securities convertible into or exchangeable or exercisable for capital stock or other equity interests or voting securities, or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for its capital stock, other equity interests or voting securities;

(vi)	declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any securities of any Transferred Subsidiary, or repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any capital stock or voting securities of, or equity interests in, any Transferred Subsidiary or any securities of any Transferred Subsidiary convertible into or exchangeable or exercisable for capital stock or voting securities of, or equity interests in, any Transferred Subsidiary, or any warrants, calls, options or other rights to acquire any such capital stock, securities or interests, other than any transfers among Transferred Subsidiaries, among Sellers, or between any Transferred Subsidiary and any Seller;

(vii)	amend the Organizational Documents of any Transferred Subsidiary or amend or enter into any Indemnification Arrangements;

(viii)	enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons related to or affecting the Business, the Transferred Assets or the Transferred Subsidiaries;

41

(ix)    take any action (other than any actions required by the Bankruptcy Court or applicable Law) in breach of the Bidding Procedures Order or the Sale Order;

(x)    (1) reject or terminate (other than by expiration in accordance with its terms) any Transferred Contract or seek Bankruptcy Court approval to do so, or (2) fail to use commercially reasonable efforts to oppose any action by a third party to so terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Transferred Contract;

(xi)    with respect to any Transferred Asset (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases; or (2) fail to use reasonable best efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(xii)    with respect to any Transferred Subsidiary, change, make or revoke any Tax election, change any method of accounting with respect to Taxes, file any amended Tax Return, surrender or compromise any right to claim a Tax refund, settle or compromise any claim, notice, audit, assessment or other proceeding related to Taxes, enter into any agreement affecting any Tax liability or any refund or file any request for rulings or special Tax incentives with any Governmental Authority, enter into any Tax allocation, sharing or indemnity agreement, or extend or waive the statute of limitations period applicable to any Tax or Tax Return; or take or cause (or cause any other Person to take or cause) any action which could increase the Buyer's or any of its Affiliates' Liability for Taxes with respect to the Transferred Subsidiaries, the Transferred Assets or the Business;

(xiii)    with respect to any Transferred Subsidiary, make any change in any method of accounting or accounting practice or policy, except as required by applicable Law or GAAP;

(xiv)    with respect to any Transferred Subsidiary, fail to maintain in full force and effect existing insurance policies;

(xv)    with respect to any Transferred Subsidiary, make any loans, advances or capital contributions to, or investments in, any other Person (other than to a Seller or Transferred Subsidiary in the Ordinary Course of Business);

(xvi)    voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any third party in pursuing or seeking, a conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 or chapter 7 of the Bankruptcy Code and/or the appointment of an examiner with expanded powers;

(xvii)    take any action to initiate any insolvency proceeding of any character, including bankruptcy, receivership, reorganization, composition, administration or an arrangement with creditors, voluntary or involuntary, of any Transferred Subsidiary or any of their respective assets or properties;

(xviii)    subject any of the Transferred Assets to any Encumbrance other than Permitted Encumbrances;

US 167746098v12
US 167746098v16

(xix)   with respect to any Transferred Subsidiary, incur any indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness;

(xx)   with respect to any Transferred Subsidiary, enter into any commitment for capital expenditures or otherwise make any capital expenditures with respect to the Business, except in accordance with the budget and business plan made available to Buyer;

(xxi)   in each case with respect to the Business and the Transferred Subsidiaries, (1) make or grant any general or special wage or salary increase (other than standard merit increases consistent with past practice within the past three years or as required by any collective bargaining or labor agreement), (2) make any increase in the payments of benefits under any Employee Benefit Plan, (3) take any action with respect to the grant of any material severance or termination pay (other than pursuant to policies or agreements of the Sellers in effect on the date of this Agreement) which will become due, (4) adopt, amend or terminate any Employee Benefit Plan, other than in the Ordinary Course of Business and consistent with past practice, and (5) enter into any material employment, consulting or similar agreement or amend any existing employment agreement; or

(xxii)   agree or commit to any of the foregoing.

Section 6.2    Covenants Regarding Information.

(a)    From the date hereof until the Closing Date or earlier termination of this Agreement, upon reasonable request, the Sellers shall (i) afford the Buyer and its Representatives reasonable access to the properties, offices, plants and other facilities, books and records (including Tax books and records) of the Sellers and the Transferred Subsidiaries, and shall furnish the Buyer with such financial, operating and other data and information, and access to all the officers, employees, accountants and other Representatives of the Sellers and the Transferred Subsidiaries as the Buyer may reasonably request in connection with the transactions contemplated by this Agreement and (ii) provide the Buyer with copies of such daily business reports regarding the Business as are currently being provided and made available on a regular basis to management of Seller Parent.  Notwithstanding anything to the contrary in this Agreement, the Sellers shall not be required to disclose any information to the Buyer or its Representatives if such disclosure would adversely affect any attorney-client or other legal privilege or contravene any applicable Laws (the "Disclosure Limitations"); provided that the Parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of the Sellers after consultation with outside counsel) reasonably be likely to cause such privilege to be undermined with respect to such information.

(b)    The Sellers shall use, and shall cause the Transferred Subsidiaries to use, commercially reasonable efforts to cause their respective employees to, on a timely basis, cooperate as reasonably requested by the Buyer and/or any potential lender to assist the Buyer in connection with such financing as Buyer may reasonably seek in connection with the operation of the Business following the Closing (it being understood that it shall not be a condition to Closing that any such financing be obtained), including using commercially reasonable efforts in (i) requesting its certified independent auditors to provide auditors' reports and customary comfort letters with respect to financial information relating to the Sellers or the Transferred Subsidiaries

43

in customary form, (ii) causing appropriate personnel of the Sellers or the Transferred Subsidiaries to participate at reasonable times in a reasonable number of sessions with prospective lenders, (iii) furnishing the Buyer and such potential lenders, as promptly as reasonably practicable, with such customary financial and other pertinent information regarding the Sellers or the Transferred Subsidiaries as may be reasonably requested by the Buyer in connection with such financing, (iv) assisting in the preparation of and to execute and deliver definitive financing documents, including guarantee and collateral documents and customary closing certificates as may be required by such financing and (v) providing customary documentation and other information about the Sellers or the Transferred Subsidiaries requested by the Buyer or such potential lenders in connection with such financing and required under applicable "know your customer," sanctions and anti-money-laundering rules and regulations.  Any and all reasonable and documented out-of-pocket costs and expenses incurred in connection with any cooperation, investigation or other matter related to this Section 6.2(b) shall be promptly reimbursed to Seller, or paid or caused to be paid, by the Buyer.

(c)     The information provided pursuant to this Section 6.2 prior to Closing will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by the terms and conditions of the DIP Credit Agreement and the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein.  No Seller makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Buyer may not rely on the accuracy of any such information.

(d)     From and after the Closing, for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), the Buyer will provide the Sellers and their Representatives, at Sellers' sole expense, with reasonable access, during normal business hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of the Buyer or the Business, to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Transferred Assets, the Assumed Liabilities, or the Excluded Assets with respect to periods or occurrences prior to the Closing Date, for the purposes of (i) complying with the requirements of any Governmental Authority, including the Bankruptcy Court, (ii) the closing of the Bankruptcy Cases and the wind down of the Sellers' estates (including reconciliation of claims and preparation of Tax returns), (iii) making insurance claims, (iv) complying with applicable Laws or (v) other reasonable business purposes; provided that the Buyer shall not be obligated to provide any such access that would, in the reasonable, good faith judgment of the Buyer, conflict with the Disclosure Limitations.  Unless otherwise consented to in writing by Seller Parent, the Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Seller Parent such books and records or any portion thereof that the Buyer may intend to destroy, alter or dispose of.

(e)     Sellers shall use commercially reasonable efforts to locate and deliver copies to Buyer of the most recent final Phase I environmental site assessment reports and any Phase II environmental site assessments (or similar reports) for the Owned Real Property and Leased Real Property, to the extent in existence and in Sellers' possession, it being understood that Sellers do not believe any to exist currently in their possession.  Additionally, Sellers shall use

44

commercially reasonable efforts to locate and deliver copies to Buyer of any existing surveys, legal descriptions and title policies with respect to the Owned Real Property that are in the possession of the Sellers.

Section 6.3    Notification of Certain Matters.  The respective Party shall promptly notify the other Parties in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Section 8.2(a) or Section 8.2(b) (in the case of Buyer) or Section 8.3(a), Section 8.3(a)(i) or Section 8.3(a)(ii) (in the case of Sellers) becoming incapable of being satisfied.

Section 6.4    Employee Matters.

(a)    Except with the prior written consent of Buyer, Sellers shall not transfer the employment of any Transferred Subsidiary Employee out of the relevant Transferred Subsidiary that employs them as of the date of this Agreement, and shall not change their then current terms and condition of employment, except as otherwise permitted by this Agreement.  Buyer shall, or shall cause one of its Affiliates to, continue the employment of each then-current Business Employee who is employed by a Transferred Subsidiary as of immediately prior to the Closing in accordance with applicable Law and on the terms set forth in this Section 6.4.

(b)    The Sellers shall use commercially reasonable efforts to provide the Buyer with a list of all Business Employees employed by, and workers and individual independent contractors engaged by the Asset Sellers, including, to the extent permitted by applicable Law, particulars of each such person's current wage or fee, as the case may be, any incentive bonus opportunity, annual vacation entitlement, (and the amount of accrued vacation in the current vacation year), notice period or confirmation that they are employed at will, or if employed or engaged pursuant to a fixed term contract, the date on which such fixed term is due to expire and details of any previous renewals, name of the employing entity, summary of benefits to which they are entitled, any suspension or leave as a consequence of which they are not actively working, and a sample of each such contract of employment or services in use in respect of such persons.  Prior to the Closing, the Buyer may provide (or cause one of its Subsidiaries to provide) to each Business Employee who is employed by an Asset Seller (including each Qualified Leave Recipient) an offer of employment on terms and conditions to be determined by Buyer (or its applicable Subsidiary) (the "Employment Offer"), in each case with such employment to commence immediately following the Closing, or in the case of a Qualified Leave Recipient, the date of his or her return to active employment; provided that such Qualified Leave Recipient returns to active status within thirty (30) days following the Closing Date (or such later date with respect to which they have reemployment rights under applicable Law).  Each Business Employee (i) who is employed by an Asset Seller (including each Qualified Leave Recipient) who receives and accepts the Employment Offer and who commences employment with Buyer or an Affiliate thereof on or following the Closing in accordance with the terms of such Employment Offer or (ii) who automatically transfers employment pursuant to Section 6.4(a) shall be a "Transferred Employee."  The Sellers shall reasonably cooperate with the Buyer in effecting the Transferred Employees' transfer of employment from the Sellers to the Buyer or a Subsidiary of the Buyer as contemplated hereby.  Each Employment Offer shall be contingent upon the Closing and the issuance of the Sale Order.

45

(c)      Notwithstanding anything in this Agreement to the contrary, (i) immediately following the Closing, the Buyer shall assume each collective bargaining agreement or other labor-related agreement listed on Section 3.11 of the Disclosure Schedules and (other than Controlled Group Liabilities) any and all Liabilities thereunder arising on or after the Closing, and provide to the Transferred Employees whose employment is subject to such collective bargaining agreement or other labor-related agreement, terms and conditions of employment in accordance with such collective bargaining agreement or other labor-related agreement until its expiration, modification, or termination in accordance with its terms and applicable Law, (ii) without limiting the generality of Section 2.4, Sellers shall retain any and all Controlled Group Liabilities and any and all Liabilities in respect of Excluded Benefit Plans and Employee Benefit Plans of the Asset Sellers that are not Assigned Benefit Plans (including, in all cases, any defined benefit pension plans), and (iii) without limiting the generality of Section 2.4, Sellers shall retain any and all Liabilities related to the employment or termination of employment of any Business Employee who is employed by an Asset Seller and who does not become a Transferred Employee in accordance with this Section 6.4.

(d)      The Buyer shall assume and pay all unpaid wages and salaries, in respect of Transferred Employees, which are earned or accrued during the payroll period in which the Closing Date occurs.  The Sellers shall retain all Liabilities relating to unpaid wages, salaries, commissions and other amounts, earned or accrued by or in respect of Business Employees that are not assumed by the Buyer as described in the preceding sentence.

(e)      To the extent permitted by Law, all unused vacation and paid time off of the Transferred Employees accrued as of the Closing Date shall, effective as of the Closing Date or, if later, the date on which such Transferred Employee becomes an employee of the Buyer, be transferred to and assumed by the Buyer and the Buyer shall honor such accrued vacation and paid time off on the same basis as under the Sellers' vacation and paid time off policy(ies) as in effect immediately prior to the Closing.

