### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DURA AUTOMOTIVE SYSTEMS, LLC, *et al.*,[1]<br><br>       Debtors. | Chapter 11<br><br>Case Nos. 19-12378 (KBO)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 1226, 1239, and 1248** |

### PRETRIAL BRIEF OF DUS OPERATING, INC., DESIGNATED ASSIGNEE OF DURA BUYER DNA, LLC, REGARDING MOTION OF HAIN CAPITAL INVESTORS MASTER FUND, LTD. FOR PAYMENT OF CURE AMOUNT

DUS Operating, Inc. ("DUS"), designated assignee of Dura Buyer DNA, LLC ("Purchaser"), by its counsel, respectfully states as follows as its pretrial brief in support of this objection to *Motion of Hain Capital Investors Master Fund, Ltd. for Payment of Cure Amount* [Docket No. 1226] (the "Cure Payment Motion"), which was filed by Hain Capital Investors Master Fund, Ltd. ("Hain") in the above-captioned cases.

## I.  BACKGROUND

1.      On October 17, 2019 (the "Petition Date"), Dura Automotive Systems, LLC and its above-captioned affiliated debtors and debtors in possession (individually, a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Tennessee. On November 1, 2019, the United States Bankruptcy Court for the Middle District of Tennessee entered the *Transfer of Venue Order*

---

[1]     The debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Dura Automotive Systems Cable Operations, LLC (7052); Dura Automotive Systems, LLC (8111); Dura Fremont L.L.C. (1252); Dura G.P. (8092); Dura Mexico Holdings, LLC (4188); Dura Operating, LLC (2304); and NAMP, LLC (3693). Dura Automotive Systems, LLC's service address is: 1780 Pond Run, Auburn Hills, Michigan 48326.

[Docket No. 1060], transferring the Debtors' chapter 11 cases to this Court, effective as of November 8, 2019.

**Plasti-Paint Claims and the Plasti-Paint Contracts**

2. On December 15, 2019, Debtor Dura G.P. filed its Schedule of Assets and Liabilities [Docket. No. 422] listing Plasti-Paint on its Schedule E/F with a claim in the aggregate amount of $1,671,308.39. In addition, on November 21, 2019, Plasti-Paint filed proofs of claim nos. 533 and 534 against Debtor Dura G.P., asserting unsecured claims in the aggregate amount of $1,849,996.02, and proof of claim no. 545 against Debtor Dura Automotive Systems, LLC, asserting an unsecured claim in the amount of $1,212,716.19 (the "Plasti-Paint Claims"). Plasti-Paint asserted that these claims were based on trade contract(s) with the Debtors, numbered 81087500, 81114801, 81157900 (collectively, the "Plasti-Paint Contracts").

3. The Plasti-Paint Contracts consisted of two purchase orders. Pursuant to one purchase order, Plasti-Paint provided products and services to the Debtors from Plasti-Paint's Michigan facility (the "Michigan Contract"), and, pursuant to the other, Plasti-Paint provided products and services to the Debtors from Plasti-Paint's Georgia Facility (the "Georgia Contract"). See attached **Exhibit A**, the Michigan Contract, and **Exhibit B**, the Georgia Contract. Importantly, the Michigan Contract related to the initial painting of roof rails (or luggage racks) used in the manufacture of automobiles (the "Parts") by Plasti-Paint, and the Georgia Contract generally related to rework required to be performed to the Parts. For purposes of clarity, originally the Parts were coated by another supplier using an e-coat process and then sent to Plasti-Paint for "wet" painting at the Michigan Plasti-Paint facility. This coating process caused a number of parts to require rework and repainting, which was performed at Plasti-Paint's Georgia facility pursuant to the Georgia Contract.