(f)      The Buyer shall, and shall cause its Affiliates to, provide each Transferred Employee with credit for such Transferred Employee's service with any Sellers or their Affiliates or predecessors prior to the Closing for all purposes, including for purposes of eligibility and determination of level of benefits (including, for purposes of vacation but excluding for purposes of severance, equity compensation and benefit accruals under any defined benefit pension plan or retiree medical plan), under any benefit plan sponsored or maintained by the Buyer or any of their Affiliates in which such Transferred Employee is eligible to participate on or following the Closing Date (each, a "Buyer Plan"); provided, however, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits.  With respect to each Buyer Plan that is a health or welfare plan, the Buyer shall, and shall cause its Affiliates to use commercially reasonable efforts to, (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements and requirements to show evidence of good health and (ii) credit each such Transferred Employee with all deductible payments, co-payments and co-insurance paid by such Transferred Employee under any Employee Benefit Plan prior to the Closing during the year in which the Closing occurs for the purpose of determining the extent to which any such Transferred Employee has satisfied any applicable deductible and whether such Transferred Employee has reached the out-of-pocket maximum for such year.

US 167746098v12
US 167746098v16

(g)      The Parties shall cooperate in good faith to cause the assignment of those Employee Benefit Plans that are sponsored or maintained by an Asset Seller (other than the Excluded Benefit Plans) from the respective Asset Seller to Buyer or its Affiliates, which assignment shall be effective as of the Closing (to the extent assigned, the "Assigned Benefit Plans").

(h)      Without limitation of Section 10.10, nothing express or implied in this Section 6.4 or this Agreement shall (i) confer upon any Business Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be treated as an amendment to, or prevent the termination of any Employee Benefit Plan, Buyer Plan or any other employee benefit plan, program, arrangement or agreement sponsored or maintained by the Buyer, the Sellers or their respective Affiliates, as applicable, or (iii) obligate the Buyer, the Sellers or any of their respective Affiliates to maintain any particular employee benefit plan, program or arrangement.

(i)      From and after the date of this Agreement, the Buyer and/or its Representatives may meet and otherwise communicate with the Business Employees, upon prior written notice to the Sellers (in a manner so as not to interfere unreasonably with the normal business operations of any Seller) in order to discuss the impact of the pending transaction and the Buyer's intentions with respect to the Business Employees in the event the Buyer is successful in acquiring any or all of the Transferred Subsidiaries or Transferred Assets, and to interview and offer employment pursuant to the terms of this Section 6.4 to the relevant Business Employees (other than the Transferred Subsidiary Employees, whose employment will continue by operation of Law). Notwithstanding the foregoing, (i) Buyer shall be permitted to introduce itself to the Business Employees at in-person meetings, and attend additional in-person meetings with the Business Employees and/or their employee representatives if any, following the initial meetings, in each case, in the presence of Representatives of the Sellers at such locations and times as the Buyer may reasonably request and (ii) the Buyer and the Sellers shall cooperate in good faith in developing and implementing an employee communication plan pursuant to which one or more written communications about the Buyer, the transactions contemplated hereby and the Buyer's plans or intentions with respect to the future operation of the Transferred Subsidiaries or the Business will, from time to time, be distributed to employees and pursuant to which meetings of the Buyer with the Business Employees may be scheduled.

Section 6.5      Consents and Filings; Further Assurances.

(a)      Each of the Parties shall use reasonable best efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements and to confirm the Buyer's ownership of the Transferred Assets as promptly as practicable, including to use commercially reasonable efforts to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from customers and other parties.  Without limiting the generality of the previous sentence, the Parties shall (i) use reasonable best efforts to obtain from Governmental Authorities all consents, approvals, clearances, expiration or termination of waiting periods, authorizations, qualifications

47

and orders as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) promptly make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement required under the HSR Act (if required) or any other applicable Law, including any other Antitrust Law; (iii) use reasonable best efforts to comply at the earliest practicable date with any request under the HSR Act, or other Antitrust Law, for additional information, documents or other materials received by each of them or any of their respective Subsidiaries from the Federal Trade Commission, the Antitrust Division of the United States Department of Justice or any other Governmental Authority in respect of such filings (collectively, an "Antitrust Authority"); (iv) cooperate with each other in connection with any such filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the Antitrust Authorities under the HSR Act or Foreign Competition Law with respect to any such filing; (v) not extend any waiting period under the HSR Act or enter into any agreement with an Antitrust Authority not to consummate the transactions contemplated hereby; (vi) defend and resolve any investigation or other inquiry of any Governmental Authority under all applicable Laws, including by defending against and contesting administratively and in court any litigation or adverse determination initiated or made by a Governmental Authority under applicable Law. This Section 6.5(a) does not apply with respect to Taxes.

(b)    Each of the Parties shall promptly notify the other Parties of any material communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority. No Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties the opportunity to attend and participate at such meeting. The Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods, including under the HSR Act. Subject to applicable Law, the Parties will provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby. This Section 6.5(b) does not apply with respect to Taxes.

(c)    From time to time, whether at or following the Closing, the Sellers and the Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in the Buyer all the right, title, and interest in, to or under the Transferred Assets, to provide the Buyer and the Sellers all rights and obligations to which they are entitled and subject pursuant to this Agreement and the Ancillary Agreements, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements. Each of the Parties will use its commercially reasonable efforts to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied.

48

(d)     The Sellers and the Buyer shall cooperate with each other and, as promptly as practicable after the date of this Agreement use reasonable best efforts to obtain the transfer or reissuance to the Buyer of all Environmental Permits necessary to lawfully own and operate the Business and Transferred Assets.  The Parties shall use reasonable best efforts to respond promptly to any requests for additional information made by such agencies, use their respective commercially reasonable efforts to participate in any hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Environmental Permits, and use respective reasonable best efforts to cause regulatory approval to be obtained as soon as practicable after the date of filing.  Each Party will bear its costs of the preparation and review of any such filing.  The Sellers and the Buyer shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection any filings to transfer the Environmental Permits and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.

(e)     From the date hereof until the Closing Date, the Asset Sellers shall use commercially reasonable efforts to, and to cause the Transferred Subsidiaries to, cooperate with Buyer to seek accommodations from customers, suppliers and other commercial counterparties; provided that (i) none of the Sellers or Transferred Subsidiaries shall be obligated to be subject to any such accommodation effective prior to the Closing or incur any Liability or expense in connection therewith and (ii) no representation, warranty or covenant of any Seller contained herein will be breached or deemed breached and no condition of the Buyer will be deemed not to be satisfied as a result of the failure to obtain any such accommodation or as a result of any Person objecting to such accommodation request.

(f)     Following Closing, Sellers shall cooperate with Buyer's reasonable requests with respect to the investigation and prosecution of any Actions related to the Business, the Transferred Assets or the Transferred Subsidiaries (other than in connection with disputes between the Parties hereto), including using commercially reasonable efforts to furnish reasonably available information and testimony, to arrange discussions with, and the calling as witnesses of, officers, directors, employees, agents and representatives, and to provide other reasonable assistance in connection with any such Actions, with such cooperation to be at the cost and expense of Buyer (but including only Sellers' direct out-of-pocket expenses to third parties, photocopying and delivery costs, and not including Sellers' internal costs such as wages or other benefits paid to its officers, directors or employees, but including any reasonable and documented legal costs and expenses incurred by Sellers or any such Person in connection with the foregoing and any related travel or other incidental costs and expenses of Sellers or any such Person in connection with the foregoing).

(g)     Sellers shall use commercially reasonable efforts to, and to cause the Transferred Subsidiaries to, avail themselves of any applicable programs of Governmental Authorities with respect to financial assistance, payroll protection, loan forgiveness, extension, or stay of remedies or other similar borrower or other financial accommodations.

Section 6.6     Certain Director and Officer Matters.

49

(a)    As soon as possible after the Closing Date, Buyer (i) shall adopt, or shall cause to be adopted, the required resolutions, (ii) shall make, or shall cause to be made, the necessary applications or filings, (iii) shall cause each of the Transferred Subsidiaries to hold such corporate meetings, or (iv) take such other corporate actions (*e.g.*, action by written consent), in each case, as are necessary pursuant to applicable Laws or the Transferred Subsidiaries' constitutive documents as in effect at the Closing to procure that those directors and officers of the Transferred Subsidiaries who resign as of the Closing shall no longer be directors and/or officers of such Transferred Subsidiaries, that they shall be discharged in their respective function as directors and/or officers, and that the effect of such resignations shall be registered with the relevant commercial or similar register, if any, as applicable, and Buyer shall vote all of the Transferred Stock, or cause the relevant Transferred Subsidiary to vote all of the voting shares of capital stock of any other Transferred Subsidiary owned by such relevant Transferred Subsidiary, at such meetings or in such other corporate action in favor of the foregoing.

(b)    Buyer shall not initiate, and shall cause its Affiliates or any Transferred Subsidiary not to initiate, any civil or administrative Proceeding of whatsoever nature against any present or former director or officer of the Transferred Subsidiaries (other than any Specified Person), out of or in connection with the transactions contemplated by this Agreement, without prejudice to (i) Buyer's right to bring a Claim or initiate a Proceeding against Sellers under and in accordance with the terms and limitations of this Agreement or (ii) Buyer's ability to comply with any criminal Action or Proceeding initiated by a Governmental Authority or to otherwise comply with applicable Law.

(c)    Buyer shall not initiate, and shall cause its Affiliates or any Transferred Subsidiary not to initiate, any civil or administrative Proceeding of whatsoever nature against any present or former director or officer of the Transferred Subsidiaries (other than any Specified Person), out of or in connection with any acts or omissions of such person in connection with his position as a director, officer or employee of the Transferred Subsidiaries prior to the Closing, without prejudice to (i) Buyer's right to bring a Claim or initiate a Proceeding against Sellers under and in accordance with the terms and limitations of this Agreement or (ii) Buyer's ability to comply with any criminal Action or Proceeding initiated by a Governmental Authority or to otherwise comply with applicable Law.

(d)    Sellers shall not initiate any civil or administrative Proceeding of whatsoever nature against any present or former director or officer of the Transferred Subsidiaries (other than any Specified Person), out of or in connection with any acts or omissions of such person in connection with his position as a director, officer or employee of the Transferred Subsidiaries prior to the Closing, without prejudice to (i) Sellers' right to bring a Claim or initiate a Proceeding against Buyer under and in accordance with the terms and limitations of this Agreement or (ii) Sellers' ability to comply with any criminal Action or Proceeding initiated by a Governmental Authority or to otherwise comply with applicable Law.

(e)    In the event that any present or former director or officer of any Transferred Subsidiary (other than any Specified Person), is sued in or made party to or subject of (or is threatened to be sued in or made party to or subject of) any Proceeding out of or in connection with any acts or omissions of such person in connection with his position as a director, officer or employee of any Transferred Subsidiary prior to the Closing, Buyer shall arrange that, subject to

50

adequate measures regarding confidentiality (such as the execution of a customary confidentiality agreement), such director or officer shall have reasonable access to non-privileged documents and information of the Transferred Subsidiaries as are in the possession of such Transferred Subsidiaries, and that such director and officer may make copies of such documents at the actual cost of such copies, as are reasonably necessary for the defense of such Proceeding.

(f)     Following the Closing until the six (6) year anniversary thereof, Buyer shall (i) cause the Transferred Subsidiaries not to amend, repeal or otherwise modify the Transferred Subsidiaries' Organizational Documents or Indemnification Arrangements as in effect at the Closing, in any manner that would adversely affect the rights thereunder of individuals who are or were directors or officers of the Transferred Subsidiaries prior to Closing and (ii) cause the Transferred Subsidiaries to honor and pay the indemnification, advancement of expenses, and exculpation provisions of each of the Transferred Subsidiaries' Organizational Documents or Indemnification Arrangements as in effect at the Closing; provided that all rights to indemnification in respect of any Proceeding pending or asserted or any claim made within such period shall continue until the disposition of such Proceeding or resolution of such claim.  Buyer shall not cancel or otherwise reduce coverage under any "tail", "run-off," or other insurance policies purchased by Sellers or the Transferred Subsidiaries prior to the Closing; provided that no payments shall be required of the Transferred Subsidiaries or Buyer with respect to such policies after the Closing.

(g)     This Section 6.6 is intended to be for the benefit of each of the directors and officers described in this Section 6.6 and may be enforced by any such Person as if such Person were a party to this Agreement.  The obligations under this Section 6.6 will not be terminated or modified in such a manner as to adversely affect any Person to whom this Section 6.6 applies without the consent of such affected Person.

(h)     Buyer shall not initiate, and shall cause its Affiliates or any Transferred Subsidiary not to initiate, any civil or administrative Proceeding related to preference claims under Chapter 5 of the Bankruptcy Code against any non-Seller party to any Transferred Contract.