4.     As described in detail below, after the sale Purchaser entered into a new contract with Plasti-Paint. **Exhibit C**, the New Contract.  The New Contract was entered into because Purchaser changed the coating process from e-coat process to a new technical anodize process. The new technical anodize process required a completely different painting process from the previous e-coat process.  With the e-coat process, Plasti-Paint was simply required to complete a "wet" paint coat.  With the new technical anodize process, Plasti-Paint was required to complete a conversion coat, a primer coat, and a "wet" paint coat.  This eliminated the need for reworking pursuant to the Georgia Contract, and Purchaser was then able to move the Plasti-Paint "wet" paint finishing process to Georgia and out of Michigan (that process was not previously performed in Georgia) and negotiate significantly better pricing.  This also eliminated many processes from the Michigan Contract and the Georgia Contract, and resulted in the New Contract to address the new location for production and the new pricing for the new process.

5.     The Plasti-Paint Contracts and the New Contract are governed by boilerplate "Global Terms and Conditions," as are all purchaser orders issued by the Debtors and Purchaser/DUS. The Debtors' and Purchaser/DUS's Global Terms and Conditions are updated only every few years, which is an industry standard. However, the negotiated terms of the individual purchase orders guide the relationship between the parties to each purchase orders, and dictate the terms under which the parties will operate.

**Assignment of Plasti-Paint Claims to Hain**

6.     On November 26, 2019, Hain Capital contacted counsel to Plasti-Paint regarding potentially purchasing the Plasti-Paint Claims.  See attached **Exhibit D**, November 26, 2019 Email.

7.     On December 16, 2019, Hain Capital contacted Plasti-Paint directly regarding potentially purchasing the Plasti-Paint Claims.  That correspondence provided, in relevant part:

> Following up on our call I wanted to let you know that if you guys were interested in selling your claim at this point I could a rate of 85%.
>
> **Since Hain would be taking the risks associated with potential recoveries and the timeline of them, this would reduce your risk and administrative responsibilities while allowing an immediate monetization of the receivables.**
>
> To get the ball rolling we would execute the attached Bid Confirm. I would then need a day or so to review the documentation supporting the claim (invoices, POs etc…), at which point I would send you an Assignment Agreement to finalize the transaction. Funds are sent concurrent with full- execution of the agreement, though to be on the safe side we say a max of 5 days.

See attached **Exhibit E**, December 16, 2019 Email (emphasis added).

8.     After exchanging certain information to substantiate the Plasti-Paint Claims, on January 9, 2020, Hain Capital and Plasti-Paint executed the Assignment of Claim, pursuant to which Hain Capital purchased the unsecured Plasti-Paint Claims for $1,572,497.39 (85% of the amounts included in the Plasti-Paint Claims). See attached **Exhibit F**, Bid Confirmation, and **Exhibit G**, Assignment Agreement.

9.     The Assignment of Claim provides, in pertinent part, that Plasti-Paint transfers to Hain Capital:

> all right, title and interest in and to the claim of Assignor (the "Claim") in the aggregate outstanding principal amount of not less than $1,849,996.93 (the "Claim Amount") against Dura Automotive Systems, LLC et al (the "Debtor") the debtor-in-possession in the chapter 11 reorganization case, case no.: 19-12378 (the "Case"), in the United States Bankruptcy Court for the District of Delaware (the

"Bankruptcy Court), including, without limitation, (a) all of Assignor's right, title and interest in and to Assignor's Claim against Debtor; (b) all other claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action against the Debtor, its affiliates, any guarantor or other third party relating to or arising from the Assignor's Claim against Debtor; (c) the Proof of Claim (as defined below), if any; (d) to the extent evidencing, giving rise to, or relating to any of the foregoing, all contracts, agreements, instruments, invoices, purchase orders, proofs of delivery and other documents; (e) all cure amounts payable to Assignor pursuant to Section 365 of the US Bankruptcy Code **to the extent any underlying contract is assumed by the Debtor**; (f) all guarantees, collateral or security of any kind for or in respect of the foregoing; (g) all of Assignor's right to receive principal, interest, fees, expenses, damages, penalties and other amounts in respect of, or in connection with, any of the foregoing; (h) all voting and other rights and benefits in respect of any of the foregoing; and (i) all cash, securities, instruments and/or other proceeds, property, or distributions issued in satisfaction of any of the foregoing.

See **Exhibit G**, preamble (emphasis added).