Section 6.7     Refunds and Remittances.

(a)     After the Closing: (i) if the Sellers or any of their Affiliates receive any refund or other amount that is a Transferred Asset or is otherwise properly due and owing to the Buyer in accordance with the terms of this Agreement, the Sellers promptly shall remit, or shall cause to be remitted, such amount to the Buyer in accordance with this Agreement and (ii) if the Buyer or any of its Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to the Sellers or any of their Affiliates in accordance with the terms of this Agreement, the Buyer promptly shall remit, or shall cause to be remitted, such amount to the Sellers in accordance with this Agreement.

(b)     In the event that, from and after the Closing, (i) Sellers or any of their Affiliates have retained ownership of a Transferred Asset, then, for no additional consideration to the Sellers or any of their Affiliates, the Sellers shall, and shall cause their controlled Affiliates to, convey, assign or transfer promptly such Transferred Asset to the Buyer or its designees in accordance with this Agreement, and the Parties shall execute all other documents and instruments,

51

and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Transferred Asset to the Buyer or its designees in accordance with this Agreement or (ii) any Excluded Asset has been conveyed to or is received by the Buyer, then, without any consideration payable to the Buyer or any of its Affiliates, the Buyer shall convey, assign or transfer promptly such Excluded Asset to the Sellers in accordance with this Agreement, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to convey, assign and transfer such Excluded Asset to Sellers or their designees in accordance with this Agreement.

Section 6.8    <u>Public Announcements</u>.  From and after the date hereof, the Parties shall consult with each other before making any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither the Buyer nor the Sellers shall make any press release or any public statement prior to obtaining Seller Parent's (in the case of the Buyer) or the Buyer's (in the case of the Sellers) written approval, which approval shall not be unreasonably withheld, except that, without limiting the foregoing consulting obligation, no such approval shall be necessary to the extent disclosure is made in any filing made to any court or may be required by applicable Law or by the Bankruptcy Court.

Section 6.9    <u>Name Change</u>.  The Sellers shall, as promptly as practicable (but in no event later than one year) after the Closing, cease using and displaying any Trademarks that are included in the Transferred Assets, and in accordance with such requirement, the Sellers shall use commercially reasonable efforts to, no later than one year after the Closing, legally change their corporate and business names (to the extent such names include such Trademarks or a confusingly similar Trademarks) to names that are not confusingly similar to such Trademarks, and file notices of such name changes with the Bankruptcy Court.  Under no circumstance shall the Sellers, after the Closing, use or otherwise exploit the Trademarks included in the Transferred Assets or any other indicia confusingly similar to the Trademarks included in the Transferred Assets, Copyrights included in the Transferred Assets, or any work substantially similar to the Copyrights included in the Transferred Assets, as a source identifier in connection with any Seller product, service or corporate, business or domain name.  Notwithstanding the foregoing, the Sellers are not prohibited from using the Trademarks for non-trademark uses, including to factually describe their prior ownership of the Business or in a manner that constitutes fair use under applicable Law.  This <u>Section 6.9</u> is subject in all respects to the terms of the IP License.  For the avoidance of doubt, nothing in this <u>Section 6.9</u> shall limit DE Buyer's use of the Trademarks acquired by DE Buyer pursuant to the DE Purchase Agreement.

Section 6.10    <u>Intellectual Property Matters</u>.

(a)    Upon the reasonable and specific request of Buyer, and at Buyer's expense for reasonable out-of-pocket costs, the Sellers shall use commercially reasonable efforts and shall reasonably cooperate with Buyer to effect the necessary change of ownership and recordals with all patent, trademark, and copyright offices and domain name registrars and other similar authorities (i) where Intellectual Property of any Seller is still recorded in the name of legal predecessors of any Seller or any Person other than a Seller or (ii) where, to the Knowledge of the Sellers, the relevant recordals of the patent, copyright, and trademark offices, and domain name registrars, and other similar authorities, with respect to any Seller's Intellectual Property, are materially incorrect for any other reason.

52

(b)     From the date hereof until the earlier of the termination of the DE Purchase Agreement or the DE Closing, the Parties shall use their commercially reasonable efforts to enter into an intellectual property license agreement in form and substance reasonably acceptable to the Buyer, Sellers and DE Buyer, pursuant to which (i) Sellers and/or DE Buyer (and their successors) will grant to the Buyer a fully paid-up, royalty-free, perpetual and irrevocable license to any Intellectual Property relating to and reasonably necessary for the conduct of the Business as currently contemplated to be conducted that is not included in the Transferred Assets and (ii) the Buyer and the Transferred Subsidiaries will grant to Sellers and/or DE Buyer (and their successors) a fully paid-up, royalty-free, perpetual and irrevocable license to any Intellectual Property relating to and reasonably necessary for the conduct of the DE Business as currently contemplated to be conducted that is not included in the Transferred Assets (as defined in the DE Purchase Agreement) (the "IP License").

(c)     From the Closing until the DE Closing, the Buyer shall make available to Sellers, on a fully paid-up, royalty-free, perpetual and irrevocable basis license, any Intellectual Property relating to and reasonably necessary for the conduct of the DE Business as currently contemplated to be conducted.

Section 6.11    Transition Services Matters.

(a)     From the date hereof until the earlier of the termination of the DE Purchase Agreement or the DE Closing, the Parties shall use their commercially reasonable efforts to enter into a transition services agreement and/or other arrangements in form and substance reasonably acceptable to the Buyer and Sellers and DE Buyer, pursuant to which the Buyer, Sellers and/or DE Buyer may have access to and/or use of the Shared Assets, Transferred Assets, or Transferred Assets (as defined in the DE Purchase Agreement), as applicable, and the Buyer may have access to and/or use certain engineering assets or services located in Hyderabad, India, in each case, as may be reasonably necessary in connection with their respective business (including for the purpose of Sellers seeking to sell the DE Business, for DE Buyer to operate the DE Business, and for the Buyer to continue to operate the Business), in each case as currently contemplated to be conducted, for such time as may be necessary for the applicable Person to be able to transition such services to itself without use of such assets as promptly as possible, and at the actual cost of the Person providing such service (collectively, the "Transition Services Agreement").

(b)     Prior to the execution and delivery of the Transition Services Agreement, the Buyer and Sellers will reasonably cooperate to provide the access and use of the assets and services contemplated by Section 6.11(a) at the actual cost of the Person providing such service and consistent with past practice.

Section 6.12    Non-Competition Agreement.  Prior to the DE Closing, the Buyer will use commercially reasonable efforts to negotiate with Sellers and DE Buyer and enter into a non-competition and non-solicitation agreement relating to the Battery Tray Business, in form and substance reasonably acceptable to the Buyer, Sellers, and DE Buyer, applicable for a period of two (2) years from the date of the Closing (the "Noncompete"), provided that the Noncompete shall be limited to the DE Business and the customers of the DE Business identified by Sellers in writing prior to the Closing.

53

Section 6.13    Post-Closing Assignment of Contracts.    With respect to any Contract that is not designated as an Transferred Contract as of Closing, following the Closing (provided that such Contract has not been rejected by Sellers pursuant to Section 365 of the Bankruptcy Code and is not a Transferred Asset (as defined in the DE Purchase Agreement)), upon written notice(s) from Buyer, as soon as practicable, Sellers shall take all actions reasonably necessary to assume and assign to Buyer pursuant to Section 365 of the Bankruptcy Code, which may be set forth in the Sale Order, any Contract(s) set forth in Buyer's notice(s); provided that any applicable Cure Claim shall either be waived by the contract counterparty or paid by Buyer. Each Seller agrees and acknowledges that (i) it shall provide Buyer with reasonable advance notice of any motion(s) to reject any Contract and (ii) the covenant set forth in this Section 6.13 shall survive the Closing. Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to Buyer pursuant to this Section 6.13, such Contract also shall be deemed an Transferred Contract.

## ARTICLE VII.
## TAX MATTERS

Section 7.1    Transfer Taxes.    Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes payable solely as a result of the sale or transfer of the Transferred Stock or the Transferred Assets and the assumption of the Assumed Liabilities pursuant to this Agreement ("Transfer Taxes") shall (to the extent not subject to an exemption under the Bankruptcy Code) be borne by the Buyer. The Sellers and the Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce, or eliminate any such Transfer Taxes, and shall each sign and file (or cause its respective Affiliates to sign and file) all documentation with the relevant Governmental Authority relating to such Transfer Taxes as it may be required to sign or file under applicable Law. The Sellers shall prepare and file all necessary Tax Returns or other documents with respect thereto and shall promptly provide a copy of any such Tax Returns or other documents to the Buyer.

Section 7.2    Tax Cooperation.    The Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information (including access to books and records relating to Taxes) and assistance relating to the Business, the Transferred Subsidiaries and the Transferred Assets and the Assumed Liabilities as is reasonably necessary for determining any Liability for Taxes, the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax; provided, however, that the Buyer shall not be required to disclose the contents of its Tax Returns to any Person. Any reasonable expenses incurred in furnishing such information or assistance pursuant to this Section 7.2 shall be borne by the Party requesting it.

Section 7.3    Bulk Sales.    Notwithstanding any other provisions in this Agreement, the Buyer and the Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to the Buyer.

## ARTICLE VIII.
## CONDITIONS TO CLOSING

Section 8.1    <u>General Conditions</u>.  The respective obligations of the Buyer and the Sellers to consummate the Closing shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any Party in its sole discretion (<u>provided</u> that such waiver shall only be effective as to the obligations of such Party):

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order (whether temporary, preliminary or permanent), or shall have initiated and be actively pursuing any legal proceedings seeking any such Order, that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements (any such Law or Order, a "<u>Legal Restraint</u>").

(b)    Any waiting period (and any extension thereof) under the HSR Act or any other Antitrust Law applicable to the transactions contemplated by this Agreement shall have expired or shall have been terminated or the necessary clearance thereunder shall have been received.

(c)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, reversed or modified absent consent of Buyer.

Section 8.2    <u>Conditions to Obligations of the Sellers</u>.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Seller Parent in its sole discretion:

(a)    The representations and warranties of the Buyer contained in this Agreement shall be true and correct both when made and as of the Closing Date (other than in the case of representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct as of such specified date), except where the failure to be so true and correct (without giving effect to any limitation or qualification as to "materiality" (including the word "material") or "Buyer Material Adverse Effect" set forth therein) would not, individually or in the aggregate, reasonably be expected to have a Buyer Material Adverse Effect.

(b)    The Buyer shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)    The Professional Fee Escrow Amount (as defined below) shall have been deposited by or on behalf of Buyer or its designee into one or more segregated bank accounts (collectively, the "<u>Professional Fee Escrow Account</u>") that the Sellers shall maintain in trust solely for the applicable professionals to the Sellers and the Creditors' Committee retained under section 327, 328 and/or 1102 of the Bankruptcy Code (the "<u>Estate Professionals</u>") and for no other entities until the professional fee and expense claims of the applicable Estate Professionals allowed by the Bankruptcy Court (the "<u>Professional Fee Claims</u>") have been irrevocably paid in full to such Estate Professionals pursuant to one or more final Orders of the Bankruptcy Court.  As used herein,

"Professional Fee Escrow Amount" means an amount equal to the aggregate amount needed to satisfy all unpaid Professional Fee Claims and other unpaid fees and expenses the Estate Professionals have incurred or will incur in rendering services to the Sellers (including for the avoidance of doubt, any transaction or success fee) up to and through the closing, dismissal, conversion, or other resolution of the Bankruptcy Cases, which Professional Fee Escrow Amount shall not exceed $11,250,000 (including amounts paid in respect of Professional Fee Claims under the DE Purchase Agreement), and the payment of such amounts shall be deemed to satisfy the condition of Section 8.2(c) of the DE Purchase Agreement; provided that a portion of the Professional Fee Escrow Amount equal to $500,000 shall not be disbursed from the Professional Fee Escrow Account until the closing, dismissal, conversion, or other resolution of the Bankruptcy Cases.

(d)    The Sellers shall have received the documents listed in Section 2.7(c).

(e)    Unless the entry into the IP License is waived by DE Buyer under the DE Purchase Agreement, the IP License shall have been duly executed and delivered on terms agreed to pursuant to (or in the event the applicable Persons are not unable to agree, as determined by the Bankruptcy Court based on) Section 6.10(b).

(f)    Unless the entry into the Transition Services Agreement is waived by DE Buyer under the DE Purchase Agreement, the Transition Services Agreement shall have been duly executed and delivered on terms agreed to pursuant to (or in the event the applicable Persons are not unable to agree, as determined by the Bankruptcy Court based on) Section 6.11(a).