10.    The Assignment of Claim further provides:

If (a) all or any part of the Claim fails to be listed on the Debtor's Schedules of Assets and Liabilities (the "Schedules"), or is listed as "contingent, unliquidated, or disputed", or is listed on the Schedules in an amount less than the Claim Amount; or (b) all or any part of the Claim is, or is threatened to be, avoided, disallowed, subordinated, reduced, objected to or otherwise impaired, in whole or in part in the Case for any reason whatsoever, or (c) **the Assignee or its assignee(s) receives distributions on the Claim which are, per dollar of claim, less in amount or different in nature or timing than distributions payable to general unsecured creditors of the Debtor generally**, or (d) Assignee fails to be substituted for the Assignor in respect of the Claim (each, a "Disallowance"), on demand of Assignee (the "Demand'), Assignor agrees to, at Assignee's option, either (a) immediately repay such portion of the consideration paid by Assignee hereunder as shall be calculated by multiplying the amount of the Claim which was so effected by such Disallowance, by the repurchase rate set forth on Schedule 2 (the "Claim Repurchase Rate"), together with interest at the rate equal to 8% from the date of this Assignment to the date of such repayment by Assignor to Assignee (collectively, the "Claim Repurchase Price"), or (b) at Assignor's own expense, conduct a diligent, good faith investigation and defense of any such Disallowance, including, but not limited to, communicating with opposing counsel and preparing, filing and arguing an appropriate response to any objection raised.

See **Exhibit G**, Section 5 (emphasis added).

11.     On January 13, 2020, Hain Capital filed a *Notice of Transfer of Claim Other Than for Securities* on January 13, 2020 [Docket No. 562].

**Designation of Transferred Contract**

12.     Long before Hain acquired the Plasti-Paint Claims, on November 19, 2019, the Court entered the *Order (I) Approving Bidding Procedures with Respect to Substantially all Assets, (II) Approving Contract Assumption and Assignment Procedures, (III) Scheduling Bid Deadlines, and Auction, and the Hearings and Objection Deadlines Related Thereto, and (IV) Approving the Form and Manner of Notice Thereof* [Docket No. 339] (the "Bidding Procedures Order").

13.     Paragraphs 15 through 25 of the Bidding Procedures Order addressed the procedures for designating a contract as an Assigned Contract (as defined in the Bidding Procedures Order) and the procedures for Cure Notice (as defined in the Bidding Procedures Order) and objections thereto.

14.     Paragraph 17 of the Bidding Procedures Order provides:

The Cure Notice shall notify the applicable Contract Counterparties that the Assigned Contracts **may** be subject to assumption and assignment in connection with a proposed sale transaction, and contain the following information: (i) a list of the Assigned Contracts; (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimates of the Cure Costs; and (iv) the deadline by which any Contract Counterparty to an Assigned Contract may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto, and the other information set forth in Exhibit 3 to this Order; provided that **service of a Cure Notice does not constitute an admission that such Assigned Contract is an executory contract or unexpired lease or that such Assigned Contract will be assumed at any point by the Debtors or assumed and assigned to the Successful Bidder**.

Bidding Procedures Order, ¶ 17 (emphasis added).

15.     Paragraph 25 of the Bidding Procedures Order provides:

The inclusion of an Assigned Contract in the Cure Notice (or Supplemental Cure Notice) **will not: (a) obligate the Debtors to assume any Assigned Contract listed thereon or obligate the Successful Bidder to take assignment of such**

**Assigned Contract**; or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract or unexpired lease. **Only those Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive sale agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to the Successful Bidder**.

Bidding Procedures Order, ¶ 25 (emphasis added).

16.    On March 6, 2020, the Debtors filed a *Supplemental Notice to Confidential Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 748] (the "Supplemental Notice"), which listed the Plasti-Paint Contracts with a total cure amount of $ 1,807,273.03.

17.    The Supplemental Notice provides, in part:

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder certain of the Assigned Contracts listed on the Assigned Contracts Schedule, attached hereto as **Exhibit A.**

*            *            *

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Assigned Contract on the Cure Notice does not require or guarantee that such Assigned Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved. Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

Supplemental Notice, p. 2, 4 (emphasis in original).