(g)    Unless the entry into the Noncompete is waived by DE Buyer under the DE Purchase Agreement, the Noncompete shall have been duly executed and delivered on terms agreed to pursuant to (or in the event the applicable Persons are not unable to agree, as determined by the Bankruptcy Court based on) Section 6.12.

Section 8.3    Conditions to Obligations of the Buyer.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by the Buyer in its sole discretion:

(a)    Representations and Warranties.

(i)    Each Fundamental Representation that is qualified by a materiality standard (including "in all material respects," "material" or "Material Adverse Effect") shall be true and correct in all respects both when made and as of the Closing Date (other than in the case of Fundamental Representations that are made as of a specified date, which Fundamental Representations shall be true and correct as of such specified date), and each Fundamental Representation that is not qualified by a materiality standard (including "in all material respects," "material" or "Material Adverse Effect") shall be true and correct in all but de minimis respects both when made and as of the Closing Date (other than in the case of Fundamental Representations that are made as of a specified date, which Fundamental Representations shall be true and correct as of such specified date).

US 167746098v12
US 167746098v16

(ii)    The representations and warranties of the Sellers contained in this Agreement (other than the Fundamental Representations) shall be true and correct both when made and as of the Closing Date (other than in the case of representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct as of such specified date), except where the failure to be so true and correct (without giving effect to any limitation or qualification by a materiality standard (including "in all material respects," "material" or "Material Adverse Effect")) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    The Sellers shall have, in all material respects, performed all obligations and agreements and complied with all covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.

(c)    No Material Adverse Effect shall have occurred after the date of this Agreement.

(d)    The Buyer shall have received the documents listed in Section 2.7(b).

(e)    The DE Purchase Agreement shall have been amended consistent with the terms of this Agreement to the Buyer's reasonable satisfaction.

(f)    One of the following shall have occurred: (i) the DE Closing shall have occurred and the rights, claims and causes of action described in Section 2.1(g) of the DE Purchase Agreement shall have been transferred to DE Buyer or its designee thereunder or (ii) this Agreement shall have been amended to provide that the rights, claims and causes of action described in Section 2.1(g) of the DE Purchase Agreement shall be transferred to the Buyer or its designee upon the Closing.

(g)    No insolvency or equivalent proceeding shall have been commenced, and no notice of an insolvency or equivalent proceeding shall have been provided, with respect to any Transferred Subsidiary or any direct or indirect subsidiary of a Transferred Subsidiary.

(h)    The Accommodation Agreements shall be in full force and effect and shall not have been terminated or amended or modified in any manner adverse to the Business.

(i)    The Bankruptcy Court shall have approved and authorized the Buyer's ability, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid the Credit Bid Amount in satisfaction of the Purchase Price set forth in Section 2.6.

## ARTICLE IX.
## TERMINATION

Section 9.1    Termination.  This Agreement may be terminated at any time prior to the Closing (the date on which this Agreement terminates in accordance with its terms):

(a)    by mutual written consent of the Buyer and Seller Parent;

(b)    either Seller Parent or the Buyer, if:

(i)    a Legal Restraint is in effect that has become final and nonappealable; provided that no Party may terminate this Agreement pursuant to this Section 9.1(b)(i) unless it has complied in all material respects with Section 6.5;

(ii)    if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Buyer or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Buyer;

(iii)    the Closing shall not have occurred on or before June 5, 2020 (the "Outside Date"); provided that if on the Outside Date the condition set forth in Section 8.1 has not been satisfied but all other conditions set forth in Article VIII shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but provided that such conditions shall then be capable of being satisfied if the Closing were to take place on such date), then the Outside Date shall be extended automatically by one (1) period of twenty (20) days and such later date shall become the Outside Date for purposes of this Agreement; provided further that the right to terminate this Agreement under this Section 9.1(b)(iii) shall not be available to any Party if such Party is then in material breach of this Agreement that is the cause of the failure of the Closing to occur prior to such date;

(c)    by the Buyer, if:

(i)    the Buyer is not in breach of this Agreement such that the conditions in Section 8.2(a) or Section 8.2(b) would not be satisfied, and the Sellers breach or fail to perform in any respect any of their representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would give rise to the failure of a condition set forth in Section 8.3(a) or Section 8.3(b), (2) has been notified to Seller Parent by Buyer promptly following discovery thereof, or (3) cannot be or has not been cured in all material respects before the earlier to occur of (A) fifteen (15) days following delivery of written notice of such breach or failure and (B) one (1) day prior to the Outside Date;

(ii)    the Sale Hearing is not held on or before May 15, 2020, or if the Sale Hearing is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iii)    the Bankruptcy Court has not entered the Sale Order on or before May 15, 2020, or if approval of the Sale Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iv)    if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(v)    the Sellers withdraw or seek authority to withdraw the Sale Motion;

(vi)    a Material Adverse Effect has occurred;

(vii)    the Sellers publicly announce any plan of reorganization or plan of liquidation or support any such plan filed by any third party, other than any such transaction related

58

to the wind down of the Sellers or the sale or transfer (directly or indirectly) or, or ownership of, any Excluded Assets, and that would not prevent or materially delay the Closing from occurring in accordance with the terms of this Agreement;

(viii)    an insolvency or equivalent proceeding has been commenced, or a notice of an insolvency or equivalent proceeding has been provided, with respect to any Transferred Subsidiary or any direct or indirect subsidiary of a Transferred Subsidiary;

(ix)    the DE Purchase Agreement is terminated in accordance with its terms;

(x)    the Accommodation Agreements are terminated or otherwise cease to be in full force and effect or are amended or modified in any manner adverse to the Business; or

(xi)    for any reason (including an Order of the Bankruptcy Court), the Buyer is legally prohibited, pursuant to Section 363(k) of the Bankruptcy Code or otherwise, to credit bid up to the full Credit Bid Amount in satisfaction of all or any portion of the Purchase Price as set forth in Section 2.6; or

(d)    by Seller Parent, if:

(i)    the Sellers are not in breach of this Agreement such that the conditions in Section 8.3(a) or Section 8.3(b) would not be satisfied, and the Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would give rise to the failure of a condition set forth in Section 8.2(a) or Section 8.2(b), (2) has been notified to Buyer by Seller Parent promptly following discovery thereof, and (3) cannot be or has not been cured in all material respects before the earlier to occur of (A) fifteen (15) days following delivery of written notice of such breach or failure and (B) one (1) day prior to the Outside Date;

(ii)    (1) the Buyer's conditions to Closing set forth in Section 8.1 and Section 8.3 have been satisfied (or waived by the Buyer), other than those conditions that by their nature can only be satisfied at the Closing (which are capable of being satisfied), (2) on or after such date, the Sellers have confirmed in a written notice to the Buyer that they are ready, willing and able to consummate the transactions contemplated by this Agreement and that Sellers' conditions to Closing set forth in Section 8.1 and Section 8.2 have been satisfied (or waived by the Sellers), other than those conditions that by their nature can only be satisfied at the Closing, and (3) the Closing Date does not occur within three (3) Business Days of the Sellers providing the Buyer with such notice; or

(iii)    if the Transaction Committee (as defined in the Limited Liability Operating Company Agreement of Seller Parent, as amended) determines in the exercise of its sole authority that proceeding with the transactions contemplated by this Agreement would be inconsistent with its fiduciary duties.

The Party seeking to terminate this Agreement pursuant to this Section 9.1 (other than Section 9.1(a)) shall, if such Party is Seller Parent, give prompt written notice of such termination

to the Buyer, and if such Party is the Buyer, give prompt written notice of such termination to the Sellers.

Section 9.2    Effect of Termination.  In the event of termination of this Agreement as provided in Section 9.1, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except (i) for the provisions of Section 6.8 (Public Announcements), Section 10.3 (Fees and Expenses), Section 10.7 (Notices), Section 10.10 (Parties in Interest), Section 10.11 (Governing Law), Section 10.12 (Submission to Jurisdiction) and this Article IX and (ii) that no such termination shall relieve any Party from liability for any willful and material breach of this Agreement.

## ARTICLE X.
## GENERAL PROVISIONS

Section 10.1    Guaranty.

(a)    Each Bardin Hill Guarantor guarantees, severally and not jointly, absolutely and unconditionally to Sellers the due and punctual payment, when and as due in accordance herewith, of its percentage as set forth opposite its name on Section 10.1(a) of the Disclosure Schedules (its "Pro Rata Portion") of the funding of the Bardin Hill Professional Fee Escrow Guarantee Portion of the Professional Fee Escrow Amount; provided that the Bardin Hill Guarantors may re-allocate the Pro Rata Portions subsequent to the date hereof among themselves or to additional guarantors by written notice to the Seller Parent so long as (i) the representations, warranties and agreements in this Section 10.1 remain true and correct following such re-allocation, including with respect to such additional guarantors, (ii) any additional guarantors execute a joinder to this Agreement and become Bardin Hill Guarantors subject to the terms and conditions of this Section 10.1, and (iii) the sum of such Pro Rata Portions continues to be equal to 100%.

(b)    The Charlton Guarantor guarantees absolutely and unconditionally to Sellers the due and punctual payment, when and as due in accordance herewith, of the funding of the Charlton Professional Fee Escrow Guarantee Portion of the Professional Fee Escrow Amount.

(c)    The Sellers hereby acknowledge and agree that (i) this guaranty will in no event be enforced against any Bardin Hill Guarantor for any amount in excess of such Guarantor's Pro Rata Portion of the Bardin Hill Professional Fee Escrow Guarantee Portion of the Professional Fee Escrow Amount or against the Charlton Guarantor for any amount in excess of the Charlton Professional Fee Escrow Guarantee Portion of the Professional Fee Escrow Amount, (ii) this guaranty will be available to be enforced only in circumstances where the Professional Fee Escrow Amount is owed and unpaid by or on behalf of Buyer in accordance with the terms of this Agreement, and (iii) no Guarantor nor any member of the Buyer Group will have any obligation or Liability to any Person relating to, arising out of, or in connection with this guaranty, other than as expressly set forth herein.

(d)    Each Guarantor, severally and not jointly, hereby makes the representations and warranties and agreements set forth in Section 4.1, Section 4.2, Section 4.3, Section 4.6, and Article X as to itself, and such representations and warranties and agreements shall apply *mutatis*

*mutandis* as if such Guarantor were substituted for Buyer therein with respect to the matters described in this Section 10.1 only.

(e)      So long as Accommodation Agreements with counterparties representing at least 85% of the currently forecasted revenues for 2020 have been executed and remain in full force and effect, each Bardin Hill Guarantor agrees, severally and not jointly, to consent to and cause (or cause their applicable Affiliates to consent to and cause) one or more increases of up to $5,000,000, in the aggregate for all such increases, of DIP Credit Agreement Indebtedness under the DIP Credit Agreement, as may be requested by Sellers (in consultation with the Buyer) prior to the Closing, pursuant to an amendment to the DIP Credit Agreement in form and substance substantially consistent with the most recent amendments to the DIP Credit Agreement, which such funding shall be used by Sellers only for the operation of the Business in the Ordinary Course of Business and not in any event for Professional Fee Claims.

(f)      Each Guarantor has sufficient uncalled capital commitments or otherwise has available liquid and unencumbered funds (or the enforceable right to obtain such funds from its investors or limited partners, as the case may be, in connection with this Agreement, pursuant to the terms of its applicable fund agreement or other governing documents) in excess of the sum of such Guarantor's obligations hereunder plus the aggregate amount of all other commitments and obligations it currently has outstanding, and such Guarantor shall maintain at least such amount of liquid and unencumbered funds (or the right to obtain such funds) necessary for such Guarantor to fulfill its obligations hereunder and the transactions contemplated hereby until the Closing is consummated in accordance with the terms of this Agreement.

Section 10.2      Nonsurvival of Representations, Warranties and Covenants.  The respective representations, warranties and covenants of the Sellers and the Buyer contained in this Agreement and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; provided that this Section 10.2 shall not limit any covenant or agreement of the Parties to the extent that its terms require performance after the Closing.

Section 10.3      Fees and Expenses.  Except as otherwise provided herein (including Section 6.5(a) and Section 7.1) or in the Order approving the DIP Credit Agreement, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 10.4      Transition of Permits.  To the extent that the Buyer has not obtained all of the Permits included in the Transferred Assets that are necessary for the Buyer to take title to all of the Transferred Assets at the Closing and to operate all aspects of the Business as of immediately following the Closing in the same manner in all material respects as it was operated by the Sellers immediately prior to the Closing, the Sellers shall, to the extent permitted by applicable Laws, use commercially reasonable efforts to maintain after the Closing such Permits that the Buyer reasonably requests, at the Buyer's sole expense, until the earlier of the time the Buyer has obtained such Permits and six (6) months following the Closing (or the remaining term of any such Permit or the closing of the Bankruptcy Case, if shorter).