18.    On May 15, 2020, the Court entered the *Order (I) Approving the North American Stock and Asset Purchase Agreement, (II) Authorizing the Sale of Substantially all of the Debtors' North American Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired*

*Leases* [Doc. No. 1029] (the "Sale Order"), pursuant to which the Court approved the sale of substantially all of the Debtors' North American business assets to DNA Buyer, LLC (together with its assignees, the "Purchaser"), pursuant to the Stock and Asset Purchase Agreement dated April 29, 2020 [Docket No. 1029-1] (the "APA"), by and among the Debtors and the Purchaser.

19.     Paragraph 14 of the Sale Order provides: "Pursuant to section 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the North American Sale, the Debtors' assumption and assignment to the North American Purchaser, and the North American Purchaser's assumption of the Transferred Contracts, on the terms set forth in the North American Purchase Agreement, is hereby approved, and the requirements of section 365(b)(1) with respect thereto are hereby found and deemed to be satisfied." Sale Order, ¶ 14.

20.     The term "Transferred Contracts" is defined in the APA to mean "(i) Accommodation Agreements, (ii) Customer Purchase Orders, (iii) the Contracts identified by the Buyer in a written notice delivered to Seller Parent prior to the Closing, and (iv) all collective bargaining agreements[.]" APA, Section 2.1(g). The Transferred Contracts are set forth on Schedule 2.1(g) to the APA.

21.     Purchaser did not list the Plasti-Paint Contracts as Transferred Contracts on Schedule 2.1(g) to the APA.

22.     Paragraph 17 of the Sale Order further provides: "All defaults or other obligations of the Debtors under the Transferred Contracts arising or accruing prior to the Closing of the North American Sale, or required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Transferred Contracts shall be cured by the North American Purchaser." Sale Order, ¶ 17.

23.     Paragraph 24 of the Sale Order provides:

Notwithstanding anything in this North American Sale Order, the Debtors <u>may</u>, pursuant to Section 6.13 of the North American Purchase Agreement, assume and assign a Contract to the North American Purchaser after the date of this North American Sale Order (<u>including after the Closing</u>) by filing a notice on the Court's docket designating such Contract a Transferred Contract with the applicable Cure Claim the Debtors are proposing and serving the same on the counterparty to such Contract. If no objections are received with respect to the proposed Cure Claim or the assumption and assignment within fourteen (14) days from the date such notice is served, the Debtors may submit an order to the Court, under certification of counsel, authorizing the assumption and assignment of such Contract to the North American Purchaser, with the applicable Cure Claim to be paid by the North American Purchaser at the time of such assignment (and **upon such assumption and assignment, such Contract shall be deemed a "Transferred Contract" for purposes of this North American Sale Order**).

Sale Order, ¶ 24 (emphasis added).

24.     Paragraph 34(h) of the Sale Order provides:

The Debtors shall file as soon as practicable and prosecute on a reasonable commercial efforts basis a motion to reject all executory contracts and unexpired leases that the Purchaser indicates it may or does not want to take assignment of as Transferred Contracts. Such agreements for which such determination has already been made by the Purchaser shall be rejected as of the effective date of the filing of such motion, and **for those agreements that the Purchaser needs more time to evaluate, rejection shall be effective as of the date of the Purchaser's decisions not to take assignment of such agreement as a Transferred Contract**.

Sale Order, ¶ 34(h) (emphasis added).

### Procedures for Rejection of Contracts

25.     The Sale Order further provides that the Debtors shall convert their cases to chapter 7 as soon as practicable following the entry of the North American Sale Order and the European Sale Order.  Sale Order, ¶ 34(d). The Sale Order set forth various conditions to conversion of the cases, including the "entry of  one or more orders (which may include the order approving the Conversion Motion) authorizing the Debtors to reject all executory contracts or unexpired leases that were not designated as a Transferred Contract (in this instance, as defined in the North

American Purchase Agreement or the European Purchase Agreement, as applicable) by the North American Purchaser or European Purchaser following the applicable Closing Date as set forth in the North American Sale[.]" Sale Order, ¶ 34(d).