61

Section 10.5    <u>Amendment and Modification</u>.    This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party; <u>provided</u> that <u>Section 8.2(c)</u> may not be amended or waived in a manner that is adverse to any Estate Professional without the written consent of such Estate Professional and this proviso is intended to be for the benefit of each Estate Professional and may be enforced by each such Person as if such Person were a party to this Agreement.

Section 10.6    <u>Waiver</u>.    No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.    Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 10.7    <u>Notices</u>.    All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent via email transmission to the email address(es) given below and the sender does not receive a notice of such transmission being undeliverable to such email address or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.    All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the Party to receive such notice:

(i)    if to the Sellers, to:

Dura Automotive Systems, LLC
1780 Pond Run
Auburn Hills, Michigan  48326
Attention:    James E. Riedy, EVP & CFO
Email:        riedy.j@duraauto.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle Street

US 167746098v12
US 167746098v16

Chicago, Illinois 60654
Attention:    Ryan Blaine Bennett, P.C.
               Gregory F. Pesce
               Steve Toth
               Mariska S. Richards
Email:        rbennett@kirkland.com
               gregory.pesce@kirkland.com
               steve.toth@kirkland.com
               mariska.richards@kirkland.com

(ii)      if to the Buyer, to:

DNA Buyer LLC
c/o
c/o Bardin Hill Investment Partners
299 Park Avenue, 24th Floor
New York, NY 10171
Attention:    John Freese
Email:        jfreese@bardinhill.com

with copies (which shall not constitute notice) to:

Arnold & Porter Kaye Scholer LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Attention:    Brian Lohan
               Edward Deibert
Email:        brian.lohan@arnoldporter.com
               edward.deibert@arnoldporter.com

and

Orrick Herrington & Sutcliffe LLP
31, avenue Pierre 1er de Serbie
Paris, 75782 Cedex 16
France
Attention:    George Rigo
Email:        grigo@orrick.com

      Section 10.8   <u>Interpretation</u>.  When a reference is made in this Agreement to a Section, Article, Exhibit or Schedule such reference shall be to a Section, Article, Exhibit or Schedule of this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement or in any Exhibit or Schedule are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  All Exhibits and Schedules

US 167746098v12
US 167746098v16

annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein.  The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement.  The term "or" is not exclusive.  The word "will" shall be construed to have the same meaning and effect as the word "shall." References to days mean calendar days unless otherwise specified.

Section 10.9  Entire Agreement.  This Agreement (including the Exhibits and Schedules hereto) and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof.  Neither this Agreement nor any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 10.10  Parties in Interest.  Except as specifically set forth in Section 5.2, Section 6.6, Section 10.5, Section 10.14, and Section 10.24, this Agreement shall be binding upon and inure solely to the benefit of each Party, and nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (including Business Employees and other employees of the Sellers) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.11  Governing Law.  Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by, and construed in accordance with the internal Laws of the State of New York, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of New York.

Section 10.12  Submission to Jurisdiction.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (x) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (y) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or proceeding; provided, however, that, if the Bankruptcy Case is closed or declines jurisdiction, each of the Parties irrevocably agrees that any Action or proceeding arising out of or relating to this Agreement brought by another Party or its successors or assigns shall be heard and determined in the courts of the State of New York sitting in the Borough of Manhattan, The City of New York, and of the United States District Court for the Southern District of New York, and each of the Parties hereby irrevocably submits to the

US 167746098v12
US 167746098v16

exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient, without limiting any other manner of service permitted by Law. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts of the State of New York sitting in the Borough of Manhattan, The City of New York, and of the United States District Court for the Southern District of New York as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

Section 10.13 <u>Disclosure Generally</u>. Notwithstanding anything to the contrary contained in the Disclosure Schedules or in this Agreement, the information and disclosures contained in any Disclosure Schedule corresponding to a Section in <u>Article III</u> of this Agreement shall be deemed to be disclosed and incorporated by reference in any other Disclosure Schedule corresponding to a Section in <u>Article III</u> of this Agreement as though fully set forth in such Disclosure Schedule for which applicability of such information and disclosure is reasonably apparent on its face. The fact that any item of information is disclosed in any Disclosure Schedule shall not be construed to be an admission by any Party to any third party of any liability or obligation with respect thereto or to mean that such information is material or immaterial, within or outside of the Ordinary Course of Business, or required to be disclosed by this Agreement. Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar terms in this Agreement. No information set forth in the Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item, which terms will be deemed disclosed for all purposes of this Agreement.

Section 10.14 <u>Personal Liability</u>. This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect stockholder of the Sellers or the Buyer or any officer, director, employee, Representative or investor of any Party hereto.

Section 10.15 <u>Assignment; Successors</u>. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Seller without the prior written consent of the Buyer, and by the Buyer without the prior written consent of Seller Parent, and any such assignment without such prior written consent shall be null and void. Notwithstanding the foregoing, subject to the terms of <u>Section 2.8</u>, Buyer may assign any of its rights and/ or obligations under this

US 167746098v12
US 167746098v16

Agreement to any of its Affiliates without obtaining the prior written consent of any Seller; provided that in connection with such assignment, Buyer shall assign to such Affiliate the necessary right and authority to make and satisfy the Credit Bid Amount. Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 10.16 Enforcement.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.  Accordingly, (x) each of the Parties shall be entitled to specific performance of the terms hereof or other equitable relief, including an injunction or injunctions, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, without proof of damages or otherwise (this being in addition to any other remedy to which any such Party may be entitled under this Agreement) and (y) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Sellers nor Buyer would have entered into this Agreement.  Each of the Parties hereby further waives (a) any defense in any Action for specific performance that a remedy at law would be adequate and (b) any requirement under any Law to post security as a prerequisite to obtaining equitable relief.

Section 10.17 Currency.  All references to "dollars" or "$" in this Agreement or any Ancillary Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement and any Ancillary Agreement.

Section 10.18 Severability.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 10.19 Waiver of Jury Trial.   EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.20 Counterparts.  Notwithstanding anything else herein to the contrary, this Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties.

Section 10.21 Facsimile or .pdf Signature.  This Agreement may be executed by facsimile or .pdf signature and a facsimile or .pdf signature shall constitute an original for all purposes.

US 167746098v12
US 167746098v16

Section 10.22 <u>No Presumption Against Drafting Party</u>.  Each of the Buyer and the Sellers acknowledges that each Party to this Agreement has been represented by legal counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting Party has no application and is expressly waived.

Section 10.23 <u>Limitation on Damages</u>.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL BUYER GROUP OR ANY SELLER PARTY BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES.

Section 10.24 <u>No Recourse</u>.

(a)    Notwithstanding anything herein to the contrary, in no event shall the Sellers or any Seller Related Party have any rights or claims against any member of the Buyer Group, other than Buyer, in connection with this Agreement, whether at law or equity, in contract, in tort or otherwise and the Sellers shall not institute, and shall use reasonable best efforts to cause the Seller Related Parties not to institute, an Action (whether in law or equity, in contract, in tort or otherwise) in connection with this Agreement against any member of the Buyer Group, other than Buyer.

(b)    Notwithstanding anything herein to the contrary, in no event shall the Buyer or any other member of the Buyer Group have any rights or claims against any Seller Related Party, other than Sellers, in connection with this Agreement, whether at law or equity, in contract, in tort or otherwise and Buyer shall not institute, and shall use reasonable best efforts to cause the other members of the Buyer Group not to institute, an Action (whether in law or equity, in contract, in tort or otherwise) in connection with this Agreement against any Seller Related Party, other than Sellers.

Section 10.25 <u>Time of Essence</u>.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.  When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

[The remainder of this page is intentionally left blank.]

US 167746098v12
US 167746098v16

IN WITNESS WHEREOF, the Sellers and the Buyer have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**DURA AUTOMOTIVE SYSTEMS, LLC**

By: _____
Name:  Jill Frizzley
Title:  Authorized Signatory

**DURA OPERATING, LLC**

By: _____
Name:  Jill Frizzley
Title:  Authorized Signatory

**DURA MEXICO HOLDINGS, LLC**

By: _____
Name:  Jill Frizzley
Title:  Authorized Signatory

**NAMP, LLC**

By: _____
Name:  Jill Frizzley
Title:  Authorized Signatory

**DURA AUTOMOTIVE SYSTEMS CABLE OPERATIONS, LLC**

By: _____
Name:  Jill Frizzley
Title:  Authorized Signatory

[*Signature page to Asset Purchase Agreement*]

**DURA FREMONT L.L.C.**

By: _____
    Name:  Jill Frizzley
    Title:  Authorized Signatory

**DURA G.P.**

By: _____
    Name: Jill Frizzley
    Title:  Authorized Signatory

[*Signature page to Asset Purchase Agreement*]

**<u>BUYER</u>:**

**DNA BUYER LLC**

**By:  Fourth Series of Halcyon Trading Fund LLC, its manager**

**By:  Bardin Hill Investment Partners LP, its manager**

By:  _____
      Name:
      Title:


By:  _____
      Name:
      Title:

*[Signature page to Stock and Asset Purchase Agreement]*

**<u>BARDIN HILL GUARANTORS (for the purposes of Section 10.1 only)</u>:**

**BARDIN HILL EVENT-DRIVEN MASTER FUND LP**

**By: Bardin Hill Investment Partners LP, its investment manager**

By:  _____
        Name:
        Title:

By:  _____
        Name:
        Title:

**HCN LP**

**By: Bardin Hill Investment Partners LP, its investment manager**

By:  _____
        Name:
        Title:

By:  _____
        Name:
        Title:

**HALCYON EVERSOURCE CREDIT LLC**

**By: Bardin Hill Investment Partners LP, its investment manager**

By:  _____
        Name:
        Title:

By:  _____
        Name:
        Title:

*[Signature page to Stock and Asset Purchase Agreement]*

**BARDIN HILL WC FUND LP**

**By: Bardin Hill Investment Partners LP, its investment manager**

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**BROWN CAYMAN I**

**By: Bardin Hill Investment Partners LP, its investment manager**

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**HALCYON VALLEE BLANCHE MASTER LP**

**By: Bardin Hill Investment Partners LP, its investment manager**

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

**CAZ HALCYON STRATEGIC OPPORTUNITIES FUND, L.P.**

**By: Bardin Hill Long Duration Recoveries Management LP, its investment manager**

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

**CAZ HALCYON OFFSHORE STRATEGIC OPPORTUNITIES FUND, L.P.**

**By: Bardin Hill Long Duration Recoveries Management LP, its investment manager**

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

*[Signature page to Stock and Asset Purchase Agreement]*

**HLDR FUND I NUS LP**

**By: Bardin Hill Long Duration Recoveries Management LP, its investment manager**

By:     _____
          Name:
          Title:

By:     _____
          Name:
          Title:

**HLDR FUND I TE LP**

**By: Bardin Hill Long Duration Recoveries Management LP, its investment manager**

By:     _____
          Name:
          Title:

By:     _____
          Name:
          Title:

**HLDR FUND I UST LP**

**By: Bardin Hill Long Duration Recoveries Management LP, its investment manager**

By:     _____
          Name:
          Title:

By:     _____
          Name:
          Title:

*[Signature page to Stock and Asset Purchase Agreement]*

**PRAETORIUM FUND I ICAV**

**By: Bardin Hill Long Duration Recoveries Management LP, its investment manager**

By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

*[Signature page to Stock and Asset Purchase Agreement]*

**CHARLTON GUARANTOR (for the purposes of Section 10.1 only):**

**CHARLTON HOLDINGS LLC**

By: _____
  Name:
  Title:

**SCHEDULES**

**to the**

**STOCK AND ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**DURA AUTOMOTIVE SYSTEMS, LLC,**

**DURA OPERATING, LLC,**

**DURA MEXICO HOLDINGS, LLC,**

**NAMP, LLC,**

**DURA AUTOMOTIVE SYSTEMS CABLE OPERATIONS, LLC,**

**DURA FREMONT L.L.C.,**

**AND**

**DURA G.P.,**

as the Sellers

**AND**

**DNA BUYER LLC**

as the Buyer,

and

solely for the purpose of Section 10.1 thereof, the Guarantors named therein

**Dated as of April 29, 2020**

**SCHEDULES**
**TO**
**STOCK AND ASSET PURCHASE AGREEMENT**

     This document and the attachments hereto (each of which is incorporated by reference herein) constitute the Disclosure Schedules (the "Schedules") referred to in the Stock and Asset Purchase Agreement, dated as of April 29, 2020 (the "Agreement"), by and among  (i) Dura Automotive Systems, LLC, a Delaware limited liability company, Dura Operating, LLC, a Delaware limited liability company, Dura Mexico Holdings, LLC, a Delaware limited liability company, NAMP, LLC, a Delaware limited liability company, Dura Automotive Systems Cable Operations, LLC, a Delaware limited liability company, Dura Fremont L.L.C., a Michigan limited liability company and Dura G.P., a Delaware general partnership (together with the foregoing entities, each a "Seller" and collectively, the "Sellers") and, (ii) DNA Buyer LLC, a Delaware limited liability company, or one of its assignees (the "Buyer") and, (iii) solely for the purposes of and subject to the terms and conditions of Section 10.1 of the Agreement, the Guarantors named therein. Capitalized terms used but not otherwise defined herein shall have the respective meaning assigned to such terms in the Agreement.