26.   On June 4, 2020, the Court issued the *Order Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases* [Docket No. 1098] (the "Rejection Procedures Order"). The Rejection Procedures Order provides, in part:

> The Debtors shall file Rejection Notices promptly following the Purchasers' determination that they do not desire assumption or assignment of the applicable Contracts, and in any event the Debtors shall file Rejection Notices with respect to all Contracts that have not been assumed and assigned to the Purchasers no later than sixty (60) days following the date on which both sales have closed.

Rejection Procedures Order, ¶ 2.

27.   Also on June 4, 2020, the Debtors filed an *Omnibus Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 1101] (the "Rejection Notice").  The Rejection Notice does not list the Plasti-Paint Contracts.

28.   On June 24, 2020, the Court entered the *Order Approving Procedures for the Conversion of the Debtors' Chapter 11 Cases to Cases under Chapter 7 of the Bankruptcy Code* [Docket No. 1144] (the "Conversion Procedures Order"). The Conversion Procedures Order enumerates as one  of the Conversion Conditions the "entry of one or more orders (which may include the Conversion Order) authorizing the Debtors to reject all executory contracts or unexpired leases that were not designated as a Transferred Contract by the North American Purchaser or European Purchaser within 60 days following the applicable Closing Date." Conversion Procedures Order, ¶ 3(c).

29.     On December 15, 2020, the Court entered the Conversion Order. The issues raised in the Motion, the DUS Objection to the Motion, and Hain's Reply to the DUS Objection were preserved in the Conversion Order.

### Status of the Plasti-Paint Contracts

30.     As previously noted, Purchaser did not list the Plasti-Paint Contracts as Transferred Contracts on Schedule 2.1(g) to the APA, and Purchaser did not designate the Plasti-Paint Contracts as Transferred Contracts pursuant to the post-closing assignment procedures set forth in Section 6.13 of the APA.

31.     Throughout the pendency of the Debtors' bankruptcy case, the Purchaser was in negotiations with Plasti-Paint for a new contract because, as noted above, it desired to switch its coating process with another supplier from an e-coat process to a technical anodize process.  By changing the coating process Purchaser would be able to eliminate the Georgia Contract in its entirety (since rework was no longer necessary under the technical anodize process), move production out of Michigan and eliminate the Michigan Contract, and enter into the New Contract, which allowed for moving all production to Georgia, changing the process to eliminate reworking, and Purchaser/DUS realizing significant cost savings. On June 22, 2020, Purchaser entered into the New Contract with Plasti-Paint, pursuant to which Purchaser is supplied product solely from the Georgia Plasti-Paint facility and at better terms than those under the original Pasti-Paint Contracts. See attached **Exhibit C**. DUS did not enter into a new agreement with Plasti-Paint for product or services from its Michigan facility, as DUS did not require product or services sourced from that facility.

32.     The New Contract includes terms significantly different and more beneficial to Purchaser than the Plasti-Paint Contracts.  The New Contract includes better pricing, better

payment terms, a different process (e-coat to technical anodized), the elimination of rework, and service from the Georgia facility (instead of both the Georgia and Michigan facilities), and it results in significant savings to the Purchaser/DUS. Compare **Exhibit A** and **Exhibit B** with **Exhibit C,** as summarized **Exhibit H**, Summary.

33.     A summary of the differences between the Michigan Contract, the Georgia Contract, and the New Contract is attached as **Exhibit H**.  Kathleen Pistole, the buyer at DUS, will be prepared to testify regarding these differences at the hearing.

## II.     ARGUMENT

A.     The Plasti-Paint Contracts were not assumed and assigned, and there is no obligation for Hain to pay cure costs associated therewith.

34.     Section 365 of the Bankruptcy Code permits a trustee to do three things with an executory contract: (i) reject it, (ii) assume it, or (iii) assume and assign it. 11 U.S.C. § 365. Rejection renders the contract counterparty an unsecured creditor. *See* 11 U.S.C. §§ 365(g), 502(g). Assumption requires the trustee to cure all defaults or to provide "adequate assurance" that such defaults will be promptly cured. *See* 11 U.S.C. § 365(b)(1)(A). Importantly, "[a]ssumption is a prerequisite to assignment." *See* 11 U.S.C. § 365(f)(2)(a) ("The trustee may assign an executory contract or unexpired lease of the debtor only if the trustee assumes such contract or lease in accordance with the provisions of this section.").