     Pursuant to the terms of the Agreement, the Schedules are incorporated in and a part of the Agreement as if set forth in full therein, and are therefore, without limitation and for the avoidance of doubt, subject to Section 10.13 of the Agreement.

**Schedule 1.1(a)**

**Transferred Subsidiaries**

| Entity | Jurisdiction |
|---|---|
| Autopartes Excel de Mexico, S.A. de C.V. | Mexico |
| Dura de Mexico, S.A. de C.V. | Mexico |
| Dura Automotive Components (Jiangsu) Co., Ltd. | China |
| Dura Automotive Components Trading (Shanghai) Co., Ltd. | China |
| Dura Automotive Systems (Shanghai) Co., Ltd. | China |
| Dura Vehicle Components co. Limited JV | China |
| Dura Automotive Systems Asia Limited | Hong Kong |

Schedule 2.1(g)

## Transferred Contracts

| Vendor Name | Contract IDs | | Cure Amount |
|---|---|---|---|
| ACE American Insurance Company | | | $0.00 |
| Advanced Disposal | J5043738, V2194336 (Auburn Hills) | | $0.00 |
| ALLSOURCE TRANSPORTATION LLC | | | $0.00 |
| AMEREN UE | 6585319135, 1950008739, 6850008237, 7051005920, 7051005939 | | $18,174.73 |
| American Data Security | | | $301.00 |
| ANSYS INCORPORATED | | | $19,700.00 |
| Barker Brothers Waste #760 | 3-0760-0009189, 3-0760-1099081 | | $2,400.00 |
| Brownsvill Public Utilities | | 549683 | $0.00 |
| BRUHN & BRUHN FIRE | | | $1,390.00 |
| BrydgeWorks, LLC | Purchase Order - 81125800 | | $0.00 |
| Ceridian HCM | | | $60,278.53 |
| Charter Communication | 8336 41 010 0080661, 8336 10  001 0324792, 8260 18 008 2557305, 8845 30 126 0149772 | | $1,082.60 |
| CITRIX SYSTEM INC. | | | $13,515.00 |
| City of Fremont | CONN-000502-0000-03, CONN-000502-0000-05 | | $0.00 |
| Comcast | 8529 10 256 0150046 (Woodward), 8529 10 256 0151614 (Woodward), 932780886, 939820893 (DHQ) | | $0.00 |
| Constellation NewEnergy - Gas Division, LLC | BG-306843 | | $4,414.15 |
| Constellation NewEnergy, Inc. | | | $9,949.74 |
| Consumers Energy | (1030 3614 3065),  1030 3603 3340 (Woodward), 1030 3603 3365 | | $6,500.00 |
| DEUSTCHE BANK MEXICO | Leasing of Matamoros 3 | | $0.00 |
| DEUSTCHE BANK MEXICO | Leasing of Matamoros 4 | | $0.00 |
| DMS | | | $0.00 |
| DTE Energy | Contracts - 9100 000 5043 5, 920016228826, 9100 000 5044 3 | | $13,000.00 |
| Fennell Spring Company, LLC | Purchase Orders - 14010200, 14010300, 24010200, 31010200, 81010200, 88010200, 89010200 | | $0.00 |
| Focus Business Solutions | | | $7,312.00 |
| Fuyao Glass Industry Group | Purchase Order - 81134800 | | $0.00 |
| Fuze Inc | | | $8,643.37 |
| GALNIK, S.A. DE C.V. | Purchase Order - 89612100 | | $0.00 |
| Great Northern Insurance Company | | | $0.00 |
| J-COM EDI SERVICES, INC. | | | $15.00 |
| Lawrenceburg Utility System | | | $0.00 |
| LEE COUNTY LANDFILL | | | $700.00 |
| LogMeIn USA, Inc. | | | $0.00 |
| MCM 1780 POND, LLC C/O MORNING CALM MANAGEMENT | Auburn Hills HQ Lease | | $0.00 |
| NDK America Inc | Purchase Order - 90526800 | | $0.00 |
| Nufast Logistics Co., Ltd | Purchase Order - 81599100 | | $32,678.84 |
| PAL Surface Treament Systems Limited | Order Nr 2019 - 02 - 019 Skopje | | $0.00 |
| PENSKE TRUCK LEASING CO LP | | | $6,739.42 |
| PV NAFTA LLC | Brownsville Warehouse Lease | | $0.00 |
| Republic Services (Allied Waste) | 3-0239-3245844 | | $0.00 |
| SECURITY LIFE OF DENVER | | | $1,595.60 |
| Soldy Manufacturing Company | Purchase Orders - 14040800, 89040800 | | $0.00 |
| VHP TOOLING CO LTD | | | $0.00 |
| Waste Management | S-44981-93001, S-81512-53009, 21-70906-23000, S-45093-93008, 22-79014-83005 | | $0.00 |
| Westchester Fire Insurance Company | | | $0.00 |

**Schedule 2.1(q)**

**Other Transferred Assets**

To be updated prior to Closing in accordance with Section 2.1(q) of the Agreement.

**Schedule 2.2(g)**

**Excluded Assets**

None.

**Schedule 3.3**

**No Conflict; Required Filings and Consents**

(a)

(i)

None.

(ii)

None.

(iii)

1.      Schedule 3.11(a) is incorporated herein by reference.

(b)

None.

**Schedule 3.4**

**Transferred Assets, Sufficiency of Assets**

(a) None.

(b) None.

(c) None.

**Schedule 3.5**

**Transferred Subsidiaries**

(a) None.

(b)

| Entity | Authorized and Outstanding Equity | Equityholder(s) |
|---|---|---|
| Autopartes Excel de Mexico, S.A. de C.V. | 50,000 Series A shares 62,908,070 Series B shares | Dura Operating, LLC (49,500 Series A; 62,908,070 Series B) Dura Mexico Holdings, LLC (500 Series A) |
| Dura de Mexico, S.A. de C.V. | 258,000 shares | Dura Operating, LLC (100 Series A, 25,800 Series B shares) Dura Mexico Holdings, LLC (1 Series B share) |
| Dura Automotive Components (Jiangsu) Co., Ltd. | $10 MM Registered Capital | Dura Operating, LLC |
| Dura Automotive Components Trading (Shanghai) Co., Ltd. | $2 MM Registered Capital | Dura Operating, LLC |
| Dura Ganxiang Automotive Systems (Shanghai) Co., Ltd. | $10 MM Registered Capital | Dura Operating, LLC |
| Dura Vehicle Components co. Limited JV | $424,600 Registered Capital | Dura Automotive Systems, LLC |
| Dura Automotive Systems Asia Limited | 1 share | Dura Operating, LLC |

(c)  None.

8

**Schedule 3.6**

**No Undisclosed Liabilities**

(b)

None.

**Schedule 3.7**

**<u>Absence of Certain Changes or Events</u>**

(i)  None.

(ii)

(a)

None.

(b)

None.

(c)

None.

(d)

None.

(e)

       (i) None.

       (ii) None.

       (iii) KEIP eligibility for Jim Reidy & Mike Beckett.

(f)

None.

(g)

None.

(h)

None.

**Schedule 3.8**

**<u>Compliance with Law; Permits</u>**

(a)

      (i) None.

      (ii) None.

(b)

None.

Schedule 3.9

**Litigation**

| Case Title and Case Name | Court or Agency and Location | Status of Case |
|---|---|---|
| Carlex Glass America, LLC v. Dura Mexico Holdings, LLC, d/b/a Dura Automotive Systems, Inc., Dura Operating, LLC d/b/a Dura Automotive System, Inc., and Dura Automotive Systems, LLC | State of Tennessee, Davidson County, 20th Judicial District; Michigan Court of Appeals; Michigan Supreme Court | Pending in Arbitration |
| Lucerne International, Inc. v Dura Automotive Systems, LLC and Milan Metal Systems, LLC (also third party co-defendants Asia Forging Supply, Co., Ltd and Faw Forging and Casting USA, Inc.) | Wayne County – Third Circuit Court; Michigan Court of Appeals; Michigan Supreme Court | Appeal |
| Paul Brian Csikos v Dura Automotive Systems, LLC and Arvis Williams | United States Court for the Eastern District of Michigan | Pending |
| Tower Metal Working Fluids vs. Dura Automotive Systems LLC d/b/a Dura Automotive | State of Illinois, Cook County, 1st Municipal District, Civil Division | Pending |
| Empresa V.L.M. Embalajes, S. de R.L. de C.V. v. Dura de Mexico S.A. de C.V., Dura Automotive Systems, LLC, Oscar Gamon (Purchasing Rep.), Victor Davila (Plant 4 Operations Mgr.) and Ruben Ramirez (Plant 3 Operations Mgr.). | El Centro de Justicia Alternativa Penal de Matamoros (Facilitator Cynthia Judith Ortega del Valle) | N/A |

12

**Schedule 3.10**

**Employee Benefit Plans**

(a)

        (i) None.

        (ii) None.

(b)

        (i) None.

        (ii) None.

        (iii) None.

(c)

None.

(d)

None.

(e)

1.      Dura Combined Pension Plan.

**Schedule 3.11**

**Employees**

(a)

1.      Collective Bargaining Agreement, dated February 1, 2018, by and between Dura Automotive Systems, LLC and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (U.A.W.) and Local 2417.

2.      Collective Labor Agreement, dated December 23, 2018, by and between Sindicato de Jornaleros y Obreros Industriales y de la Industria Maquiladora de H. Matamoros Tamaulipas and Dura de Mexico, S.A. de C.V. (Plants II, III and IV).

3.      Collective Labor Agreement, by and between Sindicato Industrial de Trabajadores de Mantenimiento, Limpieza, Conservación y Oficios Varios, Similares y Conexos, C.T.M. and Autopartes Excel De Mexico, S.A. de C.V.


(b)

None.

(c)

1.      Schedule 3.11(a) is incorporated herein by reference.

(d)

None.

**Schedule 3.12**

**<u>Real Property</u>**

(a)

None.

(b)

None.

(c)

None.

**Schedule 3.13**

**<u>Intellectual Property</u>**

(a)

See attached.

(b)

None.

(c)

None.

(d)

None.

(e)

None.

**Schedule 3.14**

**<u>Tax Matters</u>**

(a)

1. The Sellers and the Transferred Subsidiaries (the "<u>Seller Group</u>") did not pay 2018 Illinois state property tax of $27,000.
2. The Seller Group is currently subject to collection procedures in respect of Ohio sales and use tax in the amount of $190,000 for 2006.
3. $19,000,000 CAD has been assessed against the Seller Group, for which tax returns were submitted and are pending processing.

(b)

1. <u>Schedule 3.14(a)</u> is incorporated herein by reference.

(c)

1. <u>Schedule 3.14(a)</u> is incorporated herein by reference.

(d)

None.

(e)

None.

(f)

None.

(g)

None.

(h)

None.

(i)

1.      Dura US has a permanent establishment in Matamoros, Mexico and is therefore subject to corporate income tax in Mexico.

(j)

None.

(k)

1. The Seller Group files as part of the combined filing of Patriarch Partners in the State of Texas.
2. The Seller Group and Global Automotive Systems, LLC ("<u>GAS</u>") file a combined Ohio commercial activity tax return. Dura is current on its share of such tax, but GAS has outstanding liabilities with Ohio.

(l)

| Dura Owner | Address |
|---|---|
| Autopartes Excel de Mexico, S.A. de C.V. | Avenue Penuelas 7 Fracc. Industrial San Pedrito Queretaro, 76148 Mexico |
| Dura Automotive Cable Operations, LLC | 5210 Industrial Drive, Milan, Tennessee 38358 |
| Dura Automotive Cable Operations, LLC | 555 Platt Road, Milan, Michigan |
| Dura Fremont, L.L.C. | 502 Connie Avenue, Fremont, Michigan 49412 |
| Dura, G.P. | 2200 Helton Drive, Lawrenceburg, Tennessee 38464 |
| Dura, G.P. | 301 S. Simmons Street, Stockton, Illinois 61085 |
| Dura Operating, LLC | 1855 Robertson Road, Moberly, Missouri 65270 |

18

**Schedule 3.15**

**<u>Environmental Matters</u>**

(a)

None.