35.     Assumption and rejection of executory contracts requires filing a motion. *See* Fed. R. Bankr. P. 6006(a), 9014(a); 11 U.S.C. § 365(a); *see*, *e.g*., *In re Thane Int'l, Inc*., 586 B.R. 540, 546 (Bankr. D. Del. 2018) (citing *Sea Harvest Corp. v. Riviera Land Co*., 868 F.2d 1077, 1079 (9th Cir. 1989) (stating that "[the Bankruptcy Rules of Procedure] plainly specify that a debtor in possession must file a formal motion" and finding documents entitled "Affirmation and

Assumption of Executory Contracts" insufficient); *In re Gamma Fishing Co., Inc*., 70 B.R. 949, 953 (Bankr. S.D. Cal. 1987) (noting an express order is required)).

36.     As it stands, the Plasti-Paint Contracts have neither been definitively assumed or definitively rejected pursuant to the contract assumption or rejection procedures as detailed above. Purchaser and/or DUS do not require the Plasti-Paint Contracts (and have entered into the New Contract).

B.     It would be inequitable for the Court to apply its equitable powers to hold that there has been an implied assumption under the circumstances of this case.

37.     Hain asks this Court to enforce the cure requirements set forth section 365 of the Bankruptcy Code upon Purchaser, or DUS as its assignee, by applying the equitable powers set forth in section 105 of the Bankruptcy Code to imply an assumption of the Plasti-Paint Contracts.[2]

38.     Section 105(a) of the Bankruptcy Code provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

39.     Doctrine of "implied assumption" has little, if any, merit, and executory contract will not be considered to have been assumed, even though non-debtor party to contract continues to provide services under contract and debtor continues to accept benefits of such performance, absent an order of court approving assumption. 11 U.S.C. § 365; *In re Dehon, Inc*., 352 B.R. 546,

---

[2] It should be noted that this contested matter should have been brought as an adversary proceeding, pursuant to Bankruptcy Rule 7001(7), since Hain is seeking equitable relief. While the parties have been able to conduct some limited, informal discovery, given the amounts at issue and the Hain's allegations against DUS, an adversary proceeding with more a formal discovery process would have been appropriate.

{9352616:5 }
76275413.2

13

47 Bankr. Ct. Dec. (CRR) 60 (Bankr. D. Mass. 2006); *Matter of Whitcomb & Keller Mortg. Co., Inc*., 715 F.2d 375 (7th Cir. 1983); *In re Dehon, Inc*., 352 B.R. 546, 47 Bankr. Ct. Dec. (CRR) 60 (Bankr. D. Mass. 2006).

40.    In *Thane*, the court addressed the issue of whether a purchaser's continued use of a production agreement post-closing of a sale constituted an implied assumption. In *Thane*, a foreign debtor's executory agreement with a nondebtor for the production of an infomercial about one of the debtor's products was not impliedly assumed and assigned, in the absence of a formal assumption motion or any cure or adequate assurance of cure, based solely on the conduct of a purchaser of the debtor's assets. After the closing of the sale, the purchaser had mailed the nondebtor a royalty adjustment letter that pointedly referred to "your," not "our," production agreement, and had also made use of the infomercial.

41.    The *Thane* court noted that a finding of implied assumption hinges on a parties' course of conduct, which is defined as "a series of acts over a period of time evidencing a continuity of purpose." *Thane*, 586 B.R. 546-547 (quoting *Corp. Commc'n Servs. of Dayton, LLC v. MCI Commc'ns Servs., Inc*., No. 3:08–CV–046, 2009 WL 3756274, at \*12 (S.D. Ohio Nov. 9, 2009), *aff'd sub nom. Corp. Commc'n Servs. of Dayton LLC. v. MCI Commc'ns Servs. Inc*., 444 Fed. Appx. 866 (6th Cir. 2011)).   The *Thane* court stated the following regarding the application of implied assumption:

> The overarching approach and logic taken in cases finding implied assumption, however, give the Court pause. Such cases provide that a debtor who clearly failed to adhere to the requirements under the Bankruptcy Code is still obligated (or not obligated if a court finds rejection occurred) to perform under a given contract or lease. That result is one borne of uncertainty, and uncertainty is a standard that the Court is uncomfortable perpetuating. Condoning such informal means of assumption will force courts to meddle in the fact-laden intricacies of transactions—sometimes well after the departure of a necessary party, such as the case here—to determine the debtor's, purchaser's or some third party's "true intention." *See In re Treat Fitness Ctr., Inc.*, 60 B.R. 878, 879 (9th Cir. BAP

1986) (emphasis added) (finding Section 365 and Bankruptcy Rule 6006 "require that the debtor or trustee file a formal motion to assume, *thus overruling cases under the former Bankruptcy Act that required courts to judge whether words or deeds, often ambiguous at best, constituted an assumption or rejection of a lease or executory contract*"); *see also Richard Royce Collections, Ltd. v. N.Y. City Shoes, Inc.* (*In re N.Y. City Shoes, Inc.*), 84 B.R. 947, 960–61 (Bankr. E.D. Pa. 1988) (refusing to recognize implicit rejection of an executory contract based on "course of conduct"). While the facts of this case are undoubtedly unique, the Court must hold true and find that absent a motion, there is no assumption.

*Thane*, 586 B.R. at 547-48. The Court held that, while purchaser might be liable for damages based on its subsequent use of infomercial, such use did not support a finding that production agreement was impliedly assumed without satisfying any of statutory requirements for assumption. *Id.* at 550-51.

42.     The Court should not exercise its equitable powers under section 105(a) of the Bankruptcy Code to cure Hain's failure to protect its interests with regard to its relationship with Plasti-Paint. *See, Id.* at 546; *In re The IT Grp., Inc.*, 322 B.R. 729, 735 (Bankr. D. Del. 2005) (holding that judicial estoppel was inapplicable to force assumption and assignment where contract counterparty was listed on a list of assumed contracts, but the contracts were not ultimately assumed).

43.     Hain and Plasti-Paint have been given adequate and sufficient notice throughout the pendency of the sale process that (i) that the Purchaser had the option to designate the Plasti-Paint Contracts as Transferred Contracts, in its discretion, (ii) the Purchaser's option to designate the Plasti-Paint Contracts as Transferred Contracts would continue after the closing of the sale, (iii) pursuant to the terms of the Bidding Procedures Order, the Supplemental Notice, and the Sale Order, Plasti-Paint or Hain, as the contract counterparties, would not be entitled to payment of Cure Costs unless the Plasti-Paint Contracts were assumed by the Debtors and assigned to the

Purchaser, and (iv) pursuant to the Rejection Procedures Order and Conversion Procedures Order, the Plasti-Paint Contracts could also be rejected.

44.    DUS (or Purchaser) had no obligation to assume the Plasti-Paint Contracts under the APA or otherwise, and in fact, DUS did not require the Plasti-Paint Contracts. As noted above, the New Contract eliminated the need for reworking pursuant to the Georgia Contract, and Purchaser was able to move the Plasti-Paint "wet" paint finishing process to Georgia and out of Michigan (that process was not previously performed in Georgia) and negotiate significantly better pricing.  The New Contract allowed Purchaser/DUS to eliminate many processes from the Michigan Contract and the Georgia Contract, and allowed Purchaser/DUS to address the new location for production and the new pricing for the new process. As noted, the new technical anodize process required a completely different painting process from the previous e-coat process. With the e-coat process, Plasti-Paint was simply required to complete a "wet" paint coat.  With the new technical anodize process, Plasti-Paint was required to complete a conversion coat, a primer coat, and a "wet" paint coat.  Additionally, after additional diligence, it is clear that there are significant differences between the Plasti-Paint Contracts and the New Contract that benefit the Purchaser/DUS. Specifically, the New Contract includes better pricing, better payment terms, a different process, the elimination of rework, and service solely from the Georgia facility, and it results in significant savings to the Purchaser/DUS. In particular, see lines 33 on the New Contract that reflect the new pricing.  See attached **Exhibit A**, **Exhibit B**, **Exhibit C**, and **Exhibit H**.  As noted, Kathleen Pistole, the buyer at DUS, will testify regarding the specific differences between the Plasti-Paint Contracts and the New Contract at the evidentiary hearing on this matter.  There was no continuity in purpose in this case – DUS and Plasti-Paint agreed to new terms, under a New Contract, which will guide their relationship.