(b)

None.

**Schedule 3.16**

**Material Contracts**

(a)

       (i)

None.

       (ii)

None.

       (iii)

None.

       (iv)

None.

       (v)

None.

(b)

1.      The Seller Group paid fifty percent (50%) of the April rental payments that were required in respect of the Real Property leased at (i) 1780 Pond Run, Auburn Hills, MI, (ii) Poniente 2 y Norte 7 No. 1 A 6, Plant 3, Mexico and (iii) Poniente 2 y Norte 7 No, 1 A 6, Plant 4, Mexico without the consent of the landlords.

**Schedule 3.17**

**Certain Payments**

None.

**Schedule 3.18**

**<u>Insurance</u>**

None.

**Schedule 3.19**

**<u>Brokers</u>**

Jefferies Group, LLC.

**Schedule 3.20**

**Affiliated Transactions**

1.      Management Services Agreement, dated as of January 21, 2010, by and between GAS and Dura Automotive Systems, Inc., all Arrangement Documents entered into thereunder and that certain Memorandum re: Dura and GAS relationship & Managed Services Arrangement (the "GAS Agreement")..

2.      Management Services Agreement, dated as of January 21, 2010, by and between Patriarch Partners Management Group, LLC and Dura Automotive Systems, Inc.

3.      The Sellers and the Transferred Subsidiaries make rental payments in respect of the leased real property located at 34977 Woodward Ave, #401 Birmingham, MI, which is inhabited by an affiliate of Patriarch Partners.

**Schedule 6.1**

**Conduct of the Business**

(b)

(i)

1.      The Transferred Subsidiaries have agreed to sell certain production assets located in the Gaoyou facility to a third party and are required to pay approximately $1,100,000 of the proceeds of such sale to Dura Automotive Plettenberg Leisten & Blenden GmbH.

(ii) None.

(iii) None.

(iv) None.

(v) None.

(vi) None.

(vii) None.

(viii) None.

(ix) None.

(x) None.

(xi) None.

(xii) None.

(xiii) None.

(xiv) None.

(xv) None.

(xvi) None.

(xvii) None.

(xviii) None.

(xix) None.

(xx) None.

(xxi) None.

(xxii) None.

**Schedule 10.1(a)**

**Pro Rata Portion**

| Name | Percent |
|---|---|
| Bardin Hill Event-Driven Master Fund LP | 9.4994% |
| HCN LP | 32.9221% |
| Halcyon Vallee Blanche Master LP | 9.9756% |
| Halcyon Eversource Credit LLC | 4.2391% |
| Bardin Hill WC Fund LP | 14.2840% |
| Brown Cayman I | 10.8908% |
| CAZ Halcyon Strategic Opportunities Fund, L.P. | 3.6595% |
| CAZ Halcyon Offshore Strategic Opportunities Fund, L.P. | 0.5652% |
| HLDR Fund I NUS LP | 1.5533% |
| HLDR Fund I TE LP | 2.6377% |
| HLDR Fund I UST LP | 1.0357% |
| Praetorium Fund I ICAV | 8.7376% |
| | **100.0000%** |

## EXHIBIT 2

**Second DIP Amendment**

## AMENDMENT NO. 2 TO
## SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This Amendment No. 2 (this "Amendment"), dated as of [●], 2020, to the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of October 24, 2019 (as amended by Amendment No. 1 and as further amended, restated, supplemented or otherwise modified prior to the date hereof, the "Credit Agreement"), among DURA AUTOMOTIVE SYSTEMS, LLC, a Delaware limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), the Domestic Subsidiaries from time to time party thereto as guarantors thereunder and each, a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (collectively the "Guarantors"), the financial institutions and other investors from time to time lenders thereunder (collectively, the "Lenders"), and CORTLAND CAPITAL MARKET SERVICES LLC, as agent for such Lenders (in such capacity, the "Agent"). Capitalized terms used herein but not defined herein are used as defined in the Credit Agreement.

W I T N E S S E T H :

WHEREAS, Section 9.1 of the Credit Agreement provides that the Credit Documents may be amended or waived with the written consent of the Agent and the Required Lenders; and

WHEREAS, the Borrower has requested that the Agent and the Required Lenders make certain amendments to the Credit Agreement, as more specifically set forth below, and the Agent and Required Lenders have agreed to do so, subject to certain limitations and conditions set forth below;

NOW, THEREFORE the parties hereto agree as follows:

Section 1.    Amendments to the Credit Agreement. The Credit Agreement is, effective as of the date first written above and subject to the satisfaction (or due waiver) of the conditions precedent set forth in Section 2 hereof, hereby amended as follows:

(a)    The Recitals to the Credit Agreement are hereby amended by deleting "$87,000,000" where it appears therein and substituting "$92,000,000" in lieu thereof.

(b)    Section 1.1 of the Credit Agreement is hereby amended by adding the following defined terms in their proper alphabetical order:

"Amendment No. 2" means that certain Amendment No. 2 to this Agreement, dated as of the Amendment No. 2 Effective Date, among the Loan Parties, the Agent and the Lenders party thereto.

"Amendment No. 2 Delayed Draw Commitment" means, (i) with respect to each Term Loan Lender that is a Lender on the Amendment No. 2 Effective Date, the amount set forth opposite such Term Loan Lender's name on Schedule 2.1(a) as such Lender's "Amendment No. 2 Delayed Draw Commitment" and (ii) in the case of any Person that becomes a Term Loan Lender after the Amendment No. 2 Effective Date, the

amount specified as such Term Loan Lender's "Amendment No. 2 Delayed Draw Commitment" in the Assignment Agreement pursuant to which such Lender assumed such Amendment No. 2 Delayed Draw Commitment, in each case as the same may be reduced or increased from time to time pursuant to the terms hereof.  The aggregate amount of the Term Loan Lenders' Amendment No. 2 Delayed Draw Commitments on the Amendment No. 2 Effective Date is $5,000,000.

"Amendment No. 2 Delayed Draw Commitment Percentage" means, with respect to any Term Loan Lender at any time, the ratio of such Term Loan Lender's Amendment No. 2 Delayed Draw Commitment at such time to the aggregate amount of Amendment No. 2 Delayed Draw Commitments of all Term Loan Lenders at such time.

"Amendment No. 2 Delayed Draw Loans" has the meaning stated in Section 2.1(a).

"Amendment No. 2 Effective Date" means the date on which the conditions set forth in Section 2 (Conditions Precedents to the Effectiveness of Amendment No. 2) of Amendment No. 2 are satisfied, which date is [●], 2020.

"Amendment No. 2 Order" means an order of the Bankruptcy Court, in the form set forth in Exhibit H, authorizing, among other things, Amendment No. 2 and the transactions contemplated thereby, with only such modifications as are reasonably satisfactory to the Borrower and the Required Lenders.

(c)    The following defined terms appearing in Section 1.1 of the Credit Agreement shall be amended and restated in their entirety as follows:

"Maturity Date" means June 5, 2020.

"Orders" means the Interim Order, the Amendment No. 1 Order, the Amendment No. 2 Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

"Term Loan Commitment" means, individually or collectively, as the context may require, the Initial Commitment, the Delayed Draw Commitment, the Amendment No. 1 Delayed Draw Commitment or the Amendment No. 2 Delayed Draw Commitment.  The aggregate amount of (i) the Initial Commitment as of the Amendment No. 2 Effective Date is $0, (ii) the Delayed Draw Commitment as of the Amendment No. 2 Effective Date is $0, (iii) the Amendment No. 1 Delayed Draw Commitment as of the Amendment No. 2 Effective Date is $0 and (iv) the Amendment No. 2 Delayed Draw Commitment as of the Amendment No. 2 Effective Date is $5,000,000.

"Term Loan Exposure" means, with respect to any Lender at any time, the sum of (a) the Initial Commitment, the Delayed Draw Commitment, the Amendment No. 1 Delayed Draw Commitment and the Amendment No. 2 Delayed Draw Commitment of such Lender at such time and (b) the aggregate principal amount of the Term Loans of such Lender outstanding at such time.

    (d)       Section 2.1(a) of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

        (a)       Subject to the terms and conditions hereof and in the Orders, each Term Loan Lender severally agrees to (i) following entry of the Interim Order and the satisfaction (or waiver) of the conditions set forth in Sections 3.1, to make term loans to the Borrower in one or more Borrowings from time to time during the period beginning on the Closing Date and ending on October 30, 2019 in an aggregate principal amount for all such Borrowings not to exceed such Term Loan Lender's Initial Commitment (the "Initial Loans"), (ii) following satisfaction (or waiver) of the conditions to Borrowing set forth in Sections 3.2, to make additional delayed draw term loans to the Borrower in one or more Borrowings from time to time during the period beginning upon entry of the Final Order and ending on the Termination Date (the "Delayed Draw Loans") in an aggregate principal amount for all such borrowings not to exceed such Term Loan Lender's Delayed Draw Commitment, (iii) following entry of the Amendment No. 1 Order and the satisfaction (or waiver) of the conditions set forth in Section 2 of Amendment No. 1, to make delayed draw term loans to the Borrower in multiple Borrowings from time to time beginning on the Amendment No. 1 Effective Date and ending on the Maturity Date (the "Amendment No. 1 Delayed Draw Loans") in an aggregate principal amount not to exceed such Term Loan Lender's Amendment No. 1 Delayed Draw Commitment and in a weekly amount equal to the Amendment No. 1 Delayed Draw Weekly Amount and (iv) following entry of the Amendment No. 2 Order and the satisfaction (or waiver) of the conditions set forth in Section 2 of Amendment No. 2, to make delayed draw term loans to the Borrower in multiple Borrowings from time to time beginning on the Amendment No. 2 Effective Date and ending on the date of the closing of an Acceptable 363 Sale for the Borrower's North American business (the "Amendment No. 2 Delayed Draw Loans") in an aggregate principal amount not to exceed such Term Loan Lender's Amendment No. 2 Delayed Draw Commitment.  Each borrowing of Delayed Draw Loans shall be made by the Term Loan Lenders in accordance with their respective Delayed Draw Commitment Percentage of the requested borrowing (and the aggregate amount of borrowings of Delayed Draw Loans shall in no event exceed the aggregate amount of the Delayed Draw Commitments of the Term Loan Lenders). Following the making of any Delayed Draw Loans, the Delayed Draw Commitment of such Term Loan Lender in respect of the Delayed Draw Loans shall automatically be reduced by the amount of such Delayed Draw Loan so made.  To the extent not terminated earlier, each Term Loan Lender's Delayed Draw Commitment shall terminate immediately and without further action on the Termination Date.  Each Borrowing of Amendment No. 1 Delayed Draw Loans shall be made by the Term Loan Lenders in accordance with their respective Amendment No. 1 Delayed Draw Commitment Percentage of the requested Borrowing (and the aggregate amount of Borrowings of Amendment No. 1 Delayed Draw Loans shall in no event exceed the aggregate amount of the Amendment No. 1 Delayed Draw Commitments of the Term Loan Lenders).  Following the making of any Amendment No. 1 Delayed Draw Loans, the Amendment No. 1 Delayed Draw Commitment of such Term Loan Lender in respect of the Amendment No. 1

Delayed Draw Loans shall automatically be reduced by the amount of such Amendment No. 1 Delayed Draw Loan so made. Each Term Loan Lender's Amendment No. 1 Delayed Draw Commitment shall terminate when the Amendment No. 1 Delayed Draw Commitment is reduced to $0. To the extent not terminated earlier, each Term Loan Lender's Amendment No. 1 Delayed Draw Commitment shall terminate immediately and without further action on the Maturity Date. Each Borrowing of Amendment No. 2 Delayed Draw Loans shall be made by the Term Loan Lenders in accordance with their respective Amendment No. 2 Delayed Draw Commitment Percentage of the requested Borrowing (and the aggregate amount of Borrowings of Amendment No. 2 Delayed Draw Loans shall in no event exceed the aggregate amount of the Amendment No. 2 Delayed Draw Commitments of the Term Loan Lenders). Following the making of any Amendment No. 2 Delayed Draw Loans, the Amendment No. 2 Delayed Draw Commitment of such Term Loan Lender in respect of the Amendment No. 2 Delayed Draw Loans shall automatically be reduced by the amount of such Amendment No. 2 Delayed Draw Loan so made. Each Term Loan Lender's Amendment No. 2 Delayed Draw Commitment shall terminate when the Amendment No. 2 Delayed Draw Commitment is reduced to $0. To the extent not terminated earlier, each Term Loan Lender's Amendment No. 2 Delayed Draw Commitment shall terminate immediately and without further action on the date of the closing of an Acceptable 363 Sale for the Borrower's North American business. Once funded, each Initial Loan, each Delayed Draw Loan, each Amendment No. 1 Delayed Draw Loan and each Amendment No. 2 Delayed Draw Loan shall be a "Loan" and a "Term Loan" for all purposes under this Agreement and the other Credit Documents. Notwithstanding anything herein to the contrary, each of the parties hereto acknowledges and agrees that (i) Initial Loans in the principal amount of $5,100,000 were advanced by the Term Loan Lenders to the Borrower on October 24, 2019 (with the allocation among the Term Loan Lenders as set forth on Schedule 2.1(b)), (ii) Initial Loans in the principal amount of $32,000,000 were advanced by the Term Loan Lenders to the Borrower on October 25, 2019 (with the allocation among the Term Loan Lenders as set forth on Schedule 2.1(b)) and (iii) Initial Loans in the principal amount of $22,500,000 were advanced by the Term Loan Lenders to the Borrower on October 30, 2019 (with the allocation among the Term Loan Lenders as set forth on Schedule 2.1(b)). Such Initial Loans shall accrue interest from the date so advanced in accordance with the terms of this Agreement. As of October 30, 2019 (after giving effect to the advance of Initial Loans on such date), the Initial Commitments of the Term Loan Lenders are $0. The aggregate amount of the Delayed Draw Commitments remaining on the Amendment No. 1 Effective Date are $0.