45.      DUS has done nothing wrong or nefarious with regard to the Plasti-Paint Contracts such that equitable relief would be appropriate in Hain's favor.  The testimony of Kathleen Pistole, the buyer at DUS, will establish that DUS was in communications with Plasti-Paint regarding new terms during the course of the bankruptcy proceedings, DUS was able to negotiate more beneficial terms under the New Contract, and there was no scheming with Plasti-Paint or ill intention toward Hain. Application of Section 105(a) of the Bankruptcy Code to require payment of Cure Costs where no such obligation exists, as Hain requests, would be in direct contravention of Section 365 of the Bankruptcy Code, the APA, and the Sale Order. *Law v. Siegel*, 571 U.S. 415, 421, 134 S. Ct. 1188, 1194, 188 L. Ed. 2d 146 (2014) (Section 105(a) of the Bankruptcy Code "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code[;]" it "confers authority to 'carry out' the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits.").

46.      Furthermore, Hain should not be entitled to equitable relief in this case. Hain is a sophisticated party that wholly failed to protect its own interests in its Assignment Agreement with Plasti-Paint.  Hain could have protected its interests by including language in the Assignment Agreement requiring Plasti-Paint to refuse to continue production unless the Plasti-Paint Contracts were assumed and assigned the Purchaser/DUS or precluding Plasti-Paint from entering into any new contract with Purchaser/DUS.  Additionally, Hain could have purchased and taken assignment of the Plasti-Contract rights.  Instead, Hain asks this Court imply an assumption to make Hain whole, where Purchaser/DUS (who were not parties to the Assignment Agreement) will be forced to pay the entire cure amount on top of the APA purchase price as approved in the Sale Order (which did not account for assumption of the Plasti-Paint Contracts or the payment of the cure costs).  Indeed, Hain will not be left without a remedy here – Hain will be entitled to any

distribution on its unsecured claims, and it can assert any claims it may have against Plasti-Paint under the terms of the Assignment Agreement. Equity should not be used in Hain's favor to remedy Hain's failure to complete adequate diligence prior to purchasing the Plasti-Paint Claims and to protect its own interests in its own Assignment Agreement.   Indeed, it would be inequitable for Purchaser to have to pay the cure amount now, as Purchaser may not have closed on the sale if it had known it would be required to pay the cure claim on the Plasti-Paint Contracts. Hain has an avenue for relief pursuant to its agreement with Plasti-Paint, while Purchaser does not appear to have a similar avenue for relief.

## CONCLUSION

47.     The Plasti-Paint Contracts have not been assumed by the Debtors and assigned to Purchaser/DUS.  There are no equitable grounds under section 105(a) of the Bankruptcy Code or the doctrine of implied assumption for this Court to manufacture an assumption and assignment requiring payment of the Cure Costs for Hain's benefit under the circumstances of this case. Accordingly, DUS respectfully requests that the Court enter an order denying the Cure Payment Motion in its entirety.

*[Signature Block Follows]*

Dated:  January 22, 2020
      Wilmington, Delaware

**POLSINELLI PC**

/s/ *Shanti M. Katona*

Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1191
Wilmington, Delaware 19801
Telephone:  (302) 252-0920
Facsimile:  (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com

– and –

**MCDONALD HOPKINS PLC**

Stephen M. Gross (admitted *pro hac vice*)
John E. Benko (admitted *pro hac vice*)
Ashley J. Jericho (admitted *pro hac vice*)
39533 Woodward Avenue, Suite 318
West Bloomfield, Michigan 48304
Telephone:  (248) 646-5070
Facsimile:  (248) 646-5075
sgross@mcdonaldhopkins.com
jbenko@mcdonaldhopkins.com
ajericho@mcdonaldhopkins.com