(e)    The introductory paragraph to Section 3.2 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

Conditions to Delayed Draw Borrowing, Amendment No. 1 Delayed Draw Borrowing or Amendment No. 2 Delayed Draw Borrowing. The obligation of each Lender to make any Delayed Draw Loan, any Amendment No. 1 Delayed Draw Loan or any Amendment No. 2 Delayed Draw Loan on any Borrowing Date is

subject to the satisfaction, or waiver in accordance with Section 9.1, of the following conditions precedent:

(f)     Section 2.5 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

Section 2.5     Use of Proceeds.  The Borrower will use the proceeds of any Borrowing consistent with the Orders and the Approved Budget (subject to Permitted Variances), (a) in the case of the Initial Loans, to refinance all amounts owing under (i) the Existing ABL Credit Agreement and (ii) the Patriarch DIP Facility, (b) for working capital and general corporate purposes, including capital expenditures, of the Credit Parties and, to the extent funded through intercompany loans evidenced by promissory notes pledged to the Agent to secure the Obligations on a first-priority basis in accordance with the Orders, (c) the pursuit of an Acceptable 363 Sale and (d) bankruptcy-related costs and expenses, subject to the Carve Out; provided that the proceeds of any Borrowing of Amendment No. 2 Delayed Draw Loans shall be used only for ordinary course operations from the Amendment No. 2 Effective Date until the closing of an Acceptable 363 Sale for the Borrower's North American business and not in any event for professional fee claims or Carve Out. No portion of the proceeds of any Borrowing shall be used by the Borrower or any of its Subsidiaries in any manner that would cause such Borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act, in each case as in effect on the date or dates of such Borrowing and such use of proceeds.

(g)     Schedule 2.1(a) is hereby deleted in its entirety and replaced with Schedule 2.1(a) appearing on Exhibit A attached hereto.

(h)     The Credit Agreement is hereby amended by adding a new Exhibit H (Amendment No. 2 Order) thereto, which shall be in the form of Exhibit B attached hereto.

Section 2.     Conditions Precedent to the Effectiveness of Amendment No. 2.  This Amendment shall become effective when each of the following conditions precedent shall have been satisfied or duly waived by the Agent (such date, the "Amendment No. 2 Effective Date"):

(a)     The Lenders shall have received a certificate of the secretary or assistant secretary, the chief executive officer, chief financial officer, the authorized signatory, the manager, the general partner, or other Authorized Officer as the case may be, of each Credit Party with respect to (i) the articles of incorporation or certificate of formation, as the case may be, of such Credit Party (which certificate may certify that no changes have been made to the versions delivered on the Closing Date or the Amendment No. 1 Effective Date in lieu of attaching such documents to such certificate), (ii) the regulations, bylaws, operating agreement or limited partnership agreement, as the case may be, of such Credit Party (which may certify that no changes have been made to the versions delivered on the Closing Date or the Amendment No. 1 Effective Date in lieu of attaching such documents to such certificate), (iii) the resolutions of the Board of Directors of such Credit Party approving this Amendment and the other documents to be delivered

5

by such Credit Party in accordance with this Amendment and the performance of the obligations of such Credit Party thereunder, and (iv) the names and true signatures of the officers of such Credit Party or such other persons authorized to sign this Amendment and the other documents to be delivered by it thereunder.

(b)    The Lenders shall have received a good standing certificate from the applicable Governmental Authority of each jurisdiction of incorporation, organization or formation of each Credit Party, each dated a recent date prior to the Amendment No. 2 Effective Date.

(c)    The Borrower, the Agent and the Required Lenders (which shall include each Lender with an Amendment No. 2 Delayed Draw Commitment) shall have signed a counterpart hereof (whether the same or different counterparts);

(d)    The Agent and the Lenders shall have received a Borrowing Certificate in accordance with Section 2.3 of the Credit Agreement, executed by an Authorized Officer of the Borrower;

(e)    As of the date hereof, after giving effect to any Amendment No. 2 Delayed Draw Loans borrowed on the date hereof, the representations, warranties and covenants of the Credit Parties contained in the Credit Documents (after giving effect to Amendment No. 2) shall be true, correct and complied with, in each case, in all material respects (unless any such representation, warranty or covenant shall already contain a materiality qualifier, in which case it shall be true, correct and complied with in all respects) on and as of the date hereof, as if made on and as of the date hereof;

(f)    As of the date hereof, after giving effect to any Amendment No. 2 Delayed Draw Loans borrowed on the date hereof and Amendment No. 2, no event shall have occurred and be continuing or would result from the consummation of the Amendment No. 2 Delayed Draw Loans that would constitute an Event of Default or a Default;

(g)    After making any Amendment No. 2 Delayed Draw Loans requested on the Amendment No. 2 Effective Date, the aggregate outstanding principal amount of the Amendment No. 2 Delayed Draw Loans shall not exceed the aggregate amount of the Amendment No. 2 Delayed Draw Commitments;

(h)    The Borrower shall have confirmed in writing that the proceeds of the Amendment No. 2 Delayed Draw Loans shall be used in accordance with the provisions of Section 2.5 of the Credit Agreement, as amended by this Amendment;

(i)    The Bankruptcy Court shall have entered the Amendment No. 2 Order approving the incurrence of the Amendment No. 2 Delayed Draw Loans, and the Amendment No. 2 Order shall be in full force and effect, shall not have been vacated or reversed and shall not be subject to any stay;

(j)    The Agent and the Lenders shall have received a certificate from the chief executive officer, chief financial officer, the authorized signatory, the manager, the general partner, or other Authorized Officer, as the case may be, of each Credit Party stating that (i) no Customer

has provided notice of its intention to terminate, modify, amend, remove, reduce, replace or resource business with the Debtors or their non-Debtor subsidiaries, (ii) neither the Debtors nor their non-Debtor subsidiaries have received notice of any Customer's intent to purchase material tooling or other material equipment and (iii) no non-Debtor subsidiary has initiated insolvency proceedings in any jurisdiction; and

(k)     All fees and out-of-pocket expenses (including attorneys' fees) of the Lenders and the Agent incurred and payable by the Borrower in accordance with the terms of the Credit Documents in connection with this Amendment, the Credit Agreement and the other Credit Documents shall have been paid, or shall be paid substantially concurrently with, the Amendment No. 2 Delayed Draw Loans (which amounts may, at the Borrower's option, be offset against the proceeds of such Loans).

On the date hereof, the Borrower shall be deemed to have represented and warranted that the conditions specified in paragraphs (e) and (i) above have been satisfied.

Section 3.     <u>Consent of Guarantors and Reaffirmation of Obligations</u>. Each Guarantor hereby consents to this Amendment and agrees that it continues to guarantee the due and punctual payment in full in cash of all Obligations, as modified hereby, when and as the same shall become due, and that the terms hereof shall not affect in any way its obligations and liabilities, as expressly modified hereby, under the Credit Documents.  Each Credit Party hereby reaffirms as of the date hereof (a) all such Obligations, and agrees that such Obligations shall remain in full force and effect, (b) the Liens granted under the Credit Documents, and agrees that such Liens shall continue to secure the Obligations as expressly modified hereby, and (c) the validity and enforceability of the Credit Documents.

Section 4.     <u>Consent of the Agent</u>. The Agent hereby consents to the incurrence by the Borrower of the Amendment No. 2 Delayed Draw Loans and the completion by the Borrower of the other transactions contemplated hereby and confirms that such actions shall not constitute an Event of Default pursuant to Section 7.1(x) of the Credit Agreement.

Section 5.     <u>Consent of the Required Lenders</u>. The Required Lenders hereby consent to the modification of the Orders to permit the incurrence by the Borrower of the Amendment No. 2 Delayed Draw Loans and the completion by the Borrower of the other transactions contemplated hereby and confirm that (i) such actions shall not constitute an Event of Default pursuant to Section 7.1(kk) of the Credit Agreement and (ii) this Amendment shall constitute the consent required by Section 5.32 of the Credit Agreement with respect to the amendment of the Orders.

Section 6.     <u>Effect on the Credit Documents</u>. As of the Amendment No. 2 Effective Date, this Amendment shall constitute a Credit Document, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import and each reference in the other Credit Documents to the Credit Agreement (including, without limitation, by means of words like "thereunder," "thereof," "therein" and words of like import) shall refer to the Credit Agreement as modified hereby, and this Amendment and the Credit Agreement shall be read together and construed as a single agreement.  The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, (a) waive or modify any right, power or remedy under, or any other provision of, any Credit Document or (b) commit or otherwise

obligate the Agent or any Lender to enter into or consider entering into any other waiver or modification of any Credit Document.  Except as specifically amended above, all of the terms and provisions of the other Credit Documents are and shall remain in full force and effect and are hereby ratified and confirmed.

Section 7.    <u>Execution in Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.  Delivery of an executed counterpart of this Amendment by facsimile or other electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Amendment.

Section 8.    <u>Governing Law; Miscellaneous</u>. THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.  The provisions of Sections 9.11 and 9.12 of the Credit Agreement shall apply to this Amendment *mutatis mutandis*.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers and general partners thereunto duly authorized as of the date first written above.

**DURA AUTOMOTIVE SYSTEMS, LLC**

By: _____
Name:
Title:

**DURA OPERATING, LLC**

By: _____
Name:
Title:

**DURA MEXICO HOLDINGS, LLC**

By: _____
Name:
Title:

**NAMP, LLC**

By: _____
Name:
Title:

**DURA AUTOMOTIVE SYSTEMS
CABLE OPERATIONS, LLC**

By: _____
Name:
Title:

**DURA FREEMONT, L.L.C.**


By:_____
Name:
Title:

**DURA G.P.**


By:_____
Name:
Title:

SIGNATURE PAGE TO AMENDMENT NO. 2

**CORTLAND CAPITAL MARKET
SERVICES LLC**, as the Agent


By:_____
Name:
Title:

**[LENDER]**


By:_____
Name:
Title:

.

EXHIBIT A TO AMENDMENT NO. 2

**SCHEDULE 2.1(A)**

**COMMITMENTS**

Initial Commitment

| Term Loan Lender | Initial Commitment |
|---|---|
| Halcyon Loan Trading Fund LLC | $40, 711,159.11 |
| HCN LP | $13,548,481.32 |
| Praetorium Fund I ICAV | $3,595,819.14 |
| Halcyon Eversource Credit LLC | $1,744,540.43 |
| **Total:** | **$59,600,000** |

Delayed Draw Commitment

| Term Loan Lender | Delayed Draw Commitment |
|---|---|
| Halcyon Loan Trading Fund LLC | $16,666,984.61 |
| HCN LP | $5,546,693.70 |
| Praetorium Fund I ICAV | $1,472,113.86 |
| Halcyon Eversource Credit LLC | $714,207.83 |
| **Total:** | **$24,400,000** |

Amendment No. 1 Delayed Draw Commitment

| Term Loan Lender | Amendment No. 1 Delayed Draw Commitment |
|---|---|
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| **Total:** | **$3,000,000** |

Amendment No. 2 Delayed Draw Commitment

| Term Loan Lender | Amendment No. 2 Delayed Draw Commitment |
|---|---|
| [●] | $[●] |
| [●] | $[●] |
| [●] | $[●] |
| **Total:** | **$5,000,000** |

EXHIBIT B TO AMENDMENT NO. 2

**EXHIBIT H**

**AMENDMENT NO. 2 ORDER**

**(See attached.)**